**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
                                                             )
In re:                                                       )
                                                             )
CALPINE CORPORATION, *et al.*,                               )
                                                             )
                                          Debtors.           )
-------------------------------------------------------------X
PORTLAND NATURAL GAS TRANSMISSION                            )
SYSTEM AND GAS  TRANSMISSION                                 )
NORTHWEST CORPORATION,                                       )
                                                             )
                                          Plaintiffs,        )        Case No. 07-09584 (GEL)
                                                             )
vs.                                                          )
                                                             )
CALPINE CORPORATION, *et al.*,                               )
                                                             )
                                          Defendants.        )
-------------------------------------------------------------X


**MEMORANDUM OF LAW OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF CALPINE CORPORATION, *ET AL.* IN
OPPOSITION TO GAS TRANSMISSION NORTHWEST CORPORATION AND
PORTLAND NATURAL GAS TRANSMISSION SYSTEM'S MOTION TO
WITHDRAW THE REFERENCE AS TO ARTICLE V, SECTION A.2, OF THE
DEBTORS' FOURTH AMENDED JOINT PLAN OF REORGANIZATION AND
DEBTORS' LIMITED OBJECTION TO THE CLAIMS OF GAS
TRANSMISSION NORTHWEST CORPORATION AND PORTLAND
<u>NATURAL GAS TRANSMISSION SYSTEM FOR LACK OF JURISDICTION</u>**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT.................................................................................................1

BACKGROUND ......................................................................................................................3

ARGUMENT ..........................................................................................................................5

I.    WITHDRAWAL OF ARTICLE V, SECTION A.2 OF THE PLAN IS
      MOOT AND SHOULD NOT BE CONSIDERED BY THIS COURT ..................5

II.   MANDATORY WITHDRAWAL IS NOT APPLICABLE....................................6

      A.    Mandatory Withdrawal Under 28 U.S.C. § 157(d)....................................6
      B.    Mandatory Withdrawal of Article V, Section A.2 of the Plan is Not
            Appropriate ...............................................................................................8
      C.    Mandatory Withdrawal of the Limited Objection is Not
            Appropriate .............................................................................................16

III.  PERMISSIVE WITHDRAWAL SHOULD NOT BE EXERCISED
      BECAUSE DISPUTES INVOLVING THE PIPELINE CLAIMS ARE
      CORE PROCEEDINGS AND THE PIPELINES ARE UNABLE TO
      SATISFY THE MULTI-FACTOR TEST UTILIZED IN THE SECOND
      CIRCUIT...................................................................................................17

      A.    Permissive Withdrawal Under 28 U.S.C. § 157(d)..................................17
      B.    Permissive Withdrawal of Article V, Section A.2 of the Plan is Not
            Appropriate .............................................................................................18
      C.    Permissive Withdrawal of the Limited Objection is also Not
            Appropriate .............................................................................................20

IV.   WITHDRAWAL IS NOT APPROPRIATE BECAUSE THE
      wITHDRAWAL MOTION WAS NOT TIMELY FILED .....................................22

      A.    Under 28 U.S.C. § 157(d), Withdrawal Motions Must be Timely............22
      B.    The Pipelines Have Not Timely Filed the Withdrawal Motion ................24

CONCLUSION.......................................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re AOV Indus., Inc.*, 792 F.2d 1140 (D.C. Cir. 1986)....................................................18

*In re Baldwin-United Corp.,* 57 B.R. 751 (S.D. Ohio 1985) .............................................18

*Bambu Sales, Inc. v. Stern,*1998 WL 760335 (E.D.N.Y.) ..................................................18

*In re BKW Sys., Inc*., 66 B.R. 546 (Bankr. D.N.H. 1986).................................................21

*In re Best Payphones*, 370 B.R. 532 (S.D.N.Y. 2007)........................................................7

*In re CIS Corp.*, 140 B.R. 351 (S.D.N.Y. 1992)........................................................11, 16

*In re CIS Corp.*, 172 B.R. 748 (S.D.N.Y. 1994)........................................................7, 11

*In re Calpine Corp.*, 337 B.R. 27 (S.D.N.Y. 2006) ................................................... *passim*

*City of New York v. Exxon Corp.*, 932 F.2d 1020 (2d Cir. 1991) .......................................6

*In re Columbia Gas Sys., Inc.,* 134 B.R. 808 *(*D. Del. 1991)......................................11, 16

*In re Commercial Fin. Servs., Inc.*, 239 B.R. 586 (Bankr. N.D. Okla. 1999) ...................20

*Connolly v. Bidermann Indus. U.S.A., Inc.,*1996 WL 325575 (S.D.N.Y.) .................23, 25

*In re In re Delta Air Lines, Inc.,* 2007 WL 3166776 ( S.D.N.Y.)......................................17

*In re Enron Corp*, 2005 WL. 1185804 (S.D.N.Y.)................................................... *passim*

*In re Environmental Waste Control, Inc.,* 1990 WL 49032 (N.D. Ind.)............................19

*In re FMI Forwarding Co., Inc.*, 2005 WL 147298 (S.D.N.Y.)...................................23-4

*In re Kentile Floors, Inc.,*1995 WL 479512 (S.D.N.Y.)......................................................23

*In re Gulf South Systems, Inc.*, 1997 WL 35288 (E.D. La. January 29, 1997) .................18

*Gulf States Utils. Co. v. Ala. Power Co.,* 824 F.2d 1465 (5th Cir. 1987).........................13

*In re Ionosphere Clubs, Inc.*, 922 F.2d 984 (2d Cir.1990) ..................................................7

*In re Iridium Operating LLC*, 285 B.R. 822 (Bankr. S.D.N.Y. 2002)...............................18

*Kenai Corp. v. National Union Fire Ins. Co. (In re Kenai Corp.)*,
    136 B.R. 59 (S.D.N.Y.1992) ........................................................................20

*Keogh v. Chicago & Nw. Ry. Co.*, 260 U.S. 156 (1922) ....................................11

*In re Leslie Fay Companies, Inc.*, 222 B.R. 718 (S.D.N.Y 1998) ....................21

*In re Manville Forest Prods. Corp.*, 896 F.2d 1384 (2d Cir.1990) ............... 20-1

*Michaelesco v. Shefts*, 303 B.R. 249 (Bankr. D. Conn. 2004) ..........................18

*In re Mirant Corp.*, 299 B.R. 152 (Bankr. N.D. Tex. 2003),
    *overruled by Mirant*, 378 F.3d 511 (5th Cir. 2004) ....................................12

*In re Mirant Corp.*, 378 F.3d 511 (5th Cir. 2004) ..................................... *passim*

*Mississippi Power & Light Co. v. Moore*, 487 U.S. 354 (1998) ........................11

*In re New York Trap Rock Corp.*, 158 B.R. 574 (S.D.N.Y. 1993) ..............23, 25

