# Exhibit A

 **CALPINE**

717 TEXAS AVENUE
SUITE 1000
HOUSTON, TEXAS 77002
713.830.2000
713.830.2001 (FAX)

January 11, 2007

Gas Transmission Northwest
1400 SW 5th Avenue, Suite 900
Portland, Oregon 97201
Attention: Jeff Rush
Vice President and General Manager

Re:    GTN Contract No.: 8115
       GTN Contract No.: 8155
       GTN Contract No.: 8158
       GTN Contract No.: 8194
       GTN Contract No.: 8428

Dear Mr. Rush:

As Gas Transmission Northwest is aware, Calpine Energy Services, L.P. is a debtor and debtor in possession in procedurally-consolidated chapter 11 bankruptcy cases pending before the United States Bankruptcy Court for the Southern District of New York, Case No. 05069299-BRL.   Please be advised that Calpine Energy Services, L.P. has determined that the above-referenced contracts (the "Contracts") provide no benefit to its estate.

Consequently, effective immediately, Calpine Energy Services, L.P. will no longer accept service under the Contracts, and Calpine Energy Services, L.P. hereby releases and relinquishes any right to ongoing service or capacity under the Contracts.

Sincerely,

Jeffrey Kinneman
VP, Structured Finance & Strategy

# Exhibit B

1

1

2

3

UNITED STATES BANKRUPTCY COURT

4

SOUTHERN DISTRICT OF NEW YORK

5

6

7

-------------------------------------x

8

In the Matter

9            of                          Case No.
                                         05-60200

10   CALPINE CORPORATION,

11                      Debtors.

12   -------------------------------------x

13                          April 11, 2006

14                          United States Custom House
                            One Bowling Green
15                          New York, New York 10004

16

     Mtn of Gas Transmission Northwest Corp., Portland
17   Natural Gas Transmission System, and Transcanada
     Pipelines Limited to enforce stipulation and to
18   compel Debtors to replenish assurance; notice
     rejecting certain executory contracts and unexpired
19   leases;  mtn to extend exclusivity.

20   B E F O R E:

21                   HON. BURTON R. LIFLAND,

22                                  Bankruptcy Judge.

23

24

25

2

1

2   A P P E A R A N C E S :

3

https://vip21.veritextllc.com/myfiles/979905/114239.TXT

```
 4          KIRKLAND & ELLIS LLP

 5              Attorneys for Debtors

 6              153 East 53rd Street

 7              New York, New York

 8

 9     BY:   MATTHEW A. CANTOR, ESQ., of Counsel

10              -and-

11     BY:    ROBERT G. BURNS, ESQ., of Counsel

12              -and-

13     BY:   EDWARD O. SASSOWER, ESQ., of Counsel

14              -and-

15     BY:   ROSS M. KWASTENIET, ESQ., of Counsel

16

17     AKIN GUMP STRAUSS HAUER & FELD LLP

18              Attorneys for Creditors' Committee

19              590 Maidson Avenue

20              New York, New York

21

22     BY:   PHILIP DUBLIN, ESQ., of Counsel

23

24

25
```

                                                    3

```
 1

 2   A P P E A R A N C E S (Continued) :

 3

 4

 5

 6

 7      NIXON PEABODY LLP

 8          Attorneys for Wilmington Trust, as
```

05/26/2006 11:48 AM

```
 9            Collateral Agent

10            437 Madison Avenue

11            New York, New York

12

13    BY:    RICHARD J. BERNARD, ESQ., of Counsel

14

15

16

17

18     ROPES & GRAY LLP

19            Attorneys for U.S. Bank, as Trustee -

20            Tiverton and Rumford Projects

21            45 Rockefeller Plaza

22            New York, New York

23

24    BY:    KEITH H. WOFFORD, ESQ., of Counsel

25
```

```
                                                    4


 1

 2    A P P E A R A N C E S (Continued) :

 3

 4

 5     ELROD, PLLC

 6            Attorneys for Transcanada, Portland and

 7            GTN Pipelines

 8            500 North Akard

 9            Dallas, Texas

10

11    BY:    DAVID W. ELROD, ESQ., of Counsel

12

13
```

https://vip21.veritextllc.com/myfiles/979905/114239.TXT

```
14          PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

15                  Attorneys for Unofficial Committee of 2d

16                  Lien Debtholders

17                  1285 Avenue of the Americas

18                  New York, New York

19

20          BY:   ALAN W. KORNBERG, ESQ., of Counsel

21                      -and-

22          BY:    ELIZABETH R. McCOLM, ESQ., of Counsel

23

24

25
```

                                                        5

```
1

2    A P P E A R A N C E S (Continued) :

3

4

5

6

7           BROWN RUDNICK, ESQS.

8                   Attorneys for Law Debenture

9                   One Financial Centre

10                  Boston, Massacuhsetts

11

12          BY:    STEVEN B. LEVINE ESQ., of Counsel

13

14

15

16

17          KAYE SCHOLER LLP

18                  Attorneys for PMCC
```

```
19              425 Park Avenue

20              New York, New York

21

22      BY:    RICHARD G. SMOLEV, ESQ., of Counsel

23

24

25
```

                                                        6


```
1

2    A P P E A R A N C E S  (Continued) :

3

4

5        SHIPMAN & GOODWIN LLP

6                Attorneys for U.S. Bank, Trustee - South

7                Point

8                One Constitution Plaza

9                Hartford, Connecticut

10

11      BY:    IRA H. GOLDMAN, ESQ., of Counsel

12                  -and-

13      BY:    CORRINE L. BURNICK, ESQ., of Counsel

14

15

16        MILBANK, TWEED, HADLEY & McCLOY LLP

17                Attorneys for Broad River, Rockgen and

18                South Point Lessors

19                1 Chase Manhattan Plaza

20                New York, New York

21

22      BY:    WILBUR F. FOSTER, JR., ESQ, of Counsel

23
```

https://vip21.veritextllc.com/myfiles/979905/114239.TXT

24

25

7

1

2    A P P E A R A N C E S (Continued) :

3

4

5

6

7

8

9

10        DIEDRE MARTINI, ESQ.

11            United States Trustee

12            33 Whitehall Street

13            New York, New York

14

15        BY:    RICHARD C. MORRISSEY, Esq., of Counsel

16

17

18

19

20

21

22

23

24

25

8

```
 1

 2                        P R O C E E D I N G S

 3

 4              MR. CANTOR:  Good morning, Your Honor.

 5              THE COURT:  Good morning.

 6              MR. CANTOR:  Matthew Cantor of Kirkland

 7   & Ellis on behalf of the Debtors.  I have a number of

 8   colleagues here for various motions.  What I would

 9   like to go through is some of the uncontested matters

10   first.  Robert Burns, my colleague, will be handling

11   the insurance motion and a relief from stay notice of

12   presentment.

13              MR. BURNS:  Your Honor, the committee

14   would have a very brief submission and will allow

15   them to go first.

16              MR. DUBLIN:  Good morning, Your Honor.

17              THE COURT:  Is it a secret motion?

18              MR. DUBLIN:  It was until yesterday.

19   Philip Dublin on behalf of the committee.

20              The motion represented today is to amend

21   slightly the protocol that you approved back in

22   February with respect to the committee's obligation

23   to provide information to unsecured creditors under

24   the new Section 1102(b)(3)(A).  What we would like to

25   do is exclude from the requirement of third parties
```

9

```
 1

 2   providing information to unsecured creditors of the

 3   Debtors' Canadian affiliates filing proceedings in

 4   Canada.  We had a meeting last week with the Debtors'

 5   professionals and professionals of the Canadian
```

6  Debtors where we learned a couple of things about the

7  enterrelationship between the U.S. and the Canadian

8  Debtors, as well as obtaining the understanding that

9  the Canadian Debtors' can assert certain claims

10  against the U.S. Debtors have established a June 30

11  Bar Date for U.S. creditors to assert claims.  They

12  also established a data room, where they have agreed

13  the committee can have access to as long as we

14  execute a confidentiality agreement.  The other

15  condition is they be excluded from the information

16  protocol, that if other creditors here in the States

17  want to get access to that information they don't go

18  through the committee, they have to go through the

19  Canadian Debtors.  The Canadian Debtors said they can

20  sign a confidentiality agreement to enable them to

21  get access to that information as long the agreement

22  is signed.

23           We served notice of the motion, pursuant

24  to your Order either by protocol or by hand on all

25  but a few parties.  Where we were unable to get

10

1

2  e-mail addresses for those based on their location,

3  we did serve those parties by overnight mail.  I

4  understand if their ability to respond was

5  compromised, so we would extend to any of those

6  parties, reach out to deal with them on a one-on-one

7  basis.

8           I don't know if the Court has any

9  questions.  But based on the timing of the nature of

10  how quickly we need to get back a bunch of

11    information in the data room and the June 30 Bar

12    Date, we would like to be here on an emergency basis.

13              MR. CANTOR:  Your Honor, Matthew Cantor

14    on behalf of the Debtors.  We have no objection to

15    the motion.  We conferred with Canadian counsel.  For

16    any parties in interest that want to get information

17    that the Canadian counsel has, there is actually a

18    website that has been established by Canadian counsel

19    up there where there is a link to get the

20    confidential agreement executed and delivered, and

21    then a creditor or another party in interest can get

22    access.  What I will propose to do, we will post this

23    link on our website, here on the Calpine website so

24    it won't be an issue for anybody trying to get this

25    information in order to have access to it.

                                                    11

 1

 2              THE COURT:  Does anyone else want to be

 3    heard?

 4              (No response.)

 5              THE COURT:  Essentially, you are asking

 6    me to grant comity to the requirements of the

 7    Canadian proceeding.  I am certainly prepared to do

 8    that without inviting them to come here and file a

 9    Chapter 15 in order to get that accomplished.

10              MR. DUBLIN:  Thank you.

11    May I approach?

12              THE COURT:  Yes.

13              MR. DUBLIN:  (Handing.)

14              THE COURT:  I have approved the Order.

15              MR. DUBLIN:  Thank you.

16          MR. BURNS:  Your Honor, good morning.

17   Robert Burns for Kirkland & Ellis, here on behalf of

18   the Debtors.

19          Your Honor, I have two motions today.

20   The first relates to the motion pertaining to the

21   Debtors' prepetition loan-back agreement, which

22   relates to the Debtors' captive insurance company.

23   Your Honor, on January 4 you entered an Order, which

24   was interim in part and final in part.  The final

25   component authorized the Debtors to maintain their

                                                    12

1

2    existing insurance policies to go forward and buy new

3    insurance policies as they became necessary in the

4    course of their business and to pay premiums,

5    including both pre and postpetition amounts.

