**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
--------------------------------------------------------- x
In re:                                                     :
                                                           :   Chapter 11
Calpine Corporation, et al.,                               :
                                                           :   Case No.  05-60200 (BRL)
                         Debtors.                          :   (Jointly Administered)
--------------------------------------------------------- x
Portland Natural Gas Transmission System and              :
Gas Transmission Northwest Corporation,                    :
                                                           :
                         Plaintiffs,                       :   Case No. 07-cv-09584 (GEL)
                                                           :
             - against -                                   :
                                                           :
Calpine Corporation, et al.,                               :
                                                           :
                         Defendants.                       :
--------------------------------------------------------- x
```

**DEBTORS' OPPOSITION TO GAS TRANSMISSION NORTHWEST**
**CORPORATION AND PORTLAND NATURAL GAS TRANSMISSION SYSTEM'S**
**MOTION TO WITHDRAW THE REFERENCE**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................3

ARGUMENT .........................................................................................................................7

I.  The Pipelines' Motion To Withdraw Should Be Denied Because It Is Untimely. ...............7

II.  The Pipelines Have Not Satisfied The Standards For Mandatory Withdrawal. .................8

    A.  The Pipelines' Motion To Withdraw With Respect To Article V, Section A.2 Of The Plan Is Moot And Should Be Denied. .................................................9

    B.  The Pipelines' Motion To Withdraw With Respect To The Debtors' Limited Objection Is Baseless And Furnishes No Grounds For Withdrawal...........................................................................................................10

III.  The Pipelines Have Not Satisfied The Standards For Permissive Withdrawal. ...............12

IV.  Rejection Of The Gas Transportation Contracts Would Not Interfere With FERC's Jurisdiction Or Alter The Terms Of The Contracts. .............................................14

    A.  Rejecting The Contracts Would Not Interfere With FERC's Jurisdiction. ...........14

    B.  Rejecting The Contracts Would Not Alter The Contract Terms. .........................16

    C.  Rejecting The Contracts Would Not Require The Bankruptcy Court To Interpret Non-Bankruptcy Federal Laws. ............................................................17

    D.  Judge Casey's Decision Was Wrongly Decided And Readily Distinguished. ......................................................................................................19

        1.  Judge Casey's *Calpine* Decision Does Not Apply To The Contracts. ................................................................................................19

        2.  Judge Casey's *Calpine* Decision Should Not Be Followed By This Court. ......................................................................................................22

CONCLUSION.....................................................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*Abondolo v. GGR Holbrook Medford, Inc.*,
  285 B.R. 101 (E.D.N.Y. 2002) ....................................................................................... 13

*Adelphia Commc'ns Corp.*,
  No. 02 Civ. 8495, 2003 WL 21297258 (S.D.N.Y. June 4, 2003).................................... 17

*Arkansas La. Gas Co. v. Hall*,
  453 U.S. 571 (1981)....................................................................................................... 10

*Cohens v. Virginia*,
  19 U.S. (6 Wheat.) 264 (1821)....................................................................................... 20

*Donovan v. Red Star Marine Servs., Inc.*,
  739 F.2d 774 (2d Cir. 1984)........................................................................................... 20

*FCC v. NextWave Pers. Commc'ns, Inc.*,
  537 U.S. 293 (2003).................................................................................................. 15, 22

*In re Adelphia Ins., Inc.*,
  112 B.R. 534 (S.D.N.Y. 1990)....................................................................................... 10

*In re Adler, Coleman Clearing Corp.*,
  270 B.R. 562 (S.D.N.Y. 2001)......................................................................................... 9

*In re Baldwin-United Corp.*,
  57 B.R. 751 (S.D. Ohio 1985) ...................................................................................... 7, 8

*In re Burger Boys*,
  94 F.3d 755 (2d Cir. 1996)............................................................................................. 13

*In re Calpine Corporation*,
  337 B.R. 27 (S.D.N.Y. 2006).................................................................................... passim

*In re Columbia Gas Sys., Inc.*,
  134 B.R. 808 (D. Del. 1991).................................................................................... 15, 19

*In re Enron Corp.*,
  279 B.R. 695 (Bankr. S.D.N.Y. 2002)........................................................................... 19

*In re Enron Corp.*,
  No. 05 Civ. 4079, 2005 WL 1185804 (S.D.N.Y. May 18, 2005).................................... 12

*In re Enron Power Marketing, Inc.*,
  No. 01 Civ. 7964, 2003 WL 68036 (S.D.N.Y. Jan. 8, 2003)............................................ 8

*In re Enron*,
    349 B.R. 96 (Bankr. S.D.N.Y. 2006) ................................................................. 16

*In re Friedman's Express, Inc.*,
    180 B.R. 788 (Bankr. E.D. Pa. 1995) ................................................................. 11

*In re Houbigant, Inc.*,
    185 B.R. 680 (S.D.N.Y. 1995) .......................................................................... 17

*In re Ionosphere Clubs, Inc.*,
    103 B.R. 416 (S.D.N.Y. 1989) .......................................................................... 17

*In re Ionosphere Clubs, Inc.*,
    922 F.2d 984 (2d Cir. 1990) .............................................................................. 17

*In re Keene Corp.*,
    182 B.R. 379 (S.D.N.Y. 1995) .......................................................................... 17

*In re Kenai*,
    136 B.R. 59 (S.D.N.Y. 1992) .............................................................................. 8

*In re Lavigne*,
    114 F.3d 379 (2d Cir. 1997) ......................................................................... 16, 25

*In re Mahlmann*,
    149 B.R. 866 (N.D. Ill. 1993) ............................................................................. 7

*In re Malden Mills Indus., Inc.*,
    303 B.R. 688 (BAP 1st Cir. 2004) ................................................................... 16

*In re Mirant*,
    378 F.3d 511 (5th Cir. 2004) ...................................................................... passim

*In re Pan Am Corp.*,
    163 B.R. 41 (S.D.N.Y. 1993) ............................................................................ 13

*In re Stavriotis*,
    111 B.R. 154 (N.D. Ill. 1990) ............................................................................. 7

*In re Sterling Optical Corp.*,
    371 B.R. 680 (Bankr. S.D.N.Y. 2007) ............................................................. 16

*In re Texaco, Inc.*,
    84 B.R. 911 (S.D.N.Y. 1988) ........................................................................ 7, 19

*In re The Drexel Burnham Lambert Group*,
    138 B.R. 687 (Bankr. S.D.N.Y. 1992) ............................................................. 16

*In re The Ground Round, Inc.*,
     335 B.R. 253 (BAP 1st Cir. 2005) ................................................................................ 16

*In re The VWE Group, Inc.* ,
     359 B.R. 441 (S.D.N.Y. 2007).................................................................................... 1, 7

*In re US Gen New England, Inc.*,
     No. 03-30465, 2007 WL 1074055 (Bankr. D. Md. Jan. 23, 2007).................................. 19

*In re White Motor Corp.*,
     42 B.R. 693 (N.D. Ohio 1984)....................................................................................... 9

