**EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>Calpine Corporation, et al.,<br><br>Debtors. | Chapter 11<br><br>Case No.: 05-60200 (BRL)<br>Jointly Administered |

### AFFIDAVIT OF BRUCE CRAIG CHANCELLOR
### IN SUPPORT OF DEBTORS' MOTION TO REJECT
### CERTAIN NATURAL GAS PIPELINE TRANSPORTATION CONTRACTS

STATE OF TEXAS        )
                      ) ss.
COUNTY OF HOUSTON     )

I, Bruce Craig Chancellor, being duly sworn, hereby depose and state:

1. I am the Vice President – Gas Regulatory at Calpine Corporation, a debtor and debtor-in-possession ("Calpine" and, collectively with certain of its affiliates as debtors and debtors-in-possession, the "Debtors"). In this capacity, I am generally familiar with the relationship and course of dealings between the Debtors and Gas Transmission Northwest Corporation ("GTN") and Portland Natural Gas Transmission Systems ("PNGTS").

2. I have served as Calpine's Vice President – Gas Regulatory for three years and have worked for Calpine for eight years. Prior to working at Calpine, I worked at Koch Gateway Pipeline Company ("Koch") for six years. I have a Bachelor of Science degree in finance and accounting from Southwest Missouri State University. While at Koch, I directly managed a

Federal Energy Regulatory Commission ("FERC") natural gas pipeline rate case from the initial filing through resolution and participated in numerous natural gas regulatory matters. At Calpine, my responsibilities include representing Calpine as a customer in various natural gas regulatory matters at the state and federal levels. I also participate on behalf of Calpine in state and federal rate cases that affect its business. I have directly participated in or monitored several rate cases before FERC.

3. I submit this affidavit in support of the Debtors' Motion to Reject Certain Natural Gas Pipeline Transportation Contracts (the "Motion to Reject"). Except as otherwise indicated, all facts set forth herein are based on my personal knowledge. I am authorized to submit this Affidavit on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein to which I have personal knowledge.

4. I have personal knowledge of all aspects of each of the Contracts discussed below, including their material terms and negative impact upon Calpine, and I submit this affidavit in support of the Debtors' Contract Rejection Motion. As explained further below, after detailed analysis, Calpine seeks to reject nine Contracts that were repudiated more than nine months ago and that, if performed would collectively impose hundreds of millions of dollars in fixed charges over the remaining life of the Contracts.

A.  **Overview of Debtors' Gas Pipeline Transportation Contracts**

5. The Debtors entered into eight long-term firm natural gas transportation service contracts with GTN and one long-term firm natural gas transportation service contract with PNGTS.

6.  These contracts are common within the natural gas industry. In the natural gas industry, entering contracts for long-term transportation service is akin to a business entering a contract with a local messenger service or with Federal Express to ensure that, notwithstanding fluctuations in demand for such services, the particular business customer will always have access to a messenger regardless of when (or whether) the messenger may be needed. Just as a business may pay a set fee to ensure that a messenger is available to deliver its mail and packages, under the Contracts, Calpine paid a fixed demand charge to ensure that transportation capacity was reserved and available on the pipelines so that, at its option, it was able to transport its natural gas.

7.  In particular, firm natural gas transportation service means the Debtors received secure, uninterruptible service in exchange for paying a set reservation charge for the capacity, regardless of actual usage. Select terms of the Contracts are identified below:

| Contract Number | Date Signed | Termination Date | Quantity |
| --- | --- | --- | --- |
| 7357 | March 12, 2001 | October 31, 2023 | 15,000 Dth |
| 8096 | August 31, 2001 | November 30, 2042 | 35,800 Dth |
| 8115 | October 31, 2001 | October 31, 2023 | 19,438 Dth |
| 8155 | November 6, 2001 | October 31, 2023 | 10,000 Dth |
| 8158 | November 13, 2001 | October 31, 2023 | 21,348 Dth |
| 8194 | December 28, 2001 | October 31, 2015 | 10,000 Dth |
| 8428 | August 6, 2002 | October 31, 2028 | 25,000 Dth |
| 8429 | August 6, 2002 | October 31, 2028 | 25,000 Dth |
| 1998-001 | February 12, 1998 | October 31, 2020 | 44,000 MMBtu |

