**<u>EXHIBIT C</u>**

Hearing Date: November 27, 2007 at 10:00 a.m. (EST)
Objection Deadline: November 21, 2007 at 4:00 p.m. (EST)

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted *pro hac vice*)
David R. Seligman (admitted *pro hac vice*)

KIRKLAND & ELLIS LLP
655 15th Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
James W. Draughn, Jr., P.C. (admitted *pro hac vice*)
Neil L. Levy (admitted *pro hac vice*)

Counsel for the Debtors

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) )  Chapter 11 ) |
| Calpine Corporation, <u>et al.</u>, | ) ) )  Case No. 05-60200 (BRL) |
| Debtors. | )  Jointly Administered ) |

**NOTICE OF DEBTORS' MOTION TO REJECT CERTAIN
NATURAL GAS PIPELINE TRANSPORTATION CONTRACTS**

PLEASE TAKE NOTICE that at **10:00 a.m. (EST)** on **November 27, 2007,** Debtors, by

their counsel, shall appear before the Honorable Judge Burton R. Lifland, at the United States

Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House,

One Bowling Green, New York, New York 10004-1408, Room 623, or soon thereafter as

counsel may be heard (the "Hearing"), and present the *Debtors' Motion to Reject Certain*

*Natural Gas Pipeline Transportation Contracts* (the "Motion").

PLEASE TAKE FURTHER NOTICE that the Hearing may be adjourned thereafter from time to time without further notice.

PLEASE TAKE FURTHER NOTICE that objections to the Motion, if any, must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and shall be filed with the Bankruptcy Court electronically by registered users of the Bankruptcy Court's case filing system (the User's Manual for the Electronic Case Filing System can be found at http://www.nysb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (in either case, with a hard copy delivered directly to Chambers) and shall be served upon: (a) counsel to the Debtors, Kirkland and Ellis LLP, Citigroup Center, 153 East 53rd Street, New York, New York 10022, Attn.: Edward O. Sassower, and Kirkland & Ellis LLP, 655 Fifteenth Street, N.W., Washington, D.C. 20005, Attn.: James W. Draughn, Jr., P.C.; (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn.: Paul Schwartzberg; (c) counsel to the Unofficial Committee of Second Lien Debtholders, Paul Weiss Rifkind Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019-6064, Attn.: Alan W. Kornberg, Andrew N. Rosenberg, Elizabeth R. McColm; (d) counsel to the Official Committee of Unsecured Creditors, Akin Gump Strauss Hauer & Feld LLP, 590 Madison Avenue, New York, New York 10022-2524, Attn.: Michael S. Stamer, Philip C. Dublin, Alexis Freeman; (e) counsel to the Official Committee of Equity Security Holders, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004, Attn.: Gary Kaplan, Matthew Roose; and (f) counsel for Gas Transmission Northwest

Corporation and Portland Natural Gas Transmission System, Elrod, PLLC, 500 N. Akard Street,

Suite 3000, Dallas, Texas 75201, Attn.: David W. Elrod, Craig Tadlock, so as to be received no

later than **November 21, 2007 at 4:00 p.m**. **(EST)**.

Dated: November 9, 2007
      New York, New York

Respectfully submitted,

 /s/ James W. Draughn, Jr., P.C.
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted *pro hac vice*)
David R. Seligman (admitted *pro hac vice*)

KIRKLAND & ELLIS LLP
655 15th Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
James W. Draughn, Jr., P.C. (admitted *pro hac vice*)
Neil L. Levy (admitted *pro hac vice*)

Counsel for the Debtors

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted *pro hac vice*)
David R. Seligman (admitted *pro hac vice*)

KIRKLAND & ELLIS LLP
655 15th Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
James W. Draughn, Jr., P.C. (admitted *pro hac vice*)
Neil L. Levy (admitted *pro hac vice*)

Counsel for the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| Calpine Corporation, <u>et al.</u>, | ) ) ) | Case No. 05-60200 (BRL) |
| Debtors. | ) ) ) | Jointly Administered |

**DEBTORS' MOTION TO REJECT CERTAIN**
**NATURAL GAS PIPELINE TRANSPORTATION CONTRACTS**

Calpine Corporation and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, "Calpine" or the "Debtors"), hereby file this motion pursuant to 11 U.S.C. § 365(a) for the entry of an order, in substantially the form attached hereto as <u>Exhibit A</u>, authorizing the Debtors to reject certain natural gas pipeline transportation contracts set forth on <u>Exhibit B</u> attached hereto. In support of this motion, the Debtors respectfully state as follows:

## INTRODUCTION

1.     The Debtors seek to reject pre-petition natural gas transportation contracts (the "Contracts") entered into with two pipeline companies — Gas Transmission Northwest Corporation ("GTN") and Portland Natural Gas Transmission System ("PNGTS").  The Contracts are service agreements under which the Debtors paid for the right to firm transportation service on natural gas pipeline systems located in New England and the Pacific Northwest.  Firm transportation service is reserved capacity, or "space" on a pipeline, the use of which cannot be interrupted (absent force majeure) and must be paid for regardless of actual use.

2.     After filing their petitions for relief under Chapter 11 of the Bankruptcy Code, the Debtors determined that they do not need firm transportation service on the pipelines, and, in 2006 and early 2007, repudiated all the Contracts.  Since that time, no party has performed under the Contracts: the Debtors have not used the firm transportation services provided under the Contracts; GTN and PNGTS have not been required to reserve capacity for the Debtors; and no party has exercised any other rights under the Contracts.

3.     Until recently, the proceedings have moved forward with the expectation that this Court would adjudicate the amount of damages flowing from the Debtors' repudiation of the Contracts.  In late July 2006, GTN and PNGTS filed breach of contract claims against the Debtors' estates in excess of $726 million.  On September 21, 2007, the Debtors filed a limited objection to these claims and, subsequently, the parties reached agreement on the amount of new Calpine common stock that would be reserved to cover those claims.  The claims are currently the subject of extensive ongoing discovery, and the parties are in the process of convening a mediation of their valuation dispute.  If mediation is unsuccessful, the damages claims will be litigated before this Court after the scheduled hearings on confirmation of the Debtors' plan of reorganization.

4.     The only legitimate issue raised by the Debtors' repudiation of the Contracts is one of damages — an issue that can and should be resolved by this Court. Nonetheless, in hopes of gaining greater leverage and extracting a better settlement from the Debtors, GTN and PNGTS have refused to focus solely on quantifying damages, and are seeking — nine and eighteen months after the Contracts were repudiated — to challenge the Debtors' repudiation. The Pipelines argue that the Debtors' repudiation was somehow improper and that the Contracts remain in effect until they are formally rejected. Based on these arguments, on October 23, 2007, GTN and PNGTS moved to withdraw the reference as to both the Debtors' Limited Objection to the claims and the confirmation of the Debtors' plan as it relates to the Contracts. In short, on the eve of confirmation, GTN and PNGTS are now contending, notwithstanding all the actions previously taken to set the stage for mediating and, if necessary, litigating their rejection damages claims, that the Contracts somehow remain in effect and that this Court lacks jurisdiction to authorize rejection under Bankruptcy Code section 365.

5.     This eleventh hour maneuver should not be tolerated. Under settled precedent, the repudiation of the Contracts gave GTN and PNGTS the right to assert claims for total breach of the Contracts, but repudiation ended the Debtors' obligations to perform thereunder. It is equally clear that because the Contracts are pre-petition contracts, the Debtors' breach of the Contracts gives rise to only a pre-petition damages claim. There is nothing preventing the Court from adjudicating GTN and PNGTS's damages claims resulting from repudiation. Nonetheless, to moot the unfounded objection to the plan's reference to the Debtors' prior repudiation of the Contracts and to help focus the resources of the parties and the Court on the issue of damages, the Debtors hereby seek to reject the contracts.

6.    The Second Circuit, as well as other Circuits and the Supreme Court, have applied a "business judgment" standard to the rejection of executory contracts.  If, in the exercise of sound business judgment, rejecting a contract would benefit the estate, the Bankruptcy Court should approve the debtor's rejection motion, after which the other party to the contract becomes a general creditor of the estate for any damages flowing from rejection.  See, e.g., In re Orion Pictures Corp., 4 F.3d 1095, 1099 (2d Cir. 1993).

7.    The business judgment standard is readily satisfied in this case.  As described in more detail below, rejecting the Contracts, which were repudiated more than nine months ago, will benefit the estate.  If the Debtors are forced to continue performing under the contracts, the Debtors' estates will be burdened with future obligations to pay hundreds of millions of dollars for unneeded firm natural gas transportation services.  (See Section I, below.)

