# ELROD, PLLC

Trial Attorneys
500 North Akard, Suite 3000
Dallas, Texas 75201
(214) 855-5188
Fax (214) 855-5183
www.elrodtrial.com

David W. Elrod
Brian A. Farlow
Elizabeth Reding Gambrell
Susan D. Nassar
Jennifer S. Roberts
Craig Tadlock
Barbara L. Wohlrabe

delrod@elrodtrial.com

May 18, 2006

*Via E-Mail and Facsimile (212-446-4900)*
Robert G. Burns, Esq
Iskender H. Catto, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611

*Via E-Mail and Facsimile (312-861-2200)*
Ross M. Kwasteniet, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636

Re:   *In re Calpine Corporation, et al.*, Case No. 05-60200, United States Bankruptcy Court, Southern District of New York

Dear Mr. Burns, Mr. Catto, and Mr. Kwasteniet:

This letter responds to Mr. Catto's letter of May 4, 2006, regarding the Debtors' purported "repudiation" of the firm gas transportation contract (the "Contract") between Rumford Power Associates Limited Partnership ("Rumford") and Portland Natural Gas Transmission System ("PNGTS").

The Debtors have not provided any authority to support their position that they may unilaterally "repudiate" the Contract. The Debtors did not cite any supporting authority in their Objection to the Pipelines' Motion to Enforce Stipulation and Compel Debtors to Replenish Assurances, and they have not done so in any other pleading. Likewise, Debtors' counsel did not present any such authority at the April 11 hearing. I followed up with a letter dated April 28 asking for an explanation of why the Debtors failed to pay PNGTS's invoice for services rendered in March, but I have not received any response. We have also searched for authority to support the Debtors' position and have not been able to find any. Please provide us with any authority the Debtors have to support their position that they may "repudiate" the Contract, other than by rejecting the Contract pursuant to Section 365 of the Bankruptcy Code.

Robert G. Burns, Iskender H. Catto & Ross M. Kwasteniet
May 18, 2006
Page 2

As PNGTS set forth in its Motion to Withdraw the Reference with respect to Debtors' subsequently-withdrawn Notice of Rejection, the Contract falls within the exclusive jurisdiction of the Federal Energy Regulatory Commission ("FERC"). As the District Court held in its *California Dept. of Water Resources* Memorandum & Order, FERC's jurisdiction and the filed rate doctrine extend to the terms and conditions of FERC-jurisdictional contracts, such as the duration of such a contract. The Debtors have not done anything that would alter the duration of the Contract or the Debtors' obligation to pay as provided by the Contract. Moreover, even if the Bankruptcy Court had jurisdiction over the Contract rather than FERC, the Debtors would have to obtain authority from the Court to reject under Section 365 before they could reject their obligations under the Contract.

In addition, the secured lender of the Rumford facility, U.S. Bank, has taken the position in its pleadings that the Contract is bundled with the Rumford facility and that separating the Contract from the facility would be detrimental to the estate and to U.S. Bank's secured interest. For instance, at paragraph 23 of U.S. Bank's Motion to Withdraw the Reference, U.S. Bank states:

> [D]etrimental aspects of the Rejection Transaction [*i.e.*, turnback of the facility to the Owner Lessor] as proposed by Calpine include the following: ...
>
> Key contracts and agreements. The Debtors have not agreed to assign to the Owner Lessor ***key contracts required or desirable*** for the continued long-term operation of the Facilities, ***including, without limitation, the natural gas transportation contracts*** ...

U.S. Bank goes on to state, at paragraph 26 of its Motion to Withdraw the Reference:

> At least three natural gas transportation contracts were executed in connection with the operation of the Tiverton and Rumford Facilities. Calpine maintains the fiction that the fate of such gas transmission contracts is separate from that of the Facilities served thereby. ***In fact, the failure to have firm transportation in place may lead to disruption of operation of the Facilities down the road,*** and it is clearly outside the scope of the Bankruptcy Court's jurisdiction to decide whether these contracts may be unbundled from the Facilities and weigh the related public interest concerns.

In light of these issues, including the position taken by U.S. Bank that the Contract must be kept in place and bundled with the Rumford facility, we are confused by the Debtors' assertion that PNGTS has the necessary authority to market the capacity under the Contract. To date, we have not seen that the Debtors have sought or obtained

Robert G. Burns, Iskender H. Catto & Ross M. Kwasteniet
May 18, 2006
Page 3

any agreement from U.S. Bank for PNGTS to market the capacity under the Contract. If the Debtors have obtained such an agreement, please let us know.

Mr. Catto's letter of May 4 asks whether the Debtors may be of any further assistance with respect to mitigation of damages under the Contract. Apparently, the Debtors have taken no efforts to market the capacity to date, yet the Debtors' positions and actions have impaired PNGTS's ability to make the contracted capacity available for sale. More importantly, the Debtors never responded to PNGTS's offer to assist the Debtors in pursuing a mutually beneficial self-mitigation strategy, which was contained in our letter dated January 18, 2006. The position taken by U.S. Bank in its Motion to Withdraw the Reference suggests that the Owner Lessor of the Rumford facility and/or U.S. Bank are interested in taking an assignment of the Contract as part of an arrangement to turn back the Rumford facility, because reliable long-term gas transportation to the facility is integral to the value of the facility. Accordingly, PNGTS requests that the Debtors pursue assumption and assignment of the Contract as part of the proposed transaction to turn back the Rumford facility.

