# Exhibit B

Portland Natural Gas Transmission System
Proof of Claim Summary
7/26/06

Dates  8/1/2006  3/31/2008

| Contract # | path start date | path end date | rate schedule | Reservation Rate April 1, 2006 through March 31, 2008 | Reservation rate prior to April 1, 2006 and after March 31, 2008 | MDQ | Pre-petition unpaid amount Prior to Dec. 20, 2005 | Post-petition unpaid amount March 1, 2006 to July 31, 2006 | Exposure (Contingent Claim) beyond August 1, 2006 |
|---|---|---|---|---|---|---|---|---|---|
| FT-1998-001 | 11/1/2000 | 10/31/2020 | FT | 0.830000 | 0.850000 | 44,000 | $1,873,396 | $5,581,650 | $194,131,960 |
| Totals | | | | | | 44,000 | $1,873,396 | $5,581,650 | $194,131,960 |

# Exhibit C

FT-1998-001

Firm Gas Transportation Contract

# GAS TRANSPORTATION CONTRACT
# FOR FIRM TRANSPORTATION SERVICE
# BETWEEN
# PORTLAND NATURAL GAS TRANSMISSION SYSTEM
# AND
# RUMFORD POWER ASSOCIATES LIMITED PARTNERSHIP

This Gas Transportation Contract ("Contract") is made as of the _12_ Day of _February_ 1998 by and between the Portland Natural Gas Transmission System, a Maine general partnership, (herein "Transporter") and Rumford Power Associates Limited Partnership, a Maine limited partnership, (herein "Shipper") (Transporter and/or Shipper are sometimes referred to herein as "Party" or "Parties"), pursuant to the following recitals and representations:

WHEREAS, the Federal Energy Regulatory Commission ("FERC") has on September 24, 1997 issued in Docket No. CP96-249-000 a certificate of public convenience and necessity ("FERC Certificate") authorizing Transporter to construct, own, operate, and maintain a natural gas transmission system (herein "System");

WHEREAS, Shipper intends to construct an electric generating station located at Industrial Park Road, Rumford, Maine ("Rumford Station"); and

WHEREAS, Shipper intends to enter into natural gas supply arrangements, including transportation upstream of Transporter's System, and to make arrangements for the delivery of such gas supply for the account of Shipper to the Receipt Point(s), and downstream of the Delivery Point(s) and will require transportation service on Transporter's System for the supplies of natural gas that Shipper intends to acquire for use as fuel in the Rumford Station, all estimated to commence on November 1, 2000;

WHEREAS, Transporter intends to apply for and, subject to the terms and conditions set forth herein, receive and accept all necessary United States regulatory authorizations or exemptions to accept delivery of gas imported by Shipper at the Receipt Point(s) and to transport such gas on behalf of Shipper to the Delivery Point(s), subject to the terms and conditions of this Contract and Transporter's gas tariff as approved by the FERC (the "FERC Tariff"); and

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein assumed, Transporter and Shipper agree as follows:

## ARTICLE I - PRECONDITIONS

1.  (a)  Transporter shall apply for or cause to be applied for and use reasonable best efforts to obtain from governmental and regulatory authorities having jurisdiction over such authorizations or exemptions (herein "Regulatory Approvals") as are necessary: (i) to enable Transporter to construct, own and operate and to provide transportation services on Transporter's

1

System for the account of Shipper and others, and (ii) for the performance of the transactions herein contemplated or for any other transactions necessary for the performance of those herein contemplated.

(b) Shipper shall apply for or cause to be applied for and use reasonable best efforts to obtain all of the agreements and Regulatory Approvals as are necessary: (i) to enable Shipper to deliver to and receive from Transporter the transportation quantities specified below, and (ii) for the performance of the transactions herein contemplated or for any other transactions necessary for the performance of those herein contemplated.

(c) Shipper and Transporter agree that, in satisfying their respective obligations under this Contract, each shall support the applications for necessary Regulatory Approvals filed by the other and shall make any demonstrations to such regulatory and governmental agencies which may be reasonably requested by the other Party.

