FORM B10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT  Southern    DISTRICT OF    New York | | PROOF OF CLAIM |
| --- | --- | --- |

| Name of Debtor: Calpine Corporation | Case Number 05-60200 |
| --- | --- |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property): Portland Natural Gas Transmission System | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |
| --- | --- |

Name and address where notices should be sent:
c/o David W. Elrod and Craig Tadlock
Elrod, PLLC, 500 N. Akard, Suite 3000
Dallas, Texas 75201
Telephone number:       214-855-5188

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☒ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

| Last four digits of account or other number by which creditor identifies debtor: | Check here ☐ replaces    amends claim no. 4773 if this claim ☒ amends  a previously filed claim, dated:      7/31/06 |
| --- | --- |

**1. Basis for Claim**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other   See Exhibit A

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)
   Last four digits of your SS #: _____
   Unpaid compensation for services performed
   from _____ to _____
           (date)              (date)

**2. Date debt was incurred:**
See Exhibit A

**3. If court judgment, date obtained:**
N/A

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed.
See reverse side for important explanations.

**Unsecured Nonpriority Claim** $ See Exhibit A

☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**Secured Claim**
☒ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle  ☐ Other   See Exhibit A

Value of Collateral: $ See Exhibit A

Amount of arrearage and other charges at time case filed included in secured claim, if any: $ _____

**Unsecured Priority Claim**
☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority $ _____

Specify the priority of the claim:
☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B)
☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**5. Total Amount of Claim at Time Case Filed:**
$  See Exhibit A
(unsecured)    (secured)    (priority)    (Total)

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**7. Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Date-Stamped Copy:** To receive an acknowledgement of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

RECEIVED
OCT   2007
BMC PROCESSING CENTER

| Date 9/25/07 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): Ken Nichols, Director, Credit and Risk Management |
| --- | --- |

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# Exhibit A

**to Amended Proofs of Claim of Portland Natural Gas Transmission
System ("PNGTS") asserted against Calpine Corporation ("Calpine")
and Rumford Power Associates Limited Partnership ("Rumford Power")**

These proofs of claim amend the proofs of claim previously filed by PNGTS against Calpine (proof of claim no. 4773) and Rumford Power (proof of claim no. 4769).

Pursuant to the Stipulation and Agreed Order Among Calpine Corporation, Rumford Power Associates Limited Partnership, the Official Committee of Unsecured Creditors, and Portland Natural Gas Transmission System that was "So Ordered and Approved" by this Court on June 12, 2007 (the "PNGTS Allowed Claim Stipulation"), PNGTS has an allowed claim in the Calpine and Rumford Power chapter 11 cases (the "PNGTS Allowed Claim") in an amount that has yet to be quantified but is capped at $174,000,000 plus applicable interest.

Certain of PNGTS's claims against Calpine and Rumford Power are based on the Gas Transportation Contract for Firm Transportation Service Between Portland Natural Gas Transmission System and Rumford Power Associates Limited Partnership, dated February 12, 1998 (the "Contract"). PNGTS asserts (a) claims for damages as a result of the Debtors' failure to perform under the Contract post-petition; and (b) contingent claims for rejection damages under the Contract.

PNGTS also asserts a claim against Calpine (the "AELLC Deficiency Claim") related to a deficiency in PNGTS's recovery in the Chapter 11 case of *In re Androscoggin Energy LLC*, Case No. 04-12221-LHK in the United States Bankruptcy Court for the District of Maine (the "AELLC Bankruptcy Case"). Androscoggin Energy LLC ("AELLC") and the associated cogeneration facility were managed and controlled by Calpine. Pursuant to the Agreed Order on Motion to Determine Allowed Amount of Claim and Approving Stipulation Among the Debtor, TransCanada Gas Services Inc. and Portland Natural Gas Transmission System Regarding Allowed Claims in the AELLC Bankruptcy Case (the "AELLC/PNGTS Allowed Claim Order"), PNGTS has a Net Allowed Claim in the AELLC Bankruptcy Case of $47,600,000. PNGTS has received partial distributions in the AELLC Bankruptcy Case, and PNGTS recently received the last significant distribution in the case. This last significant distribution brought PNGTS's recovery in the case up to $16,173,840.71, leaving a deficiency of $31,426,159.29. PNGTS expects a small final distribution in the case, which will establish the final amount of the AELLC Deficiency Claim, and it will amend its proof of claim to assert the final amount of the AELLC Deficiency Claim at that time.

A summary of PNGTS's claims is set forth below. A copy of the Contract, as amended, is attached as Exhibit B. A copy of the AELLC/PNGTS Allowed Claim Order is attached as Exhibit C. A copy of the PNGTS Allowed Claim Stipulation is attached as Exhibit D. Other supporting evidence for these proofs of claim, including additional documents, is summarized herein.

The total principal amount of PNGTS's claims, if uncapped, would be $253,116,908.89, as follows:

| Description of Claim | Amount |
|---|---|
| Debtors' failure to perform under the Contract post-petition, to date (3/1/2006 to 8/31/2007) | $ 20,034,402.30 |
| Contingent claim for rejection damages – amounts directly due under the Contract (9/1/2007 to 10/31/2020) | $179,556,347.30 |
| Contingent claim for rejection damages – PNGTS Regulatory Asset | $ 22,100,000.00 |
| AELLC Deficiency Claim (not asserted against Rumford Power) | $ 31,426,159.29 |
| **TOTAL** | **$253,116,908.99** |

The basis for each of these claims is set forth in more detail below. PNGTS also asserts claims for attorney's fees, costs, and interest to the full extent permitted by applicable law. By virtue of the PNGTS Allowed Claim Stipulation, the total principal amount of PNGTS's claims is capped at $174,000,000 plus applicable interest.

In filing these amended proofs of claim, PNGTS reserves all of its rights, including without limitation: (a) its positions regarding jurisdictional issues with respect to the Contract and its potential rejection; (b) its right to assert that some or all of its claims are entitled to administrative priority; (c) its rights to draw down and apply assurances; (d) its rights of setoff; (e) its positions as to the inappropriateness and invalidity of the Debtors' purported "repudiation" of the Contract; (f) its rights to assert claims for interest on the amounts stated in these proofs of claim, if applicable; (g) its rights to assert claims for attorney's fees; (h) its rights to assert claims for the costs of efforts to mitigate its damages; (i) its rights to amend the amount of its claim in the event new and higher rates go into effect; (j) its rights to amend and/or supplement these proofs of claim for any other reason, at any time and in any manner; (k) its rights to file additional proofs of claim for additional claims to the extent permitted by the PNGTS Allowed Claim Stipulation; (l) its rights to attach or bring forth additional documents supporting its claims and additional documents that may become available after further investigation and discovery; (m) its rights to file proofs of claim against additional debtor entities to the extent permitted by the PNGTS Allowed Claim Stipulation; (n) its rights to assert claims against non-debtor Calpine-affiliated entities; and (o) its rights to assert claims against non-debtor entities that are not affiliated with Calpine.

In addition, PNGTS is continuing to investigate matters related to its claims. These amended proofs of claim are protective in nature and are filed to protect PNGTS from potential forfeiture of any of its rights against the Debtors. The filing of these amended proofs of claim shall not constitute: (a) a waiver or release of the rights of PNGTS against the Debtors or any other person or property; (b) a waiver of PNGTS to contest the jurisdiction of this Court with respect to the subject matter of PNGTS's claims, any objection or other proceeding commenced with respect thereto or otherwise involving PNGTS; or (c) an election of remedies or choice of law.

