Hearing Date: September 25, 2007 at 10:00 a.m. (EDT)
Objection Deadline: September 14, 2007 at 5:00 p.m. (EDT)

David W. Elrod (Texas State Bar No. 06591900)
Craig Tadlock (Texas State Bar No. 00791766)
Brian A. Farlow (Texas State Bar No. 00794339)
ELROD, PLLC
500 N. Akard St., Suite 3000
Dallas, Texas 75201
Telephone:  (214) 855-5188
Facsimile:  (214) 855-5183

**Counsel for Portland Natural Gas Transmission System,
Gas Transmission Northwest Corporation,
TransCanada PipeLines Limited, and NOVA Gas
Transmission Ltd.**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

In re:                 )     Chapter 11

                   )     Case No. 05-60200-BRL

CALPINE CORPORATION, *et al.*,  )     (Jointly Administered)

                   )

        Debtors       )

_____)

## JOINT OBJECTION OF PORTLAND NATURAL GAS TRANSMISSION SYSTEM, GAS TRANSMISSION NORTHWEST CORPORATION, TRANSCANADA PIPELINES LIMITED, AND NOVA GAS TRANSMISSION LTD TO DEBTORS' FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO <u>CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE</u>

Portland Natural Gas Transmission System ("PNGTS"), Gas Transmission Northwest

Corporation ("GTN"), TransCanada PipeLines Limited ("TCPL"), and NOVA Gas Transmission

Ltd. ("NOVA") (sometimes collectively referred to as the "Pipelines") file this Joint Objection to

Debtors' Amended Disclosure Statement for Debtors' First Amended Joint Plan of

Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Amended Disclosure Statement").[1]

## INTRODUCTION

1.      The Debtors' Amended Disclosure Statement is objectionable because the proposed Amended Plan is fatally flawed and not confirmable as a matter of law.   The Amended Plan purports to effectuate a rejection of certain agreements for firm transportation of natural gas on interstate pipelines owned by GTN and PNGTS that fall under the exclusive regulatory authority of the Natural Gas Act ("NGA") and the Federal Energy Regulatory Commission ("FERC").   The United States District Court for the Southern District of New York has entered orders in this Bankruptcy Case indicating that neither it nor the Bankruptcy Court has subject matter jurisdiction to authorize the Debtors to reject, pursuant to Section 365 of the Bankruptcy Code, agreements that are subject to the jurisdiction of FERC, "because doing so would directly interfere with FERC's jurisdiction over the rates, terms, conditions, and duration of wholesale energy contracts."   *California Dept. of Water Resources v. Calpine Corp.* (*In re Calpine Corp.*), 337 B.R. 27, 36 (S.D.N.Y. 2006).   Accordingly, the proposed Amended Plan is unconfirmable on its face.

2.      In addition, the Debtors' Amended Disclosure Statement does not provide information adequate for creditors in impaired classes to determine with any degree of certainty what they would receive under the Debtors' proposed Amended Plan.  Much of the uncertainty is

---

[1]     Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code is referred to herein as "Debtors' Amended Plan" or "the Amended Plan."   Debtors' Motion for Entry of an Order (A) Approving the Adequacy of the Debtors' Disclosure Statement; (B) Approving Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Plan of Reorganization; (C) Approving the Form of Various Ballots and Notices in Connection Therewith; and (D) Scheduling Certain Dates with Respect Thereto is referred to herein as "Debtors' Motion to Approve Disclosure Statement" or "Motion."

created by Debtors' strategy of seeking substantive consolidation of all Debtors' entities, while at the same time proposing to proceed with the current Plan without any additional disclosures in the event that substantive consolidation is not approved at all, or is only approved in part.  It is Debtors' intention to push forward with the Amended Plan even if substantive consolidation is not approved as to all Debtors.

3.    Having put all of its eggs in the substantive consolidation basket, Debtors have provided literally no information as to the possible treatment of claims against any Debtor entity for which substantive consolidation is not approved.  Creditors are thus being asked to vote on a plan that Debtors have determined will allow even impaired classes to recover 95% or more, yet if substantive consolidation is not approved as to any particular Debtor entity, the creditors of that entity could recover considerably less – possibly nothing – despite having voted in favor of the plan.  Debtors have provided no information regarding the value of the assets of the individual Debtor entities or the value of the claims made against them, and thus have failed to provide adequate information concerning the distributions to creditors in the event that substantive consolidation is not approved, or is approved as to fewer than all Debtor entities.

4.    Further, by attempting to insulate themselves from having to provide additional disclosures, solicit new votes, perform a best interest of creditors analysis and a liquidation analysis as to individual Debtor entities in the event that full substantive consolidation is not approved, Debtors endeavor to circumvent the express requirements of 11 U.S.C. §§1122-1129, thus making any plan which does not incorporate full substantive consolidation fatally flawed and unconfirmable as a matter of law.

5.      For these reasons, the Pipelines object to those portions of the Debtors' Amended Disclosure Statement which provide that (a) Debtors can pursue confirmation of the Amended Plan in the event that the Court does not authorize substantive consolidation or approves substantive consolidation of less than all of the estates; (b) the Amended Plan may constitute a separate plan of reorganization for each Debtor that is not substantively consolidated with any other Debtor; and (c) the non-allowance of substantive consolidation in whole or in part would not necessarily affect the validity of the vote of the impaired classes to accept or reject the Amended Plan or necessarily require a re-solicitation of the votes of holders of claims or interests in such impaired classes.   Debtors should either be required to provide relevant asset and claims information as to each individual Debtor, or, alternatively, the Amended Disclosure Statement should be modified to provide that in the event that substantive consolidation is not approved as to all Debtor entities, the Amended Plan cannot be confirmed.

6.      The Amended Disclosure Statement fails to provide claim holders with adequate information concerning the value of the Debtors' operations because Debtors' analysis is stale. Debtors' valuation analysis is based on data and information as of June 20, 2007.  However, since that time credit and equity markets have changed substantially, as the Debtors acknowledge.  Despite these changed conditions, Debtors have failed to update their valuation analysis, which is required under the best interests of creditors test and forms the basis for the Debtors' determination that the best interests test is satisfied, as well as for the projected recoveries that are fundamental to creditors' decisions on how to vote.  Accordingly, Debtors have failed to provide claim holders with adequate valuation information which would allow them to determine whether or not to vote in favor of the Amended Plan.

7.      The Amended Plan contains claims estimation procedures and provisions governing a New Calpine Stock Reserve which are violative of the Bankruptcy Code and of claim holders' due process rights, making the Amended Plan unconfirmable as a matter of law. The Amended Plan violates Bankruptcy Code §1129(b)(2)(B)'s absolute priority rule by providing for distributions to existing Calpine equity holders before claim holders have been paid 100% of their claims, thus making the Amended Plan unconfirmable as a matter of law. The Voting Procedures outlined in the Amended Disclosure Statement violate §§502 and 1126 of the Bankruptcy Code, making the Plan unconfirmable as a matter of law.  Finally, the Plan is unconfirmable because it makes no provision for the payment of attorney's fee claims recoverable under applicable law.

8.      In addition, Debtors' Amended Disclosure Statement fails to provide adequate information regarding key aspects of the Amended Plan, including potential recoveries under the Plan to claim holders, the proposed estimation procedures, the Reserve of New Calpine Stock, the expanded effect of claims estimation, balloting and vote tabulation, the proposed Management Incentive Plan and Director Equity Incentive Plan, the proposed document retention policies, the Debtors' calculation of projected claims amounts, the proposed non-debtor releases and Exculpation Provision, the proposed Solicitation Procedures, and whether the Amended Plan satisfies the best interests of creditors test.

## BACKGROUND

9.      PNGTS and GTN own and operate natural gas pipelines in the United States. Each of them is a party to one or more contracts with various Debtor entities for the firm transportation of natural gas on pipelines owned by PNGTS and GTN, respectively.

10.    TCPL and NOVA own and operate natural gas pipelines in Canada.  Each of them was a party to one or more contracts with various Canadian affiliates of the Debtors for the firm transportation of natural gas, and certain obligations under those contracts are guaranteed by Calpine Corporation.

11.    PNGTS has filed proofs of claim against Calpine Corporation ("Calpine Corp.") and Rumford Power Associates Limited Partnership ("Rumford Power") in the amount of $201.5 million.  By stipulation entered into between PNGTS and the Debtors on June 2, 2007, and approved by the Court, PNGTS has an allowed claim in Calpine Corporation and in Rumford for an undetermined amount not to exceed $174 million.[2]

12.    GTN has filed proofs of claim against Calpine Corp., Calpine Energy Services, L.P. ("CES"), Calpine Energy Services Holdings, Inc. ("CES Holdings"), CPN Energy Services GP, Inc. ("CPN GP"), CPN Energy Services, L.P. ("CPN LP"), and Calpine Power Company ("Calpine Power") in the amount of $525.1 million.[3]

13.    With these claims of about $700 million, GTN and PNGTS are two of the largest trade debt unsecured creditors in this case.