*Nielsen v. Miller*, 125 Fed. Appx. 227 (10th Cir. 2005) ...................................23

*O'Connell v. Terranova (In re Adelphi Institute, Inc.)*, 112 B.R. 534 (S.D.N.Y.
    1990) ...............................................................................................................7

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
    4 F.3d 1095 (2d Cir. 1993) ......................................................................... 17-8

*Pension Benefit Guaranty Corp. v. LTV Corp. (In re Chateaugay Corp.)*,
    86 B.R. 33 (S.D.N.Y. 1987) ........................................................................ 6-7

*In re Recoton Corp.*, 2004 WL 1497570 (S.D.N.Y.) .........................................18

*In re S.G. Phillips Constructors, Inc.*, 45 F.3d 702 (2d Cir. 1995) ............... 20-1

*In re Singer Co., N.V.*, 2002 WL 243779, (S.D.N.Y.) ........................................23

*South Street Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys, Inc.)*,
    94 F.3d 755 (2d Cir. 1996) .......................................................................... 17-8

*In re Stavriotis*, 111 B.R. 154 (N.D. Ill. 1990) .................................................23

*United States v. Johns-Manville Corp., et al. (In re Johns-Manville Corp.)*,
    63 B.R. 600 (S.D.N.Y. 1986) ...................................................................... 6-7

*Vista Metals Corp. v. Metal Brokers Int'l, Inc.*, 161 B.R. 454 (E.D. Wis.1993) ...............19

*In re VWE Group, Inc.*, 359 B.R. 441 (S.D.N.Y. 2007) ....................................................23

*In re Western Asbestos Co.,* 2003 WL. 23741861 (N.D. Cal. 2003) ................................18

## STATUTES

15 U.S.C. § 717a(6) .........................................................................................................10

15 U.S.C.  § 717c(a) .........................................................................................................8

15 U.S.C. § 717c(d) ..........................................................................................................9

15 U.S.C. § 717c(a)-(d) ....................................................................................................10

28 U.S.C. 157(d) .......................................................................................................6, 17, 22

28 U.S.C. § 157(b)(2)(B) ..................................................................................................20

28 U.S.C. § 157(b)(L) .......................................................................................................18

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

The Official Committee of Unsecured Creditors (the "Committee") of Calpine
Corporation, et al. (collectively, the "Debtors") hereby submits this memorandum of law in
opposition (the "Opposition") to Gas Transmission Northwest Corporation ("GTN") and
Portland Natural Gas Transmission System's ("PNGTS" and, together with GTN, the
"Pipelines") Motion to Withdraw the Reference as to Article V, Section A.2, of the Debtors'
Fourth Amended Joint Plan of Reorganization and Debtors' Limited Objection to the Claims of
Gas Transmission Northwest Corporation and Portland Natural Gas Transmission System for
Lack of Jurisdiction, and Legal Memorandum in Support (together, the "Withdrawal Motion").
In support of this Opposition, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

By the Withdrawal Motion, the Pipelines request that this Court adjudicate certain
disputes related to the proposed treatment of the Pipeline Contracts (as defined below) under the
Plan (as defined below) and in the Debtors' Limited Objection (as defined below).  As described
further below, the relief requested in the Withdrawal Motion should be denied because the
Pipelines fail to demonstrate that either mandatory or permissive withdrawal of the reference is
appropriate in this case.

First, upon information and belief, the Debtors' are removing the Pipeline Contracts from
the schedule of contracts that the Debtors intend to repudiate under the Plan (the "Repudiation
Schedule").  As the Pipeline Contracts had all been repudiated prior to the filing of the Plan, the
initial inclusion of the Pipeline Contracts on such schedule was in error.  As withdrawal of
Article V, Section A.2 of the Plan was premised upon the Pipelines being listed on the

Repudiation Schedule, the removal of the Pipeline Contracts from the Repudiation Schedule renders the Pipelines' request moot.

Second, even if this Court finds that the issue is not moot, mandatory withdrawal of Article V, Section A.2 of the Plan is inappropriate because: (a) the Pipeline Contracts do not subject the Debtors to the jurisdiction of the Natural Gas Act ("NGA"), as the Debtors don't qualify as "natural gas companies" under the NGA and, therefore, the Debtors' repudiation of the Pipeline Contracts does not, as the Pipelines contend, require significant interpretation of the NGA, and (b) the determination of whether the repudiation of the Pipeline Contracts conflicts with the "filed rate doctrine" simply requires the Bankruptcy Court to apply the relevant case law to the facts of the present dispute, a process that does not require a significant interpretation of federal non-bankruptcy law.

Third, mandatory withdrawal should be denied as to the Limited Objection: (1) for the same reasons that the mandatory withdrawal of Article V, Section A.2 of the Plan should be denied and (2) because, as held by this Court in *In re Enron Corp.*, 2005 WL 1185804 (S.D.N.Y.) ("*Enron*"), the degree to which a bankruptcy court would be required to interpret tariff decisions of the Federal Energy Regulatory Commission ("FERC" or the "Commission") in order to adjudicate a claims dispute is not significant enough to warrant withdrawal of the reference.

Fourth, permissive withdrawal of Article V, Section A.2 of the Plan and the Limited Objection should denied because matters relating to plan confirmation and claims allowance are core bankruptcy proceedings and the Pipelines have failed to satisfy the test for permissive withdrawal in the Second Circuit.

Fifth, the Withdrawal Motion was not filed in a timely manner and, thus, should be denied.

## BACKGROUND

Beginning on or about December 20, 2005, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The Debtors continue to operate their respective businesses and properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On January 6, 2006, the United States Trustee formed the Committee as the fiduciary representative for the holders of unsecured claims against the Debtors. The Debtors estimate that the amount of claims that will ultimately be allowed against the Debtors' estates ranges from $19.2 billion to $22 billion.

On February 12, 1998, the Debtors entered into a twenty-year firm gas transportation service contract with PNGTS (the "PNGTS Contract"), which became effective on November 1, 2000. Approximately three years later, the Debtors entered into a series of eight long-term firm gas transportation service contracts with GTN (the "GTN Contracts," collectively with the PNGTS Contracts, the "Pipeline Contracts").[1]

After filing for chapter 11, the Debtors determined, as a part of their restructuring, that they no longer required the capacity provided by the Pipeline Contracts. On April 7, 2006, the Debtors repudiated three of the GTN Contracts (numbers 7357, 8096, and 8429) and the PNGTS Contract in the "Debtors' Objection To Motion of Gas Transmission Northwest, Portland Natural

---

[1] Firm gas transportation service means the Debtors receive secure, uninterruptible deliveries of natural gas in exchange for paying a set reservation rate for the capacity, regardless of actual usage. A reservation rate is the rate that pipelines charge customers for securing the firm capacity needed to ensure the transport of natural gas. Under the Pipeline Contracts, the Pipelines transported natural gas to the Debtors from a specified delivery point to a specified receipt point. Once delivered, the Debtors did not resell or redistribute the natural gas. Rather, the Debtors used the natural gas in order to create electricity for the Debtors' customers.