6           Your Honor, there was also an issue with

7    regard to the $18 million prepetition loan-back

8    agreement between Calpine and a company called CPN,

9    which is the captive insurance company.  At the

10   January --

11          THE COURT:  That was the one in Hawaii?

12          MR. BURNS:   That is correct.

13          In the January 4 authority you granted

14   interim authority to allow the Debtors to repay up to

15   $18 million to the captive insurance company.  Your

16   Honor, since the entry of the Interim Order the

17   Debtors have engaged two reputable insurance brokers.

18   The first is HRH, and the second one is Willis

19   International.  These brokers were retained to assist

20   the Debtors with the process of trying to design the

https://vip21.veritextllc.com/myfiles/979905/114239.TXT

```
21   most effective insurance program for going forward.
22   Your Honor, this insurance program covers a wide
23   variety of the Debtors' operations, including
24   property insurance, insurance relating to the
25   Debtors' employees, and a variety of other insurance
```

13

```
 1
 2   policies that are necessary for the Debtors to
 3   operate.
 4              Your Honor, the Debtors, with the
 5   assistance of the two insurance brokers, considered
 6   three options.  The first option was to maintain the
 7   existing program, which included the repayment of
 8   some, but not all, of the prepetition loan-back
 9   agreement and to continue with this captive insurance
10   program on a going forward basis.  The second option
11   was to pay the claims due on a prepetition basis
12   relating to the loan-back agreement and insurance
13   programs but go to the market, the insurance markets
14   and buying new third-party market insurance on a
15   going forward basis.  And the third option, Your
16   Honor, was to basically not repay any amounts under
17   the loan-back agreement and go to the markets purely
18   on a going forward basis for new programs.  Based on
19   an analysis by the Debtors' brokers, it was
20   determined that the second option, which was to pay
21   back some of the loan-back agreements and go forward
22   into the insurance markets for new coverage, which
23   would be approximately fifteen to twenty-two percent
24   higher than maintaining the existing captive program.
25   The third option, which was to not repay any amounts
```

14

1

2    under the prepetition loan-back agreement and simply

3    go to the market was determined to be somewhere in

4    the range of thirty-five percent, fifty-two percent

5    higher than maintaining the existing program.

6            Your Honor, in addition, the Debtors

7    worked very closely with both the Official Committee

8    and the committees of the first and second lien

9    debtholders to give them substantial review of both

10   economic and legal implications of the insurance

11   programs.  I believe I can represent that both the

12   Official Committee and the Ad Hoc Committees are in

13   agreement with the proposed insurance program, which

14   is, Your Honor, to pay up to $35 million of the

15   prepetition loan-back from Calpine down to the

16   captive insurance program and maintain captive on a

17   going forward basis.

18           Your Honor, I think it was in our prior

19   motion, but the insurance policies are critical to

20   the Debtors' continued operations.  These insurance

21   programs is required under several of the Debtors'

22   loan agreements and other agreements, including the

23   Debtors' financing facility.  As, I think, Your Honor

24   is aware, or as set forth in our maintenance of these

25   insurance policies is required by certain of the

15

1

2    United States Trustee's operating guidelines here in

3    the Southern District of New York.

4            THE COURT:  Does anyone want to be

5    heard?

6            (No response.)

7            THE COURT:  I hope that my reluctance in

8    allowing you the full $35 million on the first day

9    hearing didn't spark an expensive review of the

10   program, only to come back and give you the rest of

11   what you requested originally.

12           MR. BURNS:  I can represent there is a

13   brokerage fee payable to HRH, which is, I believe, in

14   the approximate amount of $235,000.  Your Honor, even

15   absent the Chapter 11 proceedings, that sort of

16   broker arrangement would have been required, so it's

17   not active.  With respect to Willis, actually they

18   did their review, which was very extensively reviewed

19   as a courtesy to the Debtors as in relation to the

20   other matters to do with the Debtors.  So it is no

21   problem with regard to them.

22           THE COURT:  Your application is

23   approved.  I will entertain an Order either now or at

24   the end of the hearing.

25           MR. BURNS:  If you would like, Your

16

1

2    Honor, I can pass it up right now.

3            THE COURT:  Sure.

4            MR. BURNS:  (Handing.)

5            THE COURT:  I have approved the Order.

6            MR. BURNS:  The second matter I have is

7    a stipulation between the Debtors and the estate of

8    Rodney Mc Vay.  Your Honor, this relates to a

9    prepetition injury which took place on the Debtors'

10   facilities where an independent contractor was killed

11   while working on the work site.  The minor child of

12   the independent contractor has brought a lawsuit

13   against the estate seeking damages in relation to the

14   death.  Your Honor, the stipulation relates solely to

15   insurance proceeds.  The Plaintiffs in the --

16            THE COURT:  Does anyone want to be

17   heard?

18            (No response.)

19            THE COURT:  The application is granted.

20            MR. BURNS:  Thank you, Your Honor.

21            May I pass up an Order?

22            THE COURT:  You may.

23            MR. BURNS:  (Handing.)

24            THE COURT:  I have approved the Order.

25            MR. CANTOR:   Your Honor, the next

                                                    17

1

2    matter I would like to take, as we get into the

3    contested matters, I would like to skip to the second

4    one and take that first.  It's the motion with

5    respect to the Debtors' application for an Order

6    extending the time within which the Debtors must

7    assume or reject unexpired leases of nonresidential

8    real property.

9            Your Honor, the motion was served and

10   filed on March 29.  The date which the period expires

11   where the Debtors must assume or reject contracts is

12    April 18, by our calculation.  Your Honor, the motion
13    was served and filed on the United States Trustee,
14    the counter-parties to our nonresidential real
15    property leases and the 2002 list.  We received three
16    objections yesterday.  We filed and served a
17    responsive pleading.
18              Your Honor, the factors are threefold in
19    determining whether or not the Debtors should get an
20    extension of time to assume or reject contracts:  It
21    is whether or not the leases are important assets,
22    since that decision to assume or reject is important
23    to a Plan of Reorganization; whether the case is
24    completed and involves a large number of leases; or
25    whether or not there has been insufficient time to

                                                      18

1
2     make a determination whether or not to assume or
3     reject these leases.
4               Your Honor, we have a case with 273
5     Debtors.  There are over 400 leases of nonresidential
6     real property at stake.  Many of the leases are
7     essential to a Plan of Reorganization in this case.
8     As you know, the company is a large producer of
9     power.  The kind of leases we are talking about here
10    are geothermal mineral leases, office leases, ground
11    leases for power generation facilities, oil and gas
12    pipeline leases, and construction lay down leases for
13    properties which are constructing projects.  As far
14    as what we had been doing in the case is that we
15    require more time to assume these leases.
16              The Debtors, for which we are seeking

17    extensions, are set forth in Schedule 1 to Exhibit A

18    of the exhibit.  Exhibit A is the proposed Order.

19    Your Honor, we had been involved in putting together

20    the schedules.  As you know from the very complex

21    Debtor-in-Possession financing and cash collateral

22    process, we have as part of our obligation in

23    connection with that of adequate protection to our

24    secured lender is to develop a list of designated

25    properties, develop accounting strategies to

                                                    19

1

2    determine which projects are valuable and profitable

3    and move quickly to turn back those projects which we

4    will confer with our secured lender and our Official

5    Creditors' Committee determine what not to be part of

6    what should be the core business here.  We are in the

7    middle of that process now.  We have determined a

8    number of leases and projects that we will turn back,

9    they were on our first list of designated assets.  In

10   fact, some of the counter-parties are here, who filed

11   objections, that is sensitive to these projects.  But

12   we are right in the middle of that process, and we do

13   think that will be critical to getting to the plan

14   process.

15            I think it is fair to say this case is

16   complex with these number of Debtors, the regulated

17   nature of the business.  In fact, one of the

18   issues that we first ran into, which we had argued up

19   at the 2d Circuit only yesterday, is the issue of the

20   Bankruptcy Court to determine to hear and determine

21   motions to reject contracts.  And we are hoping we

22    get a decision shortly out of the 2d Circuit that
23    will give us some clarity as how we should go about
24    undertaking this process.  So between the DIP and the
25    schedules, we had been here before you over the last

20

1
2    couple of weeks with human resources issues, we had
3    been both reducing the work force and recently lost a
4    number of employees down on our Drake operations in
5    Houston, and we are managing ourselves through this
6    process.
7            So given all those things, I will submit
8    to Your Honor that in addition to these projects
9    being important assets to their respective Debtors,
10   and the case being complex, and in view of that we
11   don't believe 120 days is a sufficient amount of
12   time, and I think that given those facts, we have
13   satisfied the standards for the extension.
14           We have received two objections, three
15   objections relating to these projects.  We first have
16   the objection of U.S. Bank, as Trustee of Tiverton &
17   Rumford projects.  The second set of objections is
18   from U.S. Bank, as the owner-lessor at Broad River,
19   Rockgen and South Point.  We call them the three
20   pack.  And also objection filed by Mr. Foster on
21   behalf of the owner-lessors at those projects.
22           With respect to the Rumford-Tiverton
23   objection, Your Honor, we are not seeking to extend
24   the time in which to assume or reject those leases
25   relating to those Debtors where we are the lessees.

https://vip21.veritextllc.com/myfiles/979905/114239.TXT

21

1

2    In fact, there has been some dispute with respect to

3    those rejection notices.  There has been a fair

4    amount of negotiation about the terms of that

5    give-back.  I think what is interesting here is on

6    April 18, by virtue of Section 365(d), those leases

7    will be terminated, for those which we have not

8    gotten extensions.  So I don't believe we have an

9    objection here that is really an objection to the

10   relief, since we haven't asked to extend those

11   leases.

12           With respect to the three pack

13   objections, the objection from Milbank, Tweed and

14   from Ropes & Gray, --

15           MR. GOLDMAN:  Shipman & Goodwin.

16           MR. CANTOR:  Sorry about that.

17           -- the objections do not dispute the

18   facts set out for you concerning the complexity of

19   the cases, the force of those leases, the properties

20   and the insufficiency of time.  In fact, many of the

21   objections you are seeing here, these were parties

22   who objected to the Debtor-in-Possession financing on

23   the basis that we were not focusing on those Debtors,

24   rather reviewing those cases in an integrated whole.

25   I think that is the appropriate way to look at it to


22


1

2    consider these motions.  Even if we were to accept

3    their view, clearly those leases are the primary

4    assets of those Debtors, and we need an extension of

5    time to determine what we are going to do with that

6    three pack, those three projects.