*International Longshoreman's Ass'n v. Davis*,
     476 U.S. 380 (1986)..................................................................................................... 24

*Pan Am. World Airways, Inc. v. Evergreen Int'l Airlines*,
     132 B.R. 4 (S.D.N.Y. 1991)........................................................................................... 13

*Purdy v. United States*,
     208 F.3d 41 (2d Cir. 2000)............................................................................................ 20

*Steel Co. v. Citizens for A Better Env't*,
     523 U.S. 83 (1998)....................................................................................................... 24

*Suarez v. Gallo Wine Distributors LLC*,
     No. 02 Civ. 4273, 2003 WL 716548 (S.D.N.Y. Mar. 3, 2003) ...................................... 24

*United States v. Castillo*,
     496 F.3d 947 (9th Cir. 2007) ........................................................................................ 22

**Statutes**

*Arkansas La. Gas Co.*,
     7 FERC ¶ 61,026 (1979) ............................................................................................... 18

*California Elec. Oversight Bd. v. Calpine Energy Servs., L.P.*,
     114 FERC ¶ 61,003 (2006) ........................................................................................... 10

*Decatur Energy Center, LLC*,
     110 FERC ¶ 61,045 (2005) ........................................................................................... 18

*In re US Gen New England, Inc.*,
     116 FERC ¶ 61,285 (2006) ........................................................................................... 18

*Nevada Power Co.*,
     111 FERC ¶ 61,111 (2005) ................................................................................. 2, 11, 18

*Ozark Gas Transmission Sys.*,
     68 FERC ¶ 61,032 (1994) ............................................................................................. 18

*PPL Mont., LLC,*
  96 FERC ¶ 61,313 (2001) ........................................................................................ 11

*Public Serv. Co. of New Hampshire,*
  57 FERC ¶ 63,002 (1991) ........................................................................................ 18

*Southern Co. Energy Mktg., L.P.,*
  86 FERC ¶ 61,131 (1999) .................................................................................. 11, 18

*U.S. Gen New England, Inc.,*
  116 FERC ¶ 61,285 (2006) ...................................................................................... 11

## Other Authorities

11 U.S.C. § 1110 ............................................................................................................ 25

11 U.S.C. § 157 ................................................................................................................ 1

11 U.S.C. § 365 ........................................................................................ 14, 16, 18, 23

11 U.S.C. §§ 1113 .......................................................................................................... 25

11 U.S.C. §§ 1169 .......................................................................................................... 25

15 U.S.C. § 717a ...................................................................................................... 15, 21

28 U.S.C. § 1334 ............................................................................................................ 14

28 U.S.C. § 157(d) ................................................................................................ 7, 8, 9, 14

## INTRODUCTION

The motion filed by Gas Transmission Northwest Corporation ("GTN") and Portland Natural Gas Transmission System ("PNGTS") (collectively, the "Pipelines") seeks to withdraw the reference with respect to (1) a provision in the Debtors' plan of reorganization that references the Debtors' longstanding repudiation of the Pipelines' firm natural gas transportation contracts; and (2) the Debtors' limited objection to the Pipelines' claims against the Debtors' bankruptcy estates.  The motion should be denied because it is untimely, and because it does not satisfy the strict standards for mandatory or permissive withdrawal under 11 U.S.C. § 157.

The Pipelines' motion is untimely because it was not filed "as soon as possible after" the Pipelines had "notice of the grounds on which the withdrawal is based."  *In re The VWE Group, Inc.*, 359 B.R. 441, 446 (S.D.N.Y. 2007).  The Pipelines received written notice that four of the contracts were repudiated in April 2006, and that the remaining five were repudiated in early 2007.  The Pipelines have likewise known since at least June 2007 about the plan provision to which they are now objecting.  Nonetheless, the Pipelines waited until October 23, 2007 — almost a month after the Bankruptcy Court approved the Debtors' disclosure statement and less than 8 weeks before the December 17 plan confirmation hearing — to seek withdrawal of the reference.  The Pipelines are well aware that any delay in confirmation could significantly threaten the Debtors' ability to emerge from Chapter 11 before their favorable exit financing commitment expires on January 31, 2008.  If that occurs, the Debtors could incur hundreds of millions of dollars in additional interest expense, which could upend the reorganization plan and unnecessarily prolong the bankruptcy proceedings.  In short, the Pipelines' motion is a transparent attempt to gain leverage in the bankruptcy proceeding to extract a more favorable payout of their claims.

In addition to being untimely, the Pipelines' motion is moot to the extent it seeks withdrawal of the reference as to Article V, section A.2 of the Debtors' plan. The Pipelines argue that the Bankruptcy Code requires the Debtors to either reject or assume the contracts, and does not permit the Debtors to proceed by repudiation. Although the Pipelines' arguments are incorrect, to address this unfounded concern and to permit the bankruptcy proceedings to continue unobstructed, the Debtors have agreed to modify the plan, and have moved to reject the contracts under section 365 of the Bankruptcy Code. The plan modification and the filing of the rejection motion removes any possible grounds for withdrawing the reference in connection with Article V, section A.2 of the Debtors' plan.

With respect to the Debtors' limited objection, the Pipelines have articulated no basis for withdrawal. The Pipelines claim that the limited objection violates the filed-rate doctrine by asking the Bankruptcy Court to calculate damages based on a rate other than the rate on file with FERC. In fact, however, the Debtors are specifically asking the Bankruptcy Court to calculate damages based on the filed rate in effect at the time the Debtors filed their chapter 11 petitions. It is the Pipelines that are seeking to calculate damages based on a rate that is not in effect and that has not been accepted by FERC for filing. In any event, the case law makes clear that bankruptcy courts are not precluded from adjudicating damage claims resulting from the breach of energy contracts. *See In re Mirant*, 378 F.3d 511, 522 (5th Cir. 2004). As FERC has emphasized, a breach of an energy contract is a "straightforward matter of contract interpretation" that is "not important in relation to the regulatory responsibilities of the Commission" and is "better left to a court." *Nevada Power Co.*, 111 FERC ¶ 61,111, at ¶ 15 (2005).

Finally, the Pipelines argue at length that the Bankruptcy Court has no authority to authorize the Debtors to reject the firm natural gas transportation contracts. Although the Court need not address the issue of rejection for purposes of denying the Pipelines' motion, because the Debtors have simultaneously filed in the Bankruptcy Court a motion to reject the contracts, the Debtors will address the Pipelines' arguments. As explained below, controlling precedent provides that debtors may reject energy contracts just like any other executory contract. The Natural Gas Act does not preempt a district court's jurisdiction to authorize rejection of an executory contract as part of a bankruptcy proceeding.

## BACKGROUND

The Debtors are involved in the development, construction, ownership, and operation of power generation facilities, as well as the sale of electricity and its by-product, thermal energy, primarily in the form of steam. The Debtors operate the largest fleet of natural gas-fired power plants in North America.