**B.  Debtors' Repudiation Of Natural Gas Pipeline Transportation Contracts**

8.  After filing their Petition for relief under Chapter 11 of the Bankruptcy Code, the Debtors determined that reserved transportation capacity was no longer needed. Just as a business might repudiate its contract with a messenger service if it determined that it no longer

needed to retain an on-call messenger to deliver its mail and packages, the Debtors determined that they no longer needed reserved space on the pipeline for transporting natural gas. The Debtors contracted for the firm transportation on GTN under the unrealized expectation of future demand for power on a long term basis and a greater portfolio of operating assets in Northern California. The Debtors no longer need the firm transportation on PNGTS because the asset for which the contract was intended to provide gas transportation service is no longer owned by the Debtors. The Debtors therefore decided to repudiate the Contracts, canceling performance under the contracts and leaving themselves open to a potential damages claim by GTN and PNGTS.

9. On April 7, 2006, the Debtors formally repudiated three of the GTN contracts (contract numbers 7357, 8096, and 8429) and the PNGTS contract (contract number 1998-001) in the "Debtors' Objection To Motion of Gas Transmission Northwest, Portland Natural Gas Transmission System, and TransCanada Pipelines Limited to Enforce Stipulation and to Compel Debtors to Replenish Assurances." Since that April 7, 2006 filing, the Debtors have consistently treated those four contracts as repudiated and have neither requested service under those Contracts, nor used the firm transportation capacity available under the Contracts.

10. On January 11, 2007, the Debtors repudiated the five remaining GTN contracts (contract numbers 8115, 8155, 8158, 8194, and 8428) and, in doing so, affirmatively stated, "effective immediately, Calpine Energy Services, L.P. will no longer accept service under the Contracts, and Calpine Energy Services, L.P. hereby releases and relinquishes any right to ongoing service or capacity under the Contracts." *See* 2007-01-11 Ltr. K. Kinneman (Calpine) to J. Rush (GTN) (Exhibit A). Since the January 11, 2007 repudiation, the Debtors have consistently treated the remaining five contracts as repudiated and have neither requested service under those Contracts, nor used the transportation capacity available under the Contracts.

### C. Debtors Conducted An Extensive Contract Review Process

11. As the Debtors entered into chapter 11 protection, I developed, managed, and participated in the process of determining which contracts were not beneficial to the Debtors' estate. In connection with the chapter 11 reorganization process, the Debtors have determined in their sound business judgment that the Contracts do not benefit the estate. In my judgment, based on my experience as Vice President – Gas Regulatory at Calpine Corporation, rejecting these nine natural gas transportation contracts will benefit Calpine because they provide no benefit to the estate, while imposing potentially enormous multi-million dollar costs if the Debtors are required to continue to make payments for unused and unnecessary firm transportation services under the Contracts.

12. The Debtors are not seeking to reject the Contracts to obtain a better rate for pipeline transportation services. Instead, the Debtors do not need the firm transportation they have reserved on the pipelines under these Contracts to transport natural gas. The Debtors have repudiated these Contracts and have not used the firm transportation provided under these agreements since repudiation.

### D. Summary of The Contracts

13. Debtors have moved to reject the following Contracts, all of which were previously repudiated by Debtors.

14. <u>Firm Transportation Service Agreement</u> (GTN Contract No. 7357): The parties contracted for Debtors to pay for a set amount of pipeline capacity (15,000 Dth/d) through October 31, 2023. Debtors would be required to pay in excess of $24.5 million in fixed demand

charges to perform through the expiration of this contract for firm natural gas transportation services they do not need.

15. <u>Firm Transportation Service Agreement</u> (GTN Contract No. 8096): The parties contracted for Debtors to pay for a set amount of pipeline capacity (35,800 Dth/d) through November 30, 2042. Debtors would be required to pay in excess of $122 million in fixed demand charges to perform through the expiration of this contract for firm natural gas transportation services they do not need.

16. <u>Firm Transportation Service Agreement</u> (GTN Contract No. 8115): The parties contracted for Debtors to pay for a set amount of pipeline capacity (19,438 Dth/d), through October 31, 2023. Debtors would be required to pay in excess of $30.4 million in fixed demand charges to perform through the expiration of this contract for firm natural gas transportation services they do not need.