8.    GTN and PNGTS have taken the position in their withdrawal motion that the Debtors are prevented from rejecting the Contracts in light of Judge Casey's decision in In re Calpine Corporation, 337 B.R. 27 (S.D.N.Y. 2006).  But Calpine does not apply here.  Unlike the contracts at issue in Calpine, the Contracts the Debtors seek to reject in this motion do *not* involve the sale of power to utilities for use by consumers and do *not* involve the provision of any service by the Debtors.  Nor do the Contracts implicate any broader public interest.  In fact, although all the Contracts were repudiated between nine and eighteen months ago, the Federal Energy Regulatory Commission ("FERC") has taken no steps to exercise its regulatory authority to force performance under the Contracts.  Nor can anyone reasonably suggest that repudiating the Contracts has affected the stability of natural gas supplies.  The policy concerns on which Calpine rested simply are not present in this case.  (See Section II.A., below.)

4

9.      Moreover, even if Calpine were relevant, this Court is not bound by, and should not follow, what the Debtors respectfully submit was an erroneous decision by Judge Casey. See, e.g., In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, 160 B.R. 882, 898 (Bankr. S.D.N.Y. 1993) (a bankruptcy judge is free to reexamine an issue despite the prior decision of a single district court judge in a multi-judge district). As rulings by the Fifth Circuit and FERC make clear, Calpine misreads the statutory requirements and is out of step with controlling Supreme Court authority. Contrary to the ruling in Calpine, the Federal Power Act does not trump the Bankruptcy Code or prevent the rejection of executory contracts merely because the contracts are subject to regulation by FERC. (See Section II.B., below.)

## JURISDICTION

10.     This Court has jurisdiction under 28 U.S.C. § 157 and 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this district for this motion and these proceedings is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is section 365 of the Bankruptcy Code.

## BACKGROUND

11.     The Debtors are involved in the development, construction, ownership, and operation of power generation facilities, as well as the sale of electricity and its by-product, thermal energy, primarily in the form of steam. The Debtors operate the largest fleet of natural gas-fired power plants in North America.

12.     On December 20, 2005, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

13.     On January 9, 2006, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee") and, on May 9, 2006, appointed an Official

5

Committee of Equity Security Holders (the "Equity Committee"). No trustee or examiner has been appointed in these Chapter 11 proceedings.

14.    Before petitioning for relief under Chapter 11, the Debtors entered into a series of contracts with companies, including GTN and PNGTS, that own and operate natural gas pipelines throughout the United States. Under these Contracts, the Debtors paid for firm transportation service on interstate pipeline systems for purposes of transporting the Debtors' natural gas.

15.    The Debtors negotiated eight contracts with GTN, a subsidiary of TransCanada that owns and operates an interstate natural gas pipeline connecting markets in California, Nevada, and the Pacific Northwest with the resources of the Western Canada Sedimentary Basin. In addition, they negotiated a single contract with PNGTS, a subsidiary of TransCanada that provides transportation service for natural gas utilities, paper mills, and electric generation plants throughout New England.

16.    The Contracts provided for firm natural gas transportation services for a set quantity of natural gas, ranging from 10,000 to 44,000 dekatherms per day. See 2007-9-21 C. Keegan Aff., Exhs. A-I (Dkt. No. 6077); see also 2007-11-09 C. Chancellor Aff. ¶¶ 7, 14-22 (attached hereto as Exhibit C). Under the Contracts, the Debtors were entitled to firm, uninterruptible transportation service in exchange for paying a set "reservation" rate, regardless of whether the capacity was in fact used. Id. at ¶ 9.

17.    Early in the Chapter 11 reorganization process, the Debtors determined that the Contracts were not benefiting the estate. In particular, the Debtors determined that the Contracts provided them with more firm natural gas transportation services than they required. Accordingly, in April 2006, and in January 2007, the Debtors repudiated the Contracts. In letters

to GTN and PNGTS, the Debtors noted that the Contracts "provide no benefit to [the Debtors']
estate," and that the Debtors would "no longer accept service under the" Contracts. The letters
further confirmed that the Debtors were "releas[ing] and relinquish[ing] any right to ongoing
service or capacity" provided under the contracts. On April 7, 2006, the Debtors repudiated the
contract with PNGTS and three of the contracts with GTN. See 2007-11-09 C. Chancellor Aff.
¶ 8. On January 11, 2007, the Debtors repudiated the remaining five contracts with GTN. See
2007-11-09 C. Chancellor Aff. ¶ 10.

18.     The Debtors have not used firm transportation or any other services under the
Contracts since repudiating them in 2006 and early 2007. See 2007-11-09 C. Chancellor Aff.
¶¶ 9-10, 12, 26. By repudiating the Contracts, however, the Debtors have saved the estate
potentially hundreds of millions of dollars in demand charges, as evidenced by the hundreds of
millions of dollars in rejection damages claims claimed GTN and PNGTS. See id. ¶ 4.

19.     Moreover, because the Debtors do not need firm transportation services on the
pipelines, and because they have expressly authorized the pipelines to "release" capacity, GTN
and PNGTS have been free to remarket the capacity to other customers and to negotiate new
contracts for the capacity the Debtors are not using and do not need. See 2007-11-09 C.
Chancellor Aff. ¶ 8-10, 25-27; see also 2007-08-01 Hrg. Tr. at 18-19 (denying pipeline's request
to lift automatic stay and noting that pipeline was "free to mitigate" as soon as the Debtors
repudiated the contract). The Debtors' repudiation has thus "freed up" pipeline capacity that
may be purchased and used by other shippers to transport natural gas.

20.     After the Debtors' initial repudiation of certain GTN contracts, on July 31, 2006,
GTN and PNGTS filed proofs of claim with this Court, asserting breach of contract damages.
(Presumably because of these claims, their parent, TransCanada, has been permitted to be a

member of the Official Unsecured Creditors Committee.)  The Debtors filed a limited objection to these claims and, thereafter, the parties negotiated reserves to cover the payment of the estimated claims, subject to adjustment by Court order.  Therefore, the Court denied the Debtors' request to bifurcate the damages trial based in part on GTN and PNGTS's statements that they would be prepared to conduct a full damages trial before the Bankruptcy Court.  Currently, the Pipelines' claims are the subject of significant ongoing discovery.  If mediation or settlement discussions are not successful, the claims will be litigated before the Court after the scheduled hearings on confirmation of the Debtors' plan of reorganization.

21.    Despite filing proofs of claim and despite all the parties' efforts to establish a process for valuing their claims, GTN and PNGTS are now seeking to withdraw the reference, arguing that the Debtors' repudiation of the contracts had no effect, that the Court has no jurisdiction to permit rejection, and that the Contracts remain in effect until the FERC provides rate relief to the Debtors.  These tactics are designed to gain improper leverage in what otherwise should be a straightforward proceeding to quantify damages.  As GTN and PNGTS are well aware, their attempts at this late date to interfere with confirmation pose grave risks that the Debtors will not be able to emerge from chapter 11 before their favorable exit financing commitment expires on January 31, 2008.  See, e.g., Affidavit of Morgan P. Suckow (Oct. 3, 2007) (Exhibit D).  If that occurs, the Debtors could incur hundreds of millions of dollars in additional interest expense, which could upend the Debtors' plan of reorganization and unnecessarily prolong the bankruptcy proceedings.  See id. ¶ 7 (estimating that "if the interest cost" of the Debtors' "exit financing were to increase commensurate with the increase in the average yield on single-B rated loans — everything else being equal" — the Debtors would "incur nearly *$800 million* of additional interest expense over the life of the loan").

8

**RELIEF REQUESTED**

22.    The Debtors maintain that their prior repudiation of the Contracts had independent legal significance — that is, the repudiation constituted a breach of contract that gave rise to claims against the Debtors' estates, which in fact GTN and PNGTS have asserted. Nonetheless, to moot GTN and PNGTS's unfounded objections and to put an end to their improper attempts to use the plan's reference to the Debtors' prior repudiation as a basis for withdrawing the reference, the Court should authorize the Debtors to reject the Contracts. Granting this motion and authorizing the Debtors to reject the Contracts will permit the Court and parties to focus on the only legitimate issue — namely, the amount of damages to which GTN and PNGTS may be entitled for breach of contract.

23.    It is well-settled that the filing of a motion to withdraw the reference does not divest the bankruptcy court of jurisdiction over the administration of bankruptcy proceedings. *See* Bankr. R. 5011(c). Accordingly, this Court has the authority to grant this motion and to authorize the Debtors to reject the Contracts.