PNGTS of course reiterates its offer to assist in such a transaction, as set forth in my letter of January 18, and also reminds the Debtors that PNGTS is limited in its ability to remarket the capacity under the Contract because of its contractual "most favored nations" obligations to other shippers.

If you have any questions, please contact me.

Very truly yours,

David W. Elrod

cc:   Craig Tadlock (Firm)

# ELROD, PLLC

Trial Attorneys
500 North Akard, Suite 3000
Dallas, Texas 75201
(214) 855-5188
Fax (214) 855-5183
www.elrodtrial.com

David W. Elrod
Brian A. Farlow
Susan D. Nassar
Craig Tadlock
Barbara L. Wohlrabe

delrod@elrodtrial.com

February 19, 2007

*Via E-Mail and Facsimile (212-446-4900)*
Iskender H. Catto, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611

*Via E-Mail and Facsimile (312-861-2200)*
Ross M. Kwasteniet, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636

Re:  *In re Calpine Corporation, et al.*, Case No. 05-60200, United States Bankruptcy Court, Southern District of New York

Dear Mr. Catto and Mr. Kwasteniet:

This letter responds to the letter dated January 11, 2007, from Jeffrey Kinneman of Calpine to Jeff Rush of Gas Transmission Northwest Corporation ("GTN").

Mr. Kinneman's letter of January 11 says that Calpine "releases" and "relinquishes" its "right to ongoing service or capacity" under the five firm transportation service agreements that Calpine had designated as "retained" contracts. We cannot comprehend what Mr. Kinneman means by these statements.

GTN is not aware of any permanent or temporary release of the capacity under these contracts to another shipper. Under applicable authority and GTN's tariff, a contract cannot be permanently released without GTN's knowledge and consent. In addition, we have not seen any request for bankruptcy court approval of any transfer of any of Calpine's rights under the retained contracts. If Calpine has indeed released the capacity, please advise us of the terms and conditions of the proposed release and provide the documentation showing the requisite approval.

Likewise, GTN is not aware that Calpine has obtained the requisite approval under applicable authority to "relinquish" the capacity under the five retained contracts – that is, to turn back the capacity to GTN. If Calpine has indeed obtained the requisite

Iskender H. Catto & Ross M. Kwasteniet
February 19, 2007
Page 2

authority to relinquish the capacity, please furnish us with documentation of Calpine obtaining the authority permitting it to do so.

By stating that Calpine "will no longer accept service under the Contracts," Calpine's letter suggests that instead of truly "releasing" or "relinquishing" the capacity, Calpine may be intending to attempt to reject the five retained contracts. However, as we have previously discussed with you, Calpine has not rejected the contracts and has stated that it cannot do so at this time under the law of the case from District Court Judge Casey's opinion in *California Department of Water Resources*, because of the jurisdictional issues that were decided therein.

We are also puzzled by Mr. Kinneman's statement that Calpine has determined that the contracts "provide no benefit to its estate" when Calpine continues to utilize services on the GTN pipeline and/or purchase gas transported along the GTN pipeline, and when Calpine used the transportation services under the contracts extensively through the end of December.

At this time, we will consider Mr. Kinneman's letter to be of no force and effect, unless Calpine provides us with documentation showing that it has obtained the requisite approval to "release" or "relinquish" the contracts.

In addition, Calpine has failed to pay the November and December invoices for services under the firm transportation agreements between Calpine and GTN in accordance with the contracts and the tariff. The November invoice (Invoice ID 200611023) was in the amount of $1,264,700.44, and the December invoice (Invoice ID 200612023) was in the amount of $1,284,930.79.

We understand that Calpine has made small partial payments of $57,424.04 on the November invoice and $69,233.79 on the December invoice; however, the remaining balance (without interest) is $1,207,276.40 for November and $1,215,697.00 for December for a total of $2,422,973.40.

Calpine also had a substantial outstanding balance prior to the November and December invoices, such that the total amount outstanding at the time of the December invoice was $6,680,348.04 (without interest). Calpine's small partial payment on the December invoice reduces that amount to $6,611,114.25 (without interest).

Until the November invoice, Calpine had been paying for services under the five firm contracts that it had designated as "retained" contracts, and GTN is not aware of any good faith basis for Calpine to withhold payment for services under those contracts during the months when Calpine used them.

Iskender H. Catto & Ross M. Kwasteniet
February 19, 2007
Page 3


      Finally, as you know, GTN also contends that it is entitled to payment as an administrative expense under the three firm contracts that Calpine purported to "repudiate" several months ago. Despite repeated requests, Calpine has never provided any authority to support its position that it may unilaterally "repudiate" contracts. As discussed above with respect to the five contracts that were the subject of the January 11 letter, Calpine has not rejected the contracts and has stated that it cannot do so at this time in light of the jurisdictional issues.

      If you have any questions, please contact me.

                                          Very truly yours,

                                          David W. Elrod

cc:     Craig Tadlock (Firm)
         Carl Fink, GTN
         Ken Nichols, GTN