(d) For the period of time extending from the date of this Contract to one (1) year after Transporter's System is first placed into service, Shipper shall (i) not oppose any facility expansion, extension, or addition to Transporter's System, (ii) not oppose the phasing of certification or construction of Transporter's System, and (iii) support the rolled-in rate treatment of facilities described in subparagraphs (i) and (ii) of this paragraph (d), provided the roll-in of the cost of such facilities does not increase the rate paid by Shipper.

2. In the event that the Regulatory Approvals, or any of them, required to be obtained by Transporter as set forth in Section 1 hereof are unacceptable to Transporter, the parties agree that they shall negotiate in good faith as to what further action, if any, should be undertaken to remedy the unacceptable features of such Regulatory Approvals. Transporter may not determine that a Regulatory Approval is unacceptable to it unless (i) such determination is accompanied by a written statement to Shipper setting forth the reasons for the unacceptability, and (ii) the Regulatory Approval contains terms or conditions materially different from those terms and conditions which Transporter sought, or if such Regulatory Approval contains terms or conditions which were not expressly sought by Transporter but which are materially different from terms and conditions contained in authorizations accepted by applicants for similar services or facilities.

3. In the event that any required Regulatory Approval, other than the FERC Certificate, has not been obtained by November 1, 1999, then either party may thereafter, at its option, terminate this Contract by giving ninety (90) days written notice to the other party of its intention to terminate. Unless such required Regulatory Approval is obtained during the ninety (90) days notice period, or such additional period as the parties shall mutually agree, this Contract shall terminate effective upon the expiration of said period and shall thereafter be of no further force and effect; provided, however, that in no event shall a party have a right to terminate this Contract if the failure to obtain such Regulatory Approval is caused by the failure of such party to act in a timely manner and/or to use reasonable best efforts to obtain such approval.

2

Firm Gas Transportation Contract

4. Construction of Transporter's System and the rights and obligations under this Contract are subject to (i) the receipt of all Regulatory Approvals necessary for Transporter to perform its obligations hereunder, and (ii) the receipt by Transporter of financing commitments necessary for construction of Transporter's System in a form satisfactory to Transporter in its reasonable discretion.

5. The rights and obligations under this Contract shall cease unless (i) Shipper has obtained all financial commitments by June 1, 1999 to make the capital expenditures necessary to initiate and complete the construction of the Rumford Station for Shipper to utilize the transportation services contemplated by this Contract, (ii) Shipper has entered into natural gas supply arrangements and transportation upstream of Transporter's System by June 1, 1999, in a form satisfactory to Shipper in its reasonable discretion, (iii) Shipper has obtained all authorizations, exemptions, approvals, consents, declarations, permits and licenses from governmental and regulatory authorities of competent jurisdiction, excluding only those normally received after the commencement of the construction of facilities, to enable Shipper to construct, own, and operate the Rumford Station, including such facilities as may be required in order for Shipper to receive into the Rumford Station up to 46,000 Dth per day of natural gas to be transported and delivered by Transporter to Shipper pursuant to this Contract, all by June 1, 1999.

## ARTICLE II - SCOPE OF CONTRACT

6. Subject to the terms and conditions of this Contract, Transporter hereby agrees to provide to Shipper, and Shipper hereby agrees to accept and pay for, firm natural gas transportation service on Transporter's System under Transporter's Rate Schedule FT and its FERC Tariff, as that Rate Schedule or FERC Tariff may be changed from time to time.

7. Beginning on the Commencement Date and each Day thereafter on which Shipper and Transporter schedule Gas for transportation hereunder, Shipper shall cause the Scheduled Quantity, up to the Maximum Daily Quantity (MDQ), to be delivered to Transporter at the Receipt Point(s). Shipper may increase or decrease the MDQ by up to 2,000 Dth/day by providing written notice to Transporter by November 1, 1999. Shipper may elect to take all or a portion of its MDQ at alternate Receipt Point(s) by providing written notice to Transporter on or before the closing of the construction loan for the Rumford Station. Such service at alternate Receipt Point(s) shall be at no additional cost to Shipper, but shall be subject to backhaul limitations experienced by Transporter.