**<u>Item 1 – Basis for Claim</u>**

As noted above, PNGTS asserts claims for damages as a result of Debtors' failure to perform under the Contract post-petition, and contingent claims for rejection damages under the Contract including damages directly due under the Contract and damages attributable to the PNGTS Regulatory Asset. The amounts of these claims are set forth at their gross value and are subject to reduction based on discounting to present value at an appropriate risk-free rate and potential mitigation, if any.

The Debtors have not assumed or rejected the Contract or obtained the requisite authority of the Federal Energy Regulatory Commission ("FERC") to do so. If the Debtors assume the Contract, then the Debtors would be required to cure any outstanding defaults and assume all going-forward liabilities associated with the Contract. Such liabilities would then constitute post-petition obligations of the Debtors, rather than pre-petition damage claims. Accordingly, pending assumption or rejection of the Contract, the type and full extent of the claims made herein cannot be determined. PNGTS notes that the Debtors have purported to "repudiate" the Contract; however, the so-called "repudiation" is not authorized under the Bankruptcy Code or any other applicable law and is therefore of no legal effect. PNGTS reserves its rights to amend any of the claims set forth herein.

The calculations of the claim for damages as a result of Debtors' failure to perform and the contingent claim for rejection damages directly due under the Contract are straightforward – those amounts are simply the FERC-approved Contract rate times the capacity reservation levels contracted by Debtors, for the term of the Contract (the amount for March 2006 includes some additional charges for services used by the Debtors during that month).

The PNGTS Regulatory Asset claim is grounded in PNGTS's levelized rate design. Throughout the term of the Contract to date, PNGTS's FERC-approved Contract rate has included a levelized annual cost of service component. Under this FERC-approved levelization schedule, the Contract rate was levelized for the initial 20-year period of PNGTS's long term firm contracts with its shippers, including Rumford Power, based on the assumption that 80% of the cost of the facilities for the PNGTS pipeline would be recovered during the levelization period. The levelization schedule was based on all of the original PNGTS long term firm contracts participating. The Contract with Rumford Power (44,000 Dth/day) represented about 20% of the original long term firm contracts. The levelized rate design effectively reduced the Contract rate during the first 10 years of operation of the PNGTS pipeline, and Rumford Power has received the benefit of that reduction during the entire term of the Contract to date (the effective date of the Contract was November 1, 2000). Because the Contract rate was reduced, PNGTS under-recovered its costs, and thus a portion of the cost of service was deferred annually into a deferral account (the "Regulatory Asset"). The PNGTS Regulatory Asset will peak in 2010 at approximately $101,000,000. After the initial 10 year period, the Regulatory Asset is scheduled to be collected from shippers as a component of the cost of service for the remaining 10 years until the Regulatory Asset is reduced to zero. However, because of the bankruptcy and Debtors' failure to perform under the Contract, the Debtors will now not be contributing their portion towards the recovery of the Regulatory Asset. Accordingly, PNGTS asserts a claim

against Debtors for their allocated share of the Regulatory Asset. Taking the peak amount of the Regulatory Asset of $101,000,000, times Debtors' approximate 20% portion of the participating long term firm contracts, PNGTS quantifies the Regulatory Asset claim at $22,100,000.

PNGTS also asserts the AELLC Deficiency Claim, as discussed above, as PNGTS recently received the last significant distribution on its net allowed claim in the AELLC Bankruptcy Case. To date, PNGTS has recovered $16,173,840.71 on its net allowed claim of $47,600,000, for a deficiency at this time of $31,426,159.29. The final distribution to PNGTS in the AELLC Bankruptcy Case is anticipated to be a relatively small amount compared to earlier distributions, as almost all of the assets in the estate have been distributed at this point. However, the final distribution in the AELLC Bankruptcy Case will determine the final amount of the AELLC Deficiency Claim. PNGTS will amend its proof of claim to assert the final amount of the AELLC Deficiency Claim when it receives its final distribution in the AELLC Bankruptcy Case.

AELLC was a limited liability company controlled by Calpine. Debtors Calpine Northbrook Corporation of Maine, Inc. ("CNC") and Androscoggin Energy, Inc. ("AEI"), both of which are wholly-owned subsidiaries of Calpine Corporation, were members of AELLC. CNC was the managing member of AELLC, with the full, exclusive and complete discretion to manage and control the business and affairs of AELLC. CNC provided management and operating services to AELLC. CNC, AEI and AELLC had and have no employees of their own; rather, all of the personnel who worked on behalf of these entities were employees of Calpine. In addition, all of CNC's officers were employed by Calpine Corporation or an affiliate thereof, and CNC and AEI both shared the same office as Calpine. Under the management and control of Calpine, AELLC was severely undercapitalized, always operated at a loss, and eventually went into a bankruptcy proceeding that resulted in all of AELLC's assets being liquidated and distributed to creditors. Unsecured creditors such as PNGTS have received less than 35 cents on the dollar for their claims against AELLC as a result of Calpine's management and operation of AELLC.

PNGTS also asserts and/or reserves the right to assert any and all claims, rights and/or remedies that it may have, including without limitation, claims for setoff, indemnification, contribution, rescission, breach of contract, breach of implied contract or quasi-contract, unjust enrichment, recovery in quantum meruit, agency liability, aiding and abetting in the breach of fiduciary duties, piercing the corporate veil, alter ego liability, single business enterprise liability, fraud, specific performance, misrepresentation, reimbursement, restitution, subrogation, interest, attorney's fees, and/or costs of efforts to mitigate its damages, related to or arising from transactions by or among or involving PNGTS, the Debtors and/or any of their respective affiliates, successors, predecessors or assigns, arising as a matter of law or equity.


**Item 2 – Date Debt Was Incurred**

PNGTS's post-petition claims for Debtors' failure to perform under the Contract were incurred for services beginning March 1, 2006, and, to date, running through August 31, 2007.

These claims will continue to increase until the Contract is properly assumed or rejected. PNGTS reserves the right to assert that these claims are entitled to administrative priority.

At this time, PNGTS's contingent claims for rejection damages for firm transportation services under the Contract are for services beginning September 1, 2007, and running through the end of the term of the Contract, October 31, 2020. These claims will decrease until the Contract is properly assumed or rejected.

As discussed above, PNGTS's contingent claims for rejection damages for the amount attributable to the PNGTS Regulatory Asset is a sliding amount depending on the date of rejection that would peak at approximately $22,100,000.

PNGTS's expected AELLC Deficiency Claim will be incurred at the time it is finally determined that PNGTS has a deficiency after it receives its final distribution in the AELLC Bankruptcy Case.


**Item 4 – Classification of Claim**

PNGTS's claims are secured to the extent of $1,934,622.30 of cash collateral in escrow.

In addition, PNGTS holds 20,883 Dth of natural gas under its Operational Balancing Agreement with Rumford Power, over which PNGTS asserts a right of setoff against its claims.

The balance of PNGTS's claims is unsecured. To the extent PNGTS may have any additional setoff, counterclaim or credit, these amounts are undetermined at this time. To the extent that any portion of PNGTS's claims are entitled to administrative priority status under Sections 503 and 507 of the Bankruptcy Code, PNGTS claims such priority status in the maximum amount allowed by law. The filing of these proofs of claim shall in no way be deemed a waiver of PNGTS's rights to assert that any or all of the amounts owed under the Contract are entitled to administrative priority status.


**Item 5 – Total Amount of Claim at Time Case Filed**

As set forth above, the total principal amount of PNGTS's claims is $253,116,908.99. However, pursuant to the PNGTS Allowed Claim Stipulation, the total principal amount of PNGTS's claims is capped at $174,000,000 plus applicable interest.