14.    TCPL has filed proofs of claim against Calpine Corp., Calpine International Holdings, Inc. ("Calpine Int'l") and Quintana Canada Holdings, LLC ("Quintana") in the amount of $71.4 million.  TCPL additionally filed claims against Canadian Calpine Debtor entities

---

[2]  By virtue of a settlement agreement entered into between PNGTS, Calpine Corp., Rumford Power, and the Official Committee of Unsecured Creditors, PNGTS has reserved the right to file amended proofs of claim against Calpine Corp. and Rumford Power, which it intends to do shortly.

[3]  Debtors have filed objections to GTN's claims against CES Holdings, CPN GP, CPN LP, and Calpine Power, but have not filed objections to GTN's claims against Calpine Corp. or CES.  GTN has sought to have its claim determined by the Court prior to confirmation, but Debtors have steadfastly refused to allow that proceeding to go forward.

**JOINT OBJECTION OF PORTLAND NATURAL GAS TRANSMISSION SYSTEM, GAS TRANS-MISSION NORTHWEST CORPORATION, TRANSCANADA PIPELINES LIMITED,  AND NOVA GAS TRANSMISSION LTD TO DEBTORS' AMENDED DISCLOSURE STATEMENT    PAGE  6**

Calpine Energy Services Canada Partnership ("CESCA"), Calpine Canada Resources Company ("CCRC"), Calpine Canada Energy Ltd. ("CCEL"), and Calpine Energy Services Canada, Ltd. ("CESCL") in the amount of $71.4 million.

15.    NOVA has filed proofs of claim against Calpine Corp., Calpine Int'l, and Quintana in the amount of $31.8 million.   NOVA additionally filed claims against Canadian Calpine Debtor entities CESCA, CCRC, CCEL, and CESCL in the amount of $31.8 million.

16.    By agreement entered into on July 18, 2007 by and between the U.S. and Canadian Debtors, TCPL, and NOVA, Debtors have given TCPL and NOVA allowed claims in the amount of $44,368,141.41 and $31,631,858.59 (Canadian dollars), respectively, against CESCA.  This agreement specifically preserves the claims of TCPL and NOVA against any of the U.S. Calpine Debtors, as well as against CCRC.

17.    Debtors have purportedly repudiated each of the contracts which are the subject of the proofs of claim filed by PNGTS and GTN.[4]  Pursuant to the terms of the Amended Disclosure Statement, the claims of PNGTS and GTN have been categorized by Debtors as Rejection Damages Claims, Class C-7, which is an impaired class and thus creditors in this class are entitled to vote on the Debtors' proposed Amended Plan.  *See* Amended Disclosure Statement, pp. 108, 126-27, §H, ¶¶1,2; Plan Supplement, Exhibit. 7, pp. 1-2.   The Amended Disclosure Statement does not indicate which class the TCPL and NOVA claims have been placed in by Debtors, but presumably they have been placed in either Class C-7 or Class C-8 ("General Unsecured Claims").  Class C-7 and Class C-8 are both impaired classes, thus entitling creditors in these classes to vote on the Debtors' proposed Amended Plan.

---

[4]  As set forth below, PNGTS and GTN assert that the purported "repudiation" is impermissible under the Bankruptcy Code and other relevant law and is of no legal effect.

## ARGUMENT AND AUTHORITIES

**A.     The Amended Disclosure Statement Should be Disapproved Because the Debtors' Proposed Amended Plan is Unconfirmable as a Matter of Law.**

18.     A disclosure statement will not be approved where it describes a plan which is fatally flawed and thus incapable of confirmation. *See In re 266 Washington Associates*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992); *In re Eastern Maine Elec. Coop., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991); *In re Bjolmes Realty Trust*, 134 B.R. 1000, 1002-1003 (Bankr. D. Mass. 1991).  Examination of whether the proposed plan is confirmable is appropriate at the disclosure statement stage, because undertaking the burden and expense of plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never be legally confirmed. *See In re Eastern Maine Elec. Coop., Inc.*, 125 B.R. at 333. Where a plan's inadequacies are patent, the court should address them at the disclosure statement phase, and the disclosure statement should be disapproved when the proposed plan it describes displays fatal facial deficiencies or the stark absence of good faith. *Id.; In re Valrico Square Ltd. Partnership*, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990) ("Soliciting votes and seeking court approval on a clearly fruitless venture is a waste of the time of the Court and the parties.").

19.     In its proposed Amended Plan, Debtors treat the claims of PNGTS and GTN as "rejection damages claims,"[5] and acknowledge that the natural gas transportation contracts are subject to FERC jurisdiction by referring to them as "Repudiated FERC Jurisdictional Contracts."  *See* Disclosure Statement, p. 127, §H, ¶3; Amended Plan, p. 45, ¶2; pp. 46-47, §E;

---

[5]  Under the Amended Plan, parties to "Repudiated FERC Jurisdictional Contracts" are treated as holding rejection damage claims, and such creditors "shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full." *See* Amended Plan, p. 31, ¶ 11).  PNGTS and GTN would thus receive shares of stock which may be subject to certain transfer restrictions in lieu of the payments due them under their gas transportation contracts with Debtors.

**JOINT OBJECTION OF PORTLAND NATURAL GAS TRANSMISSION SYSTEM, GAS TRANSMISSION NORTHWEST CORPORATION, TRANSCANADA PIPELINES LIMITED,  AND NOVA GAS TRANSMISSION LTD TO DEBTORS' AMENDED DISCLOSURE STATEMENT     PAGE  8**

Plan Supplement Exhibit 8, pp. 1-2.   The Amended Plan's treatment of FERC jurisdictional contracts such as the Debtors' firm transportation agreements with GTN and PNGTS is absolutely contrary to the Bankruptcy Code and binding precedent in this case.  As discussed in more detail below, the District Court in this case squarely held that the District Court and the Bankruptcy Court have no authority to reject FERC jurisdictional contracts – rather, that power lies exclusively with the FERC.  *See In re Calpine Corp.*, 337 B.R. 27 (S.D.N.Y. 2006).

20.    Under Bankruptcy Code §365(a), the Bankruptcy Court must approve either assumption or rejection of executory contracts.  There is no authority in the Bankruptcy Code for "repudiation" as the Debtors propose under the Amended Plan.   Rather, "repudiation" is the Debtor's attempt to end-run the requirements of the District Court opinion and §365.  Debtors' "repudiation" consists of sending a letter to the other party to the FERC jurisdictional contract (such as GTN and PNGTS) stating that they are "repudiating" the contract, and then failing to perform under the contract (in the case of GTN and PNGTS, Debtors failed and refused to pay for the contracted-for service).  Debtors did not take any action with the FERC or the Bankruptcy Court to reject the Contracts.

21.    Because the Debtors have not obtained proper approval to reject these FERC jurisdictional contracts, they now attempt to circumvent this requirement by have the Plan treat "repudiation" as rejection.  As a matter of law, this is improper.  Because the Plan is conditioned on "repudiation" constituting effective rejection under §365 (which it is not), the Plan is contrary to controlling law and cannot be confirmed.

22.    The Debtors' treatment of FERC jurisdictional contracts is also simply contrary to the express ruling made by the District Court for the Southern District of New York in this case

when it considered the Debtors' attempted rejection of other energy contracts.  *See In re Calpine Corp*., 337 B.R. 27 (S.D.N.Y. 2006). As stated by the District Court, "[a]lthough energy contracts are privately negotiated, the contracts must be filed with FERC and certified 'just and reasonable' to be lawful under FPA, … and as such, FERC is vested with the 'exclusive authority to determine the reasonableness of wholesale [electricity] rates,'" *Id.* at 32 (*citing Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 371, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988)).

23.    As outlined by the District Court, FERC's plenary authority over wholesale energy contracts has led to the "filed rate doctrine," which provides that a utility's right to a reasonable rate under the FPA is the right to the rate which the FERC files or fixes and, except for review of FERC orders, a court cannot provide a right to a different rate.  *See In re Calpine*, 337 B.R. at 32; *Mississippi Power & Light*, 487 U.S. at 371, 108 S.Ct. 2428.   It has been widely recognized that the filed rate doctrine prohibits any collateral attack in the courts on the reasonableness of rates, and that the only forum for such a challenge is the FERC.  *Id.*   FERC's exclusive jurisdiction applies not only to rates but also extends to the terms and conditions of wholesale energy contracts.  *Id*. [6]

---

[6]  In *In re Calpine*, the power contracts at issue fell within the regulatory authority of FERC by virtue of the Federal Power Act ("FPA").  The natural gas transportation contracts which Debtors seek to reject under the Amended Plan fall within the regulatory authority of FERC by virtue of the Natural Gas Act ("NGA").  *See* Plan Supplement, Exhibit 8, pp. 1-2 (indicating that the PNGTS and GTN contracts are "FERC Jurisdictional Contracts").