Gas Transmission System, and Transcanada Pipelines Limited to Enforce Stipulation and to Compel Debtors to Replenish Assurances" (the "Adequate Assurances Objection") (Bankruptcy Docket No. 1181).  In addition, since April 7, 2006, the Debtors have consistently treated the remaining five contracts as repudiated and have neither requested service nor used any of the reserved capacity under those contracts.  Upon information and belief, the Pipelines have not taken any affirmative actions in the chapter 11 cases that would be inconsistent with the notion that such contracts were repudiated as of April 2, 2007.

In a letter dated January 11, 2007 (the "Repudiation Letter"), the Debtors formally repudiated the remaining GTN Contracts (numbers 8115, 8155, 8158, 8194, and 8428) and, in doing so, affirmatively stated, "effective immediately, Calpine Energy Services, L.P. will no longer accept service under the Contracts, and Calpine Energy Services, L.P. hereby releases and relinquishes any right to ongoing service or capacity under the Contracts."  The Repudiation Letter is attached hereto as Exhibit A.  Since the Repudiation Letter was sent, the Debtors have consistently treated the remaining five contracts as repudiated and have neither requested service under those contracts, nor used the subject transportation capacity.  Upon information and belief, the Pipelines have not taken any affirmative actions in the chapter 11 cases that would be inconsistent with the notion that such contracts were repudiated as of January 11, 2007.

On September 26, 2007, the Fourth Amended Disclosure Statement (the "Disclosure Statement") for Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan") was approved by the Bankruptcy Court. (Bankruptcy Docket No. 6136).

GTN and PNGTS have filed proofs of claim based on the repudiation of the Pipeline Contracts.  GTN asserts a claim for $525,167,992, including $2,350,082 in postpetition unpaid

amounts, based on the Debtors' repudiation of the eight firm transportation service agreements. PNGTS asserts a claim for $201,587,006, including $7,455,046 in prepetition and postpetition unpaid amounts. Together, GTN and PNGTS have filed more than $727 million in claims against the Debtors' estates (the "Pipeline Claims").

The Debtors have asserted that the Pipelines have overstated the Pipeline Claims by: (a) failing to discount their future damages back to present value; (b) applying incorrect reservation rates in calculating their claims; and (c) failing to mitigate their damages. As a result, on September 21, 2007, the Debtors filed the "Debtors' Limited Objection to Gas Transmission Northwest Corporation's Claim Nos. 4562, 5912, 5927, 5928, and 5929, and Portland Natural Gas Transmission System's Claim Nos. 4769 and 4773" (the "Limited Objection") (Bankruptcy Docket No. 6074) arguing that the Pipelines have overstated the Pipeline Claims by more than $496 million and requesting that the Bankruptcy Court reduce the Pipeline Claims accordingly. The Bankruptcy Court has ordered the Debtors and the Pipelines to participate in a mandatory and cost-effective mediation process to determine the appropriate amount of the Pipeline Claims.

On October 23, 2007, the Pipelines filed the Withdrawal Motion seeking withdrawal of the reference with respect to the Bankruptcy Court's authority to adjudicate the repudiation of the Pipeline Contracts and the claims allowance dispute in the Limited Objection.

## ARGUMENT

### I.    WITHDRAWAL OF ARTICLE V, SECTION A.2 OF THE PLAN IS MOOT AND SHOULD NOT BE CONSIDERED BY THIS COURT

The Withdrawal Motion, as it relates to the Plan, is premised on the inclusion of the Pipeline Contracts in the Repudiation Schedule. As discussed above, the Pipeline Contracts were repudiated well before the Debtors filed the Plan and, therefore, were erroneously included in the Repudiation Schedule. Accordingly, as of the filing of this Opposition, it is the Committee's

understanding that the Debtors have removed or are in the process of removing the Pipeline

Contracts from the Repudiation Schedule, thereby rendering the Pipelines' attempted withdrawal

of the reference with respect to Article V, Section A.2 of the Plan moot.

Even if this Court finds that the issue is not moot, the Withdrawal Motion should be

denied in its entirety for the reasons set forth below.

## II.     MANDATORY WITHDRAWAL IS NOT APPLICABLE

### A.     Mandatory Withdrawal Under 28 U.S.C. §  157(d)

Section 157(d) of title 28 of the United States Code provides in relevant part that:

> The district court shall, on timely motion of a party, so withdraw a proceeding if
> the court determines that resolution of the proceeding requires consideration of
> both title 11 and other laws of the United States regulating organizations or
> activities affecting interstate commerce.

28 U.S.C. § 157(d).

Under well-settled law in the Second Circuit, mandatory withdrawal is ***only*** appropriate

when the disposition of a proceeding would require "significant interpretation, as opposed to

simple application, of federal laws apart from the bankruptcy statutes." *City of New York v.*

*Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991); s*ee also Pension Benefit Guaranty Corp. v.*

*LTV Corp. (In re Chateaugay Corp.)*, 86 B.R. 33, 36 (S.D.N.Y. 1987) ("withdrawal is mandatory

only when 'substantial and material consideration' of non-Code federal statutes 'is necessary for

the resolution of a case or proceeding'") (internal citations omitted).  It follows, therefore, that

withdrawal is ***not*** mandated when the dispute involves the "straightforward application of a

federal statute to a particular set of facts." *United States v. Johns-Manville Corp., et al. (In re*

*Johns-Manville Corp.)*, 63 B.R. 600, 602 (S.D.N.Y. 1986).

In addition, mandatory withdrawal is to be narrowly applied, and is not to be used as an

"escape hatch" for matters properly before the bankruptcy court.  *In re Johns-Mansville Corp.*,

63 B.R. at 603 ("the mandatory withdrawal provision of § 157(d) is to be construed narrowly, so that it does not become an 'escape hatch' for matters properly before the bankruptcy court"); s*ee also In re Best Payphones, Inc.,* 370 B.R. 532, 536 (S.D.N.Y. 2007) ("[m]andatory withdrawal under § 157(d) is narrowly applied"); *O'Connell v. Terranova (In re Adelphi Institute, Inc.)*, 112 B.R. 534, 536 (S.D.N.Y. 1990) ("At a minimum, Section 157(d) does not mandate withdrawal unless the district court 'can make an affirmative determination that resolution of the claims will require substantial and material consideration of non-code statutes.'").