7            Their objections goes to an issue of

8    adequate assurance of future performance.  You should

9    know with respect to the three pack, that on May 30,

10    I think is the date, there is a rent payment due,

11    which is approximately thirty-four and a half million

12    dollars.  Their pleadings suggests we should be

13    required to make some commitment here in Court to

14    make that payment.  Providing adequate assurance of

15    future performance is not required for obtaining an

16    extension under 365(d)(4).  And in fact, I suspect

17    our obligation to pay that on May 30 will have some

18    impact on how fast we will consider what we are going

19    to do with that.  If we can conclude it is something

20    we will not be keeping, we will try to void that

21    payment.  Obviously, if we still have it and we are

22    obligated to pay it on May 30, they have their rights

23    under the law.  So I think those objections should be

24    overruled.  I can leave it to the counter- parties to

25    make their case.

23

1

2            MR. WOFFORD:  Your Honor, Ketih Wofford

3    from Ropes & Gay with respect to the Tiverton and

4    Rumford projects for which U.S. Bank is serving as

5    Trustee.

6            We have no dispute with the legal

7    standard stated by the Debtors' counsel with respect

8    to whether an extension would be granted.  We merely

https://vip21.veritextllc.com/myfiles/979905/114239.TXT

9    note that Tiverton and Rumford were both listed on

10    the schedules as an entity seeking an extension.  But

11    in contrast with the papers received from the

12    Debtors, they appear to be saying there are no real

13    property leases to which an extension would apply.

14    If the Debtors' view is that there are no such

15    leases, then we simply would ask for purposes of

16    clarity that Tiverton and Rumford be withdrawn from

17    the motion and the motion be denied with respect to

18    those entities.  If there is any ambiguity, we only

19    ask, if the Debtors are not listed in their schedules

20    and statement of affairs, we would like the motion to

21    be denied with respect to those entities.  To the

22    extent there is ambiguity, we would like it to be

23    made clear those extensions are being granted, or in

24    the alternative the motion is withdrawn and will give

25    the right of the rejection notice.


                                                        24


1

2              Again, the primary economic purpose of

3    the time, that is letting them have time to make

4    their decision is met, they have made their decision,

5    they have cut the properties off from funding, we

6    would like them to clarify by withdrawing or have you

7    deny the motion as to those two entities.

8              MR. CANTOR:   Your Honor, I am given to

9    understand that the Debtors for which those Debtors

10    are the lessees of nonresidential real property, they

11    are not intended to be included in the list.  After

12    the hearing, if that gets Mr. Wofford comfortable,

13    those Debtors will not be included in the list of

14    entities to which we are seeking extensions.  There

15    may be properties where we are the lessors.  We want

16    to ensure that there is an extension.  364 would not

17    necessarily require that, although I don't see why

18    there would be any harm there.

19              But I think making it clear on the

20    record, we can make Mr. Wofford comfortable that all

21    the Debtors on which we are the lessees of

22    nonresidential real property, relating to

23    Rumford-Tiverton, they are not to be included in the

24    list of Debtors for which we are seeking extension.

25    In fact, those leases will be terminated on April 18

25

1

2    by virtue of the Code.

3              MR. WOFFORD:  Your Honor, that is

4    acceptable.  We merely note on behalf of the Trustee

5    or the other concern stated in the response, which is

6    merely that both sides have ongoing issues as to what

7    properties are characterized as real property versus

8    personal property, and we will deal with those issues

9    another day.

10              MR. GOLDMAN:  Your Honor, Ira Goldman of

11    Shipman & Goodwin on behalf U.S. Bank.  I guess we

12    are counsel to the three pack deal that involves

13    Rockgren, South Point and Broad River.  We filed an

14    objection.  U.S. Bank essentially represents these

15    entities that is secured by the rights under those

16    leases.  And Mr. Foster of Milbank will subsequently

17    speak on behalf of the lessors themselves, who have

18    an economic interest in this also.

19          Our concern really began with language

20    that Calpine included in their motion.  And what they

21    said was they assure the Court that lessors will not

22    be prejudiced by the extension of time because the

23    Debtors will continue to perform in a timely manner

24    on the undisputed postpetition date obligations under

25    expired leases.  We read that.  And really our

26

1

2    objection or limited objection was just to basically,

3    first of all, make sure that was in the Order as well

4    as in the motion, and second, to understand what that

5    was with a little more precision, because there is a

6    thirty-four and a half million dollar rent payment,

7    semiannual rent payment that is due on May 30, which

8    is only six weeks after the relief that they are

9    seeking would be granted.

10          The reason for our concern are

11    justifiable.  Because U.S. Bank also served as

12    Indenture Trustee in the so-called Rumford-Tiverton

13    transaction, which in many ways is a mirror image of

14    this three pack deal.  In that case Your Honor may

15    recall from the DIP hearing there was a rent payment

16    due shortly after the case began on, I think, January

17    15, and there was some dispute, but I don't think

18    they disputed the fact there was at last some per

19    diem payment that was required.  On April 11, U.S.

20    Bank had not gotten a penny on that rent payment.  So

21    I think there is reason to be concerned.

22          Our other concern, although there was

23    assurance that the Debtors would continue to perform,

24    obviously this case involves a lot of separate

25    Debtors.  And, in fact, except for the fact our

27

1

2    Debtor is listed, there is no particular focus on the

3    lease.  In fact, I should really say that the leases

4    we are talking about are facility leases and ground

5    leases.  There are open questions as to whether these

6    are nonresidential real estate leases or personal

7    property leases or perhaps would be recharacterized

8    as something else.  All the parties throughout have

9    retained all of their rights.  We have done so again

10    and I suspect Calpine will do the same.

11            Assuming for the moment that Tiverton

12    was a nonresidential real property lease and we were

13    getting their assurance they will perform in a timely

14    manner, we were concerned about the possible

15    administrative insolvency of the particular lessee

16    that was making this request.  Because even though,

17    as Mr. Cantor said again, it is one integrated

18    enterprise, I don't necessarily think they were

19    saying here that Calpine Corporation would take care

20    of these timely payments in any event.  So we wanted

21    some assurance that we were going to be assured on

22    the one hand that they would continue to perform in a

23    timely manner, then be told down the road, "Well,

24    your particular obligor was administratively

25    insolvent."  If that were the case, I don't think

28

1
2    they should be seeking this relief, because they
3    can't state to the Court they will continue to
4    perform in a timely manner.  So we were seeking
5    clarification in that regard also.
6               The response, which was filed last
7    night, last evening, did some things that really
8    surprised me.  First of all, it took issue with the
9    fact that they have to make timely payments at all.
10   And I couldn't tell whether they were only doing that
11   to argue to Your Honor whether they have made timely
12   payments or not is not the sole basis on which the
13   Court is supposed to make the determination to grant
14   an extension.  We don't have any problem with that.
15   In fact, up to now I don't think in the three pack
16   deal they haven't failed to perform in a timely
17   manner.  The test is going to come on May 30.  But
18   the implication that they don't have to perform in a
19   timely manner, if that is what they are saying,
20   really does disturb us, because under 365(d)(3) they
21   have to perform in a timely manner; meaning, make the
22   payment when it is due.  And we think that the Court
23   in the case of Puggies, 239, Bankruptcy Reporter 688,
24   a 1999 case, is very clear that these are payments
25   that are supposed to be made without having to seek

29

1
2    any further motion.
3               The other thing they did was they gave
4    the example, which Mr. Cantor just gave again, that

https://vip21.veritextllc.com/myfiles/979905/114239.TXT

5   perhaps once they get this done substantially, they

6   will wait until May 29 and decide if they really

7   don't need these facilities, reject them, and then

8   they won't have to make the May 30 payment.  Which

9   really surprised us, because these are arrears

10  payments.  And, in fact, it was Mr. Cantor who first

11  pointed that out to me at the DIP hearing in regard

12  to the Rumford-Tiverton lease.  But these leases are

13  structured the same way.

14          And to the extent that they are taking

15  the position that notwithstanding the fact that these

16  are arrears payments, they can wait until May 29 and

17  then not pay the per diem amounts for all of those

18  days in the post-periods that have gone by from the

19  filing until the date that they reject is very

20  disturbing and really cuts right against what they

21  are saying, which is that the Debtors will continue

22  to perform in a timely manner.  We are expecting that

23  while they are running these facilities, we are

24  getting a portion of our rent in arrears.  And it

25  would surprise us if the Debtors --

                                                        30

1

2           THE COURT:  It's not what the agreement

3   calls for.

4           MR. GOLDMAN:  Excuse me?

5           THE COURT:  It calls for semiannual

6   payments.

7           MR. GOLDMAN:  Semiannual payments and

8   arrears.  But I think this circuit has taken the

9   position those kind of payments get prorated.  It's

10    not before the Court today.  But we --

11                THE COURT:  I was about to make that

12    point to you.

13                MR. GOLDMAN:  Thank you, Your Honor.

14                Again, what it boils down to, we were

15    seeking some meat on the bones of the statement that

16    they made that they will continue to perform in a

17    timely manner.  They are undisputed postpetition date

18    obligations.  We wanted to clarify what undisputed

19    meant.  We want to clarify what would happen if one

20    of these Debtors, or all three of them, turned out to

21    be administratively insolvent.  Because they are

22    special purpose entities, these are not the same as a

23    general operating company, what we want to clarify

24    that timely meant timely.  Instead I think the

25    response leaves us even more nervous than the motion

31

1

2    did.  We reiterate our request that they have to

3    clarify that it's appropriate for them to have to

4    clarify that when they seek this Court's

5    discretionary extension.

6                Thank you, Your Honor.

7                MR. FOSTER:  Wilbur Foster of Milbank,

8    Tweed on behalf of the Rockgen, South Point and Broad

9    River owner-leassors.  And I am not going to get that

10    right.  But there I go.  We filed an --

11                THE COURT:  I don't know if you have got

12    it right.  It seems to be an inverse order from what

13    I have.

14                MR. FOSTER:  Please do not confuse me,

15    Judge.  It has taken me a while.

16            On behalf of those entities that I filed

17    a limited objection to the extension motion.  The

18    objection was limited to the extension motion as it

19    applied to the three - I will call them - Debtor

20    lessees, of those lessees of those lessors to those

21    Debtor lessees.  I had just to follow Mr. Goldman's

22    remarks by pointing out three categories of items.