Between 1998 and 2002, the Debtors entered contracts with certain natural gas pipeline companies for purposes of obtaining the right to access capacity, or "space," on the pipelines. *See* 2007-11-09 C. Chancellor Aff. ¶¶ 6-7 (Exhibit A). The Debtors negotiated eight contracts with GTN, a subsidiary of TransCanada that owns and operates an interstate natural gas pipeline connecting markets in California, Nevada, and the Pacific Northwest with the natural gas resources of the Western Canada Sedimentary Basin. The Debtors also negotiated a contract with PNGTS, a subsidiary of TransCanada that provides transportation service for natural gas utilities, paper mills, and electric generation plants throughout New England. Under these contracts, the Debtors were entitled, at their sole discretion, to use secure firm, uninterruptible transportation service, for which they were required to pay regardless of whether the transportation service was ever used. *Id.*

3

On December 20, 2005, the Debtors filed voluntary petitions for relief under chapter 11. Since then, the Debtors have operated their businesses and managed their properties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code. Early in the reorganization process, the Debtors determined that the contracts with GTN and PNGTS were not benefiting the estate. Specifically, the Debtors determined that they no longer needed the firm, uninterruptible transportation services provided under the contracts. Accordingly, the Debtors repudiated the contracts, stating in letters to GTN and PNGTS that, because the contracts "provide no benefit to [the Debtors'] estate[,] the Debtors would "no longer accept service under the" contracts. The letters made clear that the Debtors were "releas[ing] and relinquish[ing] any right to ongoing service or capacity" provided under the contracts. On April 7, 2006, the Debtors repudiated the contract with PNGTS and three of the contracts with GTN. *See* Chancellor Aff. ¶ 8. On January 11, 2007, the Debtors repudiated the remaining five contracts with GTN. *See* Chancellor Aff. ¶ 10.

The Debtors have not used transportation services or other services under any of the contracts since repudiating them in 2006 and early 2007; GTN and PNGTS have not been required to reserve capacity for the Debtors; and no party has exercised any other rights under the contracts. *See* Chancellor Aff. ¶ 10, 12, 25. Moreover, although the contracts were repudiated between nine and eighteen months ago, FERC has never attempted to require the Debtors to perform under the contracts. Repudiating the contracts has had no effect on the stability of natural gas supplies. *See* Chancellor Aff. ¶ 2.

By repudiating the contracts, however, the Debtors have saved their estates substantial amounts in demand charges, as evidenced by the hundreds of millions of dollars in breach of contract claims asserted by GTN and PNGTS. *See id.* ¶ 4. Moreover, because the Debtors do

not need these firm transportation services, and because they have expressly authorized the pipelines to "release" capacity, GTN and PNGTS have been free to remarket the capacity to other customers. *See* Chancellor Aff. ¶¶ 9-10, 26-27.

When the Debtors repudiated the contracts, GTN and PNGTS did not seek relief in court to require the Debtors to continue to perform under the contracts. Instead, in July 2006, GTN and PNGTS filed proofs of claim in the Bankruptcy Court, asserting breach of contract damages against the Debtors' estates in excess of $726 million. On September 21, 2007, the Debtors filed a limited objection to these claims. The parties dispute the amount of damages to which the Pipelines may be entitled as a result of the Debtors' repudiation. In particular, the parties dispute the appropriate reservation rate and discount rate that should apply, and the extent to which the Pipelines' alleged damages should be reduced due to mitigation.

When the Debtors' filed their limited objection on September 21, 2007, the Pipelines did not move to withdraw the reference. Instead, the parties engaged in extensive negotiations to reach agreement on an amount of reorganized Calpine common stock to be held in reserve to cover the Pipelines' damages claims, subject to further order of the Bankruptcy Court. To date, the Pipelines' claims have been the subject of extensive ongoing discovery, and the parties have briefed the issues relating to the valuation of the Pipelines' claims. (In fact, only yesterday, on November 8, 2007, the Pipelines filed a 27-page brief in the Bankruptcy Court responding to the Debtors' limited claim objection.) At this juncture, the Bankruptcy Court has ordered the parties to mediate the value of the Pipelines' claims. If mediation or settlement discussions are not successful, the claims will be litigated in front of the Bankruptcy Court early next year.

Even before the parties were negotiating a process to value the Pipelines' breach of contract claims, on June 20, 2007, the Debtors filed a joint plan of reorganization. Article V, section A.2. of the plan states:

> Repudiation of FERC Jurisdictional Contracts: Each FERC Jurisdictional Contract shall be deemed automatically assumed as of the Effective Date … unless such FERC Jurisdictional Contract was previously repudiated by the Debtors by written notice, a Bankruptcy Court order, or is listed on the schedule of "Repudiated FERC Jurisdictional Contracts" in the Plan Supplement …

Although the plan has been amended on several occasions, this provision has not changed. Nor, until now, have the Pipelines challenged this provision by seeking to withdraw the reference.

The Bankruptcy Court has scheduled a confirmation hearing to begin on December 17, 2007. The Bankruptcy Court, the Debtors, and all interested stakeholders are moving forward on an expedited, carefully calibrated confirmation schedule because the Debtors have secured an extremely favorable exit financing commitment that is scheduled to expire on January 31, 2008. If the Debtors are not able to emerge from chapter 11 before their favorable exit financing commitment expires, the Debtors could incur hundreds of millions of dollars in additional interest expense, which could upend the Debtors' plan of reorganization and unnecessarily prolong the bankruptcy proceedings. *See*, *e.g.*, 2007-10-03 M. Suckow Aff. ¶¶ 7-9 (Exhibit B) (estimating that Debtors could "incur nearly $800 million in aggregate additional interest expense over the life of the financing").

The Pipelines are well aware that any attempts at this late date to interfere with confirmation could pose grave risks that the Debtors will not be able to emerge from chapter 11 before their favorable exit financing commitment expires, which will harm all stakeholders in these cases. The Pipelines are hoping that, if they can convince this Court to insert itself in the

confirmation process by withdrawing the reference, they will gain significant leverage in the negotiations over the amount of damages arising from their claims.

**ARGUMENT**

The Pipelines' motion should be denied because their motion is untimely, and because they have not demonstrated that withdrawing the reference is either mandatory or a proper exercise of the Court's discretion.

**I.      The Pipelines' Motion To Withdraw Should Be Denied Because It Is Untimely.**

Under 28 U.S.C. § 157(d), a party's rights are "deemed waived" if a motion to withdraw is "not made in a timely manner." *In re Mahlmann*, 149 B.R. 866, 869 (N.D. Ill. 1993) (citing *In re Stavriotis*, 111 B.R. 154, 157 (N.D. Ill. 1990)).  As courts have held, "[t]imely filing of a motion to withdraw the reference is necessary to protect the court and parties in interest from useless costs and disarrangement of the calendar, and to prevent unnecessary delay and the use of stall tactics." *In re Texaco, Inc.*, 84 B.R. 911 (S.D.N.Y. 1988).  Thus, a motion to withdraw the reference must be filed "*as soon as possible* after the moving party has notice of the grounds" on which withdrawal is based.  *In re The VWE Group, Inc.*, 359 B.R. 441, 446 (S.D.N.Y. 2007) (emphasis added).  If a motion "could have been filed earlier" but is "filed at a time when it could delay and consequently jeopardize the reorganization," the motion is not timely and should be denied.  *See In re Baldwin-United Corp.*, 57 B.R. 751, 753-54 (S.D. Ohio 1985).