17. <u>Firm Transportation Service Agreement</u> (GTN Contract No. 8155): The parties contracted for Debtors to pay for a set amount of pipeline capacity (10,000 Dth/d), through October 31, 2023, at or below the FERC-approved reservation rate. Debtors would be required to pay in excess of $15.6 million in fixed demand charges to perform through the expiration of this firm natural gas transportation contract.

18. <u>Firm Transportation Service Agreement</u> (GTN Contract No. 8158): The parties contracted for Debtors to pay for a set amount of pipeline capacity (21,348 Dth/d), through October 31, 2023. Debtors would be required to pay in excess of $ 33.3 million in fixed demand charges to perform through the expiration of this contract for firm natural gas transportation services they do not need.

19.     <u>Firm Transportation Service Agreement</u> (GTN Contract No. 8194): The parties contracted for Debtors to pay for a set amount of pipeline capacity (10,000 Dth/d), through October 31, 2015. Debtors would be required to pay in excess of $ 8.1 million in fixed demand charges to perform through the expiration of this contract for firm natural gas transportation services they do not need.

20.     <u>Firm Transportation Service Agreement</u> (GTN Contract No. 8428): The parties contracted for Debtors to pay for a set amount of pipeline capacity (25,000 Dth/d), through October 31, 2028. Debtors would be required to pay in excess of $26.5 million in fixed demand charges to perform through the expiration of this contract for firm natural gas transportation services they do not need.

21.     <u>Firm Transportation Service Agreement</u> (GTN Contract No. 8429): The parties contracted for Debtors to pay for a set amount of pipeline capacity (25,000 Dth/d), through October 31, 2028. Debtors would be required to pay in excess of $52.5 million in fixed demand charges to perform through the expiration of this contract for firm natural gas transportation services they do not need.

22.     <u>Gas Transportation Contract for Firm Transportation Service Between Portland Natural Gas Transmission System And Rumford Power Associates Limited Partnership</u> (PNGTS Contract No. 1998-001): The parties contracted for Debtors to pay for a set amount of pipeline capacity, effective November 1, 2000 through October 31, 2020. As amended, the Debtors are required to pay for 44,000 MMBtu of natural gas capacity per day for natural gas transportation services they do not need.

### E. Rejecting The Contracts Will Not Harm The Public Or Have Any Effect On Power Supply

23. Rejecting the Contracts would not disrupt the continued supply of wholesale electricity within the Debtors' areas of operation.

24. The Contracts do not involve the sale of power to utilities for use by consumers. In the parties' agreements, the Debtors are the customers and GTN and PNGTS are the sellers. Rejecting the Contracts will therefore not impact wholesale natural gas supplies.

25. Since repudiating the Contracts, the Debtors have not used any firm transportation under the Contracts. That is, the Debtors have not requested services under the Contracts, have not transported natural gas over pipelines pursuant to the Contracts, and no party has performed under the Contracts.

26. Since repudiating the Contracts, the Debtors have not prevented GTN and PNGTS from discontinuing service under the contracts, remarketing capacity to other customers, or negotiating new contracts with other customers for the capacity that the Debtors ceased using.

27. Currently, the firm capacity Debtors contracted for under the repudiated Contracts is not being used by the Debtors, and market participants have the opportunity to utilize the capacity more effectively. Debtors repudiated four contracts well over a year ago, and the remaining five in January of 2007, and the power supply has not been adversely effected.

28. There has been no curtailment or non-dispatch of the Debtors' power generating facilities as a result of repudiation of these contracts.

29. The net effect of these factors — (a) the Debtors are merely customers under these natural gas pipeline transportation contracts, and not sellers of energy pursuant to these contracts; (b) the natural gas pipelines are and have been free to remarket their capacity to other

purchasers of capacity; and (c) the Debtors repudiated these contracts at least over nine months ago, with no negative impact on the Debtors' ability to provide power — is that permitting Debtors to reject the Contracts will effect no disruption on the supply of wholesale electricity.

Executed on November 7, 2007

_____
Bruce Craig Chancellor

Sworn to and subscribed before me
this 9 day of November, 2007.

_____

[Notary Seal: SORANA LINDER, NOTARY PUBLIC, STATE OF TEXAS, MY COMMISSION EXPIRES FEB. 23, 2011]

Notary Public, State of Texas
No. _____
Qualified in Harris County
Commission Expires 2/23/2011

10