**ARGUMENT**

I.    **Rejecting The Gas Transportation Contracts Is Appropriate And In The Best Interests Of The Estate.**

24.    Rejecting the Contracts is appropriate because the Debtors do not need the firm transportation services provided thereunder, and because requiring the Debtors to perform under the Contracts, which were repudiated at least nine months ago, would unnecessarily waste the resources of the Debtors' estates.

A.    **The Bankruptcy Code Authorizes The Rejection Of Burdensome Executory Contracts.**

25.    Federal courts have "comprehensive jurisdiction" to "deal efficiently and expeditiously with all matters connected with the bankruptcy estate." Celotex Corp. v. Edwards,

514 U.S. 300, 308 (1995) (citation omitted). Congress charged district courts with "exclusive" jurisdiction "of all the property" of a debtor's estate, 28 U.S.C. § 1334(e), and "original but not exclusive jurisdiction of all civil proceedings arising under title 11." 28 U.S.C. § 1334(b). Bankruptcy courts exercise this comprehensive jurisdiction as units of the district courts under 28 U.S.C. § 157.

26.    Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession may "assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The "purpose behind allowing the ... rejection of executory contracts is to permit the ... debtor-in-possession to ... 'renounce title to and abandon burdensome property.'" In re Orion Pictures, 4 F.3d at 1098 (quoting 2 Collier on Bankruptcy ¶ 365.01[1] (15th ed. 1993)). As the Supreme Court has emphasized, "the authority to reject an executory contract" is not merely incidental to bankruptcy, but rather is "vital to the basic purpose to a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984).

27.    A debtor's decision to reject a contract is governed by the "business judgment" standard. In re Orion, 4 F.3d at 1099; In re Enron Corp., No. 01-B-16034, 2006 WL 898033, at *4 (Bankr. S.D.N.Y. Mar. 24, 2006). That standard is met if, in the exercise of the Debtors' sound business judgment, rejecting the contracts will benefit the Debtors' estate. See, e.g., In re Orion, 4 F.3d at 1098; In re Minges, 602 F.2d 38, 43 (2d Cir. 1979) (it is sufficient "if, as a matter of business judgment, rejection of the burdensome contract may benefit the estate"); In re Child World, Inc., 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992) (leases that are an "economic detriment" to the debtor are properly rejected). This Court does not review rejection as an "arbiter of disputes between creditors and the estate." In re Orion, 4 F.3d at 1099. To the

10

contrary, the Court's review entails "summary proceeding[s], intended to efficiently review" a debtor's decision to "reject a particular contract in the course of the swift administration of the bankruptcy estate." Id. at 1098.

**B.    The Standards For Rejection Are Satisfied Here.**

28.    The standards for rejection under section 365 of the Bankruptcy Code are readily satisfied here.  If the Contracts are not rejected, and if the Debtors are forced to resume and continue performance under the Contracts, the Debtors' estates would be saddled with a substantial, unnecessary economic burden.  See 2007-11-09 C. Chancellor Aff. ¶ 4.  There is no business justification for continuing to perform under the repudiated Contracts.  The Debtors do not want and do not need the firm pipeline transportation reserved under the Contracts.  See 2007-10-09 C. Chancellor Aff. ¶ 8, 11-12.

29.    In fact, the firm transportation services that were reserved under each of the Contracts have not been used for many months.  Almost 18 months ago, on April 7, 2006, the Debtors repudiated in writing four of the underlying Contracts.  On January 11, 2007, the Debtors repudiated the remaining five Contracts with GTN.  See 2007-10-09 C. Chancellor Aff. ¶ 9-10.  In their repudiation notices, the Debtors stated that they were no longer requesting service under the Contracts, and henceforth released and relinquished any contractual rights to firm transportation services or reserved capacity.  See id.  In short, since at least January of this year, the Contracts have been inoperative and the Debtors have not transported natural gas supplies under the Contracts.  See id. at ¶ 12, 25-27.

30.    Because the Contracts were repudiated many months ago, rejection should be deemed effective as of the date the Debtors repudiated each of the underlying Contracts.  As courts have held, bankruptcy courts may, in their discretion, authorize rejection effective as of a date prior to entry of the order authorizing rejection.  The leading case on the issue is a First

11

Circuit decision, which recognized that "bankruptcy courts may enter retroactive orders of approval, and should do so when the balance of equities preponderates in favor of such remediation." In re Thinking Machs. Corp., 67 F.3d 1021, 1028 (1st Cir. 1995). Here, because the Debtors formally repudiated all of the Contracts at least nine months ago, and some of the Contracts almost eighteen months ago, the equities weigh decisively in favor of deeming rejection effective as of the date of repudiation. In fact, as the Debtors' repudiation notices made clear, GTN and PNGTS were free to take mitigation measures as soon as the Contracts were repudiated, and to begin selling pipeline capacity to other natural gas shippers who may require natural gas transportation services. See 2007-08-01 Hrg. Tr. at 18-19 (denying pipeline's request to lift automatic stay and noting that the pipeline was "free to mitigate" as soon as the Debtors repudiated the contract).

31.     Moreover, regardless of the effective date of rejection, existing case law makes clear that GTN's and PNGTS's claims for the Debtors' breach of the Contracts constitute pre-petition claims. See In re Caldor, Inc., 240 B.R. 180, 192 (Bankr. S.D.N.Y. 1999) ("contract-based claims arise at the time the contract is entered into, rather than upon the occurrence of subsequent events such as termination"), aff'd, 266 B.R. 575 (S.D.N.Y. 2001); In re Chateaugay Corp., 102 B.R. 335, 351 (Bankr. S.D.N.Y. 1989) ("[w]here the debtor's obligations stem from contractual liability, even a post-petition breach will be treated as giving rise to a pre-petition liability where the contract was executed pre-petition") (citation omitted); In re Riodizio, Inc., 204 B.R. 417, 424 n.6 (Bankr. S.D.N.Y. 1997) (the "post-petition breach of a pre-petition contract gives rise only to a pre-petition claim"); In re The Drexel Burnham Lambert Group, Inc., 138 B.R. 687 (Bankr. S.D.N.Y. 1992) (same). As courts have long recognized, under 11 U.S.C. § 365(g)(1), the rejection of a contract constitutes a breach as of the moment

"immediately before the date of the filing of the petition." <u>In re Sheehan Mem'l Hosp.</u>, No. 04-11548, 2007 WL 3138616, at *3 (W.D.N.Y. Oct. 18, 2007). Any claim for damages from termination must therefore be treated as a pre-petition liability to which no administrative priority can attach. <u>See id.</u>[1]

## II.    <u>Calpine</u> Was Wrongly Decided And Is Readily Distinguished On Its Facts.

32.    In their submissions to the district court, GTN and PNGTS have taken the position that, under Judge Casey's decision in <u>In re Calpine Corporation</u>, 337 B.R. 27 (S.D.N.Y. 2006), this Court lacks jurisdiction to authorize rejection because only FERC may authorize the breach of *any* contract potentially subject to FERC's regulatory oversight. The Debtors respectfully submit that Judge Casey's <u>Calpine</u> decision was wrongly decided. But, in any event, GTN and PNGTS's sweeping interpretation his decision, which would mean that Judge Casey single-handedly wiped out bankruptcy court jurisdiction over any FERC-jurisdictional contract, is not supportable. <u>Calpine</u> is not controlling here.

### A.    <u>Calpine</u> Does Not Apply To The Natural Gas Transportation Contracts The Debtors Seek To Reject.

33.    In <u>Calpine</u>, Judge Casey held that the district court (and, by implication, the bankruptcy court) lacked jurisdiction to authorize rejection of contracts under which Calpine *sold* electric power to various counterparties, including public utilities. <u>See id.</u> at 30. Although the contracts were financially burdensome, Judge Casey held that Calpine's attempts to reject were

---

[1]    The Debtors' obligation under the Contracts was to pay for firm transportation service, regardless of whether it was used. In arguing that repudiation was invalid, GTN and PNGTS are essentially arguing that the Debtors must continue to make payments under the Contracts. But the law in this Circuit is clear that to compel a debtor to make payments under a pre-petition contract (i) the claim must arise out of a transaction between the creditor and the debtor-in-possession, and (ii) the consideration supporting the claimant's payment request must have been supplied to and beneficial to the debtor-in-possession in the operation of the business. <u>See Amalgamated Ins. Fund v. McFarlin's Inc.</u>, 789 F.2d 98, 100 (2d Cir. 1986). Here, the Contracts provide no benefit to the Debtor's estate and it is undisputed that the Debtors have not used transportation services under the contracts since the date of repudiation.

an improper "collateral attack" on rates filed with, and accepted by, FERC. Judge Casey noted that Calpine sought relief from the power contracts because it was being forced to sell power at below market rates and, therefore, wanted a "better rate." Id. at 36, 38. In Judge Casey's view, rejecting the contracts would violate the filed-rate doctrine, which prohibits collateral attacks on rates filed with FERC. Judge Casey further opined that rejecting the power contracts would "interfere with FERC's jurisdiction" by relieving Calpine of its "regulated duties," including duties to construct generation facilities, provide energy from renewable sources, and provide "emergency supply of quantities of energy into the spot market." Id. at 36-37.