8. Beginning on the Commencement Date and each Day thereafter, Transporter shall make the Scheduled Quantity available to or on behalf of Shipper at the Delivery Point(s) on a firm basis.

9. Shipper shall be solely responsible for securing faithful performance by gas supplier(s) and/or any applicable upstream or downstream shippers and transporters in all matters which may affect Transporter's performance hereunder, and Transporter shall not be liable hereunder

3



Firm Gas Transportation Contract

to Shipper as a result of the failure of gas supplier(s) and/or any applicable upstream or downstream shippers and transporters to so perform.

## ARTICLE III - RESERVATION OF FIRM TRANSPORTATION CAPACITY

10. Shipper hereby reserves the right to cause Transporter to receive from or for the account of Shipper at each Receipt Point on any Day such quantities of Gas up to the MDQ for such Receipt Point as set forth on the currently effective Schedule 1 appended hereto and Transporter shall make available to, or on behalf of Shipper at each Delivery Point on any Day such quantities of Gas up to the MDQ for such Delivery Point as set forth on the currently effective Schedule 2 appended hereto. Schedules 1 and 2 are hereby incorporated as part of this Contract.

11. Transporter shall make available to Shipper the service reserved under this Article III on the Days and for the quantities of Gas for which such service has been reserved, subject to Shipper's compliance with the terms and conditions of this Contract.

## ARTICLE IV - ALLOCATION OF OFF-PEAK CAPACITY

12. On any Day during the period from April 1 through October 31 (Off-Peak Period) that System Capacity is not otherwise scheduled under any Rate Schedule, such capacity will be allocated pro rata to Rate Schedule FT shipper(s) whose Gas Transportation Contracts have initial terms of twenty (20) Years or longer and, to the extent such shipper(s) has under its contract Maximum Contract Demand during the Off-Peak Period, based on those shippers' annual reservation charges under Rate Schedule FT.

## ARTICLE V - RATE

13. For each Month, Shipper agrees to pay the applicable maximum usage rate multiplied by the sum of the Receipt Point Scheduled Quantity or Quantities during such Month; provided, however, that in the event that Transporter determines, in its sole discretion on a basis that is not unduly discriminatory, or otherwise pursuant to this Contract to render service on behalf of Shipper for a discounted usage rate, Transporter shall notify Shipper in writing of the amount of such discounted usage rate, the Day(s) on which such rate shall be in effect and the quantities to which such rate applies. For each MMBTU of Scheduled Quantity to which a discounted usage rate applies, as set forth in Transporter's notice, Shipper agrees to pay and shall pay the applicable discounted usage rate in lieu of the maximum usage rate.

14. For each Month Shipper agrees to pay the applicable maximum reservation rate multiplied by the Shipper's Maximum Contract Demand, as specified in this Contract; provided, however, that in the event that Transporter determines, in its sole discretion, to render service on behalf of Shipper for a discounted reservation rate, Transporter shall notify Shipper in writing of the amount of such discounted reservation rate, the Day(s) on which such rate shall be in effect and the quantities of which such rate applies. For each MMBTU of the Maximum Contract Demand to

Firm Gas Transportation Contract

which a discounted reservation rate applies, as set forth in Transporter's notice, Shipper agrees to pay and shall pay the applicable discounted reservation rate in lieu of the maximum reservation rate.

15. Shipper agrees to pay and shall pay all applicable charges, including in-kind gas, specified in Rate Schedule FT.

16. The Transporter shall not place into effect Recourse Rates under Rate Schedule FT above those Recourse Rates identified as Case No. 1 in Transporter's November 1, 1996 Amendment filing at FERC, for a period of three years from the date service first begins on Transporter's System.

17. For all capacity allocated to Shipper under Article IV herein, Shipper shall not pay reservation charges but Shipper shall pay transportation usage charges, surcharges, fees, and other charges allocated to the quantities transported.