In addition, PNGTS reserves the right to assert any and all contingent unliquidated and/or undetermined claims under the Contract, including without limitation, claims identified in Item 1 above.

**Item 6 – Credits**

      See Item 4 above.

**Item 7 – Supporting Documents**

      PNGTS believes that the Debtors have copies of all documents supporting these proofs of claim not attached hereto, and such documents are summarized herein.  Additional copies or copies of any other relevant materials in the possession, custody or control of PNGTS will be provided upon request.

FT-1998-001

## GAS TRANSPORTATION CONTRACT
## FOR FIRM TRANSPORTATION SERVICE
## BETWEEN
## PORTLAND NATURAL GAS TRANSMISSION SYSTEM
## AND
## RUMFORD POWER ASSOCIATES LIMITED PARTNERSHIP

This Gas Transportation Contract ("Contract") is made as of the _12_ Day of _February_ 1998 by and between the Portland Natural Gas Transmission System, a Maine general partnership, (herein "Transporter") and Rumford Power Associates Limited Partnership, a Maine limited partnership, (herein "Shipper") (Transporter and/or Shipper are sometimes referred to herein as "Party" or "Parties"), pursuant to the following recitals and representations:

WHEREAS, the Federal Energy Regulatory Commission ("FERC") has on September 24, 1997 issued in Docket No. CP96-249-000 a certificate of public convenience and necessity ("FERC Certificate") authorizing Transporter to construct, own, operate, and maintain a natural gas transmission system (herein "System");

WHEREAS, Shipper intends to construct an electric generating station located at Industrial Park Road, Rumford, Maine ("Rumford Station"); and

WHEREAS, Shipper intends to enter into natural gas supply arrangements, including transportation upstream of Transporter's System, and to make arrangements for the delivery of such gas supply for the account of Shipper to the Receipt Point(s), and downstream of the Delivery Point(s) and will require transportation service on Transporter's System for the supplies of natural gas that Shipper intends to acquire for use as fuel in the Rumford Station, all estimated to commence on November 1, 2000;

WHEREAS, Transporter intends to apply for and, subject to the terms and conditions set forth herein, receive and accept all necessary United States regulatory authorizations or exemptions to accept delivery of gas imported by Shipper at the Receipt Point(s) and to transport such gas on behalf of Shipper to the Delivery Point(s), subject to the terms and conditions of this Contract and Transporter's gas tariff as approved by the FERC (the "FERC Tariff'); and

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein assumed, Transporter and Shipper agree as follows:

## ARTICLE I - PRECONDITIONS

1.      (a)      Transporter shall apply for or cause to be applied for and use reasonable best efforts to obtain from governmental and regulatory authorities having jurisdiction over such authorizations or exemptions (herein "Regulatory Approvals") as are necessary: (i) to enable Transporter to construct, own and operate and to provide transportation services on Transporter's

System for the account of Shipper and others, and (ii) for the performance of the transactions herein contemplated or for any other transactions necessary for the performance of those herein contemplated.

(b)    Shipper shall apply for or cause to be applied for and use reasonable best efforts to obtain all of the agreements and Regulatory Approvals as are necessary: (i) to enable Shipper to deliver to and receive from Transporter the transportation quantities specified below, and (ii) for the performance of the transactions herein contemplated or for any other transactions necessary for the performance of those herein contemplated.

(c)    Shipper and Transporter agree that, in satisfying their respective obligations under this Contract, each shall support the applications for necessary Regulatory Approvals filed by the other and shall make any demonstrations to such regulatory and governmental agencies which may be reasonably requested by the other Party.

(d)    For the period of time extending from the date of this Contract to one ( 1 ) year after Transporter's System is first placed into service, Shipper shall (i) not oppose any facility expansion, extension, or addition to Transporter's System, (ii) not oppose the phasing of certification or construction of Transporter's System, and (iii) support the rolled-in rate treatment of facilities described in subparagraphs (i) and (ii) of this paragraph (d), provided the roll-in of the cost of such facilities does not increase the rate paid by Shipper.

2.    In the event that the Regulatory Approvals, or any of them, required to be obtained by Transporter as set forth in Section 1 hereof are unacceptable to Transporter, the parties agree that they shall negotiate in good faith as to what further action, if any, should be undertaken to remedy the unacceptable features of such Regulatory Approvals. Transporter may not determine that a Regulatory Approval is unacceptable to it unless (i) such determination is accompanied by a written statement to Shipper setting forth the reasons for the unacceptability, and (ii) the Regulatory Approval contains terms or conditions materially different from those terms and conditions which Transporter sought, or if such Regulatory Approval contains terms or conditions which were not expressly sought by Transporter but which are materially different from terms and conditions contained in authorizations accepted by applicants for similar services or facilities.

3.    In the event that any required Regulatory Approval, other than the FERC Certificate, has not been obtained by November 1, 1999, then either party may thereafter, at its option, terminate this Contract by giving ninety (90) days written notice to the other party of its intention to terminate. Unless such required Regulatory Approval is obtained during the ninety (90) days notice period, or such additional period as the parties shall mutually agree, this Contract shall terminate effective upon the expiration of said period and shall thereafter be of no further force and effect; provided, however, that in no event shall a party have a right to terminate this Contract if the failure to obtain such Regulatory Approval is caused by the failure of such party to act in a timely manner and/or to use reasonable best efforts to obtain such approval.

Firm Gas Transportation Contract

4. Construction of Transporter's System and the rights and obligations under this Contract are subject to (i) the receipt of all Regulatory Approvals necessary for Transporter to perform its obligations hereunder, and (ii) the receipt by Transporter of financing commitments necessary for construction of Transporter's System in a form satisfactory to Transporter in its reasonable discretion.

5. The rights and obligations under this Contract shall cease unless (i) Shipper has obtained all financial commitments by June 1, 1999 to make the capital expenditures necessary to initiate and complete the construction of the Rumford Station for Shipper to utilize the transportation services contemplated by this Contract, (ii) Shipper has entered into natural gas supply arrangements and transportation upstream of Transporter's System by June 1, 1999, in a form satisfactory to Shipper in its reasonable discretion, (iii) Shipper has obtained all authorizations, exemptions, approvals, consents, declarations, permits and licenses from governmental and regulatory authorities of competent jurisdiction, excluding only those normally received after the commencement of the construction of facilities, to enable Shipper to construct, own, and operate the Rumford Station, including such facilities as may be required in order for Shipper to receive into the Rumford Station up to 46,000 Dth per day of natural gas to be transported and delivered by Transporter to Shipper pursuant to this Contract, all by June 1, 1999.

## ARTICLE II - SCOPE OF CONTRACT

6. Subject to the terms and conditions of this Contract, Transporter hereby agrees to provide to Shipper, and Shipper hereby agrees to accept and pay for, firm natural gas transportation service on Transporter's System under Transporter's Rate Schedule FT and its FERC Tariff, as that Rate Schedule or FERC Tariff may be changed from time to time.

7. Beginning on the Commencement Date and each Day thereafter on which Shipper and Transporter schedule Gas for transportation hereunder, Shipper shall cause the Scheduled Quantity, up to the Maximum Daily Quantity (MDQ), to be delivered to Transporter at the Receipt Point(s). Shipper may increase or decrease the MDQ by up to 2,000 Dth/day by providing written notice to Transporter by November 1, 1999. Shipper may elect to take all or a portion of its MDQ at alternate Receipt Point(s) by providing written notice to Transporter on or before the closing of the construction loan for the Rumford Station. Such service at alternate Receipt Point(s) shall be at no additional cost to Shipper, but shall be subject to backhaul limitations experienced by Transporter.