Although the District Court's opinion in *In re Calpine* was decided under the FPA, the courts have an established practice of citing interchangeably decisions interpreting the FPA and the NGA.  *See Arkansas Louisiana Gas Co*., 453 U.S. at 577 n. 7 ("as we have previously said, the relevant provisions of the Federal  Power Act and the Natural Gas Act 'are in all material respects substantially identical'… we therefore follow our established practice of citing interchangeably decisions interpreting the pertinent sections of the two statutes.") (citing *Federal Power Comm'n v. Sierra Pacific Power Co*., 350 U.S. 348, 353 (1956)); *see also Public Utility District No. 1 of Grays Harbor County Washington v. Idacorp, Inc*., 379 F.3d 641, 649 n. 8 (9th Cir. 2004).  With respect to both the filed rate doctrine and the exclusive nature of FERC's jurisdiction over the rates, terms, conditions and duration of

24.    A change as to the duration of a filed rate energy contract would also come under FERC's jurisdiction. *In re Calpine Corp.*, 337 B.R. at 32-33 (*citing In re Permian Basin Area Rate Cases*, 390 U.S. 747, 822, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968)). Once filed with FERC, wholesale energy contracts become the equivalent of a federal regulation, and therefore the duty to perform under them may be required not from the private law of contract, but by FERC itself. *In re Calpine Corp.*, 337 B.R. at 33 (*citing California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 839 (9th Cir. 2004); *Pennsylvania Water & Power Co. v. Federal Power Comm'n*, 343 U.S. 414, 422, 72 S.Ct. 843, 96 L.Ed. 1042 (1952)).

25.    In *In re Calpine Corp.*, the District Court stated that "[h]aving determined that the Bankruptcy Code does not expressly limit FERC's jurisdiction, and that it contemplates agency action during the pendency of a reorganization, it is clear the bankruptcy court's authority cannot be exercised so as to interfere with the jurisdiction of a federal agency acting in its regulatory capacity." *In re Calpine Corp.*, 337 B.R. at 35. The District Court then held that it lacked jurisdiction to authorize the rejection of the power agreements at issue "because doing so would directly interfere with FERC's jurisdiction over the rates, terms, conditions, and duration of wholesale energy contracts." [7]    *Id.* at 36. Importantly, the District Court also noted that Bankruptcy Code §1129(a)(6) prohibits court-confirmation of a reorganization plan unless, *inter*

---

wholesale energy contracts, the regulatory authority of FERC under the NGA is subject to the same analysis as that outlined by Judge Casey in his opinion in *In re Calpine,* e.g. compare 16 U.S.C. §824(a) (FPA) and 15 U.S.C. §717(a) (NGA) regarding the nature of both the interstate sale of wholesale electric energy and the business of transporting and selling natural gas for ultimate distribution to the public as "affected with a public interest"; compare *Mississippi Power & Light Co. v. Mississippi ex. Rel. Moore*, 487 U.S. 354, 371, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988) and *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 (1981) regarding the exclusivity of FERC's jurisdiction to set or determine rates under the FPA and the NGA, respectively.

[7]   "Because there is nothing in the Bankruptcy Code that limits FERC's jurisdiction, Calpine cannot achieve in Bankruptcy Court what neither it, nor any other party in this case, nor any other federally regulated energy company in the country could do without seeking FERC approval: cease performance under the rates, terms, and conditions of filed rate wholesale energy contracts in the hopes of getting a better deal." *Id.* at 36.

**JOINT OBJECTION OF PORTLAND NATURAL GAS TRANSMISSION SYSTEM, GAS TRANS-MISSION NORTHWEST CORPORATION, TRANSCANADA PIPELINES LIMITED, AND NOVA GAS TRANSMISSION LTD TO DEBTORS' AMENDED DISCLOSURE STATEMENT    PAGE  11**

*alia*, "[a]ny governmental regulatory commission with jurisdiction… over the rates of the debtor has approved any rate change provided for in the plan." *Id.* at n. 8.[8]

26.    By treating the PNGTS and GTN claims for the breach of their transportation contracts as rejection damages claims, Debtors are clearly attempting to cease performance under the rates, terms, and conditions of the contracts, thus changing the duration of a filed rate energy contract.    Debtors have neither sought nor received FERC approval for such proposed modification of the transportation contracts at issue.    As stated by the District Court in *In re Calpine Corp.*, "just as regulatory action was required to transform the terms and conditions of the Power Agreements from mere contracts into regulated duties, so also is regulatory action from FERC required to eliminate those duties … With rejection, a bankruptcy court eliminates those duties.  But what FERC giveth, only FERC may taketh away." (*citing Dynegy*, 375 F.3d at 839; *Pennsylvania Water & Power Co.*, 343 U.S. at 422, 72 S.Ct. 843 (finding that once the energy contracts were filed, the FPA, not contract law, controls).

27.    In addition, under the Amended Plan, the PNGTS and GTN claims would be paid in New Calpine Common Stock, not cash.  In the event that PNGTS and GTN are not allowed the opportunity to have their claims determined prior to confirmation, they may not receive their distributions of stock until many months after confirmation.  Because the New Calpine Common Stock will have a fluctuating value over such a long period of time, the actual value of the New Calpine Common Stock at the time of distribution to PNGTS and GTN could be substantially below the value of their contract rates.  As such, there is no guarantee that the amount of New

---

[8] Although Debtors initially appealed the District Court's decision in *In re Calpine Corp.*, they have since agreed to dismiss the appeal.  Regardless, the District Court's rulings in *In re Calpine Corp.* constitute the law of the case and are direct binding authority.

Calpine Common Stock that PNGTS and GTN will receive will be the cash equivalent of the amount of their allowed claims.  Such treatment of the PNGTS and GTN claims amounts to a further erosion of the filed rate doctrine, done without the approval of FERC.

28.     Based on the foregoing, the Bankruptcy Court is without jurisdiction to approve a plan that improperly treats Debtors' unilateral "repudiation" as satisfying the requirement of formal, Court-approved rejection under §365 and permits the rejection of energy contracts in derogation of FERC's exclusive jurisdiction.   The Court should therefore enter its order disapproving the Debtors' Amended Disclosure Statement and the proposed Amended Plan.

**B.     The Amended Disclosure Statement Provides Inadequate Information in the Event that Full Substantive Consolidation is Not Approved, and the Amended Plan is Structured in Such a Way as to Circumvent the Requirements of 11 U.S.C. §§ 1122-1129, Making It Unconfirmable as a Matter of Law.**

29.     Bankruptcy Code §1125(b) provides that a debtor may not solicit acceptance or rejection of a plan of reorganization unless, at the time of or before such solicitation, the debtor transmits to the holders of a claim or interest a written disclosure statement approved by the Court as containing "adequate information."   Bankruptcy Code Section §1125(a)(1) defines the term "adequate information" as meaning "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, … that would enable … a hypothetical investor of the relevant class to make an informed judgment about the plan …"

30.     A court should not approve a disclosure statement if it does not contain such information so that all creditors and equity shareholders can make an intelligent and informed decision as to whether to accept or reject the plan. *See In re Copy Crafters Quickprint, Inc*., 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988).  What constitutes "adequate information" for purposes of

a disclosure statement must be determined on a case by case basis. *In re Texas Extrusion Corp*., 844 F.2d 1142, 1157 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988); *accord In re Ionosphere Clubs, Inc*., 179 B.R. 24, 29 (S.D.N.Y. 1995).   No creditor should have to guess how it would be treated under the plan. *See e.g., In re Haukos Farms, Inc*., 68 B.R. 428, 433-34 (Bankr. D. Minn. 1986).

31.    Debtors' Amended Plan is based on a full substantive consolidation of all Debtors, though Debtors acknowledge that the Court may not approve substantive consolidation as to any or all Debtor entities.   All asset and claims information contained in the Amended Disclosure Statement has been provided on a consolidated basis only.   Debtors have provided no information as to the assets of or claims against individual Debtor entities, or as to the expected distributions to creditors if substantive consolidation is not approved in full.   Likewise, Debtors have not performed a best interests of creditors analysis or a liquidation analysis as to any individual Debtor entity.   As such, the Amended Disclosure Statement does not comply with the provisions of Bankruptcy Code §1125(b) in that it fails to provide creditors with information adequate to allow them to make an informed decision as to whether to accept or reject the proposed Amended Plan.

32.    The Amended Disclosure Statement contains a section entitled "Certain Factors to Be Considered Prior to Voting." *See* Amended Disclosure Statement, p. 13.   The 6th such factor reads as follows:

> "6.    The Plan provides for the substantive consolidation of the Estates into a single Estate for purposes associated with Confirmation and Consummation.   The Debtors can provide no assurance, however, that the Bankruptcy Court will authorize the Debtors to substantively consolidate any or all of the Estates.   The Debtors reserve the right to request Confirmation and Consummation, even if the Bankruptcy Court does not authorize the Debtors to substantively consolidate the

Estates, or approves substantive consolidation of less than all of the Estates. In the event that the Bankruptcy Court does not authorize the Debtors to substantively consolidate any or all of the Estates, the Plan may constitute a separate plan of reorganization for each Debtor that is not substantively consolidated with any other Debtor.

The occurrence or non-occurrence of any or all such contingencies, which could affect distributions available to Holders of Allowed Claims and Interests under the Plan, will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims and Interests in such Impaired Classes."

*See* Amended Disclosure Statement, pp. 13-14.[9]

33.    The Amended Disclosure Statement thus indicates that in the event that substantive consolidation is denied in whole or in part, Debtors do not intend to file any additional disclosures as to the expected recoveries of creditors with respect to each of the Debtor estates under the proposed Amended Plan. *Id.* Debtors acknowledge that they cannot assure that the Court will approve substantive consolidation, and yet Debtors have made no disclosures as to the value of the assets of each of the separate Debtor entities under either the Amended Plan or under a liquidation analysis.