Notably, mandatory withdrawal is not appropriate when the issues raised involve nothing more than the application of the appropriate case law to the facts of the case. *See, e.g., In re CIS Corp.*, 172 B.R. 748, 753 (S.D.N.Y. 1994) (holding that mandatory withdrawal is inappropriate where the bankruptcy court will only be required to apply the applicable case law to the facts of the dispute, even where relatively few cases are available). This is true even when the law to be applied is federal non-bankruptcy law. *See, e.g., In re CIS Corp.*, 172 B.R. at 754 (holding that the application of case law interpreting the National Bank Act and the Competitive Equality Banking Act to the facts of the dispute was insufficient to require the mandatory withdrawal of the bankruptcy reference).

Accordingly, absent a showing that the issues raised by the Pipelines require the Bankruptcy Court to conduct a "*substantial and material*" interpretation of federal non-bankruptcy law, mandatory withdrawal is not applicable. *See, e.g., In re Ionosphere Clubs, Inc.,* 922 F.2d 984, 995 (2d Cir.1990) (finding that courts have narrowly construed the mandatory withdrawal provision to apply only in cases "where substantial and material consideration of non-Bankruptcy Code federal statutes is necessary for the resolution of the proceeding."); *In re Chateaugay Corp.*, 86 B.R. at 36 (holding that withdrawal is mandatory only when "substantial

and material consideration" of federal non-bankruptcy statutes "is necessary for the *resolution* of

a case or proceeding.").

Neither the repudiation of the Pipeline Contracts nor the determination of the appropriate

amount of the Pipeline Claims through the Limited Objection poses a substantial conflict

between bankruptcy law and non-bankruptcy federal law and, therefore, the Bankruptcy Court

will not be required to "significantly and materially" interpret federal non-bankruptcy law.  As

such, the Pipelines fail to meet the standard for a mandatory withdrawal of the reference.

### B.    Mandatory Withdrawal of Article V, Section A.2 of the Plan is Not Appropriate

As addressed further below, mandatory withdrawal of Article V, Section A.2 of the Plan

should be denied for the following reasons: (1) the Pipeline Contracts do not subject the Debtors

to the NGA's jurisdiction because the Debtors are not "natural gas companies" under the NGA

and, therefore, the Debtors' repudiation of the Pipeline Contracts does not, as the Pipelines

contend, require significant interpretation of the NGA and (2) the determination of whether the

repudiation of the Pipeline Contracts conflicts with the "filed rate doctrine" simply requires the

Bankruptcy Court to apply the facts of the present case to the relevant case law, a process that

does not require a significant interpretation of federal non-bankruptcy law.

### 1.    The Repudiation of the Pipeline Contracts does not subject the Debtors to regulation under the NGA because the Debtors do not qualify as a "natural gas company" under the NGA

In the Withdrawal Motion, the Pipelines argue that the Debtors' repudiation of the

Pipeline Contracts triggers the change in rate restrictions of the NGA, thereby subjecting the

repudiation dispute to the exclusive jurisdiction of FERC.  Indeed, the NGA does require natural

gas companies, like the Pipelines, to file their transportation rates and charges with FERC, which

then determines if such rates and changes are "just and reasonable." 15 U.S.C. § 717c(a).  The

NGA, pursuant to section 717c(d), also prohibits natural gas companies from changing the rates or charges of a contract without FERC approval.  *See* 15 U.S.C. § 717c(d).

The Debtors, however, are not "natural gas companies" under the NGA and, thus, the Pipeline Contracts do not subject the Debtors to the NGA's prohibition on changes to the rates of interstate natural gas contracts.  Specifically, section 717c of the NGA limits its application to "natural gas companies":

> (a) Just and reasonable rates and charges
>
> All rates and charges made, demanded, or received by any ***natural-gas company*** for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.
>
> (b) Undue preferences and unreasonable rates and charges prohibited
>
> No ***natural-gas company*** shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.
>
> (c) Filing of rates and charges with Commission; public inspection of schedules
>
> Under such rules and regulations as the Commission may prescribe, every ***natural-gas company*** shall file with the Commission, within such time (not less than sixty days from the date this Act takes effect [effective June 21, 1938]) and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection, schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.
>
> (d) Changes in rates and charges; notice to Commission
>
> Unless the Commission otherwise orders, no change shall be made by any ***natural-gas company*** in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days'

> notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

15 U.S.C. § 717c(a)-(d) (2000) (emphasis added).

A "natural gas company" is defined under the NGA as "a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale." 15 U.S.C. § 717a(6). Thus, the Pipelines are correct that the transporters of natural gas, like the Pipelines, are not permitted under the NGA to make changes in rates or charges without the approval of FERC. It does not follow, however, that the Debtors, who do not transport natural gas in interstate commerce or sell natural gas in interstate commerce for resale, are subject to the same limitations. The language of the statute is clear; the limitations on rate changes under the NGA *only* apply to a "natural gas company."

Thus, the Debtors' repudiation of the Pipeline Contracts does not implicate section 717c(d) of the NGA because the Debtors are not "natural gas companies" under the NGA. Accordingly, the repudiation of the Pipeline Contracts does not require "significant interpretation" of the NGA.

## 2. The Determination of Whether the Filed Rate Doctrine Applies Does Not Require Significant Interpretation of Non-Bankruptcy Federal Law

The Pipelines further argue that the Pipeline Contracts are subject to the exclusive jurisdiction of FERC pursuant to the "filed rate doctrine." Under the filed rate doctrine, "[t]he reasonableness of rates and agreements regulated by FERC may not be collaterally attacked in state or federal courts. The only appropriate forum for such a challenge is before the Commission

or a court reviewing the Commission's order." *Mississippi Power & Light Co. v. Moore,* 487 U.S. 354, 375 (1998).  Notably, the filed rate doctrine is not statutory -- it is a judicial creation that arises from decisions interpreting federal statutes that give federal agencies exclusive jurisdiction to set rates for specific utilities.  *See, e.g., Keogh v. Chicago & Nw. Ry. Co.*, 260 U.S. 156 (1922).

As not all changes to a FERC-regulated contract conflict with the filed rate doctrine, the Bankruptcy Court should, in the first instance, determine whether the filed rate doctrine applies to the Debtors' repudiation of the Pipeline Contracts.  *See, e.g. In re Mirant Corp.*, 378 F.3d 511 (5th Cir. 2004) *(*hereinafter "*Mirant*"*)* (finding that the breach of a FERC-regulated contract does not necessarily implicate the filed rate doctrine); *see also In re Columbia Gas Sys., Inc.,* 134 B.R. 808, 810-11 (D. Del. 1991) (finding that the rejection of FERC-regulated natural gas contracts did not require substantial material consideration of non-bankruptcy federal and, therefore, mandatory withdrawal was not required).  This determination is made by simply applying the relevant case law regarding the filed rate doctrine to the present dispute.