23            First, point one, the Debtors say they

24    have not had sufficient time to evaluate these

25    leases.  They point to the numerous nonresidential

                                                32

1

2    real property leases they have to look at.  But these

3    are facilities, these are facility leases, plant

4    leases, a very special subset of all the leases they

5    have to evaluate.  And indeed, in the Cash Collateral

6    Order that was entered by this Court on January 30,

7    the Debtors agreed to a special and accelerated

8    review process with regard to those plants.  These

9    plants generally, including these, and that would

10   include these particular leases, and that was a

11   process under that Order would be completing just

12   about now under the deadline that they agreed to.  So

13   it's not unreasonable to suggest or to conclude that

14   they should have been able to evaluate these

15   particular leases during that period.  Again, it is a

16   very limited subset of plant leases for these

17   particular plants.

18            Second, the Debtors have contended, and

19   there is a principal contention, that the disposition

20    of these project leases is critical to a Plan of

21    Reorganization for the Debtors' lessees.  And indeed,

22    on page 10 of the response they filed yesterday they

23    have stated, and I quote, "Any assumption or

24    rejection of the project leases will necessarily need

25    to be contemplated as part of a Plan of

33

1

2    Reorganization for such Debtor lessees."  That

3    argument is undercut by the fact that although they

4    are seeking the statutorily permitted extension to

5    July 18 with respect to these leases, they are also

6    seeking an extension until December 31 of this year

7    to file a Plan of Reorganization as to these Debtor

8    lessees.  So that argument that this is essential to

9    their plan is undercut by the fact they are not

10    filing a plan any time around July 18 to these Debtor

11    lessees.  In fact, filing it almost six months later

12    if they get the relief they are seeking.

13                Third, the Debtors make the point that

14    they don't have to provide adequate assurance of rent

15    payments in order to get a Section 365(d)(3)

16    extension, pointing out that adequate assurance of

17    future performance is a requirement for assumption.

18    We don't dispute that.  But the cases they cite do

19    support the proposition that whether the Debtors are

20    making the payments required under the leases and is

21    required now under Section 365(d)(3), that is a

22    factor to be considered in determining whether and

23    how much of an extension the Debtors should get.

24    Indeed, the Debtors themselves point to these

25     payments as a reason for granting the motion.

                                                                    34

1

2               As Mr. Goldman pointed out on page 7 of

3     their motion, they say the lessors under the

4     unexpired leases ".... will not be prejudiced by the

5     extension of time requested by the Debtors because

6     the Debtors have performed and continue to perform in

7     a timely manner the undisputed postpetition date

8     obligations under expired leases." By their own

9     judicial admission, that is a relevant factor in

10    determining whether they should get an extension.

11              Fourth, they say there is no prejudice

12    to our own lessees by it being granted an extension.

13    As we point out in our response, the sooner this gets

14    resolved the better.  If they decide later to reject,

15    particularly the closer to the summer they get to

16    reject, that raises issues in terms of taking over

17    the plant, getting regulatory approvals and the like

18    as we move into the peak power season.

19              Second, they undercut their own argument

20    by the lack of prejudice by basically saying that

21    they can refuse to make the payment on the 29th,

22    having said in their motion there is no prejudice

23    because they will make it in a timely manner.  They

24    say they can refuse to make the payment coming due on

25    May 30.  So they admitted that getting payment is

                                                                    35

1

2    something to be determined.  They have come out and

3    declared they may not make the payment on May 29.  If

4    they get the extension and don't make that payment on

5    May 29, they would have obtained a free six-week

6    extension of the period, and that is just not

7    appropriate.  There is a need to have a better

8    showing of cause than that.

9            If they are going to get the extension,

10   we would ask in the alternative that they be directed

11   not just to have a commitment to make a payment and

12   not a commitment to make undisputed payments, a word

13   that is not in Section 365(d(3), they can amend that

14   statute by motion, they should be directed to make

15   the payments that come due under these leases on May

16   30 and to avoid their getting a free option.  The

17   Order should provide this.  If they don't make those

18   payments, then the owner-lessors have stay relief to

19   take appropriate action to enforce their rights under

20   the leases.

21           So in sum, we dispute their assertions

22   about cause being shown here, number one.  Number

23   two, if they are given an extension, it has to be an

24   extension with teeth; they have either to commit to

25   being required to do what they promised in their

                                                    36

1

2    motion.  If they don't, they have to pay a potential

3    price for it.

4            MR. CANTOR:  Your Honor, if I may

5    respond briefly in reverse order.

6            Picking up on the notion of

https://vip21.veritextllc.com/myfiles/979905/114239.TXT

```
 7   undercutting.  What we see in the objectors' papers
 8   is a pleading that there will be some prejudice if
 9   the leases are terminated and turned back.  It will
10   require a certain amount of the time during the
11   process of turn-back to give the owner-lessees time
12   to arrange for somebody to manage the projects, seek
13   whatever regulatory approvals are necessary.  So this
14   is not the kind of thing where a lease can be
15   terminated, keys thrown back that easy without
16   prejudice to the owner-lessors.  In fact, I think
17   they would be unhappy if we didn't get an extension
18   and suddenly terminate on May 18.  I don't think they
19   will get an operator in by summer.
20           So I actually think the Debtors will be
21   prejudiced as a consequence, their constituents will
22   be prejudiced if we don't get an extension of time,
23   if it turns back the three pack.  I mean, these are
24   very complicated discussions among primarily the
25   unsecured committee and the second lienholders about
```

37

```
 1
 2   one of the first group of projects that we should be
 3   turning back.  Yes, I know the timetable suggests we
 4   should be done by now.  But the process will take
 5   some more time to build consensus.  Even if that were
 6   to occur, a fair amount of time is required to give
 7   these back.  So it will not cause the prejudice that
 8   Mr. Foster laid out in his papers.
 9           With respect to the adequate assurance
10   of future performance, Mr. Goldman cited to
11   prejudice.  We need to cite to Burger Boys the notion
```

12    that there is no obligation to give adequate

13    assurance that we are going to make a payment in the

14    future to get an extension.  Whatever rights that

15    these folks have at the time we turn back the leases,

16    whatever rights they have on May 30, they have those

17    rights.  Our obligation to perform are set forth in

18    the Code.  We will comply with what the Code

19    suggests.

20            As Your Honor observed, that issue of

21    what that means is not before Your Honor right now

22    and is not an issue with respect to the three factors

23    the law suggests we should consider in whether or not

24    an extension is appropriate.  I think given all the

25    facts and circumstances here, this is a very complex

                                                        38

1

2    case.  It's to suggest that there are multi-party

3    negotiations to make any step here is an

4    understatement, which makes it that more complex.

5    And I would, Your Honor, respectfully request the

6    extension we requested.

7            I would like to say one thing here so

8    that I might have been a little imprecise with the

9    stipulation on the record with Mr. Wofford, and I

10   want to make it crystal clear, because I have gone

11   back and reviewed the exhibits to our Orders, and I

12   noticed the Tiverton project is on there.  As I am

13   given to understand from reviewing an e-mail that I

14   had, that there are some leases that are not subject

15   to the rejection notice where we are the lessee,

16   where we are likely to get an extension of time to

17    determine what to do with those leases.  But as those

18    relates to those leases for which we filed a

19    rejection notice, we are not seeking an extension.

20    But as I was given to understand, there may be some

21    leases for the Tiverton and Rumford projects, that we

22    will be requesting an extension.  I will meet with

23    Mr. Wofford, speak to him, and see if he has an issue

24    with that.

25                 MR. WOFFORD:  Again, that is precisely

39

1

2    the sort of thing we had been speaking of.  We do not

3    know of any other real property leases with respect

4    to which the Debtors are lessees to these

5    partnerships.  If the Debtors are planing that they

6    are given the economic decision that has been made

7    after consultation with the committee of the ultimate

8    fate of those projects, we believe the motion should

9    not be granted.  Again, we don't know that any such

10    leases exists.  And certainly the initial response

11    that was filed implies that, in fact, no such leases

12    do exist.

13                 MR. CANTOR:  Your Honor, this is clearly

14    something we want to be crystal clear on.  If there

15    aren't some leases there, that is not part of the

16    rejection package.  We don't want to prejudice

17    ourselves by losing it now.  I would commit to get to

18    Mr. Wofford and his clients about any of those

19    leases, to the extent there are any.  But I did not

20    want to agree to some broad brush stipulation that

21    might give some intended prejudice.

22          THE COURT:  It's your stipulation.  You

23    can stand up to clarify at this point.

24          MR. WOFFORD:  Your Honor, I would

25    propose there is, to the extent there are leases, and

                                                    40

1

2    we have deadlines that is coming before the next

3    omnibus hearing that is not going to be worked out at

4    the end of the day.  Perhaps an interim extension, to

5    the extent there are any such leases, to the 26th, to

6    give the parties an opportunity to resolve the issue

7    to see if they have a dispute is warranted might be

8    appropriate.

9          THE COURT:  I can approve an Order

10    today.  And you can amend the schedules based on this

11    record.

12          MR. CANTOR:   Thank you, Your Honor.

13          THE COURT:  Does anyone else want to be

14    heard?

15          MR. GOLDMAN:  May I briefly respond?

16          THE COURT:   I would like to hear from

17    those parties that had asserted some interest in the

18    three pack leases, for example, the Creditors'

19    Committee.

20          MR. DUBLIN:  Philip Dublin for the

21    committee.

22          As to what the parties have spoken about

23    today, there was a list and time line set forth in

24    the Cash Collateral Order when the Debtors'

25    Creditors' Committee and the second lienholders, I

41

1

2   believe, with obvious rights of the first lienholders

3   would be discussing a number of projects that the

4   Debtors have and what should be the appropriate

5   utilization of those projects going forward, whether

6   or not the estates should continue to fund projects

7   on an ongoing basis pertaining to do that, certain

8   projects, the group has determined that it will

9   likely be turning back.  We are continuing to

10  negotiate with all parties to see if we can maximize

11  the properties, to key them into the estate or

12  maximize them at the recovery to the constituencies

13  and all the relevant Debtors, and guarantees that

14  flow from Calpine Corporation down to the

15  subsidiaries out to people, we are continuing to

16  analyze that.  I think in connection with the

17  exclusivity extension motion, these are very

18  complicated issues that require a lot of hard work

19  and difficult analysis in trying to deal with energy

20  curves and other issues that are outside the realm of

21  bankruptcy law, we believe the extensions are

22  appropriate to deal with all of those issues in an

23  ongoing basis.

24          MR. LEVINE:  Steven Levine, counsel to

25  Law Debenture, a lien Trustee.

42

1

2              We support the extension.  We simply

3    state these are complex projects.  The extension will

4    reserve all of the value for everybody.  I think

5    laboring behind what the various proponents on this

6    side of the room are asking for is a determination of

7    the adequate assurances is a notion that they really

8    want their deal, the deal they struck prepetition to

9    be improved in the sense that they want somebody

10   other than the particular special purpose Debtors

11   that they expressly bargained for.  It asks the

12   obligors to guarantee the lease payments due at the

13   end of the day, and that is not the deal they struck.