Here, the Pipelines waited far too long to move to withdraw the reference.  Although they complain that the Debtors repudiated their contracts, the repudiations occurred between 9 and 18 months ago.  *See* 2006-04-11 Hrg. Tr. at 75 (on-the-record statement by Pipelines' counsel, made in April 2006, that "[t]he Debtors cannot …repudiate contracts in bankruptcy without FERC approval").  Similarly, although they complain about the terms of the Debtors' reorganization plan, they have known about those terms since the Debtors filed the plan almost five months ago.

7

And although they now contend that the Bankruptcy Court may not adjudicate the value of their breach of contract claims, they filed proofs of claims with the Bankruptcy Court in 2006, and have actively participated in negotiations, extensive discovery, and other proceedings specifically intended to set the stage for the Bankruptcy Court to adjudicate their claims.

The Pipelines' eleventh hour motion to withdraw should not be tolerated, especially given the status of the underlying bankruptcy proceedings. *In re Baldwin-United Corp.*, 57 B.R. at 753. The Bankruptcy Court has approved the Debtors' disclosure statement and, to ensure that the Debtors may emerge from chapter 11 before their favorable financing commitment expires, has scheduled a hearing on confirmation to begin next month. *See In re Baldwin-United Corp.*, 57 B.R. at 753, 755 (holding that motion to withdraw reference was untimely because parties waited until after the Debtor filed "its proposed plan of reorganization" which was set for confirmation within three months). In these circumstances, the Pipelines' decision to wait until the eve of confirmation before filing their motion serves no legitimate purposes, but is designed to gain unfair leverage in the underlying bankruptcy proceedings. To ensure that withdrawal does not become "just another litigation tactic for parties eager to find a way out of bankruptcy court." *In re Kenai*, 136 B.R. 59, 61 (S.D.N.Y. 1992) , the Pipelines' motion should be denied.

## II.    The Pipelines Have Not Satisfied The Standards For Mandatory Withdrawal.

Even if their motion were timely, the Pipelines have not satisfied the standards for mandatory withdrawal. It is well settled that "mandatory withdrawal" under 28 U.S.C. § 157(d) is "narrowly applied" and "appropriate only when 'substantial and material' conflicts might exist between non-bankruptcy federal laws and Title 11." *In re Enron Power Marketing, Inc.*, No. 01 Civ. 7964, 2003 WL 68036, at *4 (S.D.N.Y. Jan. 8, 2003). As courts have recognized, section 157(d) must be narrowly construed to prevent parties from employing it "as an 'escape hatch' for matters that are properly before the bankruptcy judge." *In re Adler, Coleman Clearing Corp.*,

270 B.R. 562, 564 (S.D.N.Y. 2001); *see also In re White Motor Corp.*, 42 B.R. 693, 703 (N.D. Ohio 1984) (section 157(d) should not be interpreted expansively, which would "strip the court of much of its authority to resolve debtor-creditor disputes").

### A. The Pipelines' Motion To Withdraw With Respect To Article V, Section A.2 Of The Plan Is Moot And Should Be Denied.

The Pipelines complain that withdrawal is required because Article V, Section A.2 of the proposed plan of reorganization impermissibly allows the Debtors to repudiate the contracts. They argue that the Bankruptcy Code "requires all executory contracts to be accepted or rejected" and does not permit the Debtors to repudiate the contracts. *See* Mot. at 3, 10.

These objections are unfounded and without legal support.  Nonetheless, for the convenience of the Court, and to avoid unnecessary disputes, the Debtors have taken steps to moot the Pipelines' objections.  First, simultaneous with the filing of this opposition, the Debtors have filed a motion to reject the contracts, effective as of the date of repudiation. *See* Rejection Motion (Exhibit C).  Second, the Debtors have decided to modify Article V, Section A.2 of the plan to clarify that the contracts may be repudiated or rejected only as determined by an appropriate court, or by FERC, if a court so directs.  The modified language will state:

> Each FERC Jurisdictional Contract shall be deemed automatically assumed as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such FERC Jurisdictional Contract was: (a) previously terminated by mutual agreement by the Debtors and the counterparty or counterparties to such FERC Jurisdictional Contract; (b) previously repudiated by the Debtors by written notice to the counterparty to such FERC Jurisdictional Contract, subject to ruling by any court of competent jurisdiction, or if such court directs, subject to any ruling by FERC regarding such repudiation; or (c) subject of a motion to reject pending as of the Effective Date, subject to the resolution of such motion to reject.

In light of both this modification and the Debtors' rejection motion, there are no grounds for withdrawing the reference to the Debtors' proposed plan of reorganization.  Indeed, although the Pipelines repeatedly argue the plan "seeks to repudiate" the contracts, this simply is not

correct.  The contracts were repudiated more than nine months ago and, while the Debtors believe that this repudiation was legally significant, the plan by itself takes no position on whether repudiation was valid and effective — it merely implements whatever repudiations are authorized by any court of competent jurisdiction.  The motion to withdraw the reference as to the plan should therefore be denied.

**B.**     **The Pipelines' Motion To Withdraw With Respect To The Debtors' Limited Objection Is Baseless And Furnishes No Grounds For Withdrawal.**

Because the Debtors have agreed to modify the plan and have moved to reject the contracts, the only remaining basis for withdrawal is the Pipelines' assertion that the Bankruptcy Court lacks jurisdiction to consider the Debtors' limited objection to the Pipelines' claims. According to the Pipelines, even though they filed claims with the Bankruptcy Court, the Bankruptcy Court cannot adjudicate the amount of damages without violating the filed-rate doctrine and interfering with FERC's authority over the rates charged for transportation services.

Again, the Pipelines are incorrect.  As an initial matter, adjudicating the Debtors' objection to the Pipelines' inflated damages claims does not involve a material or significant application of non-bankruptcy law.  *See In re Adelphia Ins., Inc.*, 112 B.R. 534, 536 (S.D.N.Y. 1990) (withdrawal not mandatory because "resolution of the dispute would not require the court to do more than make routine interpretations of non-Title 11 federal law").  As FERC has made clear, adjudicating damages resulting from the breach of market-based energy contracts — contracts that are privately negotiated — does *not* interfere with its broader regulatory interests. *See California Elec. Oversight Bd. v. Calpine Energy Servs., L.P.*, 114 FERC ¶ 61,003, at ¶ 8 (2006).  Nor does it conflict with, or involve any significant and material interpretation of, the Natural Gas Act or any other non-bankruptcy federal law.  *See*, *e.g.*, *Arkansas La. Gas Co. v. Hall*, 453 U.S. 571, 579 n.9 (1981); *see also PPL Mont., LLC*, 96 FERC ¶ 61,313, at 62,208

10

(2001) (FERC has "long held that disputes over contracts for the sale of electric energy at negotiated, market-based rates are more appropriately resolved in court or by arbitration").  To the contrary, a breach of an energy contract is a "straightforward matter of contract interpretation" that "is not important in relation to the regulatory responsibilities of the Commission" and is "better left to a court."  *Nevada Power Co.*, 111 FERC ¶ 61,111, at ¶ 15 (2005); *Southern Co. Energy Mktg., L.P.*, 86 FERC ¶ 61,131, at 61,459 (1999).