34.     Although GTN and PNGTS have argued that Calpine precludes the Debtors from rejecting the Contracts, Judge Casey made clear that his holding applied only to the specific "energy contracts *at issue*." Id. at 29 (emphasis added); see also id. at 30 (determining that FERC has "exclusive jurisdiction over the disposition of the energy contracts *in this case*") (emphasis added). Any non-binding dicta in Judge Casey's decision therefore should not be construed to apply to different situations involving different contracts that implicate different underlying issues. See, e.g., Donovan v. Red Star Marine Servs., Inc., 739 F.2d 774, 782 (2d Cir. 1984). As Chief Justice Marshall recognized more than a century ago, "general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 399 (1821) (quoted in Donovan, 739 F.2d at 782). If such expressions "go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision." Id.; see also Purdy v. United States, 208 F.3d 41, 46 (2d Cir. 2000) (language in an opinion that may seem to "go further than its holding" is "non-binding dicta").

35.     Judge Casey's <u>Calpine</u> decision is not applicable here for several reasons.  ***First,***
and perhaps most importantly, the Contracts here, unlike the contracts "at issue" in <u>Calpine</u>, do
not involve the *sale* of power to utilities for use by consumers.  Instead, the Contracts are service
agreements under which the Debtors have purchased firm pipeline transportation services — in
simple terms, the Debtors reserved space on an interstate pipeline system, which the Debtors
could use at their discretion for the transportation of natural gas.  Rejecting the Contracts will
affect the economic interests of only these sophisticated contracting parties, who entered into the
arm's-length agreement, and will have no effect on the public's ability to obtain natural gas
supplies.  <u>See</u> <u>Calpine</u>, 337 B.R. at 38 n. 11 (distinguishing Calpine's rejection of its agreements
to sell electricity from rejection of a contract for "unwanted, unused energy," which would "in
no way conflict" with the "stable and consistent supply of energy").  A contract to *sell* electricity
to a utility serving the public is different from a contract to *buy* reserved space on a pipeline for
the transportation of natural gas.  Rejecting the contracts here will not affect the supply of
electricity to consumers; rather, it will at most affect two commercial parties to an arm's–length
contract under which the Debtors are customers, not suppliers.

36.     ***Second***, unlike in <u>Calpine</u>, there can be no argument that the Debtors are rejecting
the Contracts to obtain a better rate.  <u>See</u> <u>Calpine</u>, 337 B.R. at 38.  The Debtors are rejecting the
contracts because they no longer need the firm transportation services provided under those
agreements.  It makes no sense to pay for such services on a going-forward basis.  <u>See</u> 2007-11-
09 C. Chancellor Aff. ¶¶ 11-12.

37.     ***Third***, rejecting the contracts will not interfere with FERC's jurisdiction or any of
the parties' "regulated duties."  <u>Cf</u>. <u>Calpine</u>, 337 B.R. at 37.  As an initial matter, the Debtors are
not "natural gas companies" subject to regulation under the Natural Gas Act.  *See* 15 U.S.C.

15

§ 717a(6) (defining "natural gas company" as a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale).  In addition, the Debtors are the *customers* (*i.e.*, purchasers) not the *providers* (*i.e.*, sellers) of the regulated services.  Although FERC has a regulatory interest in ensuring that the rates charged for regulated services by natural gas companies are "just and reasonable," it has no regulatory interest in forcing customers to continue purchasing transportation services under the terms of regulated contracts.  See, e.g., Nevada Power Co., 111 FERC ¶ 61,111, at ¶ 15 (2005) (breach of a service contract is a "straightforward matter of contract interpretation" that "is not important in relation to the regulatory responsibilities of the Commission" and is "better left to a court").  The Contracts at issue here are essentially no different than any other service contracts which the Debtors may have entered as customers in connection with any other part of their business operations.  See 2007-11-09 C. Chancellor Aff. ¶¶ 6, 8.  Authorizing rejection of the Contracts will no more interfere with the Debtors' "regulated duties" than would, for example, authorizing rejection of a real property lease or equipment lease.

38.    ***Finally***, authorizing rejection of the Contracts will not affect the "public interest." In Calpine, Judge Casey repeatedly emphasized that, under the power contracts at issue there, the "sale of wholesale electric energy is 'affected with a public interest.'"  337 B.R. at 32 (quoting 16 U.S.C. § 824(a)).  Judge Casey was therefore concerned that, if Calpine were permitted to reject the wholesale power supply contracts, it might fail to fulfill certain regulatory duties, which could harm the broader public interest by affecting the stability of wholesale power supplies.  See id. at 36-37 ("unenforceable promise from Calpine that it will continue to supply energy" did not provide adequate assurances that Calpine will comply with regulatory duties).

39.    Here, in stark contrast, these underlying policy concerns are not present. Permitting the Debtors to reject the Contracts will not impact wholesale power supplies. <u>See</u> 2007-11-09 C. Chancellor Aff. ¶ 23-24, 27-28. All that will happen is that GTN and PNGTS will lose the Debtors as firm transportation customers under the Contracts — customers they already lost more than nine months ago when the Contracts were repudiated. Indeed, by permitting the Debtors to reject the Contracts for firm transportation services, the Court will confirm the availability of pipeline capacity that may be used by other companies. <u>See</u> 2007-11-09 C. Chancellor Aff. ¶¶ 27-28. If anything, public interest considerations support freeing up pipeline capacity so that it may be purchased and used by other parties, not holding it in reserve under repudiated Contracts that the Debtors do not want and do not need.

40.    Indeed, it is telling that, although the Contracts were repudiated more than nine months ago, FERC has taken no steps, nor sought to exercise any authority it might arguably have, in an attempt to require the Debtors to continue to perform under the Contracts. Nor has anyone suggested that ceasing performance under the Contracts has destabilized natural gas supplies or affected any customers.

**B.    <u>Calpine</u> Misreads The Bankruptcy Code, Is At Odds With Controlling Precedent, And Should Not Be Followed By This Court.**

41.    Even if <u>Calpine</u> were not readily distinguished, this Court is not bound by Judge Casey's decision, which is at odds with precedent and rests on a fundamental misinterpretation of the Bankruptcy Code and the Federal Power Act.

42.    The "decision of one district court judge is not binding on another district judge, even within the same district." <u>In re Carrozzella & Richardson</u>, 255 B.R. 267, 272 (Bankr. D. Conn. 2000); <u>see also</u> <u>EEOC v. Pan Am. World Airways</u>, 576 F. Supp. 1530, 1535 (S.D.N.Y. 1984) (district court's decision is not binding even on other district courts in the same district).

Thus, "a judge of the bankruptcy court — a unit of the district court — is not bound by the decision of a single district court judge." Carrozzella, 255 B.R. at 272; In re Jamesway Corp., 235 B.R. 329, 336 n.1 (Bankr. S.D.N.Y. 1999) (where a "bankruptcy court sits in a multi-judge district, it is not bound by principles of stare decisis by the decision of a district judge in that district"); In re Abernathy, 150 B.R. 688, 693 n.7 (Bankr. N.D. Ill. 1993) ("district Court bankruptcy decisions do not bind other district judges in the district"). A bankruptcy judge "is free to reexamine an issue despite the existence of a prior decision of another judge in the same district unless, by chance or otherwise, all judges in his or her district have ruled consistently on the same issue, or the Circuit or Supreme Court has so held." In re Finley, 160 B.R. at 898; see also In re Davis, 352 B.R. 758, 764 (Bankr. D.S.C. 2006) (citing cases); In re Baker, 264 B.R. 759, 762 (Bankr. M.D. Fla. 2001) (agreeing with this "modern trend"); In re KAR Dev. Assocs., L.P., 180 B.R. 629, 640 (D. Kan. 1995) (describing this as the "better view").