## ARTICLE VI - DISCOUNTING AND DECONTRACTING

18. If Transporter discounts any mainline transportation services to any third Party, Shipper will be entitled to a discount, as set forth below, on a per MMBtu basis for all quantities contracted by Shipper under this Contract for the same period of time. If Transporter discounts service under any rate schedule during the months of November through March, Shipper will be offered an equal discount during the same period of time for the receipt and delivery points designated by Shipper. If Transporter discounts service during the off-peak months of April through October, Shipper will be entitled to a discount equal to Shipper's Imputed Off-Peak Rate minus the rate provided to the other shipper, during the same period of time for the receipt and delivery points designated by Shipper. For purposes of this paragraph, the Imputed Off-Peak Rate (IOR) shall be computed as follows:

$$IOR = \frac{(AR \times 365) - (WR \times 151)}{214}$$

where AR is the 100 percent load factor Recourse Reservation Rate in effect for Firm Transportation Service and WR is 1.9 x AR. The discount provision in this paragraph shall apply during the term of this Contract.

19. (a) Transporter will provide a notice to Shipper after all the following conditions are satisfied: (i) Transporter on a pro forma basis is projected to receive during the next 12 month period revenues at least equal to its annualized Cost of Service (as hereinafter defined), (ii) Transporter has executed an agreement with a new or existing replacement shipper for firm capacity which, together with all other transportation agreements (including the Firm Transportation Contracts), will provide revenues in excess of Transporter's Cost of Service, and
(iii) the replacement shipper has a creditworthiness rating of BBB (investment grade) or better.

5

Within sixty (60) days after giving such notice, Shipper will be permitted to request a reduction in the Maximum Contract Demand in its Firm Transportation Contracts.

(b) Shipper will be permitted to reduce the Maximum Contract Demand and the associated term in an amount equivalent to the quantity and term covered in the Firm Transportation Contract with the replacement shipper; provided, however, that any such reduction in quantity and term, after conversion of the units of quantity, term and rates to revenues, shall be permitted only to the extent it does not reduce the recovery of revenues equal to Transporter's Cost of Service. Maximum Contract Demand will be reduced among all shippers entitled to and requesting reductions in Firm Transportation Contracts, pro rata, based on annual revenue contributions. For purposes of this paragraph, the Cost of Service shall be the cost of service to be collected by Transporter calculated on the basis of the principles established in its Certificate of Public Convenience and Necessity, or any amendments thereto, issued by the FERC, or the cost of service in effect pursuant to Transporter's general rate filing under Section 4 of the Natural Gas Act. In the event the replacement shipper causes an increase in the cost of service, the Cost of Service shall be increased by an equivalent amount.

(c) If Shipper does not timely request a reduction in its Maximum Contract Demand as provided in Section 19(a), the amount by which Shipper would have been entitled to reduce its Maximum Contract Demand shall be deemed Ineligible Capacity. With respect to such Ineligible Capacity, Shipper permanently relinquishes the rights (i) to any discount under Section 18 on a quantity equivalent to the Ineligible Capacity, and (ii) to reduce its Maximum Contract Demand under Section 19 in a quantity equivalent to the Ineligible Capacity. The right relinquished under subparagraph (i) of this Section 19(c) shall take effect upon the commencement of service to the replacement shipper. The right relinquished under subparagraph (ii) of this Section 19(c) shall take effect concurrently with the relinquishment.

## ARTICLE VII - RATE SCHEDULES AND GENERAL TERMS AND CONDITIONS

20. This Contract and all provisions contained or incorporated herein are subject to the provisions of Rate Schedules FT and of the General Terms and Conditions of Transporter's FERC Tariff, as such may be revised or superseded from time to time, all of which by this reference are made a part hereof. The General Terms and Conditions and the applicable Rate Schedule shall control in the event of a conflict between the General Terms and Conditions or the applicable Rate Schedule, and this Contract. All of the terms defined in Transporter's FERC Tariff shall have the same meaning wherever used in this Contract.

## ARTICLE VIII - TERM

21. The Commencement Date shall be November 1, 2000. Shipper shall have no liability under Rate Schedule FT until such Commencement Date. The Parties acknowledge that Shipper intends to procure interruptible transportation from Transporter prior to November 1, 2000. Unless otherwise agreed, such interruptible transportation service shall be at the prevailing interruptible rate.

6