8. Beginning on the Commencement Date and each Day thereafter, Transporter shall make the Scheduled Quantity available to or on behalf of Shipper at the Delivery Point(s) on a firm basis.

9. Shipper shall be solely responsible for securing faithful performance by gas supplier(s) and/or any applicable upstream or downstream shippers and transporters in all matters which may affect Transporter's performance hereunder, and Transporter shall not be liable hereunder

3

to Shipper as a result of the failure of gas supplier(s) and/or any applicable upstream or downstream shippers and transporters to so perform.

## ARTICLE III - RESERVATION OF FIRM TRANSPORTATION CAPACITY

10.    Shipper hereby reserves the right to cause Transporter to receive from or for the account of Shipper at each Receipt Point on any Day such quantities of Gas up to the MDQ for such Receipt Point as set forth on the currently effective Schedule 1 appended hereto and Transporter shall make available to, or on behalf of Shipper at each Delivery Point on any Day such quantities of Gas up to the MDQ for such Delivery Point as set forth on the currently effective Schedule 2 appended hereto. Schedules 1 and 2 are hereby incorporated as part of this Contract.

11.    Transporter shall make available to Shipper the service reserved under this Article III on the Days and for the quantities of Gas for which such service has been reserved, subject to Shipper's compliance with the terms and conditions of this Contract.

## ARTICLE IV - ALLOCATION OF OFF-PEAK CAPACITY

12.    On any Day during the period from April 1 through October 31 (Off-Peak Period) that System Capacity is not otherwise scheduled under any Rate Schedule, such capacity will be allocated pro rata to Rate Schedule FT shipper(s) whose Gas Transportation Contracts have initial terms of twenty (20) Years or longer and, to the extent such shipper(s) has under its contract Maximum Contract Demand during the Off-Peak Period, based on those shippers' annual reservation charges under Rate Schedule FT.

## ARTICLE V - RATE

13.    For each Month, Shipper agrees to pay the applicable maximum usage rate multiplied by the sum of the Receipt Point Scheduled Quantity or Quantities during such Month; provided, however, that in the event that Transporter determines, in its sole discretion on a basis that is not unduly discriminatory, or otherwise pursuant to this Contract to render service on behalf of Shipper for a discounted usage rate, Transporter shall notify Shipper in writing of the amount of such discounted usage rate, the Day(s) on which such rate shall be in effect and the quantities to which such rate applies. For each MMBTU of Scheduled Quantity to which a discounted usage rate applies, as set forth in Transporter's notice, Shipper agrees to pay and shall pay the applicable discounted usage rate in lieu of the maximum usage rate.

14.    For each Month Shipper agrees to pay the applicable maximum reservation rate multiplied by the Shipper's Maximum Contract Demand, as specified in this Contract; provided, however, that in the event that Transporter determines, in its sole discretion, to render service on behalf of Shipper for a discounted reservation rate, Transporter shall notify Shipper in writing of the amount of such discounted reservation rate, the Day(s) on which such rate shall be in effect and the quantities of which such rate applies. For each MMBTU of the Maximum Contract Demand to

4

which a discounted reservation rate applies, as set forth in Transporter's notice, Shipper agrees to pay and shall pay the applicable discounted reservation rate in lieu of the maximum reservation rate.

      15.  Shipper agrees to pay and shall pay all applicable charges, including in-kind gas, specified in Rate Schedule FT.

      16.  The Transporter shall not place into effect Recourse Rates under Rate Schedule FT above those Recourse Rates identified as Case No. 1 in Transporter's November 1, 1996 Amendment filing at FERC, for a period of three years from the date service first begins on Transporter's System.

      17.  For all capacity allocated to Shipper under Article IV herein, Shipper shall not pay reservation charges but Shipper shall pay transportation usage charges, surcharges, fees, and other charges allocated to the quantities transported.

## ARTICLE VI - DISCOUNTING AND DECONTRACTING

      18.  If Transporter discounts any mainline transportation services to any third Party, Shipper will be entitled to a discount, as set forth below, on a per MMBtu basis for all quantities contracted by Shipper under this Contract for the same period of time. If Transporter discounts service under any rate schedule during the months of November through March, Shipper will be offered an equal discount during the same period of time for the receipt and delivery points designated by Shipper. If Transporter discounts service during the off-peak months of April through October, Shipper will be entitled to a discount equal to Shipper's Imputed Off-Peak Rate minus the rate provided to the other shipper, during the same period of time for the receipt and delivery points designated by Shipper. For purposes of this paragraph, the Imputed Off-Peak Rate (IOR) shall be computed as follows:

$$IOR = \frac{(AR \times 365) - (WR \times 151)}{214}$$

where AR is the 100 percent load factor Recourse Reservation Rate in effect for Firm Transportation Service and WR is 1.9 x AR. The discount provision in this paragraph shall apply during the term of this Contract.

      19.  (a)  Transporter will provide a notice to Shipper after all the following conditions are satisfied: (i) Transporter on a pro forma basis is projected to receive during the next 12 month period revenues at least equal to its annualized Cost of Service (as hereinafter defined), (ii) Transporter has executed an agreement with a new or existing replacement shipper for firm capacity which, together with all other transportation agreements (including the Firm Transportation Contracts), will provide revenues in excess of Transporter's Cost of Service, and (iii) the replacement shipper has a creditworthiness rating of BBB (investment grade) or better.

Within sixty (60) days after giving such notice, Shipper will be permitted to request a reduction in the Maximum Contract Demand in its Firm Transportation Contracts.

(b)    Shipper will be permitted to reduce the Maximum Contract Demand and the associated term in an amount equivalent to the quantity and term covered in the Firm Transportation Contract with the replacement shipper; provided, however, that any such reduction in quantity and term, after conversion of the units of quantity, term and rates to revenues, shall be permitted only to the extent it does not reduce the recovery of revenues equal to Transporter's Cost of Service. Maximum Contract Demand will be reduced among all shippers entitled to and requesting reductions in Firm Transportation Contracts, pro rata, based on annual revenue contributions. For purposes of this paragraph, the Cost of Service shall be the cost of service to be collected by Transporter calculated on the basis of the principles established in its Certificate of Public Convenience and Necessity, or any amendments thereto, issued by the FERC, or the cost of service in effect pursuant to Transporter's general rate filing under Section 4 of the Natural Gas Act. In the event the replacement shipper causes an increase in the cost of service, the Cost of Service shall be increased by an equivalent amount.

(c)    If Shipper does not timely request a reduction in its Maximum Contract Demand as provided in Section 19(a), the amount by which Shipper would have been entitled to reduce its Maximum Contract Demand shall be deemed Ineligible Capacity. With respect to such Ineligible Capacity, Shipper permanently relinquishes the rights (i) to any discount under Section 18 on a quantity equivalent to the Ineligible Capacity, and (ii) to reduce its Maximum Contract Demand under Section 19 in a quantity equivalent to the Ineligible Capacity. The right relinquished under subparagraph (i) of this Section 19(c) shall take effect upon the commencement of service to the replacement shipper. The right relinquished under subparagraph (ii) of this Section 19(c) shall take effect concurrently with the relinquishment.

## ARTICLE VII- RATE SCHEDULES AND GENERAL TERMS AND CONDITIONS

20.    This Contract and all provisions contained or incorporated herein are subject to the provisions of Rate Schedules FT and of the General Terms and Conditions of Transporter' s FERC Tariff, as such may be revised or superseded from time to time, all of which by this reference are made a part hereof. The General Terms and Conditions and the applicable Rate Schedule shall control in the event of a conflict between the General Terms and Conditions or the applicable Rate Schedule, and this Contract. All of the terms defined in Transporter's FERC Tariff shall have the same meaning wherever used in this Contract.