34.    As acknowledged by Debtors in their Liquidation Analysis, the "best interests" of creditors test set forth in Bankruptcy Code Section 1129(a)(7) states that the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code."    In order to show that

---

[9] *See also* Amended Disclosure Statement, p. 2, §C ("If the Bankruptcy Court authorizes the Debtors to substantively consolidate less than all of the Estates, the Debtors may, in accordance with the Plan, proceed with separate Plans for any such non-consolidated Debtor and each Class of Claims and Interests shall be treated as against each individual non-consolidated Debtor for voting and distribution purposes…")

their proposed Amended Plan satisfies the best interests of creditors test, Debtors have prepared a Liquidation Analysis on a consolidated basis. However, Debtors have not prepared liquidation analyses for each individual Debtor entity, nor, apparently, do they intend to do so in the event that a full substantive consolidation is not approved.

35.    Debtors have not provided information from which creditors can determine (a) the gross amount of claims against each individual Debtor entity, (b) an estimated range of the claims against each individual Debtor entity, or (c) the amount of and estimated range of each individual claim made against each Debtor entity. Although Debtors have provided some information about the Total Enterprise Value and Reorganized Value of Debtors on a consolidated basis, they have not provided the same information as to each individual Debtor entity. Without information as to the assets of individual Debtors and the claims against them, creditors cannot determine whether the proposed Amended Plan would satisfy the best interests of creditors test in the event that substantive consolidation is not approved. Creditors can only guess at how their claims might be treated under the Amended Plan should substantive consolidation not be approved in full. Without knowing what their expected recoveries might be in the event that the Court denies substantive consolidation, creditors are without adequate information to make an intelligent and informed decision as to whether to accept or reject the Amended Plan.

36.    The Amended Disclosure Statement provides that if less than full substantive consolidation is ordered, the Debtors "may" "(1) proceed with no or partial substantive consolidation of the Estates; (2) propose one or more separate Plans with respect to one or more of the Debtors for whose Estates substantive consolidation has not been authorized; (3) proceed

with the Confirmation of one or more separate Plans to the exclusion of other separate Plans; and (4) to [sic] withdraw some or all of the separate Plans…"  *See* Amended Disclosure Statement, p. 100, §C.   The Amended Disclosure Statement provides inadequate information as what each of these scenarios would entail and how they would affect the claims of creditors.[10]

37.    Because recoveries for individual creditors could be substantially different under a substantive consolidation analysis than they would be without substantive consolidation, the Debtors' attempts to force creditors to vote on the proposed Amended Plan without knowing whether or not complete substantive consolidation will be approved, puts them in the position of having to guess at how their claims ultimately will be treated.   If creditors vote in favor of the Amended Plan and later learn that the Debtor entity in which they have a claim is to be excluded from substantive consolidation, they will have forfeited any objection that they might have had and could end up with a recovery that is substantially lower than the Debtors' projections in the Amended Disclosure Statement.   This is an untenable position in which to place the impaired classes.

38.    By attempting to create for themselves a right to present "separate plans" in the event that full substantive consolidation is not approved, while at the same time freeing themselves from both the burden of having to make new disclosures relevant to individual Debtor entities who are not approved for substantive consolidation and from the burden of

---

[10] Other than simply listing the four alternative scenarios which might occur in the event that substantive consolidation is not approved as to all Debtor entities, Debtors have provided no real information about the details of how any of these alternative scenarios would work.  Debtors ignore the fact that substantive consolidation is an equitable remedy and that most courts that have considered the issue have determined that it is to be used "sparingly."  *See In re Owens Corning*, 419 F.3d 195, 208-09 (3d Cir. 2005); *Official Committee of Unsecured Creditors of Veristar, Inc. v. American Tower Corp.  (In re Veristar, Inc.)*, 343 B.R. 444, 462 (Bankr. S.D.N.Y. 2006).  Because Debtors' entitlement to the remedy of substantive consolidation is not easily proved, there is an inherent risk that substantive consolidation will not be approved.  Debtors have not taken this risk into consideration in proposing their Plan, and have not adequately explained the details of how they would go forward with reorganization in the event that substantive consolidation is not approved as to all Debtors.

having to re-solicit votes as to such "separate plans," the Debtors seek to completely circumvent the carefully detailed requirements for plan approval as set forth in Bankruptcy Code §§ 1122-1129. *See* Amended Disclosure Statement, pp. 13, 14, §K; Amended Plan, pp. 35-36, §D.   As such, the Debtors' Amended Plan is unconfirmable as a matter of law.

39.    "[W]hen an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face." *In re Felicity Associates, Inc.*, 197 B.R. 12, 14 (Bankr. D. R.I. 1996). *See also In re Bjolmes Realty Trust*, 134 B.R. 1000, 1002-03 (Bankr. D. Mass 1991). "For a reorganization plan to be confirmed, it must comply with all of the requirements of Chapter 11, as provided in 11 U.S.C. § 1129(a)(1)." *In re Felicity Associates*, 197 B.R. at 14.

40.    By setting forth a procedure for implementing "separate plans" for which no disclosures are made, no votes are solicited, no best interest of creditors analysis is performed and no liquidation analysis is performed, the Amended Plan violates the provisions of 11 U.S.C. §§ 1122-1129 and is therefore fatally flawed and unconfirmable.  The Court should not approve a disclosure statement that describes a plan that is fatally flawed on its face. *See In re Eastern Maine Elec. Cooperative, Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991); *In re Bjolmes*, 134 B.R. at 1002-03.

41.    In order to cure the fatal flaw in the Debtors' Amended Plan, the Court should order that that Debtors include in the Amended Disclosure Statement and Amended Plan a statement that in the event that substantive consolidation is not approved as to all Debtor entities,

the Debtors' Amended Plan cannot be confirmed, and order that all other language that is inconsistent therewith be removed.

**C.     The Amended Disclosure Statement Fails to Provide Claim Holders With Adequate Information Concerning the Value of the Debtors' Operations as of the Effective Date of the Plan.**

42.     The Debtors' Amended Plan is based on a Valuation Analysis which is stale.  As set forth in the Amended Disclosure Statement, "[t]he Valuation Analysis is based on data and information as of June 20, 2007.  Miller Buckfire makes no representations as to changes to such data and events that may have occurred since June 20, 2007."     *See* Amended Disclosure Statement, p. 12, §J.

43.     The Valuation Analysis is a critical part of the Amended Disclosure Statement. Among other things, the Valuation Analysis provides the basis for (a) the Debtors' determination that the Amended Plan satisfies the "best interests" of creditors' test (*Id.* at pp. 157-58);[11] (b) the ranges of anticipated recoveries to the various classes of creditors who will be voting on the Amended Plan; (c) the Debtors' projection that unsecured creditors will be satisfied in full (*Id.* at p. 163); and (d) the Debtors' projection that old equity will receive distributions in the form of New Calpine Common Stock valued at approximately $2.05 per share (*Id.*).

44.     There have been major changes in the markets since the valuation date of June 20, 2007.  The Debtors acknowledge this fact, as they must, in the Amended Disclosure Statement: "Beginning in late July 2007, certain financial capital markets began to experience significant

---

[11] As Debtors acknowledge, under the "best interests" test, the Bankruptcy Court must find that the Plan provides, with respect to each Impaired Class, that each Holder of an Allowed Claim or Interest in such Impaired Class has accepted the Plan, or will receive or retain under the Plan property of a value, *as of the Effective Date*, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code."  *Id.* at p. 156.  (Emphasis added).  Accordingly, under the "best interest" of creditors test, Debtors must present evidence establishing the value of the enterprise *as of the Effective Date* of the Amended Plan.

**JOINT OBJECTION OF PORTLAND NATURAL GAS TRANSMISSION SYSTEM, GAS TRANS-
MISSION NORTHWEST CORPORATION, TRANSCANADA PIPELINES LIMITED,  AND NOVA
GAS TRANSMISSION LTD TO DEBTORS' AMENDED DISCLOSURE STATEMENT     PAGE  19**

volatility, resulting in changing credit and equity market conditions." *Id*. at p. 161.  In the Amended Disclosure Statement the Debtors attempt to sweep these fundamental changes under the rug with this broad-brush statement: "While Miller Buckfire believes this volatility may have a short-term impact on the Debtors' value, Miller Buckfire does not believe that sufficient market data exists at present to cause a fundamental shift in the Debtors' long-term valuation. Should general economic conditions deteriorate, financial and capital market instability persist, or if other circumstances warrant, Miller Buckfire may determine that an adjustment to the Valuation Analysis is appropriate.  Such adjustment may have a material impact on the Valuation Analysis and the projected New Calpine Total Enterprise Value." *Id.*  The Debtors do not provide any further insight into the basis for these statements.

45.    The changes in the markets, however, are not as trivial as the Debtors suggest, as the following facts highlight:

(a)    The Debtors have repeatedly emphasized the significant value in the exit financing package that they have arranged – perhaps representing hundreds of millions of dollars in value to the estate at this point – and the value of that exit financing is attributable to this substantial disruption in the credit markets.