It is well-settled that the basic application of the relevant case law to the facts of a dispute does not require any "significant interpretation" of federal non-bankruptcy law, and does not mandate that this Court withdraw the reference.  *See, e.g., In re CIS Corp.*, 172 B.R. at 754 (holding that mandatory withdrawal is inappropriate where the bankruptcy court will only be required to apply the applicable case law to the facts of the dispute, even where relatively few cases are available); *In re CIS Corp.*, 140 B.R. 351, 353 (S.D.N.Y. 1992) (holding that the application of law to fact on the issue of subject-matter jurisdiction is straightforward and does not require the withdrawal of the reference); *see also In re Columbia Gas Sys., Inc.,* 134 B.R. at 810-11.  Because the Bankruptcy Court will not be asked to significantly interpret federal non-bankruptcy law in determining whether the filed rate doctrine applies, mandatory withdrawal is

inappropriate.  This conclusion is further supported by the decisions in *In re Mirant Corp.*, 378 F.3d 511 (5th Cir. 2004) ("*Mirant*") and *In re Calpine Corp.*, 337 B.R. 27 (S.D.N.Y. 2006).  Each of these cases are addressed below.

### (a) The Mirant Case

Mirant filed for chapter 11 protection in the Northern District of Texas in the summer of 2003.  As part of their reorganization, Mirant filed motions to reject certain long-term power purchase agreements ("PPAs") with the Potomac Electric Power Company ("PEPCO"), a regulated public utility serving the retail needs of residential and commercial customers in the District of Columbia and Maryland.  *See In re Mirant Corp.*, 299 B.R. 152, 155-56 (Bankr. N.D. Tex. 2003), *overruled by Mirant*, 378 F.3d 511.  Under these PPAs, Mirant was obligated to purchase wholesale power from PEPCO on the same terms that PEPCO was obligated to purchase energy from third parties.  *In re Mirant*, 299 B.R. at 155.

Ultimately, Mirant sought the bankruptcy court's authorization to reject the executory portion of the PPAs.  *Mirant*, 378 F.3d at 515.  Mirant claimed it was entitled to reject the agreement because it was financially burdensome, forcing the company to purchase power it no longer needed on expensive terms.  *Id.* at 520.  Notably, Mirant's reasoning for rejecting the PPAs with PEPCO was ***not*** to get a better rate, but rather because the agreement was "unnecessary to its reorganized business because it represents excess capacity in its system to supply electricity."  *Id.*  PEPCO and FERC immediately sought and obtained an order withdrawing the reference from the bankruptcy court to the United States District Court for the Northern District of Texas (the "Texas District Court"), which ruled that FERC had exclusive jurisdiction over the decision whether to allow rejection.  *Mirant*, 378 F.3d at 515.

The Fifth Circuit, in reversing the Texas District Court, held that the bankruptcy court, rather than FERC, has jurisdiction to determine whether a debtor party to a power contract

should be permitted to reject that contract. *Id.* The court reasoned that rejection within the

course of bankruptcy does not alter the filed rate and, therefore, does not implicate the filed rate

doctrine, because the rate remains in force by providing the measure of the damages claim

against the bankruptcy estate. *Id.* at 519-21. The Fifth Circuit found the reasoning behind the

rejection of particular significance to the court's decision, citing with approval prior Fifth Circuit

precedent holding that "[t]he district court would have jurisdiction if [the debtor] claimed that it

cannot take [the supplier's] electricity *regardless of price.* If, however, [the debtor] can fulfill its

purchase obligations at lower rate, then [the debtor] merely seeks rate relief not available in

district court." Id. at 520 (quoting *Gulf States Utils. Co. v. Ala. Power Co.,* 824 F.2d 1465, 1472

(5th. Cir. 1987)). Thus, *Mirant* stands for the proposition that it is appropriate for bankruptcy

courts to retain jurisdiction over breach of contract disputes, even where the contracts at issue are

regulated by FERC, provided that the purpose for the breach is excess capacity as opposed to a

desire to receive a better rate.

### (b) The Calpine Case

      Prior to the filing of its petition, Calpine was party to a number of substantial wholesale

power contracts with certain counterparties. *In re Calpine Corp.*, 337 B.R. 27, 30 (S.D.N.Y.

2006) ("*Calpine*"). Sensing that Calpine's bankruptcy was imminent, the California Electricity

Oversight Board, the California attorney general, and the California Department of Water

Resources (the "California Parties") filed an emergency petition with FERC on December 19,

2005, seeking a pre-emptive order prohibiting Calpine from rejecting certain of the power

contracts. *Calpine*, 337 B.R. at 30. Two days later, and before FERC had acted on the

emergency petition, Calpine filed its chapter 11 cases. *Id.* at 30-31. As part of the bankruptcy

filing, Calpine sought and obtained from the Bankruptcy Court a temporary restraining order that

prohibited FERC from taking any action to require continued performance of its power contracts. *Id.* Calpine then proceeded to seek Bankruptcy Court authority to reject a number of power contracts, including those that impacted the California Parties (the "Rejection Motion"). *Id. at 31.*

Shortly after Calpine filed the Rejection Motion the California Parties sought and obtained an order withdrawing the reference over the Rejection Motion from the Bankruptcy Court to the United States District Court for the Southern District of New York (the "District Court"). *Id.* On Jan. 27, 2006, the District Court issued an order holding that FERC had exclusive jurisdiction over the contracts at issue and that neither the Bankruptcy Court nor the District Court had further jurisdiction to consider the matter. *Id.* at 39. The District Court found that Calpine could not evade FERC regulation by getting a bankruptcy court to cancel "financially burdensome" power-supply contracts, stating that "Calpine cannot achieve in bankruptcy court what [no] other federally regulated energy company in the country could do without seeking FERC approval: cease performance under ... wholesale energy contracts *in the hopes of getting a better deal*." *Id.* at 36 (emphasis added). The Court acknowledged that its decision was at odds with a recent the Fifth Circuit's ruling in *Mirant*, but noted that the Fifth Circuit panel was focused on a different concern, namely, that bankrupt Mirant should not be forced to buy power it did not need from a third party.[2] *Id.* at. 38. In contrast, Calpine had power to sell, but was asking for a better rate. According to the District Court, that is a matter

---

[2] The District Court goes out of its way to distinguish the facts of *Calpine* from *Mirant*, stating that, "Calpine remains 'ready and willing to supply the same amount of wholesale electric power-but at competitive market prices,' so there is no excess capacity issue presented, but merely a desire to get a better rate. The *Mirant* Court clearly held that it would find FPA preemption where, as here, a debtor was able to fulfill its obligations but only at a lower rate. Rejection in such a situation does not 'indirectly effect' the filed rate; it is a collateral attack on it." *Calpine*, 337 B.R. at 38 (internal citations omitted). As such, the District Court created a significant distinction, even in its own decision, as to whether the alteration was based on the desire for a better rate or the power simply wasn't needed.

squarely under the exclusive jurisdiction of FERC, because such a rate change would implicate the filed rate doctrine. *Id.* at 38. Therefore, *Calpine* stands for the proposition that FERC has exclusive jurisdiction when a debtor attempts to breach a FERC-regulated contract to obtain a more preferential rate.