14   So for all of those reasons, we think it's essential

15   that we preserve value for the entire estate, that

16   this extension be granted.

17              Thank you.

18              MR. GOLDMAN:  Just briefly, Your Honor.

19              First of all, I was glad that Mr. Cantor

20   indicated that you can't just turn back these deals

21   on a one-day's notice.  That is exactly what they

22   tried to do in Rumford and Tiverton, and it caused a

23   lot of heartburn to U.S. Bank and continued to cause

24   a lot of heartburn for us.  If that is not going to

25   repeat itself, that is very good.


                                              43


1

2              Secondly, with respect to the comment

3    that was just made, "this is the deal we struck."

4    The deal we struck has a Calpine Corporation

5    guarantee.  So it would be appropriate to clarify

6    that issue, whether the statement, that they will

7    continue to meet their obligations includes the

8   obligation of Calpine Corporation to guarantee that

9   these payments are made if there is an

10   administratively insolvent special purpose entity.

11   So it may not have been clear that Calpine

12   Corporation had guaranteed these payments.  But they

13   have on a prepetition basis.

14         And finally, I just believe, and I think

15   for reasons that Mr. Foster has cited, that rather

16   than have this be a two-step process, where the

17   extension is granted regardless of any testing on the

18   ability of the Debtors to, in fact, continue to meet

19   its obligations and then come back in forty-five days

20   and have a free-for-all is not as rational as using

21   the opportunity where they are coming and asking the

22   Court's discretion to give them something that is not

23   automatically provided to test whether, in fact, they

24   have good faith and the ability to perform their

25   ongoing obligations that is required under 365(d)(3).

44

1

2         THE COURT:  Thank you.

3         Well, it's clear to the Court that there

4   is more than adequate grounds to grant the

5   application to the extent and form requested by the

6   Debtors, supported by the Creditors' Committee and

7   others.  This case is still in its triage stage.

8   It's a regulated industry.  There are pending issues

9   in the 2d Circuit which may have some impact, some

10   very strong impact on how many of these matters have

11   to be handled.  There are economic issues which have

12   to play out based on the timing of those issues.  May

13    30 is one of those times.

14              It is clear that in making the

15    evaluation as to assumption and rejection there is

16    more than just the Debtors making their evaluation.

17    It is the universe of Calpine that is involved, and

18    have to be involved.  While it may have been thought,

19    with an untoward assumption, that the determination

20    on assumption and rejection would pretty well be made

21    by this time, or close to this time, it's clear

22    that's not necessarily the case.

23              The request, accordingly, is granted.

24    The objections are overruled.  I will enter an Order.

25              MR. CANTOR:  Thank you, Your Honor.

45

1

2              THE COURT:  I have signed the Order.

3              MR. CANTOR:  Thank you, Judge.

4              The next motion is the Debtors' motion

5    to request an extension of the exclusive periods

6    within which to propose acceptance to a plan.  Mr.

7    Sassower of my office is handling that motion.

8              MR. SASSOWER:  Good morning, Edward

9    Sassower of Kirkland & Ellis, counsel to the Debtors.

10             Your Honor, by this motion the Debtors

11    hereby seek to extend the exclusive period in which

12    the Debtors may file a Plan of Reorganization from

13    April 20, 2006 through December 31, 2006 and the

14    exclusive period during which the Debtors may solicit

15    acceptances of such plan through January 20, 2006

16    through March 31, 2006.

17             Your Honor, in the motion the Debtors

18  describe how they have satisfied the various factors

19  that Courts commonly consider in evaluating whether

20  Debtors have established cause to extend exclusivity.

21  The bottom line is that the Debtors have accomplished

22  a great deal in a short time they had been in

23  bankruptcy.  But there is still a great deal more to

24  accomplish.

25          As Mr. Cantor noted in his presentation,


                                                    46


1

2   these cases are complex and large by any standard.

3   As Mr. Cantor noted, there are over 270 Debtors,

4   there are also over ninety plants spread throughout

5   twenty-three states and four countries, more than $18

6   billion of debt spread among secured and unsecured

7   projects and parent level financing there are

8   thousands of contracts and leases and creditors.  And

9   as Mr. Cantor noted, there is a litigation that is

10  pending before the 2d Circuit.  As a result of the

11  size and complexity, the Debtors require substantial

12  time in which to formulate and file a Plan of

13  Reorganization.

14          Your Honor, as Mr. Cantor noted, the

15  Debtors currently are focused on designated projects,

16  process, and asset sale process.  Once we have

17  identified the first group of underperforming

18  projects, and a second group is coming soon once we

19  have identified them.  That was the first step.  Then

20  we have to figure out whether we want to sell them or

21  mothball them or abandon them or restructure them.

22          And as Mr. Cantor noted, that is not

23    just the Debtors who are making that exercise, it's

24    also that we have got to go through the present

25    committees that we are working with.  Then there are

47

1

2    a dozen or so additional assets that the Debtors are

3    focused on selling.  Once we have dealt with the

4    designated projects, and once we have dealt with

5    those negotiations or some additional projects we

6    would like to sell, then at that point the Debtors

7    can begin to focus on what are the remaining assets

8    so that we can then form a Plan of Reorganization.

9              We are also dealing with the threshold

10    issue of the litigation pending before the 2d

11    Circuit.  And once we have got a better sense of how

12    we will be able to reject power supply contracts,

13    that is going to enable us to better assess what this

14    company should look like when it emerges from Chapter

15    11.

16              Your Honor, there have been two limited

17    objections that have been filed and one statement.

18    The first limited objection was filed by a vendor on

19    behalf of the first lienholders.  The first argument

20    was that a 255-day extension sought by the Debtors is

21    longer than the initial extension of exclusivity that

22    are granted in other large Chapter 11 cases, and

23    therefore the proposed extension should be reduced to

24    one hundred-eighty days.

25              Your Honor, we have looked at these

48

https://vip21.veritextllc.com/myfiles/979905/114239.TXT

```
 1

 2   cases cited by the first lienholders and argue that

 3   our proposed extension is not too long, but rather

 4   the initial extensions granted in some of those other

 5   cases was too short.  The cases they cite are Enron,

 6   Marent, Aldephia, World Com, Delfi, Lorral, and RG

 7   and Global Crossing.  In Enron it is true the initial

 8   extension of exclusivity was only one hundred-eighty

 9   days.  But what happened next?  There were five

10   additional extensions of exclusivity and three

11   additional extensions of the solicitation period, and

12   the case took 957 days.  In Marent, there was a

13   similar pattern.  There was a 171-day initial

14   extension of exclusivity, but then there were three

15   additional extensions after that in the case that

16   took 880 days.  The same pattern was reflected in

17   most of these cases.  There were a few exceptions.

18   In RG There was a renegotiated plan.  Delphi, of

19   course, just filed, so that case has just begun.

20            Your Honor, exclusivity motions costs a

21   lot of money.  Thus, as long as they are warranted

22   longer extensions of exclusivity, which should result

23   in fewer exclusivity motions, fewer exclusivity

24   motions over the life of the estate should save the

25   estates money.  Here, the proposed extension is
```

                                                    49


```
 1

 2   clearly warranted.  The earliest the Debtors would

 3   put a plan on file would be by the end of the year.

 4   From their papers, not even the first lienholders are
```

5    arguing otherwise.  Having said that, even if we get

6    this relief for a long extension of exclusivity, we

7    may be back here at the end of the year asking for a

8    second extension of exclusivity.

9              There are two the things I would like to

10   note with respect to this objection.  Pursuant to the

11   request of the second lienholders, the Debtors have

12   revived a proposed Order which now explicitly

13   provides that it's without prejudice to any parties'

14   in interest right to seek to reduce or terminate

15   exclusive periods for cause in accordance with

16   Section 1121(d) of the Bankruptcy Code.  Therefore,

17   if, in fact, the facts, as we go forward in time,

18   indicate that this proposed extension was too long,

19   the first lienholders always have the right to come

20   back here to seek to terminate the exclusivity or to

21   shorten it.

22             Lastly, the length of this proposed

23   initial extension of exclusivity has been negotiated

24   with and approved by the Official Committee of

25   Unsecured Creditors and the Ad Hoc Second

50

1

2    Lienholders.  Your Honor, U.S. Bank also filed a

3    limited objection to exclusivity.  Many of these

4    backup with the last motion are repeated here.

5              As Mr. Cantor noted, this is in some

6    ways a replay of the DIP hearing.  They argue that

7    the exclusivity periods for solely the Rumford and

8    Tiverton estates should be terminated because the

9    Debtors have filed these notices to reject these

10      certain leases.  The Debtors argued at the DIP

11      hearing, and as Mr. Cantor just argued a moment ago,

12      the Debtors view and conduct themselves as an

13      integrated enterprise.  There may come a time when

14      they have individual plans for individual Debtors,

15      but that time is not here.  It's not now.  This case

16      would not be manageable at this point if we had 273

17      individually tailored exclusivity periods.

18              I have two other points worth noting.

19      While the Debtors filed a notice of rejection,

20      nothing has been rejected as of yet.  Even if that

21      notice of rejection were to become effective, there

22      would still be other matters that these estates would

23      have to deal with.  There are leases, there is land,

24      interconnecting facilities, buildings, gas supply

25      contracts, et cetera.

                                                        51

1

2               Lastly, Arcadia filed a statement, it's

3       not an objection, they don't object to the relief

4       sought, but take issue with the following statement

5       that the Debtors have "sufficient liquidity to pay,

6       and are paying their postpetition bills as they come

7       due."  Arcadia argues the statement is inconsistent.

8       The Debtors do not have Arcadia's invoices.  At best

9       this argument is hypertechnical as though the Debtors

10      have not paid those monies.  These invoices are

11      subject to litigation, which will be in play in a few

12      weeks, on April 26.  If the Court determines at that

13      time that the Debtors should have paid Arcadia those

14      invoices, then the Debtors will deal with it to fully

15    pay those invoices.

16              With that I will yield the podium to the

17    objectors.