Moreover, contrary to the Pipelines' assertions, the Debtors are not challenging the filed rate.  They are seeking to enforce it by insisting that the Pipelines' damages be computed based on the filed rate, rather than on one other rate.  *See In re Friedman's Express, Inc.*, 180 B.R. 788, 794 (Bankr. E.D. Pa. 1995) (holding that because debtor seeks to recover "the difference between … the filed rates at the times in question, and the lower, unfiled rates which it alleges were mistakenly used" it was not seeking to "repudiate" filed rates).  Specifically, the Debtors argue that the Bankruptcy Court should quantify the Pipelines' allowable claim by computing payments under the contracts using the rate filed with FERC and effective as of the petition date, applying an appropriate discount rate, and reducing the resulting damages by an appropriate amount for mitigation.  Calculating damages based on the filed rate obviously does not seek to change or alter this rate, or otherwise violate the filed rate doctrine.  Nor does offsetting damages by an appropriate amount for mitigation.  *See*, *e.g.*, *U.S. Gen New England, Inc.*, 116 FERC ¶ 61,285, at ¶ 32 (2006) ("[m]itigation does not change the filed rate; it only changes the net amount owed as an equitable remedy for the breach of the contract" when bankruptcy court has authorized rejection).  By contrast, the Pipelines' proposal — that the Bankruptcy Court should quantify damages not as of the petition date, but rather by applying a new rate that has not yet

11

been accepted by FERC — runs afoul of not only the filed-rate doctrine but also the principle that claims are valued as of the petition date. *See* 11 U.S.C. § 365(g).

The Pipelines' arguments here are analogous to those made in *In re Enron Corp.*, No. 05 Civ. 4079, 2005 WL 1185804 (S.D.N.Y. May 18, 2005). In *Enron*, the moving parties argued that withdrawal was mandated because the debtors' objections to plaintiffs' proofs of claim "would require substantial interpretation" of FERC tariffs. *Id.* at *2. The district court denied that request, because plaintiffs had not "articulated what [was] *substantial and material* with regard to" the bankruptcy court's consideration of the issues. *Id.* (emphasis in original). The "bare contention" that the bankruptcy court's decision might conflict with FERC decisions interpreting the tariffs did not mean that "substantial and material interpretations of federal law" were implicated. *Id.* Mandatory withdrawal was therefore "not warranted." *Id.*

So too here. Adjudicating the amount of damages flowing from the breach of contracts will not require the Bankruptcy Court to engage in any significant interpretation of non-bankruptcy federal law. The mere fact that the Bankruptcy Court may need to identify the filed rate relevant for purposes of calculating damages does not involve a "substantial and material interpretation" of non-bankruptcy federal law. To the contrary, determining the amount of damages is a straightforward determination, and is precisely the type of determination that bankruptcy courts make all the time.

## III. The Pipelines Have Not Satisfied The Standards For Permissive Withdrawal.

In two short, conclusory paragraphs, the Pipelines contend that, even if withdrawal is not mandatory, the Court should exercise its discretion to withdraw the reference. *See* Mot. at 10. They also argue that withdrawing the reference will not interfere with confirmation, as long as the Debtors revise the plan of reorganization to accede to all of the Pipelines' demands.

The Pipelines' request for permissive withdrawal is not justified. As an initial matter, the adjudication of the Debtors' claims is a "core proceeding" that goes to the heart of the chapter 11 reorganization process. Section 157(b)(2) of the Bankruptcy Code enumerates those matters that are subject to the core jurisdiction of the bankruptcy court. The list of core proceedings specifically includes "allowance or disallowance of claims against the estate." 28 U.S.C. § 157(b)(2)(B). Moreover, when a creditor files a claim in a bankruptcy case the creditor is deemed to have consented to the bankruptcy court's jurisdiction with respect to the adjudication of that claim. *See*, *e.g.*, *Pan Am. World Airways, Inc. v. Evergreen Int'l Airlines*, 132 B.R. 4, 7 (S.D.N.Y. 1991) (when a "creditor files a proof of claim it submits itself to the bankruptcy court's equitable power, and the claims … become core proceedings within the jurisdiction of the bankruptcy court"). Accordingly, because this is a core proceeding, there is very "strong presumption" against withdrawal that can only be overcome by establishing "that the withdrawal of reference is *essential* to preserve a higher interest." *In re Pan Am Corp.*, 163 B.R. 41, 43 (S.D.N.Y. 1993) (emphasis added); *Abondolo v. GGR Holbrook Medford, Inc.*, 285 B.R. 101, 112 (E.D.N.Y. 2002) (noting "presumption that bankruptcy courts, and not district courts, should determine core matters").

The Pipelines have not come close to overcoming this very "strong presumption." Nor have they even attempted to show that withdrawing the reference would be in the interests of fairness or an efficient allocation of judicial resources. *See Orion*, 4 F.d at 1101; *see also In re Burger Boys*, 94 F.3d 755, 762 (2d Cir. 1996). As noted above, the issues raised in connection with the Debtors' limited claim objection are straightforward and easily resolved by the Bankruptcy Court, which is most familiar with the underlying issues.

13

**IV.    Rejection Of The Gas Transportation Contracts Would Not Interfere With FERC's Jurisdiction Or Alter The Terms Of The Contracts.**

Although the Pipelines seek to withdraw the reference only with respect to Article V, Section A.2 of the Debtors' plan and with respect to the Debtors' limited objection, the Pipelines spend much of their motion addressing a different question — namely, whether the Bankruptcy Court has authority under section 365 of the Bankruptcy Code to authorize the Debtors to reject the contracts.  While deciding this issue is not necessary to deny the motion to withdraw, as noted above, the Debtors have now moved the Bankruptcy Court to authorize rejection of the contracts.  Accordingly, to clarify the issues, the following sections address the Pipelines' meritless arguments concerning the Bankruptcy Court's rejection authority.

**A.    Rejecting The Contracts Would Not Interfere With FERC's Jurisdiction.**

The Pipelines cannot dispute that Congress charged district courts with "exclusive" jurisdiction "of all the property" of a debtor's estate, 28 U.S.C. § 1334(e), and "original but not exclusive jurisdiction of all civil proceedings arising under title 11."  28 U.S.C. § 1334(b); *see also* 28 U.S.C. § 157 (bankruptcy courts act as adjuncts of the district courts).  Nor can they dispute that section 365(a) of the Bankruptcy Code specifically authorizes a debtor to "assume or reject any executory contract."  11 U.S.C. § 365(a).  As the Supreme Court has emphasized, the "authority to reject an executory contract" is "vital to the basic purpose to a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization."  *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984).