43.    Calpine rests on Judge Casey's determination that there is "little evidence" in the Bankruptcy Code of "congressional intent to limit FERC's regulatory authority." Calpine, 337 B.R. at 33. But that stands the required legal inquiry on its head. As the Supreme Court has held, "where Congress has intended to provide regulatory exceptions to provisions of the Bankruptcy Code, it has done so clearly and expressly." FCC v. NextWave Personal Commc'ns, Inc., 537 U.S. 293, 302 (2003); see also Bildisco, 465 U.S. at 521. The Bankruptcy Code makes clear that bankruptcy court jurisdiction exists "notwithstanding any Act of Congress that confers exclusive jurisdiction" on some other tribunal. 28 U.S.C. § 1334(b). The question, then, is not whether the Bankruptcy Code expressly limits FERC regulatory jurisdiction, but rather whether the Bankruptcy Code contains an express exemption for FERC-regulated contracts that restricts

the Court's rejection authority.  Because no such exemption exists, <u>Calpine</u> improperly nullified the Court's right to authorize rejection of FERC-regulated power sales agreements.

44.     The Supreme Court's decision in <u>NLRB v. Bildisco & Bildisco</u>, 465 U.S. 513 (1984), is on point.  The issue before the Court was whether a debtor's obligations to its employees under the National Labor Relations Act ("NLRA") limited the debtor's ability to reject a collective bargaining agreement.  Although an employer's unilateral termination or modification of a collective bargaining agreement without appropriate notice is an unfair labor practice under the NLRA, subject to the NLRB's exclusive jurisdiction, the Court found that this authority did not trump the right of contract rejection under section 365 of the Bankruptcy Code. <u>See Bildisco</u>, 465 U.S. at 518-19, 526.  The Court observed that section 365 authorizes rejection of "<u>all</u> executory contracts except those expressly exempted."  <u>Bildisco</u>, 465 U.S. at 521 (emphasis added).  Finding no exemption to this rejection authority for collective bargaining agreements, the Court held that the bankruptcy court could properly authorize rejection of such agreements. The Court reasoned that "[o]bviously, Congress knew how to draft an exclusion for collective-bargaining agreements when it wanted to."  <u>Id</u>. at 522-23.  The "failure to do so … indicates that Congress intended that section 365(a) apply to all collective-bargaining agreements covered by the NLRA." <u>Id</u>. at 523.

45.     Shortly after <u>Bildisco</u>, Congress enacted section 1113 of the Bankruptcy Code, which exempted collective bargaining agreements from section 365 and made clear that a higher hurdle existed before a collective bargaining agreement could be rejected.  <u>See, e.g.</u>, <u>Norfolk and W. Ry. Co. v. American Train Dispatchers Ass'n</u>, 499 U.S. 117, 136 n.2 (1991) ("Collective-bargaining agreements can be rejected only if the additional requirements of 11 U.S.C. § 1113 are met").  Neither before nor after <u>Bildisco</u>, however, has Congress excepted FERC-regulated

contracts from this Court's rejection authority. Indeed, as courts have recognized, <u>Bildisco</u> did not limit its analysis to collective bargaining agreements and, although Congress enacted section 1113, it "left intact <u>Bildisco</u>'s discussion" of the "general principles" applicable to the rejection of executory contracts. <u>In re FBI Distribution Corp.</u>, 330 F.3d 36, 44 (1st Cir. 2003). Accordingly, those principles — namely, that, absent an express statutory provision, there are no exceptions to a court's rejection authority — remain the law.

46.    In <u>Calpine</u>, Judge Casey attempted to distinguish <u>Bildisco</u>, suggesting that in that case the "parties conceded the rejection power of the bankruptcy court." <u>Calpine</u>, 337 B.R. at 34. But that distinction is unavailing, because "every federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it." <u>Steel Co. v. Citizens for A Better Env't</u>, 523 U.S. 83, 95 (1998). Judge Casey also suggested that <u>Bildisco</u> is distinguishable because the NLRB "does not possess exclusive jurisdiction over the terms and conditions of collective bargaining agreements." <u>Calpine</u>, 337 B.R. at 34. But, in fact, the NLRB's jurisdiction is broad and generally exclusive. <u>See International Longshoreman's Ass'n v. Davis</u>, 476 U.S. 380, 391 (1986) ("in enacting the NLRA Congress intended for the Board generally to exercise exclusive jurisdiction" over claims for unfair labor practices); <u>see also Trustees of the Int'l Bhd. of Teamsters Local 531 Sick & Welfare Fund v. Marangis Bros., Inc.</u>, 289 F. Supp. 2d 455, 466 n.5 (S.D.N.Y. 2003) ("as a general rule, the NLRB has exclusive jurisdiction over claims brought under" the NLRA); <u>Suarez v. Gallo Wine Distribs. LLC</u>, No. 02 Civ. 4273, 2003 WL 716548, at *1 (S.D.N.Y. Mar. 3, 2003) ("the National Labor Relations Board has original, exclusive jurisdiction of claims of unfair labor practices arising under sections 7 and 8 of the NLRA"). Whereas Judge Casey held that "where there is conflict, the

power of the bankruptcy court must yield to that of the federal agency," Calpine, 337 B.R. at 34, the Bildisco Court reached just the opposite conclusion — a bankruptcy court may permit the rejection of collective-bargaining agreements notwithstanding the NLRB's authority over the modification or termination of such agreements.

47.    The Fifth Circuit's Mirant decision further confirms, in the Debtors' respectful view, that Calpine was wrongly decided.    As the Fifth Circuit emphasized, Congress gave bankruptcy courts express authority over the rejection of executory contracts under section 365, while creating certain express exemptions to that general authority.  In re Mirant, 378 F.3d 511, 522 (5th Cir. 2004).  The Fifth Circuit considered it dispositive that the Bankruptcy Code does not "include an exception prohibiting rejection of, or providing other special treatment for, wholesale electric contracts subject to FERC jurisdiction."  Mirant, 378 F.3d at 521 (noting that Congress made such specific exceptions in 11 U.S.C. §§ 1110, 1113, and 1169).    Thus, according to the Fifth Circuit, it is "clear that Congress intended" section 365(a) "to apply to contracts subject to FERC regulation."  Id. at 522.

48.    The Fifth Circuit recognized, moreover, that the rejection of a FERC-regulated power contract does not encroach on FERC's jurisdiction under the Federal Power Act. Rejection under section 365(a) permits a debtor-in-possession to "breach" a contract, rendering the counterparty to the rejected contract "a general creditor of the estate for any damages flowing from the rejection." In re Orion, 4 F.3d at 1098 (citation omitted).  Accordingly, the Fifth Circuit held that a motion to reject an executory power contract is "not a collateral attack upon that contract's filed rate because that rate is given full effect when determining the breach of contract damages resulting from the rejection."  Mirant, 378 F.2d at 522.  In other words, contrary to Judge Casey's decision, rejection of the contract does not violate the filed rate doctrine by

21

changing the rates of the contract or otherwise affecting its duration. It merely "frees the estate from the obligation to perform" and provides the counterparty with a right to damages based on the contract's filed terms and conditions, including its rates and duration. See In re Lavigne, 114 F.3d 379, 387 (2d Cir. 1997) ("[r]ejection merely frees the estate from the obligation to perform; it does not make the contract disappear") (citation omitted).

49.     FERC itself has confirmed this analysis. In FERC's view, the breach through rejection of a market-based power contract — contracts that are privately negotiated — does not interfere with its broader regulatory interests. See California Elec. Oversight Bd. v. Calpine Energy Servs., L.P., 114 FERC ¶ 61,003, at ¶ 8 (2006). Nor does FERC have exclusive jurisdiction over claims for breach of contract. See, e.g., Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 579 n.9 (1981); see also PPL Mont., LLC, 96 FERC ¶ 61,313 at 62,208 (2001) (FERC has "long held that disputes over contracts for the sale of electric energy at negotiated, market-based rates are more appropriately resolved in court or by arbitration"). Indeed, as FERC has recognized, "breach of contract issues ... are matters better dealt with by courts of competent jurisdiction rather than through Commission review." Southern Co. Energy Mktg. L.P., 86 FERC ¶ 61,131 at 61,459 (1999). Because breaches of contract through rejection or otherwise neither interfere with FERC's jurisdiction under the Federal Power Act nor fall within FERC's exclusive jurisdiction, nothing prevents this Court from exercising its authority under the Bankruptcy Code to permit rejection. See In re Enron Corp., No. 05 Civ. 4079, 2005 WL 1185804, at *2-3 (S.D.N.Y. May 18, 2005) (denying withdrawal of the reference with respect to plaintiffs' claims premised on the Federal Power Act because debtors' objections to proofs of claims "do not lead to any jurisdictional conflict requiring substantial and material interpretation of non-Bankruptcy federal law").