## ARTICLE VIII - TERM

21.    The Commencement Date shall be November 1, 2000. Shipper shall have no liability under Rate Schedule FT until such Commencement Date. The Parties acknowledge that Shipper intends to procure interruptible transportation from Transporter prior to November 1, 2000. Unless otherwise agreed, such interruptible transportation service shall be at the prevailing interruptible rate.

22.    This Contract shall be effective as of the date first herein above written, and shall continue in force and effect for an initial term of twenty (20) Years from the Commencement Date; provided, however, that Transporter shall have no liability under this Contract and shall be under no obligation to receive or to deliver any quantities of Gas hereunder prior to the Commencement Date.

23.    After expiration of the initial term, this Contract shall continue in force and effect Year to Year thereafter unless terminated by either Party upon twenty-four (24) Months prior written notice to the other; provided, however, that if the FERC authorizes Transporter to abandon service to Shipper on an earlier date, this Contract shall terminate as of such earlier date.

24.    The termination of this Contract by expiration of fixed Contract term or by termination notice provided by Shipper triggers pregranted abandonment under Section 7 of the Natural Gas Act as of the effective date of the termination.

25.    Any provision of this Contract necessary to correct or cash-out imbalances or to make payment under this Contract as required by the FERC Tariff will survive the other parts of this Contract until such time as such balancing or payment has been accomplished.

## ARTICLE IX - NOTICES

26.    Except as herein otherwise provided, any written statement, notice and/or request provided for in this Contract or any notice which either Party may desire to give to the other shall be in writing and mailed by registered or certified mail or sent by a nationally recognized overnight courier service to the post office address of the Party intended to receive the same, as the case may be, as follows:

Notices to Transporter shall be addressed to:

Portland Natural Gas Transmission System
30 Monument Square
Concord, MA 01742
Phone: (508) 371-5656
Fax: (508) 371-9999

Notices to Shipper shall be addressed to:

Rumford Power Associates Limited Partnership
One Energy Road
North Dartmouth, MA 02747
Phone: (508) 998-8515
Fax: (508) 998-7478

Either Party may change its address under this Article by written notice to the other Party.

## ARTICLE X - TRANSFER AND ASSIGNMENT OF CONTRACT

27.    Any entity which shall succeed by purchase, merger or consolidation to the properties, substantially as an entirety, of either Transporter or Shipper, as the case may be, shall be entitled to the rights and shall be subject to the obligations of its predecessor in title under this Contract. Either Party may, without relieving itself of its obligations under this Contract, assign any of its rights hereunder to an entity with which it is affiliated, but otherwise no assignment of this Contract or of any of the rights or obligations hereunder shall be made unless there first shall have been obtained the written consent thereto of Shipper in the event of an assignment by Transporter, or Transporter in the event of an assignment by Shipper, which consents shall not be unreasonably withheld. It is agreed, however, that the restrictions on assignment contained in this Article X shall not in any way prevent either Party to this Contract from pledging or mortgaging its rights hereunder as security for its indebtedness.

28.    Shipper acknowledges that Transporter intends to make a collateral assignment of this Contract to financial institutions (collectively, the "Transporter's Lenders") in connection with a Financing Agreement and agrees that if the Transporter's Lenders succeed to the interest of Transporter by foreclosure or otherwise Shipper shall accord the Transporter's Lenders the same rights as Transporter hereunder.

29.    In order to facilitate obtaining financing or refinancing for the System, Shipper shall execute such consents, agreements or similar documents with respect to a collateral assignment hereof to the Transporter's Lenders, and any credit support documents, and shall deliver an opinion of counsel on behalf of Shipper and any provider of credit support, as Transporter's Lenders may reasonably request in connection with the documentation of the financing or refinancing for the System, which consent and opinion shall, among other things warrant or opine the enforceability of this Contract and of any credit support documents under the applicable governing law(s) and the compliance thereof with all applicable law.

30.    Transporter acknowledges that Shipper intends to make a collateral assignment of this Contract to financial institutions (collectively, the "Shipper's Lenders") in connection with a Financing Agreement and agrees that if the Shipper's Lenders succeed to the interest of Shipper by foreclosure or otherwise Transporter shall accord the Shipper's Lenders the same rights as Shipper hereunder; provided however, that Shipper's Lenders must demonstrate creditworthiness pursuant to the provisions of Transporter's pro forma FERC Tariff or FERC Tariff, as applicable, and must assume all of Shippers obligations under this Contract including all past due obligations.

31.    In order to facilitate obtaining financing or refinancing for the Rumford Station, Transporter shall execute such consents, agreements or similar documents with respect to a collateral assignment hereof to the Shipper's Lenders, and any credit support documents, and shall deliver an opinion of counsel on behalf of Transporter and any provider of credit support, as Shipper's Lenders may reasonably request in connection with the documentation of the financing or refinancing for the Rumford Station, which consent and opinion shall, among other things warrant or opine the

8

enforceability of this Contract and of any credit support documents under the applicable governing law(s) and the compliance thereof with all applicable law.

## ARTICLE XI - NONRECOURSE OBLIGATION OF PARTNERSHIP AND OPERATOR

32.     Shipper acknowledges and agrees that: (a) Transporter is a Maine general partnership; (b) Shipper shall have no recourse against any partner in Transporter with respect to Transporter's obligations under this Contract and that Shipper's sole recourse shall be against the partnership assets, irrespective of any failure to comply with applicable law or any provision of this Contract; (c) no claim shall be made against any partner under or in connection with this Contract; (d) Shipper shall have no right of subrogation to any claim of Transporter for any capital contributions from any partner to Transporter; (e) no claims shall be made against the Operator, its officers, employees, and agents, under or in connection with this Contract and the performance of Operator's duties as Operator (provided that this shall not bar claims resulting from the gross negligence or willful misconduct of Operator, its officers, employees or agents) and Shipper shall provide Operator with a waiver of subrogation of Shipper's insurance company for all such claims; and (f) this representation is made expressly for the benefit of the partners in Transporter and Operator.

33.     Transporter acknowledges and agrees that: (a) Shipper is a Maine limited partnership; (b) Transporter shall have no recourse against any partner in Shipper with respect to Shipper's obligations under this Contract and that Transporter's sole recourse shall be against the partnership assets, irrespective of any failure to comply with applicable law or any provision of this Contract; (c) no claim shall be made against any partner under or in connection with this Contract; (d) Transporter shall have no right of subrogation to any claim of Shipper for any capital contributions from any partner to Shipper; (e) Rumford Operator shall mean an entity other than Shipper, which has been designated by Shipper to operate the Rumford Station; (f) no claims shall be made against the Rumford Operator, its officers, employees, and agents, under or in connection with this Contract and the performance of the Rumford Operator's duties as Rumford Operator (provided that this shall not bar claims resulting from the gross negligence or willful misconduct of Rumford Operator, its officers, employees or agents) and Transporter shall provide Rumford Operator with a waiver of subrogation of Transporter's insurance company for all such claims; and (f) this representation is made expressly for the benefit of the partners in Shipper.

## ARTICLE XII - LAW OF CONTRACT

34.     Notwithstanding conflict-of-laws rules, the interpretation and performance of this Contract shall be in accordance with and controlled by the laws of the State of Maine.