(b)    The stock market has reacted strongly to these market changes.  Take, for instance, the impact of the market changes on Mirant Corporation, which is a close competitor of the Debtors.  On June 20, 2007, the date of the Debtors' Valuation Analysis, Mirant stock closed at $43.54.  After the market changes occurred, Mirant stock dropped to a low closing price of $36.55 on August 16, a drop of 16.1% - about one-sixth of that energy company's value.  Now, although Mirant stock has rebounded

somewhat, its September 13 close price of $40.20 is still 7.7% below its price on June 20. Similarly, the market changes had a profound effect on the stock market as a whole, as the S&P 500 dropped more than 9% from its high close of 1553.08 on July 19 to its close of 1406.70 on August 15.

(c)    The market changes dramatically changed the expected result of the Debtors' RFP process for investors to support an alternative plan of reorganization in this case.    According to the 8-K statement filed by Calpine, the RFP packages were distributed on July 20, and the Debtors were sufficiently optimistic of receiving high bids that they postponed the original hearing date for the Disclosure Statement.  *See* Calpine Corp. 8-K filed on July 27, 2007.  Final commitment letters from potential plan sponsors were due by August 16, 2007.  *Id.*  After the market changes occurred, however, the Debtors did not receive any RFP responses that they deemed to be more favorable than the waterfall plan they originally proposed.

46.    There is no doubt that the market changes beginning in late July 2007 were significant.  The question here is, how and to what degree do these major market changes affect the valuation of Calpine.  For instance, even a 5% drop in Calpine's Total Enterprise Value would equate to a reduction of more than a billion dollars and would change the result of the Debtors' "litigation-risk adjusted outcome" analysis such that (a) unsecured creditors would not be satisfied in full but rather would receive less than 100 cents on the dollar for their claims; and (b) old equity would not receive anything, as opposed to the $2.05 per share value described in the Amended Disclosure Statement.  Creditors are entitled to know the Debtors' best valuation at

the relevant time, and not be left to guess how much impact the market changes have had on Calpine or their expected impact on recoveries under the Amended Plan.

47.    The Debtors have failed to provide claim holders with adequate information concerning the valuation of the Debtors' operations as of the Effective Date of the Amended Plan, or under the most recent information available, and accordingly the Amended Disclosure Statement is inadequate because claim holders are unable to make an intelligent and informed decision as to whether to accept or reject the Amended Plan.

**D.    The Amended Disclosure Statement Fails to Provide Adequate Information Concerning the Debtors' Proposed Claims Estimation Procedures and the Reserve of New Calpine Common Stock, and the Proposed Provisions Relating to Both are Violative of the Bankruptcy Code and of Claim Holders' Due Process Rights, Making the Amended Plan Unconfirmable as a Matter of Law.**

48.    Both the Amended Disclosure Statement and the Amended Plan reflect that the Debtors propose to vest in themselves, in consultation with the Creditors' Committee, the discretion to estimate or value claims, and to limit ultimate distributions to creditors to the amounts so estimated.  *See* Amended Disclosure Statement, pp. 133-34, §c; Amended Plan pp. 51-52, §3.  The Amended Disclosure Statement provides that even if the Court itself makes a claims estimation under 11 U.S.C. §502(c), or if an agreement is entered into between Debtors and the holder of a claim concerning the amount of such claim holder's claim, the Debtor is still free to make *its own* determination as to the number of shares of New Calpine Common Stock necessary to satisfy such claim, and then only set aside that number of shares for ultimate distribution on that claim.[12]

---

[12]    "3.  <u>Reserve of New Calpine Common Stock</u>:  On the Effective Date, the Reorganized Debtors shall maintain in reserve shares of New Calpine Common Stock as the New Calpine Stock Reserve to pay Holders of Allowed Claims and Interests pursuant to the terms of the Plan.  The amount of New Calpine Common Stock

49.    Bankruptcy Code §502(a) provides that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest … objects." Under §502(b), if a claim has been objected to, the Court shall determine the amount of the claim and shall allow the claim in such amount.  Under §502(c) the court shall estimate for purpose of allowance, any contingent or unliquidated claim, the fixing or liquidation of which would unduly delay the administration of the case.

50.    There is nothing in the Bankruptcy Code that empowers a debtor to engage in the type of claims estimation and determination that the Debtors propose, nor has the Debtor provided any other legal support for such a procedure.

51.    Under the Proposed Plan, Debtors are free to "denominate" any "Disputed Claim" as "contingent or unliquidated," and then only set aside enough New Calpine Common Stock to satisfy the claim as it so elects.  *See* Amended Disclosure Statement, p. 132, ¶3.  Under the

---

withheld as a part of the New Calpine Stock Reserve for the benefit of a Holder of a Disputed Claim or Interest shall be equal to *the lesser of*: (a) the number of shares necessary to satisfy the distributions required to be made pursuant to the Plan based on the asserted amount of the Disputed Claim or Interest or, *if the Claim is denominated as contingent or unliquidated as of the Distribution Record Date, the amount that the Debtors, in consultation with the Creditors' Committee, elect to withhold on account of such Claim* in the New Calpine Stock Reserve; (b) the number of shares necessary to satisfy the distributions required to be made pursuant to the Plan for such Disputed Claim or Interest based on an amount as estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code for purposes of allowance; or (c) the number of shares necessary to satisfy the distributions required to be made pursuant to the Plan based on an amount as may be agreed upon by the Holder of such Disputed Claim or Interest and the Reorganized Debtors."  (Emphasis added).

   **"… Notwithstanding anything in the applicable Holder's Proof of Claim or otherwise to the contrary, the Holder of a Claim shall not be entitled to receive or recover a distribution under the Plan on account of a Claim in excess of the lesser of the amount: (a) stated in the Holder's Proof of Claim, if any, as of the Distribution Record Date, plus interest thereon to the extent provided for by the Plan; (b) if the Claim is denominated as contingent or unliquidated as of the Distribution Record Date, the amount that the Debtors, in consultation with the Creditors' Committee, elect to withhold on account of such Claim in the New Calpine Stock Reserve and set forth in the Plan Supplement, or such other amount as may be estimated by the Bankruptcy Court prior to the Confirmation Hearing; or (c) if a Claim has been estimated, the amount deposited in the New Calpine Stock Reserve to satisfy such Claim after such estimation."**  (Emphasis in text).

Amended Disclosure Statement, p. 133, ¶3.c; Amended Plan, p. 51-52, ¶3.

**JOINT OBJECTION OF PORTLAND NATURAL GAS TRANSMISSION SYSTEM, GAS TRANS-MISSION NORTHWEST CORPORATION, TRANSCANADA PIPELINES LIMITED,  AND NOVA GAS TRANSMISSION LTD TO DEBTORS' AMENDED DISCLOSURE STATEMENT    PAGE   23**

Amended Plan's definitions, any claim that has not been Allowed for distribution by a Final Order is a Disputed Claim.[13]   Because Debtors have reserved the right to object to claims up until one year after confirmation, they need not even have an objection on file at the time of confirmation in order to "denominate" a claim as contingent or unliquidated and then set aside whatever number of shares of New Calpine Common Stock they decide will satisfy the claim. [14]

52.     Debtors have vested in themselves the authority to determine the distribution amount for all claims that have not been Allowed for distribution by Final Order of the Court, and a claim holder has absolutely no recourse if it is later determined by the Court that Debtors' valuation of the claim was too low.  *See* Amended Plan, p. 51-52, ¶3.  Even where the Court has estimated the claim prior to confirmation, Debtors still are free under the Amended Plan to value the claim at a lower amount.  *See* Amended Disclosure Statement, p. 134, ¶3.c.

53.     Debtors' attempt to secure for themselves the discretion to engage in claims estimations/determinations that can override the authority of a Court estimation or a lawful agreement between parties violates Bankruptcy Code §502.   Debtors' proposed claims estimation/determination scheme is further objectionable because the Amended Disclosure Statement does not outline any procedure by which a claim holder is to be notified (a) that its claim has been "denominated as contingent or unliquidated" by the Debtors, or (b) of the number

---

[13]   The Amended Plan defines a disputed claim as "any Claim or Interest on the Claims Register that is not yet Allowed."  *See* Amended Plan, p. 12, ¶80.  The Amended Plan incorporates a very lengthy definition of "allowed" which essentially boils down to this:  a claim is allowed if there is a timely filed proof of claim or the claim appears on the Debtors' Schedules as of the Effective Date as not disputed, not contingent, and not unliquidated, *and*, no objection to the allowance has been interposed within the time period fixed by the Plan (i.e., one year after confirmation), or such an objection is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order.  *Id.* at p. 4, ¶21.

[14]   It should be noted that although Debtors intend to file a list of Contingent and Unliquidated Claims as part of their Plan Supplement, that list has not yet been filed and Debtors now indicate that it may not be filed until up to fourteen days before the Voting Deadline, i.e. after approval of the Amended Disclosure Statement. *See* Motion to Approve Disclosure Statement, ¶30.

of shares of New Calpine Common Stock that Debtors "elect to withhold on account of such Claim in the New Calpine Stock Reserve, " nor does it allow for any procedure by which a claim holder could object to either the "denomination" of its claim as contingent or unliquidated, or to the number of shares of New Calpine Stock that Debtors elect to withhold on account of such claim.