> **(c) Regardless of the outcome, the adjudication of the present dispute will not require the Bankruptcy Court to "significantly and materially" interpret federal non-bankruptcy law.**

Mandatory withdrawal is inappropriate because, regardless of the ultimate outcome, the adjudication of whether the Debtors' repudiation of the Pipeline Contracts was valid will not require the Bankruptcy Court to "significantly and materially" interpret non-bankruptcy federal law.

If the Bankruptcy Court determines that the repudiation implicates the filed rate doctrine, then the Bankruptcy Court may, pursuant to the above-mentioned case law, hold that FERC has exclusive jurisdiction over the Debtors' repudiation, and, as such, that it does not have the subject matter jurisdiction to adjudicate the matter. Along the same lines, if the Bankruptcy Court determines, pursuant to the applicable case law, that the filed rate doctrine is not applicable to the repudiation, then the Bankruptcy Court will make its own determination as to whether the repudiation is appropriate under bankruptcy law. This analysis will not require the Bankruptcy Court to make any significant interpretation of non-bankruptcy federal law, and therefore mandatory withdrawal would be inappropriate.[3]

As such, the current dispute does not require the significant and material interpretation of federal non-bankruptcy law by the Bankruptcy Court, and is not yet ripe for consideration for

---

[3] The Pipelines will have the right to appeal the Bankruptcy Court's ruling to this Court if the Pipelines believe that the Bankruptcy Court's application of the law is erroneous.

withdrawal from the Bankruptcy Court. *See, e.g., In re CIS Corp.*, 140 B.R. at 353 (holding that the application of law to fact on the issue of subject-matter jurisdiction is straightforward and does not mandate the withdrawal of the reference); *see also In re Columbia Gas Sys., Inc.,* 134 B.R. at 810-11 (finding that the rejection of FERC-regulated natural gas contracts did not require substantial material consideration of non-bankruptcy federal and, therefore, mandatory withdrawal was not required).

### C.    Mandatory Withdrawal of the Limited Objection is Not Appropriate

In addition to all of the reasons discussed above, the mandatory withdrawal of the Limited Objection is inappropriate for the same reasons set forth in this Court's holding in *In re Enron Corp.*, 2005 WL 1185804 (S.D.N.Y.).

Prior to filing for bankruptcy, certain Enron affiliates had participated in wholesale power markets operated by the California Power Exchange Corporation and the California Independent System Operator Corporation. *Enron*, 2005 WL 1185804 at *1. These markets were governed by tariffs and rate schedules approved by FERC. *Id.* at *1. A number of parties (the "<u>Plaintiffs</u>") filed separate proofs of claim for amounts they claimed Enron owed them under the contracts. *Id.* Enron filed objections to the proofs of claim on various grounds. *Id.* The Plaintiffs then moved to withdraw the reference from the bankruptcy court with respect to all of the proofs of claim arguing, among other things, that the resolution of the Enron's claims objections would implicate the filed rate doctrine. *Id.* at *1-3.

In rejecting the Plaintiffs' arguments, this Court held that the resolution of a claims objection with respect to a FERC-regulated contract did not "require substantial and material interpretation of federal non-bankruptcy law mandating withdrawal of the reference." *Id.* at *2. The Court noted that, "[m]andatory withdrawal is not available merely because during a

bankruptcy proceeding, non-Bankruptcy Code federal statutes or laws will be considered." *Id.*
The Court found that the degree to which the bankruptcy court would be required to interpret
FERC's tariff decisions in order to determine the appropriate amount of the Plaintiffs' claims
was simply not significant enough to warrant withdrawal of the reference. *Id.*

This Court should follow *Enron* and find the Bankruptcy Court capable of interpreting
the appropriate rates to be applied to the Pipeline Contracts and, by extension, the appropriate
amount of the Pipeline Claims.

### III. PERMISSIVE WITHDRAWAL SHOULD NOT BE EXERCISED BECAUSE DISPUTES INVOLVING THE PIPELINE CLAIMS ARE CORE PROCEEDINGS AND THE PIPELINES ARE UNABLE TO SATISFY THE MULTI-FACTOR TEST UTILIZED IN THE SECOND CIRCUIT

#### A. Permissive Withdrawal Under 28 U.S.C. § 157(d)

Section 157(d) of title 28 of the United States Code provides that "[t]he district court may
withdraw, in whole or in part, any case or proceeding referred under this section, on its own
motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d). Section 157
does not define what constitutes "cause shown." *See e.g., In re Delta Air Lines, Inc.,*
2007 WL 3166776, *2 ( S.D.N.Y.).

Under Second Circuit case law, courts are instructed to analyze the following factors
when determining whether cause exists for a permissive withdrawal of the reference: (1)
whether the dispute is core or non-core; (2) what is the most efficient use of judicial resources;
(3) what is the delay and what are the costs to the parties; (4) what will promote uniformity of
bankruptcy administration; (5) what will prevent forum shopping; and (6) other related factors.
*See South Street Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys, Inc.)*, 94 F.3d 755,
762 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures
Corp.)*, 4 F.3d 1095, 1101 (2d Cir. 1993). Of the various factors, greatest weight is given to

whether the issue at hand is a core or non-core proceeding. *In re Burger Boys, Inc.*, 94 F.3d at 762; *In re Orion Pictures Corp.*, 4 F.3d at 1101.

Courts have held that withdrawing the reference of a core matter is inappropriate "given that the bankruptcy court generally will be more familiar with the facts and issues." *In re Orion, 4 F.3d at 1101; see, e.g., In re Recoton Corp.*, 2004 WL 1497570 *4 (S.D.N.Y.)*; Michaelesco v. Shefts,* 303 B.R. 249, 252 (Bankr. D. Conn. 2004); *In re Iridium Operating LLC,* 285 B.R. 822, 834-835 (Bankr. S.D.N.Y. 2002); *Bambu Sales, Inc. v. Stern,* 1998 WL 760335, *3 (E.D.N.Y.). Indeed, at least one court has stated that "as a practical matter it [would be] difficult to envision a situation" where it would be appropriate to withdraw the reference with respect to a core proceeding. *In re Baldwin-United Corp.*, 57 B.R. 751, 756 (S.D. Ohio 1985).