18              MR. LEVINE:  Good morning.  Steven

19    Levine, again, for the Law Debenture first lien

20    Trustee.

21              Mr. Sassower quite correctly

22    characterized our objection as a limited one.  The

23    first lien Trustee is not opposed to the concept of

24    the extension, it is opposed to the length.  In his

25    presentation Mr. Sassower conceded that the extension

52

1

2    that they are seeking has surpassed and was

3    unprecedented with any of the other complex cases

4    that we cite in our objection, most of which are the

5    cases that they cited in their motion for extension

6    of exclusivity.  None of them had an initial

7    extension beyond one hundred-eighty days.  Several of

8    them had extensions that were one hundred days.  I

9    will submit that substantially all of these cases

10    were decided prior to the 2005 Code amendments that

11    limit the ultimate period of time in which the

12    Debtor's rights can be extended, solicitation rights.

13    Those limitations evince a policy judgment of

14    Congress.  Extensions should be viewed very carefully

15    and granted judicially.  I am not saying these

16    extensions go beyond what Congress permits.  But

17    obviously they don't.  We believe that the Debtors

18    should have the burden to come back to Court at an

19    appropriate juncture and demonstrate that they are

20    continuing to make progress towards a plan and

21    working constructively.

22          The suggestion that the second

23    lienholders said that any party in interest has the

24    ability to come back in and seek to terminate

25    exclusivity is a constructive one, but kind of

53

1

2    reverses that burden.  So we would respectfully

3    request that the Court, one, grant the extension, but

4    limit it to no more than one hundred-eighty days, as

5    has been the limit in every other complex case in

6    this district.

7          Thank you.

8          MR. WOFFORD:  Your Honor, I suppose I

9    will start on behalf of U.S. Bank.  The Tiverton and

10   Rumford projects are, obviously, not in very

11   different circumstances than the rest of the Debtors'

12   generating facilities.  I think we agree with the

13   Debtors with respect Tiverton-Rumford on one, that

14   Mr. Sassower said there should be one hearing on the

15   extension of exclusivity, and should be today, and

16   should be denied with respect to these Debtors.

17         It's very, very clear where the Debtors

18   come with respect to the Tiverton and Rumford

19   projects.  They filed rejection notices.  They cut

20   off funding from the DIP facility by designation as a

21   designated project.  They have made repeated

22   statements to the media disclaiming any obligation of

23   taxes.  They made clear that they do not want to have

24   any regulatory burdens of the facility.  So at this

25    point the question is what is the point of granting

54

1

2    exclusivity?  Well, the Debtors have said that, in

3    fact, there are ancillary assets.  We would submit

4    those assets are precisely that ancillary and that

5    any realistic hand over of the plant is going to

6    involve hand over of things like, or at least access

7    to interconnection lines.  The notion you are giving

8    back a power plant but not giving back the wire that

9    attaches to the grid or continuation pursuant to a

10    Plan of Reorganization because of a bunch of wire

11    that attaches to the grid or ancillary buildings, et

12    cetera, doesn't seem to make a lot of sense.

13              There is simply nothing these Debtors,

14    we believe, can reorganize around, Your Honor.  And

15    the original purpose of such an extension would be to

16    continually drag what are going to become schemes

17    into the continued drama of the larger Calpine

18    reorganization.  Certainly, we are not saying that

19    there should be 270 separate plan proposals going,

20    Your Honor, but there has been no cause shown under

21    the McClain factor to show the Debtors haven't shown

22    there is complexity with respect to these Debtors.

23    They haven't shown extension is to preserve the

24    dominant creditor of these entities.  The Debtors

25    have not shown they had been currently paying their

55

```
 1
 2   bills.  In fact, they disclaim any responsibility to
 3   do so, and have not paid the administrative claims
 4   outstanding since January.
 5            Finally, they have said that they
 6   haven't been able to prove there is an unresolved
 7   contingency that is significant.  Under the McClain
 8   factor, they can't satisfy any of them; yet, they
 9   still say they are justified to an extension.  We
10   disagree and desire the motion be denied as to
11   Tiverton and Rumford and the related Debtors.
12            MR. SMOLEV:  Richard Smolev of Kaye
13   Scholer.  If I can have a moment to follow on Mr.
14   Wofford.  By way of orientation, I represent Philip
15   Morris. The question in Tiverton and Rumford, when
16   Calpine is saying someone is liable for taxes, they
17   are saying we are liable for taxes, which caused an
18   enormous bitterness between us.  I have a suggestion
19   how to deal with Tiverton and Rumford.  We have a
20   hearing on April 26 on the Debtors' motion to reject
21   certain leases with respect to Tiverton and Rumford.
22   You will hear a great deal at that hearing beyond
23   what we are talking about.
24            It was interesting that Mr. Cantor said
25   that the Debtors simply shouldn't throw the keys
```

                                                    56

```
 1
 2   away.  You will hear on the 26th, for example, that
 3   they shut down those plants on a weekend.  At 2:00,
 4   on Monday, sent me 121 pages worth of documents and
 5   said by 4:00 o'clock on that Monday I had to react to
```

6    them or else they are walking away from the plant.

7    So the Debtors have done some things that destroy

8    value.  I think, perhaps, you should consider

9    Tiverton and Rumford and the exclusivity on Tiverton

10   and Rumford in the context of all the questions you

11   will hear on the 26th.

12            In the case of Tiverton and Rumford we

13   have a Bridge Order taking exclusivity to the 26th.

14   I don't think anyone will file a plan.  I agree, Mr.

15   Sassower, you will not allow a designer plan on every

16   single project case.  But I think we have to carve

17   Tiverton and Rumford out of whatever global Order is

18   entered and let that proceed on its own path.  There

19   are myriad issues surrounding those two facilities.

20            Thank you.

21            MR. KORNBERG:  Alan Kornberg of Paul,

22   Weiss for the Unofficial Committee of Second lien

23   debtholders.

24            Your Honor, it was a close call when our

25   committee was going to object to this extension of

57

1

2    exclusivity.  As Mr. Sassower related to the Court

3    earlier, we might not object in return for the

4    modification of the Order that Mr. Sassower described

5    to Your Honor.

6            I just want to make a very clear point,

7    and that is as we heard from Mr. Cantor and others

8    today, there are some very essential critical

9    benchmarks that have to be achieved by these Debtors.

10   We would like to have seen them embodied in an

11    Exclusivity Order granting the requested extension,

12    but the Debtors declined to agree to that.  But I

13    think everyone would agree that this company has to

14    finally come to some conclusion as to which projects

15    it's going to keep and which projects it won't keep.

16    We really need to see and I think the other

17    constituencies need to thread through project by

18    project's financial statements, we also need to see

19    more data and more analysis concerning the visibility

20    of CES, the energy trading subsidiary.  Those are

21    absolutely critical items that we need to see.  It is

22    not going to take six or eight months for the Debtors

23    to address those issues.  I am rising only to say

24    those are things that we will be pressing for.  If

25    those deliverables are not made available in the

                                                      58

1

2    short order, we may be back and we may be taking

3    advantage of the modification to the Order that Mr.

4    Sassower described, seeking to terminate exclusivity.

5          We, for example, pressed the Debtors to

6    deliver a business plan by May 31.  We were told that

7    was absolutely impossible.  And yet, I noted that in

8    the motion that we will come back to Court shortly to

9    establish an executive incentive plan.  If they have

10   delivery of a business plan by June 1 as one of the

11   incentive factors, that many be considered.  So I

12   think our committee and our financial advisors feel

13   that these goals are attainable in short term.  We

14   will be pressing the Debtors to deliver them.  And if

15   we don't get them, you may be hearing from us again.

16          MR. DUBLIN:  Your Honor, Philip Dublin

17  on behalf of the committee.

18          I think what everybody is saying so far

19  is that there are a lot of complex issues in this

20  case that has to be dealt with, and extension of

21  exclusivity is most definitely warranted.

22          With respect to the Rumford and Tiverton

23  creditors, I think they are losing sight of the fact

24  that while they have interest in the project, there

25  are other creditors, all those creditors that have


                                                    59


1

2   substantial intercompany claims in connection with

3   this integrated, complex structure that Calpine has

4   created over the years, that's going to have to be

5   addressed and numerous parties will have to be

6   involved in addressing those issues, potentially

7   including Your Honor at the some point.

8           Mr. Kornberg, I think, got a provision

9   added to the Order which requires any party has a

10  right to seek to terminate the exclusivity periods to

11  the extent they don't think they should go in the

12  right direction.  The committee is heavily involved

13  with the Debtors in negotiating this.  There is a

14  substantial operational restructuring.  It is not

15  like some of the other cases where there was a first

16  lien negotiation, there was a pre-negotiation or

17  might have been some issues of fraud, and it was

18  clarifying those issues as opposed to fixing the

19  operations that were also involved.

20          We think it's probably likely the

21    Debtors are going to be before you again, probably

22    around Thanksgiving time filing a motion to extend

23    its exclusive periods.  It would not be surprising,

24    based on the management of these cases, that the

25    Debtors, as well as the committee, would have an

                                                          60

1

2     obligation to maximize the value of this enterprise

3     for the Debtors, for everybody, the committee and

4     creditors as the fiduciaries for those parties.  We

5     believe this extension is most appropriate and should

6     be granted.

7              MR. SASSOWER:  Your Honor, I would

8     respond to some of the objections.

9              With respect to Law Debenture, I will

10    argue that the new Bankruptcy Code's amendments cut

11    the other way.  Under the old Bankruptcy Code I know

12    there was maybe a rationale for having short

13    extensions of exclusivity by means of keeping the

14    Debtor's feet to the fire.  Because of the new

15    Bankruptcy Code amendments where there is a hard stop

16    on eighteen months of the exclusivity, our feet is

17    already to the fire.  We are racing as fast as we can

18    in this case, because we are so cognizant of that

19    weight.

20             THE COURT:  I am aware of all of this.

21    Do you have anything else in response?

22             MR. DUBLIN:  Let me qualify a few

23    comments.  The June 1 date mentioned by Mr. Kornberg,

24    the benchmark that he mentioned, I don't believe that

25    is necessarily correct.  But the compensation motion

61

1
2    hasn't been filed.  When we file it we will see what
3    it says.  As far as Mr. Smolev's compromise of the
4    June 26 hearing, I want to remind the Court the
5    rejection will become effective, but on the 18th that
6    will have the big impact on the hearing on the 26th.
7              That is all, Your Honor.  Thank you.
8              THE COURT:  Thank you all.
9              I am well aware that there are some
10   highly complex issues that have to be resolved, some
11   can be done here in the pit, and many other issues
12   will be resolved outside of this Court's penumbra.
13   But nevertheless, there does seem to be a need for a
14   fair amount of the time.  The backstop of eighteen
15   months put in by Congress does change the picture
16   somewhat, and even brings it back to an early case, I
17   can't remember the name, I can only remember the
18   district, it's the Northern District of Florida
19   where, I think it was a large hotel case, where it
20   was sometime in 1980 or '81 where the presiding Judge
21   looked around and saw all of these constant requests
22   for extensions of exclusivity and said, "Come on.
23   Let's get real.  It's a waste of time to keep coming
24   back here.  We all have better things to do.  Let's
25   look and see what a logical amount of time should

62

1
2    be."  And I think he extended it out four times, more

3      than what the Debtor had actually asked for.  The

4      Judge is now retired.  But the concept is there.  And

5      Congress has now put a backstop here.

6              Realistically, I expect, if I yield to

7      the request of 180 days or 120 days, you will be back

8      and you will be charging the estate your very nice

9      fees for these extra extensions.  And I think this is

10     a party that we do not need to have too frequently.