The Pipelines nonetheless argue that the Bankruptcy Court may not consider issues relating to rejection of contracts because rejection would purportedly "interfere" with FERC's exclusive jurisdiction.  *See* Mot. at 9.  But that turns the required legal inquiry on its head.  The

14

Bankruptcy Code makes clear that bankruptcy court jurisdiction exists "*notwithstanding* any Act of Congress that confers exclusive jurisdiction" on some other tribunal.  28 U.S.C. § 1334(b) (emphasis added).  And, as the Supreme Court has held, "where Congress has intended to provide regulatory exceptions to provisions of the Bankruptcy Code, it has done so clearly and expressly."  *FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 302 (2003); *Bildisco*, 465 U.S. at 521.  It is therefore dispositive that the Bankruptcy Code does not "include an exception prohibiting rejection of, or providing other special treatment for," energy contracts subject to FERC's jurisdiction.  *In re Mirant*, 378 F.3d 511, 522 (5th Cir. 2004).

As a legal matter, then, the Pipelines' arguments are meritless.  But, as a factual matter, they also fail.  Authorizing the Debtors' to reject the contracts will not interfere with FERC's jurisdiction because the Debtors are not "natural gas companies" regulated under the Natural Gas Act, *see* 15 U.S.C. § 717a(6), and because the contracts do not provide for the sale of natural gas.  Although FERC exercises regulatory oversight of the rates that natural gas companies charge for services, it has no regulatory interest in forcing parties to purchase transportation services they do not require.  Put simply, FERC may well order a regulated utility to supply the energy needed to keep the lights on, but it certainly cannot force others to continue purchasing firm pipeline transportation service that is no longer wanted or needed.  As courts have recognized, the fact that FERC might exercise regulatory power to require regulated entities to provide public services does not mean that it can stop parties from breaching privately negotiated agreements. *See In re Columbia Gas Sys., Inc.*, 134 B.R. 808, 812 (D. Del. 1991) (distinguishing between "contracts and service obligations" and holding that Bankruptcy Court's jurisdiction over contracts "does not infringe on the jurisdiction of FERC over" the parties' "service obligations").

### B.    Rejecting The Contracts Would Not Alter The Contract Terms.

The Pipelines also argue that rejection would effectively alter the contract terms, and suggest that having the Bankruptcy Court quantify damages based on rates accepted by FERC would violate the filed-rate doctrine.  But these arguments fundamentally misunderstand the nature of rejection under the Bankruptcy Code.  As the Fifth Circuit has held, rejecting a contract is "not a collateral attack upon that contract's filed rate because that rate is given full effect when determining the breach of contract damages resulting from rejection."  *Mirant*, 378 F.3d at 522.

It is well settled that rejection "does not affect the parties' substantive rights under the contract."  *In re Malden Mills Indus., Inc.*, 303 B.R. 688, 702 (BAP 1st Cir. 2004).  Nor does it change the contract's duration; rejecting a contract is not the same as terminating it.  *See*, *e.g.*, *In re The Drexel Burnham Lambert Group*, 138 B.R. 687, 703 (Bankr. S.D.N.Y. 1992) (rejection does not make the contract "disappear"); *see also In re The Ground Round, Inc*., 335 B.R. 253, 261 (BAP 1st Cir. 2005).  Rejection is merely "a bankruptcy estate's election … not to obligate the estate on the contract … as the price of obtaining the continuing benefits of the non-debtor party's performance."  *In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997).  Accordingly, rejection amounts to nothing more than a breach as of the petition date so that, inasmuch as the breach creates a claim in the non-debtor party, this claim can be processed through the bankruptcy proceedings.  *See* 11 U.S.C. § 365(g).  Even after rejection, the "rights and obligations of the parties remain intact."  *Ground Round*, 335 B.R. at 261.  And the non-breaching party is entitled to damages to put it in the same position *as if the contract had been fully performed.  See In re Enron*, 349 B.R. 96, 106 (Bankr. S.D.N.Y. 2006); *In re Sterling Optical Corp.*, 371 B.R. 680, 692 (Bankr. S.D.N.Y. 2007) (citing cases).

16

C.    **Rejecting The Contracts Would Not Require The Bankruptcy Court To Interpret Non-Bankruptcy Federal Laws.**

The Pipelines argue that rejecting the contracts would "involve a 'significant interpretation' of federal law." Mot. at 10. This argument is also meritless and unsupported.

Under controlling Second Circuit authority, to substantiate their withdrawal request, the Pipelines must demonstrate that the Bankruptcy Court will engage in a "significant interpretation" of non-bankruptcy statutes, *In re Keene Corp.*, 182 B.R. 379, 382 (S.D.N.Y. 1995), or will resolve "complicated issues of first impression." *Adelphia Commc'ns Corp.*, No. 02 Civ. 8495, 2003 WL 21297258, at *4 (S.D.N.Y. June 4, 2003). The fact that other federal statutes may be applied, referenced, or "considered in the Bankruptcy Court proceeding" is not sufficient. *In re Ionosphere Clubs, Inc.*, 103 B.R. 416, 418-19 (S.D.N.Y. 1989). Mandatory withdrawal is appropriate only in instances where "substantial and material consideration" of non-bankruptcy federal law "is necessary for the resolution of the proceeding." *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 995 (2d Cir. 1990) (quotation omitted); *In re Houbigant, Inc.*, 185 B.R. 680, 684 (S.D.N.Y. 1995).

The Pipelines assert that authorizing rejection would require "a significant interpretation" of the Natural Gas Act, "the regulatory powers granted to the FERC and a potential conflict between the goals of title 11 and a comprehensive, statutory scheme." Mot. at 10. But the Pipelines provide no support for these bare, conclusory assertions. They identify no specific provisions of the Natural Gas Act requiring significant interpretation, much less explain how authorizing rejection would require substantial consideration of FERC's "regulatory powers." In fact, even though they complain that the Debtors are not complying with "FERC procedures," they never specify what those procedures might be. *See id.* at 11 (Debtors should "follow[]

17

FERC procedures"); *see also id.* at 3 (Debtors should not be permitted to reject "without FERC approval").