22

50.    FERC recently re-emphasized these points in <u>Nevada Power Co.</u>, 111 FERC ¶ 61,111, at ¶ 15 (2005). In <u>Nevada Power</u>, an owner and operator of an electric transmission system sought a declaration from FERC preventing Calpine from terminating a transmission service agreement under which Calpine purchased capacity for the transmission of electric power. The transmission provider argued that the contract could not be breached without prior FERC approval. But FERC rejected that argument. As FERC explained, the breach of a transmission service agreement is a "straightforward matter of contract interpretation" that "is not important in relation to the regulatory responsibilities of the Commission." <u>Id</u>. Although Calpine's failure to perform under the contract was a "matter of significance to the parties," FERC held that the mere breach of an energy contract does not involve "broad issues of regulatory policy or statutory interpretation." <u>Id</u>. Instead, where, as here, the parties' dispute is "merely a contract dispute … over the damages resulting from termination of an agreement," the issues are "better left to a court." <u>Id</u>.

51.    In sum, the plain language of the Bankruptcy Code grants federal courts the power to authorize rejection of contracts. This authority extends to contracts for natural gas transportation because Congress has not expressly crafted an exemption for such contracts. <u>See</u> <u>Bildisco</u>, 465 U.S. at 521 (permitting rejection of "all executory contracts except those expressly exempted"); <u>NextWave</u>, 537 U.S. at 302 ("regulatory exceptions to provisions of the Bankruptcy Code" must be clear and express). As the controlling authorities make clear, Debtors may breach energy contracts, just like any other contracts; FERC does not have exclusive jurisdiction over breach of contract claims; and, therefore, as the Fifth Circuit and FERC have held, the Federal Power Act, like the Natural Gas Act, "does not preempt a district court's jurisdiction to authorize the rejection of an executory contract subject to FERC regulation as part of a

bankruptcy proceeding." <u>Mirant</u>, 378 F.3d at 522.  Judge Casey's contrary decision is wrong and should not be followed by this Court.

WHEREFORE, the Debtors respectfully request the entry of an order authorizing Debtors to reject the Contracts retroactive to the date of repudiation and granting such other and further relief as the Court deems appropriate.

Dated: November 9, 2007
      New York, New York

Respectfully submitted,

  /s/ James W. Draughn, Jr., P.C.
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted pro hac vice)
David R. Seligman (admitted pro hac vice)
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

James W. Draughn, Jr., P.C. (admitted pro hac vice)
Neil L. Levy (admitted pro hac vice)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Counsel for the Debtors*

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| | )  Chapter 11 |
| Calpine Corporation, et al., | ) |
| | )  Case No. 05-60200 (BRL) |
| Debtors. | )  Jointly Administered |
| | ) |

## ORDER AUTHORIZING THE DEBTORS TO REJECT
## CERTAIN NATURAL GAS PIPELINE TRANSPORTATION CONTRACTS

Upon motion (the "Motion")[1] of the above-captioned debtors (collectively, the "Debtors") for entry of an order authorizing the Debtors to reject certain natural gas pipeline transportation contracts; it appearing that the relief requested is in the best interest of the Debtors' estates, their creditors and other parties in interest; it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; it appearing that this proceeding is a core proceeding pursuant to 28 U.S.C. § 1572(b)(2); it appearing that venue of this proceeding and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; notice of this Motion and the opportunity for a hearing on this Motion was appropriate under the particular circumstances and that no other or further notice need be given; and after due deliberation and sufficient cause appearing therefore, it is hereby ORDERED

1.      The Motion is granted in its entirety.

2.      The Debtors are authorized and empowered to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

3.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

---

[1]      Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

4.      Each Contract listed on the attached <u>Schedule 1</u> is rejected effective as of the Repudiation Date, that is, April 7, 2006 for GTN contract numbers 7357, 8096, and 8429, and PNGTS contract number 1998-001, and January 11, 2007 for GTN contract numbers 8115, 8155, 8158, 8194, and 8428.

5.      The Debtors do not waive any claims that they have or may have against any of the counter-parties to the Contracts, whether such claims are related to the rejection of the Contracts.

6.      The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

7.      The requirement set forth in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that any motion or other request for relief be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

8.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2007

_____
United States Bankruptcy Judge

2

| SCHEDULE 1 | | | |
|---|---|---|---|
| | | | |
| Counterparty | Contract Tracking Number | Contract Title | Date of Contract Execution |
| Gas Transmission Northwest Corporation | 7357 | Firm Transportation Service Agreement | 3/12/2001 |
| Gas Transmission Northwest Corporation | 8096 | Firm Transportation Service Agreement | 8/31/2001 |
| Gas Transmission Northwest Corporation | 8115 | Firm Transportation Service Agreement | 10/31/01 |
| Gas Transmission Northwest Corporation | 8155 | Firm Transportation Service Agreement | 11/6/2001 |
| Gas Transmission Northwest Corporation | 8158 | Firm Transportation Service Agreement | 11/13/2001 |
| Gas Transmission Northwest Corporation | 8194 | Firm Transportation Service Agreement | 12/28/2001 |
| Gas Transmission Northwest Corporation | 8428 | Firm Transportation Service Agreement | 8/6/2002 |
| Gas Transmission Northwest Corporation | 8429 | Firm Transportation Service Agreement | 8/6/2002 |
| Portland Natural Gas Transportation System | 1998-001 | Gas Transportation Contract for Firm Transportation Service Between Portland Natural Gas Transmission System And Rumford Power Associates Limited Partnership | 2/12/1998 |

**EXHIBIT B**

## EXHIBIT B

| Counterparty | Contract Tracking Number | Contract Title | Date of Contract Execution |
|---|---|---|---|
| Gas Transmission Northwest Corporation | 7357 | Firm Transportation Service Agreement | 3/12/2001 |
| Gas Transmission Northwest Corporation | 8096 | Firm Transportation Service Agreement | 8/31/2001 |
| Gas Transmission Northwest Corporation | 8115 | Firm Transportation Service Agreement | 10/31/01 |
| Gas Transmission Northwest Corporation | 8155 | Firm Transportation Service Agreement | 11/6/2001 |
| Gas Transmission Northwest Corporation | 8158 | Firm Transportation Service Agreement | 11/13/2001 |
| Gas Transmission Northwest Corporation | 8194 | Firm Transportation Service Agreement | 12/28/2001 |
| Gas Transmission Northwest Corporation | 8428 | Firm Transportation Service Agreement | 8/6/2002 |
| Gas Transmission Northwest Corporation | 8429 | Firm Transportation Service Agreement | 8/6/2002 |
| Portland Natural Gas Transportation System | 1998-001 | Gas Transportation Contract for Firm Transportation Service Between Portland Natural Gas Transmission System And Rumford Power Associates Limited Partnership | 2/12/1998 |

**EXHIBIT C**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Calpine Corporation, <u>et al.</u>,<br><br>Debtors. | Chapter 11<br><br>Case No.: 05-60200 (BRL)<br>Jointly Administered |

**AFFIDAVIT OF BRUCE CRAIG CHANCELLOR**
**IN SUPPORT OF DEBTORS' MOTION TO REJECT**
**CERTAIN NATURAL GAS PIPELINE TRANSPORTATION CONTRACTS**

STATE OF TEXAS              )
                           ) ss.
COUNTY OF HOUSTON           )

I, Bruce Craig Chancellor, being duly sworn, hereby depose and state:

1.      I am the Vice President – Gas Regulatory at Calpine Corporation, a debtor and debtor-in-possession ("Calpine" and, collectively with certain of its affiliates as debtors and debtors-in-possession, the "Debtors"). In this capacity, I am generally familiar with the relationship and course of dealings between the Debtors and Gas Transmission Northwest Corporation ("GTN") and Portland Natural Gas Transmission Systems ("PNGTS").

2.      I have served as Calpine's Vice President – Gas Regulatory for three years and have worked for Calpine for eight years. Prior to working at Calpine, I worked at Koch Gateway Pipeline Company ("Koch") for six years. I have a Bachelor of Science degree in finance and accounting from Southwest Missouri State University. While at Koch, I directly managed a

Federal Energy Regulatory Commission ("FERC") natural gas pipeline rate case from the initial filing through resolution and participated in numerous natural gas regulatory matters. At Calpine, my responsibilities include representing Calpine as a customer in various natural gas regulatory matters at the state and federal levels. I also participate on behalf of Calpine in state and federal rate cases that affect its business. I have directly participated in or monitored several rate cases before FERC.