## ARTICLE XIII - CHANGE IN TARIFF PROVISIONS

35.     Shipper agrees that Transporter shall have the unilateral right to file with the Federal Energy Regulatory Commission or any successor regulatory authority any changes in any of the provisions of its Tariff, including of any of its Rate Schedules, or the General Terms and Conditions,

as Transporter may deem necessary, and to make such changes effective at such times as Transporter desires and is possible under applicable law. Nothing herein contained shall be construed to deny Shipper any rights it may have under the Natural Gas Act, as amended, including the right to participate fully in rate proceedings by intervention or otherwise to contest increased rates in whole or in part. Subject to the provisions of this Article XIII, no modification of this Contract shall be made except by both Parties pursuant to a written agreement.

10

Firm Gas Transportation Contract

## ARTICLE XIV - DEFAULT AND REMEDIES

36. If either Party defaults under this Contract after the Commencement Date, the other Party shall have available all remedies under the law.

## ARTICLE XV - MISCELLANEOUS

37. This Contract, including the FERC Tariff and Rate Schedules FT, reflects the whole and entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings among the Parties with respect to the subject matter hereof.

IN WITNESS WHEREOF, the Parties hereto have caused this Contract to be duly executed in several counterparts by their proper officers thereunto duly authorized, as of the date first herein above written.

ATTEST:

PORTLAND NATURAL GAS TRANSMISSION SYSTEM

By _____

ATTEST:

RUMFORD POWER ASSOCIATES LIMITED
PARTNERSHIP
By: EMI/Rumford Inc., its General Partner

By: _____
James S. Gordon,
President, EMI/Rumford, Inc.

11

**Firm Gas Transportation Contract**

## SCHEDULE 1

Receipt Point:                          Pittsburg, New Hampshire

Maximum Daily Quantity:                 46,000 MMBtu/day

Minimum Delivery Pressure:              Transporter's line pressure as may exist from time
                                        to time

Maximum Contract Demand:                46,000 MMBtu/day

12

Firm Gas Transportation Contract

**Firm Gas Transportation Contract**

## SCHEDULE 2

| | |
|---|---|
| Delivery Point: | Rumford Station, Rumford, Maine |
| Maximum Daily Quantity: | 46,000 MMBtu/day |
| Minimum Delivery Pressure: | 450 psig |
| Maximum Contract Demand: | 46,000 MMBtu/day |

14

**AMENDMENT NO. 1 TO GAS TRANSPORTATION CONTRACT**
**FOR FIRM TRANSPORTATION SERVICE**
**BETWEEN**
**PORTLAND NATURAL GAS TRANSMISSION SYSTEM**
**AND RUMFORD POWER ASSOCIATES LIMITED PARTNERSHIP**

This Amendment No. 1 is hereby made to the Gas Transportation Contract for Firm Transportation Service ("FT Service Contract") between Portland Natural Gas Transmission System ("Transporter") and Rumford Power Associates Limited Partnership ("Shipper") dated the 12th Day of February 1998 pursuant to the following recitals and representations:

WHEREAS, on October 1, 2001 Transporter filed with the Federal Energy Regulatory Commission ("FERC"), in Docket No. RP02-13-000, revised rates pursuant to Section 4 of the Natural Gas Act, proposing to increase Transporter's rates for, among other things, service under Shipper's FT Service Contract; and

WHEREAS, Article VI of Shipper's FT Service Contract contains a Most Favored Nations provision which provides that if Transporter discounts any mainline transportation services, Shipper will be entitled to a discount, as set forth in the FT Service Contract, on a per MMBtu or per Dth basis for all quantities contracted by Shipper under the FT Service Contract for the same period of time ("Discount Clause"); and

WHEREAS, Transporter's other FT shippers have similar Discount Clauses in their FT Service Contracts with Transporter; and

WHEREAS, Transporter, Shipper, and the other parties to Docket No. RP02-13-000 have agreed to certain principles of settlement ("Principles") to resolve all issues in Docket No. RP02-13-000, and those Principles will be memorialized in a formal Stipulation and Settlement Agreement ("Settlement"), which will be filed with the FERC for approval; and

WHEREAS, the Principles provide that Transporter's FT shippers will each execute a permanent amendment to their FT Service Contracts to reflect modifications to the Discount Clause of such contracts which will limit the applicability of such clauses, as set forth herein;

NOW THEREFORE, in consideration of the mutual covenants and agreements herein assumed, Transporter and Shipper agree as follows:

1. **Preconditions for Effectiveness.** This Amendment No. 1 will be effective only if and after: (1) it and like amendments have been executed by all shippers that are parties to FT Service Contracts with Discount Clauses as of the date the Settlement is filed with the FERC; and (2) the Settlement becomes effective either (a) as the result of a FERC order which approves the Settlement without modification and which has become final, or (b)

1

in the event the order approving the Settlement modifies the Settlement or does not become final, as the result of the ratification of the Settlement by Shipper, Transporter and all other shippers that are parties to FT Service Contracts with Discount Clauses.

2.  **Modification to Discount Clause.** Transporter and Shipper agree that, upon the effectiveness of this Amendment No. 1, the Discount Clause contained in Article VI, paragraph 18, of the FT Service Contract between Shipper and Transporter is amended and restated in its entirety, for the remaining term of the FT Service Contract, as follows:

"If Transporter discounts the applicable Recourse Rate under Rate Schedule FT for service provided to a third party pursuant to an FT Service Contract with a primary term greater than 24 consecutive months, then Shipper will be entitled to a discount, as set forth below, on a per Dth basis for all quantities contracted by Shipper under this Contract for the same period of time.  Provided, however, that such third-party transportation services which entitle Shipper to a discount hereunder shall not include any firm off-peak seasonal service, or any backhaul service north of Westbrook (defined as any service for which the Primary Receipt Point designated in the transportation contract is located (a) south of the Primary Delivery Point designated in the transportation contract and (b) at, or north of, the Westbrook, Maine interconnection).  If Transporter so discounts during the months of November through March, Shipper will be offered an equivalent unit-rate discount during the same period of time for the receipt and delivery points designated by Shipper.  If Transporter so discounts during the off-peak months of April through October, Shipper will be entitled to a discount equal to Shipper's Imputed Off-Peak Rate minus the unit rate provided to said third party, during the same period of time for the receipt and delivery points designated by Shipper.  For purposes of this paragraph, the Imputed Off-Peak Rate (IOR) shall be computed as follows:

$$IOR = \frac{(AR \times 365) - (WR \times 151)}{214}$$

where AR is the 100 percent load factor Recourse Rate in effect for FT Service and WR is 1.9 x AR.  The discount provision in this paragraph shall apply during the term of this Contract."

3.  **Relationship to FT Service Contract.** Except as specified in this Amendment No. 1, all terms and provisions of Shipper's FT Service Contract will remain in effect without limitation or modification.