54.    Furthermore, the Amended Plan's "Provisions Governing Distributions" provides for disparate, unequal, and discriminatory treatment of creditors within the same or similar classes.    Under the Amended Plan, holders of allowed (i.e., allowed for distribution by Final Order) class C-7 claims are not subject to having their claims determined by Debtors, and are not at risk of having inadequate shares of New Calpine Common Stock reserved to pay their claims, as are holders of claims which have not yet been allowed by Final Order.    Such disparate, unequal, and discriminatory treatment of creditors within the same or similar classes is without justification and violates Bankruptcy Code §§1122 and 1123(a)(4).[15]

55.    GTN has filed proofs of claim totaling $525.1 million against Debtors.    Unless GTN is able to obtain, *before confirmation*, a Final Order allowing its claim for distribution purposes, Debtors are free under the Amended Plan to take it upon themselves to determine the amount of GTN's claim and then set aside only enough New Calpine Common Stock to satisfy the claim amount as determined by Debtors.    Although GTN made efforts to obtain discovery from Debtors several months ago in order to have its claim determined by the Court prior to

---

[15]    "One of the cardinal principles underlying bankruptcy law is equality of treatment of similarly situated creditors."    *In re 222 Liberty Associates*, 108 B.R. 971, 991 (Bankr. E.D. Pa. 1990) (citing 5 COLLIER ON BANKRUPTCY, ¶1122.04, at 1122-18 (15TH Ed. 1989).    *See also Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning),* 280 F.3d 648, 659 (6th Cir. 2001) ("[Bankruptcy Code] section 1123(a)(4) requires that claims of creditors that are members of the same class be treated equally.")

confirmation, Debtors refused such discovery on the grounds that it was "premature."  Now Debtors seek to use GTN's lack of a Final Order allowing its claim to prejudice GTN's rights under the Plan.

56.    Additionally, by agreement entered into with Debtors, PNGTS has an allowed claim in Calpine Corp. and Rumford Power in an amount not to exceed $174 million.  Despite this agreement, the Amended Plan as written allows Debtors to determine the amount of the claim unless PNGTS is able to obtain a Final Order allowing its claim for distribution purposes before confirmation.

57.    The Debtors' proposed scheme for estimating claims and determining the amount of stock to set aside in the New Calpine Stock Reserve for distribution to creditors completely circumvents Bankruptcy Code §502.    To the extent that the Amended Plan allows Debtors to engage in claims estimations and in determinations as to the number of shares of New Calpine Common Stock to set aside for distribution purposes that can *supercede* the Court's estimation or later determination of a claim, it is unsupported by the law, violative of claim holders' due process rights, and allows for disparate, unequal and discriminatory treatment of claims, in violation of Bankruptcy Code §§1122 and 1123(a)(4).  As a matter of law the Debtors' Amended Plan cannot be confirmed.

**E.    Under the Amended Plan, Calpine's Existing Equity Holders Stand to Receive Distributions Before Allowed Claims of Unsecured Creditors Have Been Paid in Full, in Violation of Bankruptcy Code §1129(b)(2)(B), Making the Amended Plan Unconfirmable as a Matter of Law.**

58.    As set forth in the preceding section, under the Debtors' proposed Amended Plan, it is possible that Debtors may fail to set aside an adequate number of shares of New Calpine Common Stock to satisfy an allowed Claim, particularly in the situation where a claims

determination or estimation is not made by the Court until some time after confirmation.   For example, Debtors could elect to set aside 1000 shares of New Calpine Common Stock in reserve to satisfy the distributions required to be made to claim holder "X" under the Amended Plan. *See* Amended Plan, p. 51-52, ¶3.  Later, if the Court were to determine, under Bankruptcy Code §502(b), that the allowed amount of claim holder "X's" claim is the cash equivalent of 1500 shares, Debtors would, under the terms of the Amended Plan, only have to distribute 1000 shares of New Calpine Common Stock to claim holder A and no more.  *Id.*

59.    Debtors' proposed Amended Plan allows for distributions to Calpine's existing equity holders.  *See* Disclosure Statement, pp. 132-34; pp. 160-61.  It is clear that under the Amended Plan distributions to existing Calpine equity holders may indeed be made even though claim holders may not receive 100% of their allowed claims.

60.    Because the Amended Plan purports to limit distributions to holders of contingent or unliquidated claims to an amount determined by the Debtors, rather than to the amount allowed by the Court, any payments made to existing Calpine equity holders before all claim holders have received distribution "equal to the allowed amount of such claim," violates the absolute priority rule of Bankruptcy Code §1129(b)(2)(B).  Debtors cannot skirt around the requirements of §1129(b)(2)(B) by redefining the term "allowed" and usurping the Court's claims estimation and allowance powers.

61.    The Debtors' proposed claims determination and distribution procedures violate the express provisions of Bankruptcy Code §502, making the Amended Plan unconfirmable as a matter of law.

**F.      Debtors' Proposed Voting Procedures Violate Bankruptcy Code §§ 502 and 1126, Making the Amended Plan Unconfirmable as a Matter of Law.**

62.      Bankruptcy Code §502(a) provides that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest … objects." Under §502(b), if a claim has been objected to, the Court shall determine the amount of the claim and shall allow the claim in such amount.  Under §502(c) the court shall estimate for purpose of allowance, any contingent or unliquidated claim, the fixing or liquidation of which would unduly delay the administration of the case.  Pursuant to Bankruptcy Code §1126(a), "[t]he holder of a claim or interest allowed under section 502 of this title may accept or reject a plan."

63.      Despite the Bankruptcy Code's clear delineation of the procedures to be followed in order for a claim holder to have an allowed claim entitling it to vote on a debtor's proposed reorganization plan, Debtors propose their own definition of an "allowed claim," and seek to adjust the voting rights of claim holders accordingly.

64.      Specifically, Debtors propose that not only must objected-to claims be allowed or estimated by the Court in order for the holder of such claim to be entitled to vote, but so too must "disputed" claims be allowed or estimated by the Court (or agreed to by Debtors) in order for the holder of such a claim to be entitled to vote on the Amended Plan.  *See* Amended Disclosure Statement, pp. 192, 194.  As set forth in a preceding section of this Objection, the Amended Plan defines a disputed claim as "any Claim or Interest on the Claims Register that is not yet Allowed," and an Allowed Claim means only a claim that has been Allowed for distribution purposes by a Final Order.  *See* Amended Plan, p. 4, ¶21, p. 12, ¶80.  Accordingly, under the terms of the Amended Disclosure Statement, every claim that has not been allowed for

distribution purposes by a Final Order must be estimated by the Court for voting purposes, regardless of whether or not Debtors have filed an objection to such claim.

65.     Such a procedure is contrary to the express provisions of Bankruptcy Code §§502 and 1126, and adversely impacts the procedural and substantive rights of claim holders under the Bankruptcy Code.  If Debtors have an objection to a claim, they must be required to file an objection and the parties can proceed in the manner set forth in §502.  If the Debtors do not file a claims objection, then, in accordance with §502(a) and §1126, a claim holder is entitled to vote its claim in the face amount of its proof of claim.  *See also* Fed. R. Bankr. P. 3001(f) ("a proof of claim executed and filed in accordance with these rules shall constitute *prima facie* evidence of the validity and amount of the claim.").

66.     The Debtors' proposed voting procedures violate the express provisions Bankruptcy Code §§502 and 1126, and Fed. R. Bankr. P. 3001(f), making the Amended Plan unconfirmable as a matter of law.

**G.     The Amended Plan is Unconfirmable Because it Makes No Provision for the Payment of Attorneys Fees to Claim Holders Who May Be Entitled to Such Fees.**

67.     The United States Supreme Court has recently held that the Bankruptcy Code does not prohibit the recovery of attorneys' fees in connection with claims filed under §501.  *See Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co*., 127 S.Ct. 1199, 1205-06, 1208 (2007) (holding that the Court of Appeals erred in disallowing a creditor's claim for attorneys' fees incurred in the bankruptcy proceeding).   In *Travelers*, the Supreme Court disavowed the so-called *Fobian* rule followed by some courts which dictates that "attorney fees are not recoverable in bankruptcy for litigating issues 'peculiar to federal bankruptcy law.'"  *Id*., at 1205-06 (citing *In re Fobian*, 951 F.2d 1149, 1153) (9th Cir. 1991).   Finding that the *Fobian*

rule has no support in the Bankruptcy Code, the Supreme Court determined that "[c]onsistent with our prior statements regarding creditors' entitlements in bankruptcy… we generally presume that claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed." *Travelers*, 127 S.Ct. at 1206.

68.    Because the Plan makes no provision for the payment of attorneys' fees to claim holders who may be entitled to such amounts, the Amended Plan is unconfirmable.  Further, by not providing any information in the Amended Disclosure Statement as to the anticipated or estimated amount of all such fees that might be recoverable by claim holders, creditors are unable to determine what impact the payment of such fees might have on the Debtors' Claims Estimates and Treatment of Claims.   *See* Amended Disclosure Statement, pp. 6-10, 102-111. Without such information, claim holders are unable to make an intelligent and informed decision as to whether to accept or reject the Amended Plan.