### B.    Permissive Withdrawal of Article V, Section A.2 of the Plan is Not Appropriate

Matters relating to plan confirmation are unquestionably core proceedings under the Bankruptcy Code. *See e.g. In re AOV Indus., Inc.*, 792 F.2d 1140, 1145 (D.C. Cir. 1986) ("The approval of a disclosure statement and the confirmation of a reorganization plan are clearly proceedings at the core of bankruptcy law"). Indeed, Congress specifically categorized plan confirmation as a core proceeding. 28 U.S.C. 157(b)(2)(L); *see In re Western Asbestos Co.*, 2003 WL 23741861, *1 (N.D. Cal.) (holding that a request to withdraw the reference from the bankruptcy court with respect to matters relating to plan confirmation was impermissible because plan confirmation is explicitly identified in the statute as a core proceeding); *In re Gulf South Systems, Inc.*, 1997 WL 35288, *3 (E.D. La.) (holding that the confirmation process is clearly a core proceeding pursuant to 28 U.S.C. §157(b)(2)(L)). The withdrawal of the Bankruptcy Court's reference to consider whether the Debtors can appropriately repudiate the Pipeline Contracts in their Plan would clearly require this Court to rule on matters relating to the

confirmation of the Debtors' Plan. Therefore, the first factor weighs heavily in favor of permitting the bankruptcy court to retain jurisdiction over Article V, Section A.2 of the Plan.

The other relevant factors also weigh against permissive withdrawal. As the Bankruptcy Court is already familiar with many of the factual and legal issues central to the Pipeline Claims, resolution of this action by the Bankruptcy Court is the most efficient use of judicial resources and promotes the uniform administration of bankruptcy court proceedings. *See, e.g. Vista Metals Corp. v. Metal Brokers Int'l, Inc.,* 161 B.R. 454, 458 (E.D. Wis.1993) (where bankruptcy judge had "significant exposure" to many relevant factual and legal issues through bankruptcy proceedings, "he can best address [this dispute] while ensuring the uniform, efficient administration of the entire bankruptcy estate, and that this matter will proceed through bankruptcy with minimal delay").

In addition, pursuant to the Pipelines' request, the Bankruptcy Court would presumably retain jurisdiction to consider whether the balance of the Plan ought to be confirmed. Such bifurcated consideration of the Plan cannot be said to preserve judicial efficiency or promote the uniform administration of bankruptcy court proceedings. *See In re Environmental Waste Control, Inc.*, 1990 WL 49032, *3 (N.D. Ind.) (stating that because the district court has less familiarity than the bankruptcy court with the bankruptcy issues associated with disclosure statements, it would be inefficient to withdraw the reference). The Bankruptcy Court is thus in the best position to interpret whether applicable law allows the Debtors to repudiate the Pipeline Contracts and, therefore, whether the Plan can be confirmed.

Moreover, allowing this issue to proceed in the Bankruptcy Court will also minimize delay and cost to the parties. The Bankruptcy Court has already held a hearing on issues related to the Limited Objection and has scheduled the Debtors' confirmation hearing to commence on

December 17, 2007.  The withdrawal of the reference with respect to this Plan issue would, in effect, force the Debtors, the Pipelines, and all other parties in interest to conduct two distinct hearings in connection with  confirmation.  The cost alone, not to mention the additional time, will render such bifurcated proceedings inefficient.

Finally, denying the Withdrawal Motion with respect to the Plan discourages forum shopping.  Courts have cautioned that the discretion to withdraw the reference from the bankruptcy court should be employed "judiciously in order to prevent [withdrawal] from becoming just another litigation tactic for parties eager to find a way out of bankruptcy court." *Kenai Corp. v. National Union Fire Ins. Co. (In re Kenai Corp.)*, 136 B.R. 59, 61 (S.D.N.Y.1992) (citation omitted); *see also In re Commercial Fin. Servs., Inc.,* 239 B.R. 586, 597 (Bankr. N.D. Okla. 1999)(quoting *In re Kenai Corp.,* 136 B.R. at 61).  A party may not engage in forum shopping by seeking to benefit from a different judge's understanding and application of the same laws. *In re Kenai Corp.,* 136 B.R. at 61; *In re Commercial Fin. Servs., Inc.,* 239 B.R. at 597.  In the present case, the Pipelines are simply hoping to be given the opportunity to have what they believe will be a more sympathetic forum to adjudicate issues that are core bankruptcy proceedings.

### C.    Permissive Withdrawal of the Limited Objection is also Not Appropriate

The Bankruptcy Code provides a non-exclusive list of matters that Congress considered to be within the bankruptcy court's core jurisdiction, including the "allowance or disallowance of claims against the estate." 28 U.S.C. § 157(b)(2)(B).  The Second Circuit has repeatedly held that when a creditor files a proof of claim, the bankruptcy court has core jurisdiction to determine that claim.  *See In re S.G. Phillips Constructors, Inc.*, 45 F.3d 702 (2d Cir. 1995); *In re Manville Forest Prods. Corp.,* 896 F.2d 1384, 1389-90 (2d Cir.1990).  Indeed, the Second Circuit has

stated unequivocally that, "[n]othing is more directly at the core of bankruptcy administration ... than the quantification of all liabilities of the debtor." *In re S.G. Phillips Constructors, Inc.*, 45 F.3d 702, 705 (2d Cir. 1995) (quoting *In re BKW Sys., Inc.,* 66 B.R. 546, 548 (Bankr. D.N.H. 1986). It is a "basic principle" that the filing of a proof of claim invokes the special rules of bankruptcy concerning objections to the claim, estimation of the claim for allowance purposes, and the rights of the claimant to vote on the proposed distribution. *In re S.G. Phillips Constructors, Inc.*, 45 F.3d at 706; *see also In re Manville Forest Prods. Corp.,* 896 F.2d at 1390. Therefore, the Bankruptcy Court's determination whether, and in what amount, to allow the Pipeline Claims is a core proceeding. *See, e.g., In re Leslie Fay Companies, Inc.*, 222 B.R. 718, 720 (S.D.N.Y 1998) (holding that the adjudication of proofs of claim "fall squarely within the statutory definition of 'core proceedings.'"). As such, the first factor weighs heavily in favor of permitting the bankruptcy court to retain jurisdiction over the Limited Objection.

The other factors also weigh against permissive withdrawal of the Limited Objection. The Bankruptcy Court's familiarity with this case makes it uniquely qualified to adjudicate the Limited Objection. *See, e.g., In re Enron Corp.*, 2005 WL 1185804, *3 (S.D.N.Y.) (holding that judicial efficiency as well as the uniform administration of bankruptcy court proceedings weigh in favor of not withdrawing the reference where the bankruptcy court had presided over the case for three years and where the bankruptcy court was more thoroughly familiar with the Debtors' claims).

In addition, allowing the Limited Objection to proceed in the Bankruptcy Court will minimize delay and cost to the parties. The Bankruptcy Court has already held a hearing on this matter and has ordered the Debtors and the Pipelines to participate in a mandatory and cost-

effective mediation process to determine the appropriate amount of the Pipeline Claims.[4] Withdrawal of the reference would only hinder the parties' willingness to reach a settlement on this issue and would likely result in significant litigation costs for all parties involved. Moreover, it would be a waste of judicial resources to have this Court adjudicate these issues unless and until the mediation fails. As such, this Court should abstain from making a determination on the Withdrawal Motion until after the parties conclude their mediation.