11     The case is highly complex.  The solutions with

12     respect to the operating fix that has to be put into

13     place, and clearly it's an operating fix, that has to

14     be put into place, perhaps in this case a little bit

15     more than an economic fix that you usually find that

16     drives the case.

17             Accordingly, the calculus of time to

18     December 31 under these circumstances, I do find is

19     appropriate.  And notwithstanding the fact that

20     appended to the language of this Order is the legend

21     that "Upon application for cause any party in

22     interest can come in and shorten the time."  I don't

23     know why that is to be in an Order.  It is built into

24     the Code.  It is built into the operation of Title 11

25     for cause where anybody can come in at any time and

                                                        63

1

2      seek relief.  And that goes as well to the Tiverton

3      and Rumford people.  They may be here on a shorter

4      timetable than anybody else.  I don't know.  But

5      under all of the circumstances here, the application

6      for this particular case at this particular time is

7      appropriately gauged to the end of this year.

8              MR. SASSOWER:  Thank you, Your Honor.

9    May I approach?

10              THE COURT:  Yes.

11              MR. SASSOWER:  (Handing.)

12              THE COURT:  Of course, the objections

13   are overruled.  I have signed the Order.

14              MR. CANTOR:  Your Honor, the next motion

15   is a motion of the Gas Transmission Northwest

16   Corporation to compel performance under the

17   stipulation.  I will let them press with their

18   motion.  My colleague, Mr. Ross Kwasteniet, is going

19   to be handling the response.

20              MR. ELROD:  Good morning.  I am David

21   Elrod on behalf of Gas Transmission Northwest

22   Corporation, Portland Natural Gas Tranmission System

23   and Tanscanada Pipelines Limited.

24              We filed a motion to enforce a

25   stipulation, which we read into the record on January

                                                      64

1

2    18, 2006 before the Court.  On that date the Debtors

3    had set a motion, utility motion, and we entered into

4    an agreement with counsel for the Debtors, which Mr.

5    Burns read into the record and the Court accepted

6    concerning, in part, those three pipelines I just

7    referred to.

8              The stipulation required that the

9    pipelines would not be treated as utilities for the

10   purposes of Section 366 in this case and also said

11   the pipelines may draw down on the postpetition

12   assurances they held to save their prepetition debt.

13    And all the pipelines have collateral.  And the

14    Debtors and the pipelines agreed that they could go

15    ahead and lift the stay and draw down on that

16    collateral for prepetition debt.  Also it was agreed

17    that the Debtors would replenish the collateral to

18    the extent that the pipelines drew down for the

19    prepetition amount owed.  We also agreed that to the

20    extent there was a letter rejection, the pipelines

21    would be permitted to use their prepetition

22    collateral to offset the rejection damages.

23            Now, since that date we have traded

24    proposed Orders, traded letters, and traded various

25    communications to try to get an Order entered to

65

1

2    reflect the stipulation.  The reason why an Order is

3    not necessary is because there has been at least one

4    escrow agent holding the prepetition collateral who

5    has refused to relinquish that collateral without an

6    Order entered by the Court.  And they have taken the

7    position that they have to have a formal Order

8    lifting the stay to permit draw down on prepetition

9    collateral, although we have a stipulation.

10            Now, at the time we filed our motion to

11    enforce, Your Honor, none of the replenishment had

12    occurred.  Since that time I have found out through

13    communications that were received yesterday that the

14    Debtors filed its objection that the Debtors have and

15    does intend to replenish collateral on some of the

16    pipeline contracts.  As this Court --

17            THE COURT:  And you want them all.

18                MR. ELROD: Yes, Your Honor.  That was

19     the stipulation.

20                The bottom line on that date, as the

21     Court will remember, it said it sounds to me like the

22     Debtors are assuming under 365 these pipeline

23     contracts, because the Court asked me, "If you are

24     not a utility, what are you?"  I said, "We are a

25     pipeline with an executory contract."  And the Court

66

1

2     then said, "This agreement sounds like an

3     assumption."  At that point we clarified it and said

4     it may be, but was not what our agreement is.  The

5     Debtors are going to evaluate through the course of

6     the bankruptcy which of these contracts the Debtors

7     wants to assume or reject.

8                At one point the Debtors did send a

9     notice to reject the Portland Natural Gas contract,

10    and we filed, obviously, an objection to the notice

11    and a motion to withdraw.  Because it's our position

12    that that is governed by FERC jurisdiction, and that

13    is tide up with the case that is currently heard

14    before the 2nd Circuit.

15                Today, what we are asking the Court to

16    do is hold the Debtors to the stipulation.  We have

17    cited authority to that effect in one case in

18    particularly, the Department of Crite versus The

19    Department of Treasury, it's 145 B.R. 1007.  The

20    Court makes it clear that "Stipulations read into the

21    record are binding, are agreements with the Court as

22    well as with the parties when they are absolutely

23    binding.  They are binding on the attorneys in that

24    matter.  The stipulation read into the record is not

25    only binding, because it's read into the record, it's


67


1

2    binding on the party who read it into the record."

3    That is the situation we have in this case, Your

4    Honor.

5              It's disappointing, and I understand

6    it's a very complex case, I understand the Debtors

7    have a lot going on, there is no doubt about that.

8    There is no doubt the Debtors have a lot of

9    contingencies and lots of complexity it is dealing

10    with.  That is also the issue what contracts it is

11    going to reject or assume.  We understand the

12    pipeline contracts are complicated contracts and they

13    are currently involved in that process.  We also

14    understand that the Debtors have now made its

15    objection, indicated that it's not going to be

16    assuming certain contracts.

17              Now, I asked the Debtors prior to the

18    hearing, Does that mean that was your notice of

19    rejection?  And the Debtors have agreed that does not

20    constitute a notice.  That is their statement, these

21    are the ones they intend to reject.  So, what is at

22    dispute today is based on the stipulation that was

23    entered back in January where the Debtors agreed to

24    replenish the collateral when it was drawn down.  The

25    Debtors have not done that.  It has just recently

1

2    agreed to do it as to certain contracts but not on

3    those contracts it now contends it may reject.

4              The stipulation is clear, Your Honor.

5    We believe it has to do with credibility.  We believe

6    it's an agreement entered into with the consent of

7    this Court, and we believe the Debtors should be held

8    to that agreement and replenish that collateral.  It

9    is no harm to the Debtors.  If these Debtors do

10   ultimately reject those contracts, even though it

11   made postpetition assurances, then the Debtors are

12   permitted, depending on how the 2d Circuit --

13              THE COURT:  Ah, there is the rub.  If

14   that is the rub, either Court will permit, or this

15   Court will permit it.

16              MR. ELROD:  If, in fact, the Debtors can

17   walk away from those contracts, and we have a claim

18   in this case for breach of contract, then the issue

19   becomes what happens to postpetition collateral?  The

20   Debtors are concerned, I assume.  I have no idea what

21   their concern is, is that we may try to grab on to

22   that collateral for prepetition rejection damages.

23   The Court is not going to permit us to do that.  We

24   don't intend to do that.  We do intend to claim

25   against that collateral if there is any postpetition

69

1

2    claims for amounts not paid, that is the purpose of

3    assurances.  So the Debtors are not harmed to pay

https://vip21.veritextllc.com/myfiles/979905/114239.TXT

4    those postpetition payments in any way because they

5    are obligated to pay the tariff charges, reservation

6    charges set forth in the contract the Debtors by

7    posting postpetition collateral replenish these

8    assurances are not at risk.

9              So the whole nature of that risk

10   concerning this is simply something they should have

11   considered, and they did consider in January when we

12   entered into the stipulation, and we will withdraw

13   our objection to the utility motion.  They should now

14   abide by that.  It's not a large amount of money.

15   The Debtors puts --

16              THE COURT:  Is it more than my salary?

17              MR. ELROD:  I would said so.  But

18   based --

19              THE COURT:  It's a large amount of

20   money.

21              MR. ELROD:  It is based on what they

22   posted yesterday that they intend to replenish.  And

23   there are some issues which we can work out with the

24   Debtors concerning whether or not the exact amount

25   has been replenished or not.  Those issues we can

                                                    70

1

2    resolve.  But on those that has not, I don't believe

3    we are talking about a significant amount of money in

4    the scheme of this case, the Debtors should be

5    obligated and required and ordered to abide by the

6    stipulation.

7              Thank you, Your Honor.

8              MR. KWASTENIET:  Ross Kwasteniet of

9    Kirkland & Ellis on behalf of the Debtors.  I will

10   try to make this as easy as possible.

11          Mr. Elrod and his clients notes we have

12   posted collateral under all of our collateral with

13   the pipelines we intend to use.  If there is any

14   dispute as to reconciliation of collateral amounts we

15   are happy to work with the pipelines.  So the sole

16   remaining issue is whether or not the Debtors should

17   be compelled to post adequate assurance deposits in

18   support of these reputed contracts.  These are

19   contracts that in a normal case we would have filed a

20   motion to reject long ago.

21          As Your Honor is well aware, there is

22   the issue pending before the 2d Circuit, and so

23   rejection is currently not a path that we feel we can

24   pursue.  Nonetheless, we made a business

25   determination that there is no ongoing need for the

71

1

2    reputed contracts.  We put the pipelines on notice.

3    We have no intention to post collateral on those

4    pipelines.  We have no intention to make future

5    payments under those contracts and requests the

6    pipelines to terminate performance of those

7    contracts.  Whether the Debtors are required to post

8    collateral with respect to the reputed contracts,

9    there are three reasons why we should not.

10          The first is the pipelines have

11   articulated no need for the ongoing collateral.  They

12   have gone at some length of inputting the creditors,

13   the Debtors and counsel.  They spent no time in

14    arguing why on earth they need additional collateral

15    in support of these contracts.  The Debtors have made

16    it clear that they are willing to accept service

17    under those contracts.  We don't think there is an

18    issue with respect to ongoing payments because we

19    will not be making any and we expressly authorized

20    the pipelines to release the capacity.