The Pipelines' failure in this regard is not surprising. Rejecting an executory contract "constitutes a breach," 11 U.S.C. § 365(g), and, as noted above, FERC has made clear that "breach of contract issues … are matters better dealt with by courts of competent jurisdiction rather than through Commission review." *Southern Co. Energy Mktg., L.P.*, 86 FERC ¶ 61,131, at 61,459 (1999); *see also Nevada Power Co.*, 111 FERC ¶ 61,111, at ¶ 15 (2005) (breach of service contract is "better left to a court"). Rather than requiring parties to follow unspecified regulatory procedures, FERC has made clear that the bankruptcy court is the proper forum for determining whether contracts should be rejected. *See, e.g., Arkansas La. Gas Co.*, 7 FERC ¶ 61,026, at 61,044 (1979) (deferring to bankruptcy court's determination of rejection issues); *Public Serv. Co. of New Hampshire*, 57 FERC ¶ 63,002, at 65,010 (1991). And, in numerous proceedings, FERC has acknowledged the bankruptcy court's authority to authorize rejection without so much as hinting that prior FERC approval is required. *See, e.g., In re US Gen New England, Inc.*, 116 FERC ¶ 61,285 (2006) (noting that bankruptcy court approved rejection of natural gas transportation agreements); *Decatur Energy Center, LLC*, 110 FERC ¶ 61,045, at 61,177 (2005) (noting that bankruptcy court approved debtor's rejection of executory contracts for purchase of steam); *Ozark Gas Transmission Sys.*, 68 FERC ¶ 61,032, at 61,107-61,108 (1994) (noting that "one of Ozark's two principal customers … is involved in bankruptcy proceedings" and "could still choose to reject its contract with Ozark").

Bankruptcy courts have likewise authorized debtors to reject natural gas transportation contracts — the same types of contracts at issue here — without engaging in significant interpretations of federal energy law. *See, e.g., In re US Gen New England, Inc.*, No. 03-30465,

2007 WL 1074055, at *2 (Bankr. D. Md. Jan. 23, 2007) (noting that the bankruptcy court approved the rejection of natural gas transportation contracts); *see also In re Enron Corp.*, 279 B.R. 695, 703-04 (Bankr. S.D.N.Y. 2002) (setting deadline for Debtor to reject natural gas transportation contracts).  As district courts have held, a bankruptcy court's decision to authorize rejection of a natural gas contract is not subject to mandatory withdrawal, because "a substantial and material consideration of the Natural Gas Act" or other federal statutes is not required.  *In re Columbia Gas Sys., Inc.*, 134 B.R. 808, 814 (D. Del. 1991) (denying motion to withdraw because debtor's request to reject gas purchase contract did not require substantial, material consideration of the Natural Gas Act); *see also In re Texaco Inc.*, 84 B.R. 911, 925 (S.D.N.Y. 1988) (denying motion to withdraw because debtor's request to assume oil and gas leases did not require a "substantial or material" consideration of the Natural Gas Policy Act).

### D.    Judge Casey's Decision Was Wrongly Decided And Readily Distinguished.

Perhaps recognizing that the overwhelming weight of authority contradicts their position, the Pipelines rely heavily on Judge Casey's decision in *In re Calpine Corporation*, 337 B.R. 27 (S.D.N.Y. 2006).  They read *Calpine* as effectively stripping bankruptcy courts of jurisdiction to authorize rejection of any contract potentially subject to FERC's jurisdiction.  But that overbroad reading is not the law.  *Calpine* is not controlling here.

### 1.    Judge Casey's *Calpine* Decision Does Not Apply To The Contracts.

In *Calpine*, Judge Casey held that the district court lacked jurisdiction to authorize rejection of contracts under which Calpine sold electric power to various counterparties, including public utilities.  *See id.* at 30.  Judge Casey held that Calpine's attempts to reject were an improper "collateral attack" on rates filed with, and accepted by, FERC.  According to Judge Casey, Calpine sought relief from the contracts because it was being forced to sell power at below market rates and, therefore, wanted a "better rate."  *Id.* at 36, 38.  In Judge Casey's view,

rejecting the contracts would therefore violate the filed-rate doctrine and "interfere with FERC's jurisdiction" by relieving Calpine of its "regulated duties," including duties to construct generation facilities, provide energy from renewable sources, and provide "emergency supply of quantities of energy into the spot market." *Id*. at 36-37. In addition, noting that the "sale of wholesale electric energy is 'affected with a public interest,'" Judge Casey expressed concern that, if Calpine rejected the contracts, it could harm the broader public interest by affecting the stability of wholesale power supplies. *Id*. at 32, 36-37.

Although the Pipelines assume that *Calpine* is relevant, Judge Casey made clear that his holding in *Calpine* applied only to the specific "energy contracts *at issue*." *Id*. at 29 (emphasis added); *see also id*. at 30 (determining that FERC has "exclusive jurisdiction over the disposition of the energy contracts *in this case*") (emphasis added). The non-binding dicta in Judge Casey's decision therefore should not be construed to apply to different situations involving different contracts that implicate different underlying issues. *See*, *e.g.*, *Donovan v. Red Star Marine Servs., Inc.*, 739 F.2d 774, 782 (2d Cir. 1984). As Chief Justice Marshall recognized more than a century ago, "general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821) (quoted in *Donovan*, 739 F.2d at 782). If such expressions "go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision." *Id.*; *see also Purdy v. United States*, 208 F.3d 41, 46 (2d Cir. 2000) (language that may seem to "go further than its holding" is "non-binding dicta").

Judge Casey's *Calpine* decision is not controlling here for several reasons. Perhaps most importantly, the contracts here, unlike the contracts "at issue" in *Calpine*, do not involve the *sale* of power to utilities for use by consumers. The Debtors are the customers (*i.e.*, purchasers) not

the providers (*i.e.*, sellers) of the regulated services. *See* 15 U.S.C. § 717a(6). In particular, the contracts are service agreements under which the Debtors reserved space on the interstate pipeline system that they could opt, at their sole discretion, to use for transporting natural gas. Rejecting the contracts will affect the economic interests of only the contracting parties and will have no affect on the public's ability to obtain natural gas supplies. *See Calpine*, 337 B.R. at 38 n. 11 (distinguishing Calpine's rejection of its agreements to sell electricity from rejection of a contract for "unwanted, unused energy," which "in no way conflicts" with the "stable and consistent supply of energy").

Moreover, unlike in *Calpine*, there can be no argument that the Debtors are seeking to obtain a better rate for firm pipeline transportation services. *See id*. at 38. The Debtors simply do not need the firm transportation services provided under those agreements. It makes no sense to pay for unwanted, unused firm transportation services on a going-forward basis. *See* Chancellor Aff. ¶ 17.

Finally, rejecting the contracts would not interfere with any of the parties' "regulated duties." *Cf. Calpine*, 337 B.R. at 37. The Debtors have no regulatory duty to purchase or contract for firm transportation services. The natural gas transportation service contracts are essentially no different than any other service contracts the Debtors may have entered as customers in connection with any other part of their business operations. And rejecting the contracts will no more impact the "public interest" than would, for example, rejecting a real property lease or equipment lease. *See* Chancellor Aff. ¶¶ 6, 8. Indeed, although the contracts were repudiated more than nine months ago, FERC has taken no steps, nor sought to exercise any authority it might arguably have, to require the Debtors to continue to perform under the

contracts. No one can suggest that ceasing performance under the contracts has destabilized natural gas supplies. *See* Chancellor Aff. ¶ 23.

### 2. Judge Casey's *Calpine* Decision Should Not Be Followed By This Court.

Even if *Calpine* were not readily distinguished, this Court is not bound by Judge Casey's decision, which is at odds with precedent and rests on a fundamental misinterpretation of the Bankruptcy Code and the Federal Power Act.