3.      I submit this affidavit in support of the Debtors' Motion to Reject Certain Natural Gas Pipeline Transportation Contracts (the "Motion to Reject"). Except as otherwise indicated, all facts set forth herein are based on my personal knowledge. I am authorized to submit this Affidavit on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein to which I have personal knowledge.

4.      I have personal knowledge of all aspects of each of the Contracts discussed below, including their material terms and negative impact upon Calpine, and I submit this affidavit in support of the Debtors' Contract Rejection Motion. As explained further below, after detailed analysis, Calpine seeks to reject nine Contracts that were repudiated more than nine months ago and that, if performed would collectively impose hundreds of millions of dollars in fixed charges over the remaining life of the Contracts.

**A.      Overview of Debtors' Gas Pipeline Transportation Contracts**

5.      The Debtors entered into eight long-term firm natural gas transportation service contracts with GTN and one long-term firm natural gas transportation service contract with PNGTS.

2

6.    These contracts are common within the natural gas industry.  In the natural gas industry, entering contracts for long-term transportation service is akin to a business entering a contract with a local messenger service or with Federal Express to ensure that, notwithstanding fluctuations in demand for such services, the particular business customer will always have access to a messenger regardless of when (or whether) the messenger may be needed.  Just as a business may pay a set fee to ensure that a messenger is available to deliver its mail and packages, under the Contracts, Calpine paid a fixed demand charge to ensure that transportation capacity was reserved and available on the pipelines so that, at its option, it was able to transport its natural gas.

7.    In particular, firm natural gas transportation service means the Debtors received secure, uninterruptible service in exchange for paying a set reservation charge for the capacity, regardless of actual usage.  Select terms of the Contracts are identified below:

| Contract Number | Date Signed | Termination Date | Quantity |
|---|---|---|---|
| 7357 | March 12, 2001 | October 31, 2023 | 15,000 Dth |
| 8096 | August 31, 2001 | November 30, 2042 | 35,800 Dth |
| 8115 | October 31, 2001 | October 31, 2023 | 19,438 Dth |
| 8155 | November 6, 2001 | October 31, 2023 | 10,000 Dth |
| 8158 | November 13, 2001 | October 31, 2023 | 21,348 Dth |
| 8194 | December 28, 2001 | October 31, 2015 | 10,000 Dth |
| 8428 | August 6, 2002 | October 31, 2028 | 25,000 Dth |
| 8429 | August 6, 2002 | October 31, 2028 | 25,000 Dth |
| 1998-001 | February 12, 1998 | October 31, 2020 | 44,000 MMBtu |

**B.    Debtors' Repudiation Of Natural Gas Pipeline Transportation Contracts**

8.    After filing their Petition for relief under Chapter 11 of the Bankruptcy Code, the Debtors determined that reserved transportation capacity was no longer needed.  Just as a business might repudiate its contract with a messenger service if it determined that it no longer

3

needed to retain an on-call messenger to deliver its mail and packages, the Debtors determined that they no longer needed reserved space on the pipeline for transporting natural gas. The Debtors contracted for the firm transportation on GTN under the unrealized expectation of future demand for power on a long term basis and a greater portfolio of operating assets in Northern California. The Debtors no longer need the firm transportation on PNGTS because the asset for which the contract was intended to provide gas transportation service is no longer owned by the Debtors. The Debtors therefore decided to repudiate the Contracts, canceling performance under the contracts and leaving themselves open to a potential damages claim by GTN and PNGTS.

9.      On April 7, 2006, the Debtors formally repudiated three of the GTN contracts (contract numbers 7357, 8096, and 8429) and the PNGTS contract (contract number 1998-001) in the "Debtors' Objection To Motion of Gas Transmission Northwest, Portland Natural Gas Transmission System, and TransCanada Pipelines Limited to Enforce Stipulation and to Compel Debtors to Replenish Assurances." Since that April 7, 2006 filing, the Debtors have consistently treated those four contracts as repudiated and have neither requested service under those Contracts, nor used the firm transportation capacity available under the Contracts.

10.     On January 11, 2007, the Debtors repudiated the five remaining GTN contracts (contract numbers 8115, 8155, 8158, 8194, and 8428) and, in doing so, affirmatively stated, "effective immediately, Calpine Energy Services, L.P. will no longer accept service under the Contracts, and Calpine Energy Services, L.P. hereby releases and relinquishes any right to ongoing service or capacity under the Contracts." *See* 2007-01-11 Ltr. K. Kinneman (Calpine) to J. Rush (GTN) (Exhibit A). Since the January 11, 2007 repudiation, the Debtors have consistently treated the remaining five contracts as repudiated and have neither requested service under those Contracts, nor used the  transportation capacity available under the Contracts.

### C.    Debtors Conducted An Extensive Contract Review Process

11.    As the Debtors entered into chapter 11 protection, I developed, managed, and participated in the process of determining which contracts were not beneficial to the Debtors' estate. In connection with the chapter 11 reorganization process, the Debtors have determined in their sound business judgment that the Contracts do not benefit the estate. In my judgment, based on my experience as Vice President – Gas Regulatory at Calpine Corporation, rejecting these nine natural gas transportation contracts will benefit Calpine because they provide no benefit to the estate, while imposing potentially enormous multi-million dollar costs if the Debtors are required to continue to make payments for unused and unnecessary firm transportation services under the Contracts.

12.    The Debtors are not seeking to reject the Contracts to obtain a better rate for pipeline transportation services. Instead, the Debtors do not need the firm transportation they have reserved on the pipelines under these Contracts to transport natural gas. The Debtors have repudiated these Contracts and have not used the firm transportation provided under these agreements since repudiation.

### D.    Summary of The Contracts

13.    Debtors have moved to reject the following Contracts, all of which were previously repudiated by Debtors.

14.    <u>Firm Transportation Service Agreement</u> (GTN Contract No. 7357):  The parties contracted for Debtors to pay for a set amount of pipeline capacity (15,000 Dth/d) through October 31, 2023.  Debtors would be required to pay in excess of $24.5 million in fixed demand

charges to perform through the expiration of this contract for firm natural gas transportation services they do not need.

15.     <u>Firm Transportation Service Agreement</u> (GTN Contract No. 8096):  The parties contracted for Debtors to pay for a set amount of pipeline capacity (35,800 Dth/d) through November 30, 2042.  Debtors would be required to pay in excess of $122 million in fixed demand charges to perform through the expiration of this contract for firm natural gas transportation services they do not need.

16.     <u>Firm Transportation Service Agreement</u> (GTN Contract No. 8115):  The parties contracted for Debtors to pay for a set amount of pipeline capacity (19,438 Dth/d), through October 31, 2023.  Debtors would be required to pay in excess of $30.4 million in fixed demand charges to perform through the expiration of this contract for firm natural gas transportation services they do not need.

17.     <u>Firm Transportation Service Agreement</u> (GTN Contract No. 8155):  The parties contracted for Debtors to pay for a set amount of pipeline capacity (10,000 Dth/d), through October 31, 2023, at or below the FERC-approved reservation rate.  Debtors would be required to pay in excess of $15.6 million in fixed demand charges to perform through the expiration of this firm natural gas transportation contract.

18.     <u>Firm Transportation Service Agreement</u> (GTN Contract No. 8158):  The parties contracted for Debtors to pay for a set amount of pipeline capacity (21,348 Dth/d), through October 31, 2023.  Debtors would be required to pay in excess of $ 33.3 million in fixed demand charges to perform through the expiration of this contract for firm natural gas transportation services they do not need.

19.     <u>Firm Transportation Service Agreement</u> (GTN Contract No. 8194):  The parties contracted for Debtors to pay for a set amount of pipeline capacity (10,000 Dth/d), through October 31, 2015.  Debtors would be required to pay in excess of $ 8.1 million in fixed demand charges to perform through the expiration of this contract for firm natural gas transportation services they do not need.

20.     <u>Firm Transportation Service Agreement</u> (GTN Contract No. 8428):  The parties contracted for Debtors to pay for a set amount of pipeline capacity (25,000 Dth/d), through October 31, 2028.  Debtors would be required to pay in excess of $26.5 million in fixed demand charges to perform through the expiration of this contract for firm natural gas transportation services they do not need.