R:\M&R_Shared\Le\FT-Contracts\FT Amend 1 Rumford Power. Doc

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment No. 1 to be duly executed in several counterparts by their proper officers thereunto duly authorized, as of this _24th_ day of September 2002.
~~October~~

ATTEST:                          RUMFORD POWER ASSOCIATES LIMITED PARTNERSHIP

_____                 By _____


ATTEST:                          PORTLAND NATURAL GAS TRANSMISSION SYSTEM

_____                 By _____


3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ANDROSCOGGIN ENERGY LLC, | ) | Case No. 04-12221-LHK |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
|  | ) |  |

AGREED ORDER ON MOTION TO DETERMINE ALLOWED AMOUNT
OF CLAIM AND APPROVING STIPULATION AMONG THE DEBTOR,
TRANSCANADA GAS SERVICES INC. AND PORTLAND NATURAL
GAS TRANSMISSION SYSTEM REGARDING ALLOWED CLAIMS

WHEREAS, on November 26, 2004, the above-captioned debtor and debtor-in-possession (the "Debtor")[1] filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and the Debtor is continuing in possession of its property and is acting as a debtor-in-possession, pursuant to section 1107(a) and 1108 of the Bankruptcy Code. On August 5, 2005, creditor TransCanada Gas Services Inc. ("TransCanada") filed a proof of claim in the above-captioned bankruptcy case in the principal amount of $45,565,385 (Proof of Claim No. 47; the "TransCanada Claim"). On August 5, 2005, creditor Portland Natural Gas Transmission System ("PNGTS") filed a proof of claim in the above-captioned bankruptcy case in the amount of $122,312,545.29, and on January 19, 2006, PNGTS filed an amended proof of claim in the principal amount of $80,146,046.76 (Proof of Claim No. 49; the "PNGTS Amended Claim"). PNGTS held a letter of credit partially securing such claims, and the parties entered into a letter agreement dated July 27, 2005,

---

[1] All capitalized terms in this Agreed Order that are not defined herein are defined as set forth in the Debtor's Second Amended Plan of Reorganization Dated January 9, 2006 (the "Amended Plan").

- 1 -

by which PNGTS placed and retained the letter of credit proceeds in the amount of $2,254,796 (the "Proceeds") in a segregated bank account pending final judicial determinations regarding the amount of the claims to be allowed. On November 11, 2005, TransCanada filed a Motion to Determine Allowed Amount of Claim requesting relief on behalf of itself and PNGTS [Docket No. 687]. No party in interest, including the Debtor, has filed any objection to the TransCanada Proof of Claim, the PNGTS Amended Proof of Claim, or the Motion to Determine Allowed Amount of Claim. On January 9, 2006, the Debtor filed its Second Amended Plan of Reorganization Dated January 9, 2006 (the "Amended Plan").

WHEREAS, on February 10, 2006, the Debtor, TransCanada and PNGTS entered into that certain Stipulation Among the Debtor, TransCanada Gas Services Inc. and Portland Natural Gas Transmission System Regarding Allowed Claims (the "Stipulation"). The Stipulation is attached as Exhibit A hereto.

The Court having found that proper and adequate notice has been given under the circumstances and that all parties in interest have had all necessary opportunity to object to the TransCanada Proof of Claim, the PNGTS Amended Proof of Claim, and the entry of this Order,

NOW, THEREFORE, it is hereby ORDERED, ADJUDGED and DECREED that:

1.      The Stipulation attached as Exhibit A is hereby approved and is effective as an Order of this Court as to all matters set forth therein.

2.      The Stipulation and this Agreed Order are binding on Reorganized AELLC to the same extent as the Debtor.

- 2 -

3.     This Agreed Order shall be immediately effective and not subject to any stay under applicable law.

Dated: February 15 , 2006

_Louis H Kornreich_

_____
The Honorable Louis H. Kornreich
United States Bankruptcy Judge

AGREED IN FORM AND SUBSTANCE:

_____
Robert J. Keach, Esq.
Bernstein Shur Sawyer & Nelson, P.A.
Attorney for Debtor

_____
David W. Elrod, Esq.
Elrod, PLLC
Attorney for TransCanada & PNGTS

- 3 -

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

| | |
|---|---|
| In re: | ) |
| | ) |
| ANDROSCOGGIN ENERGY LLC, | ) |
| | ) |
| Debtor. | ) |
| | ) |

Chapter 11

Case No. 04-12221-LHK

STIPULATION AMONG THE DEBTOR, TRANSCANADA GAS
SERVICES INC. AND PORTLAND NATURAL GAS
TRANSMISSION SYSTEM REGARDING ALLOWED CLAIMS

On November 26, 2004, Androscoggin Energy, LLC (the "Debtor")[1] filed its
voluntary Chapter 11 petition.  On August 5, 2005, creditor TransCanada Gas Services
Inc. ("TransCanada") filed a proof of claim in the above-captioned bankruptcy case in the
principal amount of $45,565,385 (Proof of Claim No. 47; the "TransCanada Claim").  On
August 5, 2005, creditor Portland Natural Gas Transmission System ("PNGTS") filed a
proof of claim in the above-captioned bankruptcy case in the amount of $122,312,545.29,
and on January 26, 2006, PNGTS filed an amended proof of claim in the principal
amount of $80,146,046.76 (Proof of Claim No. 49; the "PNGTS Amended Claim").
PNGTS held a letter of credit partially securing such claims, and the parties entered into a
letter agreement dated July 27, 2005, by which PNGTS placed and retained the letter of
credit proceeds in the amount of $2,254,796 (the "Proceeds") in a segregated bank
account pending final judicial determinations regarding the amount of the claims to be
allowed.  On November 11, 2005, TransCanada filed a Motion to Determine Allowed

---

[1] All capitalized terms in this Stipulation that are not defined herein are defined as set forth in the Debtor's
Second Amended Plan of Reorganization Dated January 9, 2006 (the "Amended Plan").

- 1 -

Amount of Claim requesting relief on behalf of itself and PNGTS [Docket No. 687]. No party in interest, including the Debtor, has filed any objection to the TransCanada Proof of Claim, the PNGTS Amended Proof of Claim, or the Motion to Determine Allowed Amount of Claim. On January 9, 2006, the Debtor filed its Second Amended Plan of Reorganization Dated January 9, 2006 (the "Amended Plan").

With respect to the TransCanada Claim, the PNGTS Amended Claim, and the Motion to Determine Allowed Amount of Claim, the Debtor, TransCanada and PNGTS hereby stipulate as follows:

1.    TransCanada shall have a general unsecured present value Allowed Claim of $37,000,000 in Class Three-A under the Amended Plan (the "TransCanada Allowed Claim"). The TransCanada Allowed Claim shall be satisfied by a fixed distribution to TransCanada by the Debtor of $8,450,000 (the "TransCanada Guaranteed Distribution").

2.    PNGTS shall have a general unsecured present value Allowed Claim of $49,854,796 in Class Three-A under the Amended Plan ("The PNGTS Allowed Claim"). PNGTS shall be entitled with withdraw from the segregated bank account and apply forthwith the letter of credit Proceeds in the amount of $2,254,796 to the PNGTS Allowed Claim, resulting in a net allowed claim in Class Three-A under the Amended Plan of $47,600,000 (the "PNGTS Net Allowed Claim").

3.    The Debtor has investigated and analyzed the TransCanada Claim and the PNGTS Amended Claim, including without limitation taking into account mitigation and an appropriate discount rate, and has determined that all of the terms of this Stipulation and Agreed Order, including without limitation the amounts of the TransCanada Allowed

Claim, the TransCanada Guaranteed Distribution, the PNGTS Allowed Claim, and the PNGTS Net Allowed Claim, are fair and equitable and in the best interests of the estate.

4.     The TransCanada Allowed Claim, the TransCanada Guaranteed Distribution, the PNGTS Allowed Claim and the PNGTS Net Allowed Claim shall not be subject to reconsideration under Section 502(j) of the Bankruptcy Code, or Rule 3008 of the Federal Rules of Bankruptcy Procedure or any other applicable law. The Debtor shall not initiate any contested matter, adversary proceeding or any other cause of action against TransCanada or PNGTS.