**H.    The Disclosure Statement Does Not Provide Claim Holders Information Adequate for Them to Determine Whether The Amended Plan Satisfies the Best Interests of Creditors Test.**

69.    As the Amended Disclosure Statement indicates, the Debtors' estimates of the value of potential recoveries under the Plan to Holders of Allowed Unsecured Claims and Interests  "(1) do not take into account that a certain percentage of New Calpine Common Stock will be reserved for the Management and Director Equity Incentive Plans, and that there may be further dilution of the New Calpine Common Stock as a result of the exercise of rights or options under such Incentive Plans; (2) do not take into account a certain percentage of New Calpine Common Stock that may be issued pursuant to a rights offering; (3) exclude shares that may be issued to satisfy Allowed Subordinated Equity Securities Claims, to the extent such Claims are

Allowed; and (4) assume no distributions on account of any Old Calpine Common Stock held by or for the benefit of the Debtors, including with respect to the Share Lending Agreement." *See* Amended Disclosure Statement, p. 161.

70.    Debtors have failed to provide any information from which claim holders could reasonably determine how and to what extent each of the factors listed above might dilute the value of the distributions to unsecured creditors.  Debtors have not indicated that they are *unable* to provide such information, only that they are *not* providing such information.

71.    The Amended Disclosure Statement outlines the gross amount of the claims made against Debtors, on a consolidated basis, as well as the Debtors' estimate of the range of the value of such claims, but provides no information as to how the Debtors arrived at their claims estimations or the effect on recoveries under the Amended Plan in the event that the Debtors' claims estimations are inaccurate.  Debtors anticipate that the gross claims of approximately $35.5 billion against Debtors will ultimately be reduced to approximately $20 billion in allowed claims, yet provide no information as to how such a claims reduction is to be achieved or the feasibility of the Amended Plan in the event that Debtors' claims estimations are inaccurate.

72.    Debtors have failed to provide claim holders with adequate information about the value of their potential recoveries under the plan and accordingly claim holders are unable to make an intelligent and informed decision as to whether to accept or reject the Amended Plan.

I.    **The Amended Disclosure Statement Fails to Provide Adequate Information Concerning Balloting, Vote Tabulation, and the Proposed Expanded Effect of Claims Estimation.**

73.    In their Motion to Approve Disclosure Statement, Debtors state that in tabulating votes,

"all Ballots shall be counted as if filed against a single consolidated Estate, and any obligation of any of the Debtors and all guaranties thereof by or enforceable against any other Debtors and any joint and several liability of the Debtors will be treated as a single obligation in the amount of the obligation of the primary obligor."

*See* Debtors' Motion to Approve Disclosure Statement, ¶55.   Debtors further state that

"[t]he proposed forms of the Ballots and Master Ballots will be customized by Debtor, allowing the Debtors to tabulate acceptances and rejections of the Plan on a Debtor-by-Debtor basis so that the Debtors may tabulate votes on a non-consolidated basis in the event the Bankruptcy Court does not authorize substantive consolidation of all of the Estates.  As such, the Debtors shall not have to resolicit votes in the event substantive consolidation is not ordered, as the Debtors will tabulate votes as if each Debtor proposed a separate plan of reorganization."

*Id.*, at ¶56.

74.    It is unclear from these statements how Debtors intend to handle balloting and voting with respect to joint and several liability claims in the event that full substantive consolidation is not approved.  For example, if a creditor has filed a proof of claim in the amount of $1 million against subsidiary A, and has filed a proof of claim against Calpine Corp. in the amount of $1 million, but the primary obligor on the indebtedness is subsidiary A, will the creditor have a vote in both Calpine Corp. and in subsidiary A, and will both of those votes be tabulated in the event that substantive consolidation is approved as to Calpine Corp. but not approved as to subsidiary A?  It is unclear from the Debtors' disclosures whether creditors will actually have a vote in each jointly and severally liable entity in which they have filed a proof of claim, and if so, whether adequate funds or New Calpine Common Stock will be set aside to pay claims of creditors who have asserted joint and several liability claims against Calpine Corp. under the above scenario.  Without such information, claim holders are without adequate

information to make an intelligent and informed decision as to whether to accept or reject the Amended Plan.

75.     Further, under the Amended Plan, Debtors propose to have any estimated claim amount, as determined by the Court under Bankruptcy Code Section 502(c), constitute a "ceiling" with respect to any later determination of the amount of such claim.  *See* Amended Disclosure Statement, p. 130, §I, ¶3.  The Amended Disclosure Statement provides that the Debtor can request estimation anytime before or after plan confirmation, and that once the Court has estimated a claim, "that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan…" *Id*.  The Debtors have failed to show, and do not attempt to show, why this expansion of the effect of estimation of claims is required or justified.

76.     There is nothing in the Bankruptcy Code that would allow Debtors to use the estimation procedure – which is not intended to be an actual trial or allowance procedure – to limit a creditor's ultimate recovery on its claim.  Such a proposed "cap" on claims will result in a long and drawn out estimation phase that will ultimately cause considerable delay in the confirmation process, because any creditor whose claim must be estimated under Section 502(c) will likely feel it necessary to engage in full discovery in order to present all of its evidence in support of its claim, or potentially risk no recovery or a reduced recovery.  Such a scheme defeats the very purpose of claims estimation under Section 502(c).[16]

---

[16]  It would appear that the only justification for Debtors' proposal that claims estimation amounts serve as "caps" on claims is that by limiting a creditor's distribution rights in this way Debtors can proceed to make distributions to existing Calpine equity holders.  To the extent that the proposed claims estimation cap is to be used by Debtors in order to provide a recovery to existing equity holders before claim holders have been paid 100% of their allowed claims, this provision in the Amended Plan violates the absolute priority rule.

**JOINT OBJECTION OF PORTLAND NATURAL GAS TRANSMISSION SYSTEM, GAS TRANS-MISSION NORTHWEST CORPORATION, TRANSCANADA PIPELINES LIMITED,  AND NOVA GAS TRANSMISSION LTD TO DEBTORS' AMENDED DISCLOSURE STATEMENT     PAGE  33**

77.     In addition, the Amended Disclosure Statement provides that creditors whose claims have been estimated cannot seek reconsideration of any estimation unless a motion is filed within twenty days after the estimation.  *See* Amended Disclosure Statement, p. 130, §I, ¶3. Again, Debtors provide no explanation or justification for Debtors' proposed limitation on creditors' ability to seek reconsideration of claims estimation, nor is there anything in the Bankruptcy Code that would support such a limitation on creditors' rights.   This proposed limitation will likely also cause considerable delay in the confirmation process.

78.     The Debtors' proposed Amended Plan language concerning the expanded effect of the claims estimation process, and of the time limitation on the ability of creditors to seek a reconsideration of any claims estimation, has no support in the Bankruptcy Code or Bankruptcy Rules and should be stricken from the Amended Plan.

**J.     The Amended Disclosure Statement Provides Inadequate Information Concerning the Management and Director Equity Incentive Plans.**

79.     The Amended Disclosure Statement and the Amended Plan provide that the reorganized debtors will adopt a Management Incentive Plan and Director Equity Incentive Plan (the "Incentive Plans").  *See* Amended Disclosure Statement, p. 125, ¶16; Amended Plan, p. 43, §O.  According to the Amended Disclosure Statement, descriptions of the Incentive Plans shall be contained in the Plan Supplement, however, there is currently no description whatsoever of the Incentive Plans the Plan Supplement.  *See* Plan Supplement, Exhibit 13.    Debtors have failed to provide adequate information related to the Incentive Plans which would enable creditors to make an intelligent and informed decision as to whether to accept or reject the Amended Plan.

80.     Information concerning the Incentive Plans is particularly important because it could affect the amount of stock being issued by the reorganized debtors under the Amended Plan, as well as the value of such stock.   The Debtors concede the importance of this information, stating: "The Debtors' estimates of the value of potential recoveries under the Plan to Holders of Allowed Unsecured Claims and Interests…do not take into account that a certain percentage of New Calpine Common Stock will be reserved for the Management and Director Equity Incentive Plans, and that there may be further dilution of the New Calpine Common Stock as a result of the exercise of rights or options under such Incentive Plan."  *See* Amended Disclosure Statement, p. 161, §d.

81.     The details of the Incentive Plans, including the number of shares of New Calpine Common Stock to be set aside to fund the Incentive Plans and the ability of managers and directors to exercise rights or options with respect to the Incentive Plans, are material information that affects the unsecured creditors.  Without adequate information as to the details of the Incentive Plans, creditors are unable to evaluate the effect of the Incentive Plans on the Amended Plan itself, as well as potential distributions to unsecured creditors and the value of New Calpine Common Stock.  There is insufficient information concerning the details of the Incentive Plans to enable creditors to make an intelligent and informed decision as to whether to accept or reject the Amended Plan.

**K.     The Amended Disclosure Statement Fails to Provide Adequate Information Concerning the Debtors' Document Retention Policies.**

82.     The Amended Plan proposes that the Reorganized Debtors "may" maintain documents in accordance with their current document retention policies, and that such policies may be "altered, amended, modified, or supplemented" by the Reorganized Debtors.  *See*

Amended Disclosure Statement, p. 143, ¶10; Amended Plan, p 61, §L.  However, neither the Amended Disclosure Statement nor the Amended Plan provides any description or explanation of the Debtors' current document retention policies, and therefore creditors cannot evaluate whether such policies are acceptable or sufficient.  The fact that the debtors could potentially alter, amend or modify its document retention policies at will makes them even less certain.