For the reasons discussed above, denying the Withdrawal Motion will also discourage forum shopping. This Court should not sanction the Pipelines' inappropriate attempt to have what they believe will be a more sympathetic forum in which to adjudicate issues that are core bankruptcy proceedings.

### IV. WITHDRAWAL IS NOT APPROPRIATE BECAUSE THE WITHDRAWAL MOTION WAS NOT TIMELY FILED

### A. Under 28 U.S.C. § 157(d), Withdrawal Motions Must be Timely

Under the express language of 28 U.S.C. § 157(d), a motion for withdrawal of the reference must be timely, regardless of whether the withdrawal in question is discretionary or mandatory. Specifically, section 157(d) states:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or *on timely motion* of any party, for cause shown. The district court shall, *on timely motion* of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. 157(d) (emphasis added). Although the statute itself does not provide a specific time limit during which a motion to withdraw the reference will be considered "timely," courts in the Second Circuit "have defined 'timely' to mean 'as soon as possible after the moving party has

---

[4] In fact, the parties have already agreed on a mutually acceptable mediator.

notice of the grounds for withdrawing the reference ." *In re The VWE Group, Inc.*, 359 B.R. 441, 446 (S.D.N.Y. 2007); *In re FMI Forwarding Co., Inc.*, 2005 WL 147298, *6 (S.D.N.Y.); *In re Kentile Floors, Inc.*, 1995 WL 479512, at *2 (S.D.N.Y.).  This is consistent with the purpose of the timeliness requirement, which is to save the court and the parties from incurring unnecessary cost and disruption of the court's calendar, while also ensuring that the movant has adequate time to determine whether the matter implicates the type of claims for which withdrawal would be appropriate.  *See, e.g.*, *Nielsen v. Miller*, 125 Fed. Appx. 227, 229 (10th Cir. 2005) (motion was untimely where debtors waited until the bankruptcy case was on the "brink of closure" to file a motion to withdraw the reference); *In re Stavriotis*, 111 B.R. 154 (N.D. Ill. 1990) (motion was not timely where movant waited to file the motion for eight months after learning that matter involved federal securities laws).

Based on the particular circumstances at issue, a delay that is acceptable in one case may not be acceptable in another case.  *E.g.*, *In re FMI Forwarding Co., Inc.*, 2005 WL 147298 at *6*; compare Connolly v. Bidermann Indus. U.S.A., Inc.,*1996 WL 325575, *3 (S.D.N.Y.) (finding untimely a motion to withdraw reference filed after a delay of eight months), *with In re Kentile Floors, Inc.,*1995 WL 479512, at *2 (finding timely a motion to withdraw reference filed after a delay of nine months where the parties had been in mediation for several months and the motion was filed promptly after mediation was abandoned).  It is clear, however, that "[d]elay for tactical reasons, prejudicial to the opposing party or the administration of justice, can be grounds for denying" a withdrawal motion. *In re New York Trap Rock Corp.*, 158 B.R. 574, 577 (S.D.N.Y. 1993); *see also FMI Forwarding Co.,* 2005 WL 147298 at *6-7; *In re Singer Co., N.V.*, 2002 WL 243779, *4 (S.D.N.Y.).

**B.      The Pipelines Have Not Timely Filed the Withdrawal Motion**

The Pipelines had notice of the Debtors' repudiation of three of the GTN Contracts (numbers 7357, 8096, and 8429) and the PNGTS Contract on April 7, 2006, more than eighteen months before the Pipelines filed the Withdrawal Motion.  Additionally, the Pipelines had notice of the repudiation of the remaining GTN Contracts (numbers 8115, 8155, 8158, 8194, and 8428) on January 11, 2007, more than 9 months before the Pipelines filed the Withdrawal Motion. Furthermore, in an adequate assurance hearing held before the Bankruptcy Court on April 11, 2006 (the transcript of which ( the "April 2006 Hearing Transcript") is attached hereto as Exhibit B), counsel for the Pipelines, stated in response to the Debtors' contention that they weren't required to pay adequate assurance on the repudiated Pipeline Contracts that, "[t]he Debtors cannot come in, contrary to the statements, and repudiate contracts in bankruptcy without FERC approval.  They simply cannot do that.  They have to go to FERC and tell FERC they will not perform anymore and get that acquiescence."  April 2006 Hearing Transcript, pg. 75.  The Pipelines were clearly aware, as early as April of 2006, of the grounds that the Pipelines now assert as the basis for the Withdrawal Motion, namely their contention that the repudiation of the Pipeline Contracts implicates FERC's exclusive jurisdiction.

However, the Pipelines waited until October 23, 2007 -- more than *eighteen months* later -- before filing the Withdrawal Motion.  Thus, the Pipelines ask this Court to hold that the Withdrawal Motion, which was filed two and a half years after the Pipelines had notice of the grounds for withdrawing the reference, qualifies as having been filed "as soon as possible."  The courts in this Circuit have implicitly rejected this argument by routinely finding motions to withdraw untimely when made after delays of similar, or even shorter, duration.  *See, e.g., FMI Forwarding Co.,* 2005 WL 147298 at *7 (finding untimely a motion to withdraw reference made eighteen months, exclusive of time spent in mediation, after the moving party became aware of

the grounds for the motion); *Connolly v. Bidermann Indus. U.S.A., Inc.,* 1996 WL 325575, *3

(finding untimely a motion to withdraw reference filed after a delay of eight months); *In re New*

*York Trap Rock Corp.,* 158 B.R. at 577 (finding untimely a motion to withdraw reference filed

after a "short" period of three months where the circumstances strongly indicated forum

shopping). This Court should not permit the Pipelines to claim, against both the weight of the

authority and the plain language of this Circuit's definition of "timely," that a delay of over

eighteen months in filing the Withdrawal Motion meets the requirement of having been filed "as

soon as possible."

## <u>CONCLUSION</u>

For all of the reasons stated above, the Committee respectfully requests that the District

Court (i) deny the Withdrawal Motion and (ii) allow the bankruptcy court to rule on the

repudiation of the Pipeline Contracts in the Debtors' Plan and the Debtors' Limited Objection

with respect to all issues raised thereunder.

Dated: November 9, 2007
      New York, New York

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By:  Michael S. Stamer
    Michael S. Stamer (MS-4900)
    Philip C. Dublin (PD-4919)
    Abid Qureshi (AQ-4882)
    Philip M. Abelson (PA-0809)
    590 Madison Avenue
    New York, New York 10022-2524
    (212) 872-1000 (Telephone)
    (212) 872-1002 (Facsimile)
    mstamer@akingump.com

Counsel to the Official Committee of Unsecured
Creditors of Calpine Corporation, <u>et al</u>.