21             Secondly, Your Honor, we believe that

22    the pipelines had misconstrued the agreement read

23    into the record at the adequate assurance hearing.

24    As you are aware, the only issue before the Court

25    that day was what would constitute adequate assurance

72

1

2    of future performance with respect to utilities.  And

3    in this case, pipeline contracts.

4             Since the Debtors have determined that

5    we don't need reputed contracts going forward, there

6    could be no basis for an adequate assurance deposit.

7    Adequate assurance by its very nature presupposes the

8    pipelines would need to be protected against

9    rendering services to the Debtors for which they will

10    not be paid.  We told the pipelines that they can

11    cease performance, that we don't need the capacity

12    going forward.  They can remarket it and there is no

13    need to holding it available to the Debtors.

14             Your Honor, the third reason why posting

15    additional collateral is not necessary here, it is

16    clear the remedy available to the pipelines, indeed

17    the remedy is set out in Section 366 of the

18    Bankruptcy Code to utility employers generally is to

https://vip21.veritextllc.com/myfiles/979905/114239.TXT

19    suspend performance in the event of the non-payment.

20    In the event there is not adequate assurance, the

21    remedy for pipelines is to suspend performance.

22              Now, Mr. Elrod has argued that we should

23    go to FERC or some need to involve the Federal Energy

24    Regulatory commission in this breach situation.  We

25    don't think that issue is before the Court.  We are

73

1

2    not seeking Court approval for the breach of this

3    contract.  FERC has repeatedly held that it is not in

4    the business of adjudicating private contract

5    disputes, breach of contract disputes.

6              Moreover, the Natural Gas Act, which is

7    applicable here, specifically provides that gas

8    pipelines that does not receive the adequate

9    assurance of future payment doesn't receive the

10    collateral it is entitled to may suspend performance,

11    which is precisely the situation we have here.  We

12    have simply not heard any reason why the pipelines

13    should be entitled to what amounts to well over $2

14    million in additional collateral.  We don't think

15    there is any basis for it, and request the motion be

16    denied.

17              MR. ELROD:  Your Honor, very briefly.

18              What the Debtors are attempting to do

19    now is contrary to its stipulation that is in place.

20    The burden is on the pipelines and executory

21    contracts to come in and say the Debtors can't reject

22    or assume because the 2d Circuit is considering the

23    issue of whether or not these type of contracts are

24    governed exclusively by FERC.  The Debtors comes in

25    and says, "Wait a second, we will not perform and

74

1

2    thereby you are required to claim repudiation," and

3    this is not a rejection or assumption in the

4    bankruptcy case.  That is simply contrary to 365 and

5    the Debtor's obligations.  The Debtors cannot come

6    in, contrary to the statements, and repudiate

7    contracts in bankruptcy without FERC approval.  They

8    simply cannot do that.  They have to go to FERC and

9    tell FERC they will not perform anymore and get that

10    acquiescence.

11            Now, they also said under 366(a) when

12    the ultimate provider doesn't receive the assurances

13    it's entitled to just suspends performance.  What is

14    wrong with that argument?  That argument was done

15    away with on January 18 when the Debtors stood up in

16    open Court and stipulated that the pipelines were not

17    utilities for the purposes of 366.  Now if they are

18    attempting to go back and drag us into 366, contrary

19    to the stipulation on the record, we will withdraw

20    our objection.  The law does not permit that on a

21    stipulation.

22            They have also taken the position that

23    the stipulation was tentative.  I want them to show

24    me anywhere in the record where the word tentative is

25    utilized.  It is not.  There is a clear and final

75

1
2    stipulation.  They said we have spent a lot of time
3    impugning the Debtors and its counsel, Your Honor.
4    We have not done that.  We have simply pointed to the
5    stipulation and said they should be obligated to
6    stand by the stipulation in accordance with the case
7    law.  If anybody is impugned, it is the Debtors
8    counsel it is their actions and not proceeding with a
9    clear stipulation they made on the record, Your
10   Honor.
11           Thank you.
12           THE COURT:  Thank you.  Does anyone else
13   want to be heard?
14           MR. WOFFORD:  Yes, Your Honor.  I am the
15   Trustee of two of the contracts in question are
16   contracts that happen to be of Rumford Power
17   Associates, and we have a number of concerns.  Number
18   one, as to the clarity of the stipulation, there is
19   many references to the Debtors as a whole as opposed
20   to Rumford in particular.  And further, the Debtors
21   are saying they want to pay nearly one million
22   Canadian.
23           Now, under one of the reputed contracts,
24   the Trustee feels, because it was mentioned in the
25   footnote, it would like to have more of what is the

76

1
2    source of those funds that is going to be a 1 million
3    payment of Rumford, whether it's internally funded or
4    be intercompany borrowing.  It appears in the
5    Debtors' footnote they intend a intercompany

6      borrowing, because they will refer to the bar under

7      the designated project distinction that keeps them

8      from moving cash down into Rumford.  We don't know

9      that the cash is necessary to be moved.

10              In any event, the Trustee wants to have

11     more information because the plants to which these

12     contracts are related by the Debtors own description

13     is shut.  You have two trans contracts.  The plant is

14     not operating, yet the Debtors wants to fund money

15     into the entity that had run the plant and we don't

16     quite know why or whether there is a benefit that

17     would justify moving that cash down.  I think there

18     needs to be more information on that for the benefit

19     of the Trustee, because, as you know, we are the

20     dominant creditor of Rumford.

21              MR. KWASTENIET:    A couple of responses

22     in rebuttal.

23              With respect to Mr. Wofford's

24     allegations, I understand it, and I have to clarify

25     with my client.  I don't have the information in

77

1

2      front of me the reason we wanted to post collateral

3      on the Transcanada contract.  Even though it related

4      to designated assets, we feel we may have had a

5      signing of that contract elsewhere and certainly

6      willing to give additional information to Mr. Wofford

7      about that point.

8              With respect to Mr. Elrod's argument,

9      first of all, Your Honor, the Debtors have the right

10     to breach contracts at any point.  We don't dispute

11    that the pipelines may have claims against the

12    Debtors relates to breach of contract.  Case law in

13    this district is clear that the breach of a

14    prepetition contract, even if the breach occurs

15    postpetition, gives rise to only a prepetition damage

16    claim.

17           What the pipelines are seeking by

18    requesting additional postpetition deposits is

19    essentially to remember to convert their breach

20    claims into postpetition administrative expense

21    claims notwithstanding the fact that the Debtors are

22    on record saying these contracts provide absolutely

23    no benefit to the estate and therefore the type of

24    pipelines utterly failed to meet the standard in this

25    circuit for qualifying administrative expense

                                               78

1

2    priority.

3           The second point I would like to make,

4    even if Your Honor is inclined to believe that the

5    Debtors made an unqualified promise to post

6    collateral, which again is not our position.  Our

7    position was, and remains, the agreement for posted

8    collateral was in the context of adequate assurance.

9    Even if there was a technical promise to post

10    regardless of whether we needed these contracts, the

11    fact remains the pipelines have not articulated a

12    reason why they will need to hold the Debtors'

13    collateral.

14           The Debtors don't need these contracts

15    going forward.  If I was to pay over collateral

16    today, tomorrow I will file a turnover motion seeking

17    return of the collateral, because in light of the

18    circumstances, the pipelines would have no basis to

19    hold that.  I think that is all I have to say.

20              THE COURT:  Does anyone else want to be

21    heard?

22              (No response.)

23              THE COURT:  I am going to deny the

24    motion.  The original stipulation was based on a

25    concept either going in or going out of a form of

79

1

2    adequate assurance of future performance.  The

3    collateral that is sought to be posted now is

4    essentially that, that is collateral that would be

5    utilized depending upon your mental reservation that

6    would take place to be utilized for future

7    performance.  There is no performance under these

8    contracts, no services sought, so there is no basis

9    for the collateral to be put up under all of the

10    circumstances.

11              It is almost at this point a parking

12    place for utilization over some other kind of claim

13    that may be asserted by the pipelines.  But certainly

14    it is not to be made available under the

15    circumstances that pertain today of performance of

16    the services, which is the intent of the underlying

17    agreement.  There are no services sought.  And

18    certainly if the Debtors did come along and sought

19    the services, the pipelines would be fully justified

20    in refusing that, which is a remedy, whether it's a

21    remedy under 366 or otherwise.

22              Accordingly, I am sustaining the

23    objection and denying the motion.

24              MR. ELROD:  As a point of clarity.  From

25    the one escrow agent's collateral for the prepetition

                                                        80

1

2     date, can we get an Order lifting the stay to permit

3     us to do that in accordance with the stipulation?  I

4     don't think the Debtors would object to that.

5               MR. KWASTENIET:  We don't object to

6     that.

7               THE COURT:  Is this, in effect, to

8     replenish where there is a service being sought?

9               MR. KWASTENIET:    There --

10              THE COURT:  Then that part of the

11    application is granted.  You may settle an

12    appropriate Order.

13              MR. ELROD:  Thank you, Your Honor.

14              MR. CANTOR:  Just briefly, Your Honor.

15              We have two motions adjourned until

16    April 26.  It's the motion of Redding Municipal Light

17    Department and others for an entry of Orders

18    confirming applicability of the stay, or in the

19    alternative for relief from the stay.  Then we have

20    the motion of the United States Bank to compel the

21    Debtors to pay administrative claims, and withdrawal

22    of the motion to compel Debtors to assume or reject

23    the Tiverton and Rumford projects.  I am sorry.  The

24    third would be the hearing on notice rejecting

25    certain executory contracts is also adjourned to the

                                                         81

 1

 2    26th.  That is the end of the calendar, Your Honor.

 3                 THE COURT:  Thank you all.

 4                 MR. CANTOR:  Have a nice holiday.

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                         82

 1

```
 2

 3                    C E R T I F I C A T E
                      - - - - - - - - - - -
 4
      STATE OF NEW YORK        )
 5                             )  ss.:
      COUNTY OF NEW YORK       )
 6

 7                I, ROBERT PAYENSON, a

 8        Shorthand Reporter and Notary Public within

 9        and for the State of New York, do hereby

10        certify:

11                I reported the proceedings in the

12        within-entitled matter, and that the within

13        transcript is a true record of such

14        proceedings.

15                I further certify that I am not

16        related, by blood or marriage, to any of

17        the parties in this matter and that I am

18        in no way interested in the outcome of this

19        matter.

20                IN WITNESS WHEREOF, I have hereunto

21        set my hand this 18th day of April,

22        2006.

23                      - - - - - - - - - - - - - - - - - - - - - - - - - -
                              ROBERT PAYENSON
24

25
```

05/26/2006 11:48 AM