In *Calpine,* Judge Casey stated that a bankruptcy court could not authorize rejection of a wholesale power contract without seeking FERC's approval, because "what FERC giveth, only FERC may taketh away." *Id*. at 37. With all due respect, Judge Casey was incorrect. Irrespective of what FERC might "giveth," *Congress* made clear that bankruptcy court jurisdiction exists "*notwithstanding* any Act of Congress that confers exclusive jurisdiction" on some other tribunal. 28 U.S.C. § 1334(b); *cf. United States v. Castillo*, 496 F.3d 947, 954 (9th Cir. 2007) (when it "comes to jurisdiction" "the Congress giveth and the Congress taketh away"). The question is not whether the Bankruptcy Code expressly limits FERC regulatory jurisdiction, as Judge Casey suggested, *see id*. at 33, but whether the Bankruptcy Code contains an express exemption for FERC-regulated contracts that restricts the Bankruptcy Court's rejection authority. *See NextWave*, 537 U.S. at 302. Because no such exemption exists, *Calpine* improperly nullified the Bankruptcy Court's right to authorize rejection.

The Supreme Court's decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984), is on point. The issue before the Court was whether a debtor's obligations to its employees under the National Labor Relations Act ("NLRA") limited the debtor's ability to reject a collective bargaining agreement. Although an employer's unilateral termination or modification of a collective bargaining agreement without appropriate notice is an unfair labor practice under the

NLRA, subject to the NLRB's exclusive jurisdiction, the Court found that this authority did not trump the right of contract rejection under section 365 of the Bankruptcy Code. *See Bildisco*, 465 U.S. at 518-19, 526.   The Court observed that section 365 authorizes rejection of "*all* executory contracts except those expressly exempted." *Bildisco*, 465 U.S. at 521 (emphasis added).  Finding no exemption to this rejection authority for collective bargaining agreements, the Court held that the Bankruptcy Court could properly authorize rejection of such agreements. The Court reasoned that "[o]bviously, Congress knew how to draft an exclusion for collective-bargaining agreements when it wanted to." *Id*. at 522-23.  The "failure to do so … indicates that Congress intended that section 365(a) apply to all collective-bargaining agreements covered by the NLRA." *Id*. at 523.

Shortly after *Bildisco*, Congress enacted section 1113 of the Bankruptcy Code, which exempted collective bargaining agreements from section 365 and made clear that a higher hurdle existed before a collective bargaining agreement could be rejected. *See*, *e.g.*, *Norfolk and W. Ry. Co. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 136 n.2 (1991) ("Collective-bargaining agreements can be rejected only if the additional requirements of 11 U.S.C. § 1113 are met"). Neither before nor after *Bildisco*, however, has Congress excepted FERC-regulated contracts from this Court's rejection authority.  Indeed, as courts have recognized, *Bildisco* did not limit its analysis to collective bargaining agreements and, although Congress enacted section 1113, it "left intact *Bildisco*'s discussion" of the "general principles" applicable to the rejection of executory contracts. *In re FBI Distribution Corp.*, 330 F.3d 36, 44 (1st Cir. 2003).  Accordingly, the principles of *Bildisco* — namely, that absent an express statutory provision there are no exceptions to a court's rejection authority — remain the law.

In *Calpine*, Judge Casey attempted to distinguish *Bildisco*, suggesting that in *Bildisco* the "parties conceded the rejection power of the bankruptcy court." *Calpine*, 337 B.R. at 34. But that distinction is unavailing, because "every federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it." *Steel Co. v. Citizens for A Better Env't*, 523 U.S. 83, 95 (1998) (citations omitted). Judge Casey also suggested that *Bildisco* is distinguishable because the NLRB "does not possess exclusive jurisdiction over the terms and conditions of collective bargaining agreements." *Calpine*, 337 B.R. at 34. But, in fact, the NLRB's jurisdiction is broad and generally exclusive. *See International Longshoreman's Ass'n v. Davis*, 476 U.S. 380, 391 (1986) ("in enacting the NLRA Congress intended for the Board generally to exercise exclusive jurisdiction" over claims for unfair labor practices); *see also Suarez v. Gallo Wine Distributors LLC*, No. 02 Civ. 4273, 2003 WL 716548, at *1 (S.D.N.Y. Mar. 3, 2003) ("the National Labor Relations Board has original, exclusive jurisdiction of claims of unfair labor practices arising under sections 7 and 8 of the NLRA"). Whereas Judge Casey held that "where there is conflict, the power of the bankruptcy court must yield to that of the federal agency," *Calpine*, 337 B.R. at 34, the *Bildisco* Court reached just the opposite conclusion — a bankruptcy court may permit the rejection of collective-bargaining agreements notwithstanding the NLRB's authority over the modification or termination of such agreements.

The Fifth Circuit's *Mirant* decision further confirms that *Calpine* was wrongly decided. In *Mirant*, the Fifth Circuit emphasized that, because the Bankruptcy Code does not "include an exception prohibiting rejection of, or providing other special treatment for, wholesale electric contracts subject to FERC jurisdiction," it is "clear that Congress intended" section 365(a) "to apply to contracts subject to FERC regulation." *In re Mirant Corp.*, 378 F.3d 511, 521-22 (5th

Cir. 2004) (noting that Congress made such specific exceptions in 11 U.S.C. §§ 1110, 1113, and 1169).  The Fifth Circuit recognized, moreover, that the rejection of a FERC-regulated power contract does not encroach on FERC's jurisdiction.  A motion to reject an executory power contract is "not a collateral attack upon that contract's filed rate because that rate is given full effect when determining the breach of contract damages resulting from the rejection."  *Mirant,* 378 F.3d at 522.  In other words, contrary to Judge Casey's decision, rejection of an energy contract does not violate the filed rate doctrine by changing the rates of the contract or otherwise affecting its duration.  It merely "frees the estate from the obligation to perform" and provides the counterparty with a right to damages based on the contract's filed terms and conditions, including its rates and duration.  *See In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997).

In sum, the plain language of the Bankruptcy Code grants federal courts the power to authorize rejection of contracts.  This authority extends to contracts for natural gas transportation because Congress has not expressly crafted an exemption for such contracts.  As the controlling authorities make clear, Debtors may breach energy contracts just like other contracts; FERC does not have exclusive jurisdiction over breach of contract claims; and, therefore, the Federal Power Act, like the Natural Gas Act, "does not preempt a district court's jurisdiction to authorize the rejection of an executory contract subject to FERC regulation as part of a bankruptcy proceeding."  *Mirant*, 378 F.3d at 522.  Judge Casey's contrary decision is wrong and should not be followed by this Court.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion to withdraw the reference.

Dated: November 9, 2007                              Respectfully submitted,
      New York, New York

    /s/  Gregory T. Heyman
Richard M. Cieri (RC 6062)
Marc Kieselstein
David R. Seligman
Gregory T. Heyman
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

James W. Draughn, Jr., P.C.
Neil L. Levy
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Counsel for Defendants Calpine Corporation, et al.