21.     <u>Firm Transportation Service Agreement</u> (GTN Contract No. 8429):  The parties contracted for Debtors to pay for a set amount of pipeline capacity (25,000 Dth/d), through October 31, 2028.  Debtors would be required to pay in excess of $52.5 million in fixed demand charges to perform through the expiration of this contract for firm natural gas transportation services they do not need.

22.     <u>Gas Transportation Contract for Firm Transportation Service Between Portland Natural Gas Transmission System And Rumford Power Associates Limited Partnership</u> (PNGTS Contract No. 1998-001):  The parties contracted for Debtors to pay for a set amount of pipeline capacity, effective November 1, 2000 through October 31, 2020.  As amended, the Debtors are required to pay for 44,000 MMBtu of natural gas capacity per day for natural gas transportation services they do not need.

**E.    Rejecting The Contracts Will Not Harm The Public Or Have Any Effect On Power Supply**

23.    Rejecting the Contracts would not disrupt the continued supply of wholesale electricity within the Debtors' areas of operation.

24.    The Contracts do not involve the sale of power to utilities for use by consumers. In the parties' agreements, the Debtors are the customers and GTN and PNGTS are the sellers. Rejecting the Contracts will therefore not impact wholesale natural gas supplies.

25.    Since repudiating the Contracts, the Debtors have not used any firm transportation under the Contracts.   That is, the Debtors have not requested services under the Contracts, have not transported natural gas over pipelines pursuant to the Contracts, and no party has performed under the Contracts.

26.    Since repudiating the Contracts, the Debtors have not prevented GTN and PNGTS from discontinuing service under the contracts, remarketing capacity to other customers, or negotiating new contracts with other customers for the capacity that the Debtors ceased using.

27.    Currently, the firm capacity Debtors contracted for under the repudiated Contracts is not being used by the Debtors, and market participants have the opportunity to utilize the capacity more effectively.   Debtors repudiated four contracts well over a year ago, and the remaining five in January of 2007, and the power supply has not been adversely effected.

28.    There has been no curtailment or non-dispatch of the Debtors' power generating facilities as a result of repudiation of these contracts.

29.    The net effect of these factors — (a) the Debtors are merely customers under these natural gas pipeline transportation contracts, and not sellers of energy pursuant to these contracts; (b) the natural gas pipelines are and have been free to remarket their capacity to other

purchasers of capacity; and (c) the Debtors repudiated these contracts at least over nine months ago, with no negative impact on the Debtors' ability to provide power — is that permitting Debtors to reject the Contracts will effect no disruption on the supply of wholesale electricity.

Executed on November 7, 2007

_____
            Bruce Craig Chancellor

Sworn to and subscribed before me
this __9__ day of November, 2007.

_____

Notary Public, State of ___Texas___
No. _____
Qualified in ___Harris___ County
Commission Expires ___2/23/2011___

SORANA LINDER
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
FEB. 23, 2011

**EXHIBIT D**

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted pro hac vice)
David R. Seligman (admitted pro hac vice)
Edward O. Sassower (ES 5823)

Counsel for the Debtors

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) ) Chapter 11 |
| Calpine Corporation, <u>et al.</u>, | ) ) ) Case No. 05-60200 (BRL) |
| Debtors. | ) Jointly Administered ) |

**AFFIDAVIT OF MORGAN P. SUCKOW IN SUPPORT OF
DEBTORS' RESPONSE TO THE BANKRUPTCY COURT'S ORDER
TO SHOW CAUSE WHY THE EQUITY COMMITTEE'S MOTION
FOR A STAY PENDING APPEAL SHOULD NOT BE GRANTED**

| | | |
|---|---|---|
| STATE OF NEW YORK | ) | |
| | ) | ss: |
| COUNTY OF NEW YORK | ) | |

Morgan P. Suckow, being duly sworn, deposes and states:

1.     I am a Vice President of Miller Buckfire & Co. LLC ("Miller Buckfire"), which is serving as Financial Advisor and Investment Banker to the debtors in the above-captioned Chapter 11 Cases (collectively, the "Debtors").

2.     I graduated from Duke University.

3.     During my professional career, I have advised clients in numerous restructurings involving billions of dollars of debt. I have extensive experience representing debtors, creditors

and other constituents in numerous M&A, financing and restructuring transactions, including many in the energy industry. In addition to my work with these Debtors, my energy industry experience includes engagements with TECO Energy and the Official Committee of Unsecured Creditors of Mirant Corporation.

4.    I am familiar with and participated in the Debtors' efforts to obtain additional capital to fund their emergence from these chapter 11 cases.

5.    Between April and June 2007, the Debtors, through Miller Buckfire, ran a competitive process to obtain an exit financing commitment. During that process, Miller Buckfire contacted five potential lenders and received favorable initial proposals from each. The Debtors and Miller Buckfire subsequently negotiated with each potential lender to ensure that the Debtors would receive the most attractive terms available for the exit financing. On May 11, 2007, the Debtors selected Goldman Sachs to be the lead arranger for the exit financing. The Debtors and Goldman Sachs negotiated the exit financing commitment until June 20, 2007, when the Debtors received an executed commitment for an exit financing (the "Exit Financing Commitment") with very competitive pricing and structure terms. That Exit Financing Commitment expires on January 31, 2008.

6.    Shortly after the Debtors executed the Exit Financing Commitment and paid a portion of the commitment fee, the capital markets began to experience significant volatility, resulting in deteriorating debt market conditions. Those worsening conditions are evidenced by market metrics for leveraged loans similar to Calpine's exit facility. For example, according to Standard & Poor's Leveraged Commentary and Data, the average yield in the secondary market for large single-B rated loans, expressed as a spread over the prevailing LIBOR rate, rose from 229 basis points to 367 basis points from the end of June 2007 to the end of September 2007. (A

true and accurate copy of the LCD chart showing the "Average Secondary Spread of B-Rated Deals Subset of Top 100 Facilities by Outstandings" is attached hereto as Exhibit A.) That rise represents investors' increased yield requirements in the current debt markets.

7.      If the current debt capital market conditions were to persist, and if the Debtors were required to negotiate a new exit financing due to an expiration of the Exit Financing Commitment, the cost of new financing likely would be materially higher and certain terms would be materially worse. Consequently, the Debtors' interest expense on a new exit financing of similar size would significantly exceed the interest expense under the Exit Financing Commitment, costing the Debtors hundreds of millions of dollars over the life of the loan. For example, if the interest cost of Calpine's exit financing were to increase commensurate with the increase in the average yield on single-B rated loans – everything else being equal – Calpine would incur nearly $800 million in aggregate additional interest expense over the life of the financing. In short, the current Exit Financing Commitment is a valuable and irreplaceable asset of the Debtors' estates.

8.      Further, if Calpine were to lose the Exit Financing Commitment and were required to raise new and more expensive exit financing, the Debtors may determine that it is prudent to raise less debt in order to maintain a manageable level of interest expense. Given current or further deteriorated debt capital market conditions, there is also a possibility that the amount of financing contemplated by the Exit Financing Commitment would not be available to the Debtors. The Debtors consequently may have insufficient liquidity to satisfy their second-lien lenders in cash, requiring material changes to the structure of the Debtors' plan of reorganization and further delaying these Chapter 11 cases.

9.    Finally, if the Debtors were to lose their Exit Financing Commitment and their emergence from bankruptcy were to be delayed, the Debtors would continue to accrue claims in respect of post-petition interest on, among other things, the second-lien debt, unsecured debt claims, contract rejection claims and general unsecured claims.    Based on current claims estimates, the Debtors would accrue approximately $70 million in additional claims per month in respect of post-petition interest for each month that emergence from bankruptcy is delayed.

Dated:  October 3, 2007                    Respectfully submitted,

                                           _____
                                           Morgan P. Suckow
                                           Vice President
                                           Miller Buckfire & Co. LLC

                                           Financial Advisor and Investment Banker
                                           to the Debtors

Sworn to and subscribed before
me this _3_ day of October 2007.

Notary Public: _Michelle Nunns_

My Commission Expires: _Nov. 1 2008_

> MICHELLE NUNNS
> Notary Public, State of New York
> No. 01NU6117939
> Qualified in New York County
> Commission Expires November 1, 2008

5

**<u>Exhibit A</u>**



Average Secondary Spread of B-Rated Deals Subset of Top 100 Facilities by Outstandings

Source: Standard and Poor's LCD and S&P/LSTA Leveraged Loan Index

All (58) — Cov-Lite (16) — Cov Heavy (42)