5.     In consideration of this Stipulation and the corresponding Agreed Order, TransCanada and PNGTS have voted to accept the Amended Plan and support the Amended Plan. In the event this Stipulation and Agreed Order is not approved and entered by the Court prior to confirmation of the Amended Plan, the parties agree that (a) TransCanada and PNGTS have the right to assert any and all objections to confirmation of the Amended Plan, and that such objections will be deemed timely; (b) TransCanada and PNGTS will be permitted to change their votes with respect to the Amended Plan, good cause appearing therefor; and (c) TransCanada and PNGTS will be permitted to pursue their Claims in the full amounts of the TransCanada Claim and the PNGTS Amended Claim and the Debtor will be permitted to pursue and prosecute any and all objections to such claims.

6.     This Stipulation is binding on Reorganized AELLC to the same extent as the Debtor.

7.     This Stipulation is immediately effective and binding on the Debtor, TransCanada and PNGTS, upon execution by their counsel. The Agreed Order

approving this Stipulation shall be immediately effective upon entry by the Court and not

subject to any stay under applicable law.

Robert J. Keach, Esq.
Bernstein Shur Sawyer & Nelson, P.A.
Attorney for Debtor
Dated:  February _____, 2006

David W. Elrod, Esq.
Elrod, PLLC
Attorney, TransCanada &  PNGTS
Dated:  February _10_ , 2006

- 4 -

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | ) |
|  | ) |
| Calpine Corporation, et al., | ) Chapter 11 |
|  | ) |
|  | ) Case No. 05-60200 (BRL) |
| Debtors. | ) Jointly Administered |
|  | ) |

**STIPULATION AND AGREED ORDER AMONG CALPINE CORPORATION,**
**RUMFORD POWER ASSOCIATES LIMITED PARTNERSHIP, THE**
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND**
**PORTLAND NATURAL GAS TRANSMISSION SYSTEM**

On or about December 20, 2005, Calpine Corporation ("Calpine") and many of its U.S.

subsidiaries, including Rumford Power Associates Limited Partnership ("Rumford Power")

(collectively "Debtors"), filed voluntary petitions for Chapter 11 bankruptcy. On July 31, 2006,

creditor Portland Natural Gas Transmission System ("PNGTS") filed a Proof of Claim in the

amount of $201,587,006 against each of the following Debtors ("Claims"):

| Proof of Claim No. 4773 | Calpine Corporation |
|---|---|
| Proof of Claim No. 4772 | Calpine Power Company |
| Proof of Claim No. 4771 | Calpine Rumford, Inc. |
| Proof of Claim No. 4770 | Calpine Rumford I, Inc. |
| Proof of Claim No. 4769 | Rumford Power Associates Limited Partnership |
| Proof of Claim No. 4768 | Calpine Energy Services Holdings, Inc. |
| Proof of Claim No. 4767 | CPN Energy Services GP, Inc. |
| Proof of Claim No. 4766 | CPN Energy Services LP, Inc. |
| Proof of Claim No. 4765 | Calpine Energy Services, L.P. |
| Proof of Claim No. 4764 | Androscoggin Energy, Inc. |
| Proof of Claim No. 4763 | Calpine Northbrook Corporation of Maine, Inc. |

To date, no party in interest has filed an objection to any of the Claims.

On May 14, 2007, Debtors filed their Motion for Entry of an Order Approving Settlement

of Claims of the Indenture Trustee, Pass Through Trustee, Owner Participant and Owner Lessor

Relating to the Rumford and Tiverton Facilities ("Motion to Approve Settlement"). On May 31,

1

2007, PNGTS filed an Objection to the Motion to Approve Settlement ("Objection").   The

Hearing Date for the Motion to Approve Settlement is currently scheduled for June 5, 2007.   In

order to, among other things, resolve PNGTS' Objection, and facilitate the reconciliation of

claims asserted against the Debtors, Calpine, Rumford Power, the Official Committee of the

Unsecured Creditors ("the Committee"), and PNGTS hereby stipulate as follows:

        1.     PNGTS shall have an allowed claim in the Calpine and Rumford Power chapter

11 CASES ("PNGTS Allowed Claim").  The amount of the PNGTS Allowed Claim has not been

agreed to by the Parties.   In this regard, Calpine, Rumford Power, and the Committee reserve

their objections as to the ultimate quantification of the PNGTS Allowed Claim. The allowed

amount of the PNGTS Allowed Claim shall not exceed $174,000,000 (PLUS INTEREST TO

THE EXTENT PROVIDED FOR UNDER A PLAN OF REORGANIZATION FOR CALPINE

AND/OR RUMFORD POWER).   PNGTS shall not be entitled to a double recovery on the

PNGTS Allowed Claim.  For example, if the ultimate allowed amount of the PNGTS Claims

against each of Calpine and Rumford is $174 million plus interest, the total recovery that PNGTS

may receive on account of both of such claims in the aggregate shall not exceed $174 million,

plus interest.   Within three (3) business days of approval by the Bankruptcy Court of this

Stipulation and Agreed Order, PNGTS shall withdraw all of the Claims filed other than the

Claims evidenced by proof of claim numbers 4769 and 4773 filed in the Rumford Power and

Calpine CHAPTER 11 CASES.  PNGTS shall not file any additional pre-petition claims against

any of the Debtors; however, PNGTS has the right to amend claim numbers 4769 and 4773 to

assert additional claims against Calpine and Rumford Power in accordance with applicable

bankruptcy law and has the right to assert any administrative claims against Calpine and

Rumford Power.

2.     Debtors shall adjourn the hearing on the Motion to Approve Settlement until June 13, 2007, to be heard immediately after the hearing, if any, on this Stipulation and Agreed Order.

3.     In the event this Stipulation and Agreed Order is not approved and entered by the Bankruptcy Court prior to the hearing on the Motion to Approve Settlement, this Stipulation and Agreed Order shall be null and void and the  parties agree that nothing contained herein shall limit (a) the Debtors' ability to proceed with their Motion to Approve Settlement; (b) PNGTS' rights to pursue its Objection; (c) PNGTS' rights to pursue all of its Claims; or (d) the rights of any party to oppose the Claims on any grounds.

4.    The Agreed Order approving this Stipulation shall be immediately effective upon

entry by the Court and not subject to any stay under applicable law.

| | |
|---|---|
| /s/ Bennett L. Spiegel | /s/ Philip C. Dublin |
| Richard M. Cieri (RC 6062) | Michael S. Stamer (MS 4900) |
| Mark E. McKane (admitted pro hac vice) | Philip C. Dublin (PD 4919) |
| KIRKLAND & ELLIS LLP | AKIN GUMP STRAUSS HAUER & FELD LLP |
| Citigroup Center | 590 Madison Avenue |
| 153 East 53rd Street | New York, NY 10022 |
| New York, New York 10022-4611 | Telephone: (212) 872-1000 |
| Telephone: (212) 446-4800 | Facsimile: (212) 872-1002 |
| Facsimile: (212) 446-4900 | |

Counsel for the Official Committee of Unsecured
Creditors of Calpine Corporation, et al.

          and

Bennett L. Spiegel (BS 7153)
Katherine C. Piper (admitted pro hac vice)
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, California 90017
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

Counsel for the Debtors

          /s/ David W. Elrod
          David W. Elrod (Texas State Bar No. 06591900)
          ELROD, PLLC
          500 N. Akard Street, Suite 3000
          Dallas, Texas 75201
          Telephone: (214) 855-5188
          Facsimile: (214) 855-5183

          Counsel for Portland Natural Gas Transmission
          System

**SO ORDERED AND APPROVED:**

          Dated: New York, New York
                 June 12, 2007

/s/Burton R. Lifland
UNITED STATES BANKRUPTCY JUDGE