83.    Furthermore, noting that this bankruptcy case has already been pending for over twenty (20) months, and noting that the Amended Plan anticipates an even longer time period to finally resolve disputed and unliquidated claims, it is imperative that the Debtors maintain *all* documents relevant to the claims.  Without more information concerning what retention policies will be followed by Debtors going forward, creditors cannot reasonably evaluate this item of the Amended Plan and thus are unable to make an intelligent and informed decision as to whether to accept or reject the Amended Plan.

**L.    The Amended Disclosure Statement Provides Inadequate Information Concerning Key Aspects of the Amended Plan**

84.    As it currently stands, the Amended Disclosure Statement fails to provide information concerning key aspects of the Amended Plan, including (i) Solicitation Procedures (Plan Supplement Ex. 1), (ii) Retained Causes of Action (Plan Supplement Ex. 2) , (iii) List of Entities Excepted from Certain POR Provisions (Plan Supplement Ex. 3), (iv) Contingent and Unliquidated Claims (Plan Supplement Ex. 4), (v) Rejected Indemnification Obligations for Former Employees (Plan Supplement Ex. 7), (vi) Guarantees Subject to Reinstatement (Plan Supplement Ex. 10), (vii) Management Equity Incentive Plan (Plan Supplement Ex.13), (viii) Director Equity Incentive Plan (Plan Supplement Ex. 14), (ix) Amended and Restated Bylaws of Calpine Corporation (Plan Supplement Ex. 15), and (x) Restated Certificate of Calpine

Corporation (Plan Supplement Ex. 16).  *See* Amended Disclosure Statement, Exhibit B Plan Supplement.

85.    The Plan Supplement indicates that information as to the above aspects of the Amended Plan will be provided at a later date.  Debtors represent in their Motion to Approve Disclosure Statement that a complete version of the Plan Supplement will be filed on or before fourteen days before the Voting Deadline, i.e. after approval of the Amended Disclosure Statement.  *See* Motion to Approve Disclosure Statement, ¶30.  It is not acceptable for Debtors to state that information regarding key aspects of the Amended Plan will be provided to creditors on a date ***after*** the deadline for filing objections to the Amended Disclosure Statement has passed. [17]

86.    Debtors' failure to provide creditors with information concerning key provisions of the Amended Plan prior to the hearing on the Amended Disclosure Statement has deprived creditors of their right to receive adequate information concerning the Debtors' Amended Plan in the manner and time frame contemplated by Bankruptcy Code §1125.  "Of prime importance in the reorganization process is the principle of disclosure.  The Code obliges a Debtor to engage in full and fair disclosure, providing to creditors 'information of a kind, and in sufficient detail, as far as is reasonably practicable … that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the

---

[17]    In their July 2, 2007 Motion to Approve Disclosure Statement, Debtors have cited to specific provisions of the Solicitation Procedures, thus indicating that a version of those procedures existed at least as of that date.  *See* Motion to Approve Disclosure Statement, ¶¶ 47-49.  Nonetheless, to date, Debtors have failed to provide even a draft proposal of the Solicitation Procedures which they intend to implement, thus preventing creditors from being able to raise objections to such procedures, or to address them in any respect prior to the Court's approval of such procedures.  Accordingly, the Debtors' request in their Motion to Approve Disclosure Statement that the Court approve the voting and tabulation procedures described in the Solicitation Procedures should be denied until such time as all creditors have had an opportunity to review and analyze such procedures and raise objections, if any, thereto.

plan…'" *Momentum Mfg. Corp. v. Employee Creditors' Comm.* (*In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994) (citing 11 U.S.C. §1125(a)(1)).

87.    By failing to provide creditors with information related to key provisions of their Amended Plan prior to the Amended Disclosure Statement objection deadline, Debtors have violated the basic tenets of 11 U.S.C. §1125(a)(1).  Claim holders have been deprived of their right to timely receive adequate information about a proposed reorganization plan, in violation of their due process rights.  The Amended Disclosure Statement should be disapproved.

**M.    The Amended Disclosure Statement Does Not Provide Adequate Information About or Justification for the Proposed Non-Debtor Releases and Exculpation and Injunction Provisions.**

88.    The Debtors' Amended Plan provides for non-debtor releases and Exculpation and Injunction Provisions which are not supported by applicable law.  *See* Amended Plan, pp. 58-60 and pp. 13, 20 (relevant definitions).  Non-debtor releases must meet the standard set forth under *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141 (2d Cir. 2005).  In *Metromedia*, the Second Circuit Court of Appeals held that "[i]n bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan."  *Id*. (*citing SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.*), 960 F.2d 285, 293 (2d Cir. 1992).   "[S]uch a release is proper only in rare cases." *Metromedia*, 416 F.3d at 141.

89.    The Court of Appeals noted in *Metromedia* that there are at least two considerations that justify reluctance to approve non-debtor releases: (1) the only explicit authorization in the Code for non-debtor releases is 11 U.S.C. §524(g), which authorizes releases

in asbestos cases when specified conditions are satisfied, including the creation of a trust to satisfy future claims; and (2) a non-debtor release is a device that lends itself to abuse ("it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code.")  *Id.* at 142.   As the Second Circuit further noted, "[n]o case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique."  *Id.*

90.    Debtors have not provided any information or analysis as to why the circumstances of this case merit the granting of non-debtor releases and why such releases are important to the Debtors' reorganization plan.    The proposed Exculpation and Injunction Provisions are similar in effect to the non-debtor releases and therefore also must meet the governing standards of *Metromedia*.   Debtors have provided no information or analysis as to why the Exculpation Provision and the Injunction Provision protecting non-debtors are important to Debtors' reorganization, or what unique facts make these Provisions appropriate in this case. Debtors also have failed to fully disclose the scope of such provisions and what they are contemplated to cover.   Accordingly, Debtors have failed to provide adequate information related to the proposed non-debtor releases and Exculpation and Injunction Provisions which would allow a creditor to make an intelligent and informed decision as to whether to accept or reject the Amended Plan.

## **RESERVATION OF RIGHTS**

91.    PNGTS, GTN, TCPL, and NOVA reserve the right to make further objections to the Debtors' proposed Amended Plan and Amended Disclosure Statement and to any modifications or amendments thereto, on any legal basis.

## CONCLUSION

For the reasons set forth hereinabove, PNGTS, GTN, TCPL and NOVA respectfully request that the Court deny approval of the Amended Disclosure Statement and grant them such other and further relief to which they are entitled.

Dated:  September 14, 2007                    Respectfully submitted,


                                              /s/  David W. Elrod
                                              David W. Elrod (TX State Bar 06591900)
                                              Craig Tadlock (TX State Bar 00791766)
                                              Brian A. Farlow (TX State Bar 00794339)
                                              ELROD, PLLC
                                              500 N. Akard Street, Suite 3000
                                              Dallas, Texas 75201
                                              Telephone: (214) 855-5188
                                              Facsimile: (214) 855-5183

                                              **ATTORNEYS FOR PORTLAND
                                              NATURAL GAS TRANSMISSION
                                              SYSTEM, GAS TRANSMISSION
                                              NORTHWEST CORPORATION,
                                              TRANSCANADA PIPELINES
                                              LIMITED, AND NOVA GAS
                                              TRANSMISSION LTD.**

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2007, the above-referenced document was served upon parties in interest via the Court's ECF notification system and in accordance with the Debtor's July 2, 2007 Notice of Debtors' Motion for Entry of an Order (A) Approving the Adequacy of the Debtors' Disclosure Statement; (B) Approving Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Plan of Reorganization; (C) Approving the Form of Various Ballots and Notices in Connection Therewith; and (D) Scheduling Certain Dates with Respect Thereto, via facsimile and e-mail to: **(a)** Kirkland & Ellis LLP, Citigroup Center, 153 East 53rd Street, New York, New York 10022, *Attn: Richard Cieri and Edward Sassower;* and Kirkland & Ellis LLP, 200 East Randolph Street, Chicago, Illinois 60601, *Attn.: David R. Seligman*; **(b)** the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, *Attn: Paul Schwartzberg*; **(c)** Counsel to the Unofficial Committee of Second Lien Debtholders, Paul Weiss Rifkind Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064, *Attn.: Alan W. Kornberg, Andrew N. Rosenberg, Elizabeth R. McColm*; **(d)** counsel to the Official Committee of Unsecured Creditors, Akin Gump Strauss Hauer & Feld LLP, 590 Madison Avenue, New York, New York 10022-2524, *Attn: Michael S. Stamer, Philip C. Dublin, Alexis Freeman*; **(e)** counsel to the Official Committee of Equity Security Holders, Fried Frank Harris Shriver & Jacobson LLP, One New York Plaza, New York, New York, 10004, *Attn: Brad E. Scheler and Gary Kaplan;* and **(f)** counsel to Credit Suisse, as administrative agent under the debtor in possession financing facility, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, *Attn.: Peter V. Pantaleo, Robert H. Trust*.

_____/s/ Craig Tadlock_____
Craig Tadlock