David W. Elrod (Texas State Bar No. 06591900)
Craig Tadlock (Texas State Bar No. 00791766)
ELROD, PLLC
500 N. Akard St., Suite 3000
Dallas, Texas 75201
Telephone:  (214) 855-5188
Facsimile:  (214) 855-5183

**Counsel for Gas Transmission Northwest Corporation
And Portland Natural Gas Transmission System**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| _____ | ) | |
| In re: | ) | Chapter 11 |
| | ) | Case No. 05-60200-BRL |
| CALPINE CORPORATION, *et al.*, | ) | (Jointly Administered) |
| | ) | |
| Debtors | ) | |
| _____ | ) | |

### INITIAL RESPONSE TO DEBTORS' LIMITED OBJECTION TO GAS TRANSMISSION NORTHWEST CORPORATION'S CLAIM NOS. 4562, 5912, 5914, 5927, 5928  AND 5929, AND PORTLAND NATURAL GAS TRANSMISSION SYSTEM'S CLAIM NOS. 4769 AND 4773

In accordance with Bankruptcy Code sections 501 and 502 and Rule 3007 of the Federal

Rules of Bankruptcy Procedure, Gas Transmission Northwest Corporation ("GTN") and Portland

Natural Gas Transmission System ("PNGTS") (collectively referred to as the "Pipelines") hereby

file this Initial Response to Debtors' Limited Objection to Gas Transmission Northwest

Corporation's Claim Nos. 4562, 5912, 5914, 5927, 5928 and 5929, and Portland Natural Gas

Transmission System's Claim Nos. 4769 and 4773 ("Response").[1]

---

[1]  This Initial Response is expressly filed subject to the objection of GTN and PNGTS to the jurisdiction of
the Court with respect to the FERC jurisdictional contracts at issue, as set forth in the Pipelines' Motion to
Withdraw the Reference filed on October 23, 2007 [Docket No. 6392], and as discussed at length in the Joint
Objection to Debtors' Amended Disclosure Statement for Debtors' First Amended Joint Plan of Reorganization
Pursuant to Chapter 11 of the United States Bankruptcy Code filed by GTN and PNGTS on September 14, 2007
[Docket No. 5905].

## **INTRODUCTION**

Debtors have filed their Limited Objection to Gas Transmission Northwest Corporation's Claim Nos. 4562, 5912, 5914, 5927, 5928 and 5929, and Portland Natural Gas Transmission System's Claim Nos. 4769 and 4773 ("Limited Objection").  Debtors have objected only to the amount of the GTN and PNGTS claims, arguing that the recoverable portion of such claims is significantly lower than the face amount of the Proofs of Claim.  Debtors have requested the Court to cap GTN's claim at $112.7 million and to cap PNGTS's claim at $118.3 million.

Subsequent to Debtors' filing of their Limited Objection, and upon the agreement of the parties, the Court estimated the claims of GTN at $300 million and estimated the claims of PNGTS at $174 million, and thus the Pipelines' claims have already been reduced and  "capped" in the manner requested by the Limited Objection.  *See* September 26, 2007 Order Approving Disclosure Statement, pp. 9-10, ¶33 [Docket No. 6136].

Debtors have presented objections to the GTN and PNGTS proofs of claim based on Debtors' assertions that: (1) the Pipelines applied incorrect contract reservation rates in calculating the amount of their claims; (2) the Pipelines applied incorrect discount rates in calculating the present value of their claims; and (3) the Pipelines have failed to account for actual or potential mitigation in calculating the amount of their claims.

 The Debtors' calculation of the amount of the GTN's and PNGTS's claims is incorrect. Debtors have relied upon incorrect contract reservation rates and incorrect discount rates in calculating the GTN and PNGTS claims.[2]    In determining the amount of the Pipelines' claims,

---

[2] Debtors have not as yet presented any facts or evidence in support of their argument that the Pipelines' claims should be reduced for mitigation, despite bearing the burden of proof as to both the fact and the amount of any mitigation.  At such time as Debtors come forward with facts and evidence to support their mitigation defense, the Pipelines will respond accordingly.

the Court should decline to apply the contract reservation and discount rates urged by Debtors, and should instead apply the rates outlined by the Pipelines hereinbelow.

## BACKGROUND & PROCEDURAL HISTORY

1.      GTN and PNGTS own and operate natural gas pipelines in the United States. From 2001 through 2002, GTN entered into eight Firm Transportation Service Agreements with Debtors by which GTN agreed to provide capacity on the GTN pipeline for the transport of natural gas.  *See* Declaration of Christopher W. Keegan In Support of Debtors' Limited Objection ("Keegan Declaration"), Exhibits A-H.  On February 12, 1998, PNGTS entered into a Gas Transportation Contract for Firm Transportation Service with Debtors' predecessor by which it agreed to provide capacity on the PNGTS pipeline for the transport of natural gas.  *See* Keegan Declaration, Exhibit I.

2.      The Debtors' contracts with GTN were executed at various times between March 2001 and August 2002.  The contracts provide for firm gas transportation services for a set quantity of gas (ranging from 10,000 to 44,000 Dth per day) for a period of years. As is standard in contracts for firm transportation services, the reservation charges under the contracts are payable regardless of whether gas is actually shipped.  The contracts have termination dates which fall in the years 2015, 2020, 2023, 2028, and 2042.

3.      Debtors' contract with PNGTS similarly provides that Debtors will pay for 44,000 MMBtu of natural gas capacity per day for a term of twenty years, beginning November 1, 2000 through October 31, 2020.

4.      Both the GTN contracts and the PNGTS contract expressly provide that the rates payable under the contracts are subject to change.[3]

5.      At the time of entering into its contracts with Debtors, GTN's FERC-approved daily reservation rate was $0.254825/Dth for the full length of the pipeline.  In June 2006, GTN filed its rate case with FERC seeking an increase in the reservation rate applicable to its firm transportation contracts.  *See* Affidavit of Bruce Craig Chancellor In Support of Debtors' Limited Objection ("Chancellor Affidavit"), ¶11.    As a result of that proceeding and its

---

[3] *See* GTN Firm Transportation Service Agreements, Keegan Declaration, Exhibits A-H, pp. 3-4:

"**VI**
**Rate(s), Rate Schedules**
**And General Terms and Conditions of Service**

6.1      Shipper [Debtors] shall pay PG&E GTN [GTN] each month for services rendered pursuant to this Agreement in accordance with PG&E GTN's [GTN's] Rate Schedule FTS-1, *or superseding rate schedule(s), on file with and subject to the jurisdiction of FERC*…

6.3      This Agreement in all respects shall be and remains subject to the applicable provisions of Rate Schedule FTS-1, or superseding rate schedule(s) and of the applicable Transportation General Terms and Conditions of PG&E GTN's [GTN's] FERC Gas Tariff First Revised Volume No. 1-A on file with the FERC, all of which are by this reference made a part hereof.

6.4      PG&E GTN [GTN] shall have the unilateral right from time to time to propose and file with FERC such changes in the rates and charges applicable to transportation services pursuant to this Agreement, the rate schedule(s) under which this service is hereunder provided, or any provisions of PG&E GTN's [GTN's] Transportation General Terms and Conditions applicable to such services."

 (Emphasis added)

*See also* PNGTS Gas Transportation Contract for  Firm Transportation Service, Keegan Declaration, Exhibit I, p. 6:

"**Article VII – Rate Schedules and General Terms and Conditions**

20.      This Contract and all provisions contained or incorporated herein are subject to the provisions of Rate Schedules FT and of the General Terms and Conditions of Transporter's FERC Tariff, *as such may be revised or superseded from time to time*, all of which by this reference are made a part hereof."

uncontested settlement, $0.33/Dth will be the effective daily reservation rate under the GTN contracts, effective as of January 1, 2007.[4]

6.      The reservation rate payable by Debtors under their contract with PNGTS has also changed during the term of the contract.  Since the settlement of PNGTS's last rate case in 2002, the FERC-approved daily rate under the contract has been $0.85/Dth, subject to a discount of $0.02 in effect from April 1, 2006, through March 31, 2008.  By FERC order, PNGTS is required to file a new rate case on April 1, 2008, unless a settlement is reached before then.

7.      On December 20, 2005, Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

8.      GTN timely filed proofs of claim against Calpine Corporation ("Calpine Corp.")., Calpine Energy Services, L.P. ("CES"), Calpine Energy Services Holdings, Inc. ("CES Holdings"), CPN Energy Services GP, Inc. ("CPN GP"), CPN Energy Services, L.P. ("CPN LP"), and Calpine Power Company ("Calpine Power"), each in the amount of $525.1 million.

9.      PNGTS timely filed proofs of claim against Calpine Corp. and Rumford Power Associates Limited Partnership ("Rumford Power"), and against other Debtor entities, each in the amount of $201.5 million.

10.      Debtors have neither assumed nor rejected the long-term contracts which are the subject of the GTN and PNGTS proofs of claim.  Instead, Debtors have "repudiated" the contracts and attempt to treat them as rejected, contrary to the Bankruptcy Code and binding precedent in this case regarding FERC's exclusive jurisdiction over these contracts.  *See* 4th Amended Disclosure Statement, p. 138, §I, ¶3; 4th Amended Plan, p. 45, ¶2; p. 47, §E; Plan

---

[4] Pursuant to proceedings in the rate case since January 1, 2007, an agreement has been reached among all participants thereof – including Calpine – as to a new rate of $0.33/Dth.  One of the Debtors' contracts with GTN is for a shorter haul, with a lower daily reservation rate.

Supplement Exhibit 8, pp. 1-2; *see also California Dept. of Water Resources v. Calpine Corp.* (*In re Calpine Corp.*), 337 B.R. 27, 36 (S.D.N.Y. 2006).

11.     By stipulation entered into between PNGTS and the Debtors on June 2, 2007, and so ordered by the Court on June 12, 2007, PNGTS was granted an allowed claim in the estates of Calpine Corp. and Rumford Power for an undetermined amount not to exceed $174 million.  On September 28, 2007, PNGTS filed Amended Proof sof Claim against Calpine Corp. and Rumford Power, claims no. 6356 and 6357.  These describe an additional $53.5 million in claims, but recognize the agreed cap of $174 million.[5]

12.     On June 20, 2007, Debtors filed their proposed Plan of Reorganization and Disclosure Statement.  On September 27, 2007, Debtors filed their Fourth Amended Plan.[6]

13.     As the result of a claims estimation agreement entered into between Debtors and the Pipelines that also addressed the Pipelines' objections to the Disclosure Statement, on September 26, 2007 this Court entered its order estimating the GTN and PNGTS claims at $300 million and $174 million, respectively, both for voting purposes and for purposes of establishing reserves of New Calpine Common Stock under Articles VI.C and VII.C3 of the Plan.  *See* Order Approving Disclosure Statement, p. 9-10, ¶ 33 [Docket 6136].

---

[5]   As specifically provided by the terms of the June 2, 2007 Stipulation, PNGTS reserved the right to file amended proofs of claim against Calpine Corp. and Rumford Power.  *See* also Plan, Article V, §E, p. 47.

[6] Under the Plan, GTN and PNGTS are Class C-7 creditors with rejection damages claims, whose claims will be paid with distributions of New Calpine Common Stock after Plan confirmation.  *See* Plan, Article III, section B.11., p. 32.

**INITIAL RESPONSE TO DEBTORS' LIMITED OBJECTION TO GAS TRANSMISSION NORTHWEST CORPORATION'S CLAIM  NOS. 4562, 5912, 5914, 5927, 5928 AND 5929, AND PORTLAND NATURAL GAS TRANSMISSION SYSTEM'S CLAIM NOS. 4769 AND 4773                    PAGE  6**

# ARGUMENT

**A.**  **Debtors Have Applied Incorrect Contract Reservation Rates in Arriving at Their Calculations of the Allowed Amount of the GTN and PNGTS Claims.**

  *i.* *The Reservation Rate in Effect as of the Petition Date is Not the Correct Measure of Damages for Future Losses under the Pipelines' Contracts.*

14. Debtors argue that the contract reservation rates used by the Pipelines in their damage calculations are speculative and that the Pipelines must apply their final FERC-approved reservation rates in calculating all future losses under their contracts.  *See* Limited Objection, p. 13.  In calculating its claims, GTN has used both the FERC-approved reservation rate that was in effect on the Petition Date, and the new contract reservation rate that has recently been agreed to by all interested parties in the FERC rate case filed by GTN in 2006.   In calculating its claims, PNGTS has used two different rates, both of which have been in effect since the effective date of its contract with Debtors.

15. In support of their position that the Court must look only to the rate in effect on the Petition Date in determining the Pipelines' damages under the contracts, Debtors argue that "the Bankruptcy Code requires that claims are valued 'as of the date of the filing of the petition,'" citing Bankruptcy Code §502(b).  Debtors have misinterpreted §502(b) by ignoring its express limitations.  Section 502(b) provides as follows:

> "Except as provided in subsections (e)(2), (f), (g), (h), and (i) of this section… the court, after notice and a hearing, *shall determine the amount of such claim … as of the date of the filing of the petition*, and shall allow such claim in such amount…"  (Emphasis added).

16. Section §502(g), which is expressly excepted from the effect of §502(b), addresses rejection damage claims and provides as follows:

> "*A claim arising from the rejection*, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, *of an executory contract* or unexpired

lease of the debtor that has not been assumed *shall be determined*, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, *the same as if such claim had arisen before the date of the filing of the petition*."  (Emphasis added).

17.     Because the Pipelines' claims arise from a rejection under Debtors' Plan – if not from a rejection under Bankruptcy Code §365 [7] -- the Pipelines' claim must be determined "*as if such claim had arisen before the date of the filing of the petition*."   (Emphasis added).   *Id*. Accordingly, the Court must look to applicable state law to determine the method for calculating the amount of the GTN and PNGTS claims, rather than to the language of §502(b) relied upon by Debtors.

### ii.     *Applicable State Law, Not the Bankruptcy Code Determines the Proper Measure of Damages in  Calculating the Amount of the Pipelines' Claims.*

18.     As stated by the Court in *In re Audra-John Corp*., 140 B.R. 752, 757 (Bankr. D. Minn. 1992), "Congress specifically incorporated the common-law concept of breach of contract into its treatment of contracting parties subjected to rejection.  By that incorporation, it clearly implicated a whole body of nonbankruptcy law to govern the fixing of those rights… The statute [§365] defines the time as of which a rejection of an executory contract constitutes a breach, and fixes the date as the time immediately before the debtor's bankruptcy filing.  The purpose of going back to this point 'is to treat rejection claims as pre-petition claims.'"  (*citing* H.REP. NO. 595, 95th Cong., 1st Sess. 349 (1977) and S.REP. NO. 989, 95th Cong. 2d Sess. 60 (1978), U.S. Code Cong. & Admin. News 1978, p. 5787).

19.     As further stated by the *Audra-John* Court, "[s]tate law, then, must govern the parties' rights in consequence of a deemed breach under §365(g) – not the least because those

_____

[7]  Although Debtors take the position that they have "repudiated" and not "rejected" the GTN and PNGTS contracts, the Pipelines' claims have been assigned to Class C-7 by Debtors, which is a class of "Rejection Damages Claims."  *See* Plan Article III, §B.11.p.32; Article V, §A.2., p. 45.

rights are deemed to have arisen *before* federal bankruptcy law overlay the pre-petition legal configuration.  State law – not federal bankruptcy law – identifies the remedies which the non-rejecting party has upon the deemed breach, and dictates the relief that the Bankruptcy Court must accord to the non-rejecting party."  *Id.*    *See also Stewart Title Guaranty Co. v. Old Republic National Title Ins. Co*., 83 F.3d 735, 741 (5th Cir. 1996) ("The Code states that, except in certain narrowly circumscribed instances, rejection of an executory contract or lease constitutes a material breach.  11 U.S.C. §365(g).  As a legal fiction, such a breach is deemed to have occurred on the day immediately prior to the commencement of the bankruptcy so rejection claims are treated as prepetition claims… and because the parties' rights are deemed prepetition, state law governs the rights stemming from the breach." (*citing Audra-John*, 140 B.R. at 757)).

20.    The United States Supreme Court has "long recognized that the 'basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankruptcy estate to state law."  *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co*., 127 S.Ct. 1199, 1205, 75 USLW 4131, 167 L.Ed.2d 178 ( 2007) (*citing Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000) and *Butner v. United States*, 440 U.S. 48, 57, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)).  "As we stated in *Butner*, '[p]roperty interests are created and defined by state law,' and '[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.'"  *Travelers*, 127 S.Ct. at 1205.

21.    In making a determination under §502 as to the extent of the claim to be allowed, the Court must go beyond the Bankruptcy Code to the substantive state law governing the rejected contract.  *In re Independent American Real Estate*, 146 B.R. 546, 553 (Bankr. N.D. Tex.

1992) (citing *Audra-John's* recognition of state law's governance regarding remedies applicable

to rejection contracts with approval).   *See also In re Bellamy*, 962 F.2d 176, 180 (2d Cir. 1992)

("A creditor's right to payment -- what is due -- is generally determined according to state law."

(citing *Butner v. United States*, 440 U.S. at 54)).

22.     Based on the foregoing legal authority, it is state law that governs the calculation

of the amount of the Pipelines' rejection damage claims, not the Bankruptcy Code.   The GTN

contracts are governed by California law and the PNGTS contract is governed by Maine law, [8]

and thus the Court must look to California law and Maine law, respectively, to determine the

measure of GTN's and PNGTS's damages.

> ### iii.    Under California Law, GTN is Entitled to Recover as Damages an Amount that Will Compensate It  for All Detriment Proximately Caused By Debtors' Breach of the Contracts.

23.     California has codified its law concerning the recovery of damages in breach of

contract cases.   *See* California Civil Code §§ 3300, 3301 and 3283.[9]   Under California law, a

---

[8] *See* Keegan Declaration, Exhibits A-H, p. 4, ¶7.1; Exhibit I, p. 9, ¶34.

[9] Relevant sections of the California Civil Code (West's Ann. Cal. Civ. Code)) are reproduced below:

"**§3300  Measure**

> For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby or which, in the ordinary course of things, would be likely to result therefrom."

"**§3301 Certainty**

> "DAMAGES MUST BE CERTAIN.  No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin."

"**§3283 Damages for detriment after commencement of action; future damages**

> "INJURIES RESULTING OR PROBABLE AFTER SUIT BROUGHT.  Damages may be awarded, in a judicial proceeding, for detriment resulting after the commencement thereof, or certain to result in the future."

party may recover as damages an amount which will compensate it for "all the detriment proximately caused" by the breach of an obligation arising from contract. CAL. CIV. CODE §3300. California law allows for recovery of damages for "detriment resulting after the commencement" of a legal proceeding, or certain to result in the future. CAL. CIV. CODE §3283.

24.    California law provides that damages are awarded in an action for breach of contract to give the injured party the benefit of his bargain, and insofar as possible, to place him in the same position he would have been in had the promisor performed the contract. *Avery v. Schuman Co.*, 159 F.Supp. 906, 910 (S.D. Cal. 1958) (citing *Coughlin v. Blair*, 41 Cal.2d 586, 603, 262 P.2d 305, 314 (Cal. 1953); *see also Ilkhchooyi v. Best*, (1995) 37 Cal. App. 4th 395, 412, [45 Cal. Rptr.2d 766] ('[C]ontract damages seek to approximate the agreed-upon performance by allowing the injured party to recover what he would have received had the contract been performed."). "This means that recoverable damages are those that could fairly and reasonably be seen as arising naturally from the breach… This includes those that should have been reasonably contemplated or foreseen in light of all of the known facts or facts that the breaching party should have known, at the time of contracting." *Archdale v. American Int'l Specialty Lines Ins. Co.*, (2007) 154 Cal App.4th 449, 469, [64 Cal. Rptr.3d 632]. *See also Erlich v. Menezes*, (1999) 981 P.2d 978, 982, 21 Cal.4th 543, 550) (citing *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515, 28 Cal Rptr.2d 475, 869 P.2d 454).

25.    In the instant case, it was contemplated by Debtors and GTN – and thus foreseeable -- that the reservation rates under the contracts at issue would adjust over the term of the contracts. *See* GTN contracts, Keegan Declaration, Exhibits A-H, p. 3-4, ¶¶ 6.1 to 6.4.

26.    Had Debtors continued to perform under the contracts, they would have been obligated to pay any new reservation rates as they became effective. *Id.*  Accordingly, to place

GTN in the same position it would have been in had Debtors continued to perform under the contracts, the Court must calculate GTN's future losses under the contracts using the contract reservation rates that GTN would have been able to charge Debtors under the contracts.

> ### iv. The Contract Rate Applied by GTN in its Damage Calculation Has Been Agreed to by Calpine Corporation in the Pending FERC Rate Case and Has Been Submitted to the FERC for Approval, and Thus is not Speculative.

27.     As outlined hereinabove, in June 2006, GTN filed its rate case with FERC wherein GTN sought an increase in the reservation rate applicable to its firm transportation contracts. *See* Chancellor Affidavit, ¶11.    Effective as of January 1, 2007, the FERC had conditionally approved a daily rate of $.427193/Dth, "subject to refund," for the full haul on the GTN pipeline. *Id.,* at ¶¶ 11, 15.   Pursuant to proceedings in the rate case since January 1, 2007, an agreement has been reached among all participants thereof – including Calpine Corp. – as to a new rate of $0.33/Dth.   Once approved by the FERC -- a mere formality in light of the fact that all interested parties that previously contested GTN's proposed rate increase have now agreed to the new rate -- the new reservation rate of $0.33/Dth will be the daily rate with respect to the GTN contracts, effective January 1, 2007.[10]

28.     Contrary to Debtors' assertions, the $0.33/Dth GTN rate is not speculative and is no longer being contested in the pending FERC rate case.   The $0.33/Dth rate has been agreed to by all interested parties, including Calpine Corporation and the FERC Trial Staff, and has been submitted to the FERC for final approval.   In light of the fact that no interested party is contesting the proposed $0.33/Dth rate, approval of the proposed new rate is essentially a formality, and there is virtually no possibility that FERC approval of the $0.33/Dth rate will not occur.

---

[10]  GTN will file Amended Proofs of Claim shortly using the new reservation rate.

29.     As stated by the California Supreme Court, "[t]he most elementary conceptions of justice and public police require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created… That principle is an ancient one." *Speegle v. Board of Fire Underwriters,* (1946), 29 Cal.2d 34, 46, 172 P.2d 867, 874 (citing *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). *See also Stott v. Johnston*, (1951) 36 Cal.2d 864, 876, 229 P.2d 348, 355 ("[T]he defendant whose wrongful act gave rise to the injury will not be heard to complain that the amount thereof cannot be determined with mathematical precision."); *Long Beach Drug Co. v. United Drug Co*., (1939) 13 Cal.2d 158, 174, 89 P.2d 386, 388 ("The fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent, or difficult of ascertainment does not bar the recovery.").

30.     In its forthcoming amended proofs of claim, GTN will recalculate its claim using (a) the contract reservation rate of $0.254825/Dth for the time period from when the Debtors stopped paying GTN under the contracts through December 31, 2006, and (b) the new agreed upon rate of $0.33/Dth for the time period beginning January 1, 2007 through the date of termination of each contract.[11]     GTN's calculation of its damages under the contracts comports with California law.     Debtors' damage calculation which relies on the contract rate of $0.254825/Dth throughout the entire remaining term of the contracts would not compensate GTN for "all the detriment proximately caused" by Debtors' breach of the contracts at issue, and

---

[11]   The amount of GTN's estimated claim for voting and reserve purposes has already been reduced to account for using the Settlement rates.  For Contract No. 8428, the old daily rate was $0.133337/Dth and the new rate is $0.152419/Dth.

**INITIAL RESPONSE TO DEBTORS' LIMITED OBJECTION TO GAS TRANSMISSION NORTHWEST CORPORATION'S CLAIM  NOS. 4562, 5912, 5914, 5927, 5928 AND 5929, AND PORTLAND NATURAL GAS TRANSMISSION SYSTEM'S CLAIM NOS. 4769 AND 4773                                 PAGE  13**

therefore the Court should decline to use Debtors' calculation as to the amount of damages recoverable by GTN.[12]

31.     In addition, the Debtors' attempt to have the Court apply the pre-2007 reservation rate to determine GTN's damages in 2007 and beyond violates the filed rate doctrine. *See e.g., Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 101 S.Ct. 2925 (1981); *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 108 S.Ct. 2428 (1988).

> **v.     Under Maine Law, PNGTS is Entitled to Recover as Damages an Amount that Will Place It in the Same Position It Would Have Enjoyed Had There Been No Breach by Debtors.**

32.     Under Maine law, an injured party seeking recovery for breach of contract damages is entitled to recover for all losses actually suffered as a result of the breach. *Lee v. Scotia Prince Cruises Ltd*., 828 A.2d 210, 216 (Me. 2003). The purpose of an award of compensatory damages for a breach of contract is to place the plaintiff in the same position that he or she would have enjoyed had there been no breach. *Id*.; *see also Marchesseault v. Jackson*, 611 A.2d 95, 98 (Me. 1992) ("Subject to the limitations of avoidability and unforeseeability, an injured party is entitled to recover for all loss actually suffered as a result of the breach." (Citing *Restatement (Second) of Contracts* §347 comment c (1981))).

33.     "In actions premised on breach of contract, the general rule allows recovery of those damages which were reasonably within the contemplation of the contracting parties when the agreement was made and which would naturally flow from a breach thereof." *Winship v. Brewer School Committee*, 390 A.2d 1089, 1095 (Me. 1978).

---

[12]  Because most of the GTN contracts extend so far into the future, it is a virtual certainty that the contract reservation rates will increase again one or more times before the last contract terminates in the year 2042. *See* Keegan Declaration, Exhibits A-H, p.2, ¶ 3.1. Nevertheless, GTN is not seeking to recover damages based on any such future rate increases.

34.    As set forth in the PNGTS contract, the parties agreed that the tariff rate could be "revised or superseded from time to time."    *See* PNGTS Gas Transportation Contract for Firm Transportation Service, Keegan Declaration, Exhibit I, p. 6.  Because tariff rate increases were "within the contemplation of the contracting parties," Debtors are liable under the contract to pay PNGTS based on any increases in the tariff rate that would have occurred.

35.    The rates used by PNGTS in calculating its damages are consistent with the October 25, 2002 Stipulation and Settlement Agreement ("Settlement") entered into and approved by the FERC in the FERC proceeding styled *In the Matter of Portland Natural Gas Transmission System,* Docket No. RP02-13-000.    *See* Keegan Declaration, Exhibit R, "Explanatory Statement to Stipulation and Settlement Agreement" (October 25, 2002), p. 2; *see also* "Stipulation and Settlement Agreement" (October 25, 2002), p. 3, ¶1.2.  Pursuant to the Settlement, PNGTS agreed to "reduce its rates for long-term shippers by means of a $.02 per Dth discount commencing on April 1, 2006 and *continuing through the remainder of the term of the Settlement.*" *Id.* (emphasis added).[13]

36.    As set forth in the Settlement, the term of the Settlement is from April 1, 2002 until April 1, 2008, which is the date on which PNGTS is required under the Settlement to file a general rate change case under Section 4 of the Natural Gas Act.  *See* Keegan Declaration, Exhibit R, "Stipulation and Settlement Agreement" (October 25, 2002), p. 12, ¶6.1; p. 11, ¶5.1(a).    After expiration of the term of the Settlement on March 31, 2008, the $.02/Dth rate

---

[13]    The $.02 discount brought PNGTS's rate down to $.83/Dth from $.85/Dth for the two-year period of April 1, 2006, through March 31, 2008.  *Id.*

discount will expire.[14]  Accordingly, PNGTS calculated its claim using the discount for the time
it was in effect and otherwise using the FERC-approved rate of $0.85/Dth for the remainder of
the contract term.[15]

37.    In order to compensate PNGTS for all losses which it will suffer as a result of
Debtors' breach of the contract at issue, PNGTS must recover damages based on the tariff rates
that will be in effect during the term of the contract.  It is clear under the terms of the Settlement
that the reduced $.83/Dth tariff rate will only be in effect through March 31, 2008, even though
the contract will not terminate until October 31, 2020.  Once the Settlement term expires, it is no
longer appropriate to use the Settlement tariff rate in calculating PNGTS's damages under the
contract.

38.    PNGTS's estimated claim amount was calculated using (a) the $.83/Dth tariff rate
from the repudiation or rejection date through March 31, 2008, and (b) the $.85/Dth tariff rate
from April 1, 2008 through the contract termination date of October 2020.  PNGTS's damage
calculation comports with Maine law.   Debtors' damage calculation which relies on the contract
rate of $0.83/Dth throughout the entire remaining term of the contracts would not compensate
PNGTS for "all losses actually suffered" as a result of Debtors' breach of the contracts at issue,
and therefore the Court should decline to use Debtors' calculation as to the amount of damages
recoverable by PNGTS.[16]

---

[14]  Debtor Rumford Power Associates, L.P. was a participant in the PNGTS FERC proceeding and did not
oppose the terms of the Settlement.  *See* Keegan Declaration, Exhibit R, "Stipulation and Settlement Agreement"
(October 25, 2002), p. 1 n.1.

[15]  PNGTS reserves the right to supplement or amend its proofs of claim to reflect higher future rates,
including without limitation any rates as a result of the rate case to be filed on April 1, 2008, or any settlement in
advance of that filing that changes PNGTS's rates.

[16]  As stated above, PNGTS is required to file a new rate case on April 1, 2008.  It is likely that at that time,
or at some other time prior to the contract termination date of October 2020, the tariff rate under the contract will

**B.    Debtors Have Applied Incorrect Discount Rates in Arriving at Their Calculations of the Allowed Amount of the GTN and PNGTS Claims.**

39.    The Pipelines' claims arise from Debtors' rejection or repudiation of their multi-year contracts for firm transportation capacity on GTN's and PNGTS's respective natural gas pipelines.  The Pipelines' resulting claims for breach of contract damages are for direct damages based on a known and fixed stream of future payments, and as such they must be discounted to present value.   In light of the facts specific to this case, the Pipelines' claims should be discounted at either (a) a "safe investment" rate, such as (a) the federal judgment rate or treasury bill rate, or (b) a rate based on the rate of return achievable by a reasonable, prudent person in light of the facts and circumstances of GTN and PNGTS, as outlined by this Court in its decision in *In re Chateaugay Corp.*, 126 B.R. 165, 175 (Bankr. S.D.N.Y. 1991).[17]

**i.    The Pipelines' Claims for Contract Damages Should be Discounted at a "Safe Investment" Rate.**

40.    It is a fundamental principle of contract law that in awarding damages for breach of contract, the non-breaching party is entitled to damages sufficient to place the non-breaching party in as good a position as it would have been had the contract been performed.[18]

---

increase one or more times before the contract's termination.  *See* Keegan Declaration, Exhibit I, Article VIII, ¶¶ 21-22, pp. 6-7.  Nevertheless, PNGTS is not seeking to recover damages based on any such future rate increases.

[17]  Debtors contend that the Pipelines' claims should be reduced for potential future mitigation, though Debtors have not as yet advanced any facts or evidence to support such future mitigation.  Any future potential income streams from mitigation are uncertain and unliquid, and therefore the stream of any potential future mitigation of the Pipelines' damages must be discounted at a risk-adjusted rate reflecting the uncertainties in the Pipelines' business going forward.  Any such mitigation would come from subsequent sales of pipeline capacity by the Pipelines.  Although both GTN and PNGTS have made reasonable efforts to mitigate their damages, they have substantial amounts of unsubscribed capacity over the terms of the contracts.  The Pipelines will continue to make reasonable efforts to mitigate, but that is an ongoing effort that is subject to the uncertainties of the Pipelines' businesses.   *See Energy Capital Corp. v. U.S.*, 302 F.3d 1314 (Fed. Cir. 2002).

[18]  *See* Restatement (Second) of Contracts, §§ 344, 347 (1981); *see also Avery v. Schuman Co.*, 159 F.Supp. 906, 910 (S.D. Cal. 1958); *Coughlin v. Blair*, 41 Cal.2d 586, 603, 262 P.2d 305, 314 (Cal. 1953); *Ilkhchooyi v. Best*, (1995) 37 Cal. App. 4th 395, 412, [45 Cal. Rptr.2d 766]; *Lee v. Scotia Prince Cruises Ltd*., 828 A.2d 210, 216 (Me. 2003); *Marchesseault v. Jackson*, 611 A.2d 95, 98 (Me. 1992).

Discounting contract damages at a non-risk-adjusted rate squares with this principle.  Such damages are a legal certainty – the nonbreaching party is absolutely entitled to judgment for such amounts – and therefore it would be improper to further discount them for the risk of nonpayment.  *See Kucin v. Devan*, 251 B.R. 269, 273 (D. Md. 2000) (expressly rejecting breaching party's argument that discount rate should be based on the risk of nonpayment and creditworthiness of the breaching party). Courts have implemented this principle in two ways – some have discounted based on the rate of return from a "safe investment" in instruments such as U.S. treasuries, and others have used a "legal" rate of interest such as the Federal judgment rate. *See In re Highland Superstores,* 154 F.3d 573 (6th Cir. 1998); *Kucin v. Devan*, 251 B.R. at 273; *In re Stone & Webster, Inc*., 279 B.R. 748, 806 (Bankr. D. Del. 2002) (applying 3.6% discount rate based on the nonbreaching party's rate of return for its invested funds, which the court concluded was the rate of return that the nonbreaching party expected to receive on its investment of the funds from the judgment); *In re United Financial Corp*., 55 B.R. 117, 120 (Bankr. E.D. Tenn. 1985) (citing *E.E.O.C. v. Wooster Brush Co. Employees Relief Ass'n*, 727 F.2d 566 (6th Cir. 1984)) (in discounting a claim for a stream of future payments under an aircraft lease, court applied the rate of interest statutorily mandated for the calculation of postjudgment interest).

41.    Notably, in the *Solutia* Bankruptcy case, where Calpine filed claims based on the debtor's rejection of long-term contracts, Calpine took the position that its contract damages should be discounted at a "safe investment" discount rate.[19]    GTN and PNGTS are in virtually the same position here as Calpine occupied in the *Solutia* bankruptcy.  GTN and PNGTS agree

---

[19]  It is the Pipelines' understanding that Calpine also took the position in the *Solutia* case that streams of potential future mitigation, if any, should be discounted at a higher rate that appropriately reflects the risk and uncertainty of the claim holder's business going forward in generating any such projected revenues.

that their contract damages -- other than streams of potential mitigation -- should be calculated using a "safe investment" or risk-free rate.

42.     Debtors' contention in this proceeding that the Pipelines' damages should be discounted based on (a) a risk-adjusted rate, based on (b) the creditworthiness of the breaching party is contrary to fundamental principles of contract law.  *See Highland Superstores*, 154 F.3d at 579-80; *Kucin v. Devan,* 251 B.R. at 279.

43.     The court in *Kucin v. Devan* expressly rejected Debtors' approach.  In that case, certain former executives of a bankrupt company made claims under Deferred Compensation Agreements for benefits that were fixed at $100,000 per year for life commencing at age sixty-five, adjusted annually for increases in the cost-of-living.  The expert for the Trustee asserted that "the value of the unfunded promise to make future retirement payments should have been discounted based on [the debtor's] creditworthiness, just as Debtors assert here.  *Id*. at 273.  The court flatly rejected this analysis, stating that the methodology of the Trustee's expert "completely ignored fundamental principles of contract law."  *Id.*  The court went on to conclude as follows:

> "Here, the Executives expected to receive from [the debtor] their retirement benefits upon reaching the age of sixty-five (age sixty for Rice).  Therefore, their claims for retirement benefits, discounted to present value, are a legal certainty and need not be further discounted for the risk of nonpayment.  Otherwise, the risk of nonpayment would be accounted for twice since the Executives stand to receive only a fraction of their claims."

*Id.*

44.     The Court in *In re Highland Superstores*, a case involving a stream of future payments under a lease, gave the following hypothetical illustrating the absurdity of discounting fixed contractual damages based on the creditworthiness of the debtor:

"[T]he Committee's position would turn existing principles of contract law on their head. Suppose a lessor of an apartment building leases identical apartments to Bill Gates, reputed to be the wealthiest person in the United States, and to a destitute individual. Assume both persons default under their leases on the same day and vacate the apartments. Further assume that the apartment owner cannot relet either apartment. The lessor thereafter sues both persons for breach of the lease, requesting actual damages. Under the traditional approach advanced by [the creditor] and hornbook contract law, the actual damages would be the same: both persons must pay the rent remaining on the lease term, reduced to present value using the rate at which the apartment owner can invest those funds to be placed in the same position as if both persons had performed the lease. The Committee's approach leads to a radically different result. Bill Gates's damages would be reduced to present value using an extremely low discount rate, reflecting the minimal risk that an individual possessing a large net worth would be unable to pay rent on an apartment; accordingly, the damages awarded against Gates would be quite high. In contrast, the award of damages against the destitute individual would be quite low because it would have been discounted at a very high rate, reflecting the higher nonpayment risk associated with that individual. Under basic contract law, however, the ability of a breaching promisor to pay does not affect the promisee's award of damages. While the lessor's ability to collect a judgment against Bill Gates would be greater, contract law does not distinguish between the two individuals in determining the value of the lessor's award of damages. In short, collectibility is simply not factored into the calculation of damages for breach of contract.[20]

45.    In sum, the holding and rationale of *Kucin v. Devan* and the compelling hypothetical from *In re Highland Superstores* demonstrate that Debtors' approach to the discount rate in this case is wrong and that the Pipelines' damages for their breach of contract claims should be discounted at a non-risk-adjusted rate (that excludes the risk of nonpayment by Debtors) and cannot be based on the creditworthiness of Debtors. The rates using this approach over the terms of the contracts are in the range of 4.3% to 4.8%.[21]

---

[20] *In re Highland Superstores*, 154 F.3d at 580 n. 9.

[21] The Pipelines will supplement this Initial Response with expert testimony regarding the applicable rate. The Federal Judgment Rate, as set forth in 28 U.S.C. §1961 may have particular relevance here – it is the rate that has been proposed by Debtors for paying interest on allowed unsecured claims (including the Pipelines' claims). *See* Plan, Article III, §B.11, 12, p. 32-33. Accordingly, application of a discount rate which equals the Federal Judgment Rate would be appropriate in this case.

**ii.    *Alternatively, the Court Should Apply a Rate which is Commensurate with the Rate of Return Achievable by a Reasonable, Prudent Pipeline in the Circumstances of GTN and PNGTS.***

46.    Alternatively, a discount rate based on a rate of return available to the Pipelines, behaving prudently under the unique facts and circumstances, as outlined by this Court in *In re Chateaugay*, may be an appropriate discount rate to use in this matter.  *See* Limited Objection, p. 11.  However, Debtors mistakenly conclude that the rates of return available to the Pipelines are the FERC-disclosed rates of return in the Pipelines' rate cases.  *Id.*   Those rates are much higher than the rates of return than the Pipelines could actually achieve in light of their business conditions and regulatory restrictions.

47.    The Pipelines, as owners of natural gas pipelines, owe a duty of prudence to their shippers.  The Pipelines' existing pipelines are currently undersubscribed, and thus the Pipelines are not expanding their network of natural gas pipelines at this time.  Debtors have participated in the GTN FERC rate case and are well aware that GTN currently has an overabundance of pipeline capacity which it cannot sell.  PNGTS is in the same position, with an overabundance of capacity.  Based on the current economic conditions, the Pipelines' duty of prudence as well as reasonable, prudent business judgment would dictate that monies which they could anticipate receiving in this bankruptcy case as a result of Debtors' breach of the long term contracts at issue would not be used to build additional pipelines or otherwise invest in the pipeline business at a weighted average cost of capital rate, but instead would be used to (a) pay down the Pipelines' existing debt, or (b) invest in a reasonably safe investment that would achieve the best long-term return on investment.

48.    In *In re Chateaugay*, this Court approved of a discount rate for the PBGC, a pension fund manager, based upon an analysis of "the rate of return achievable by a reasonable,

prudent, long-term … investor who seeks to achieve the best long-term return on his investment consistent with preserving his capital and minimizing risk." *Id*. at 175.  As this Court noted, the theoretical framework for such a discount rate is "grounded on the proposition that claims for a series of cash payments in the future should be discounted to present value by a discount factor which would result in estimating the amount of cash required, as of the petition date, which when prudently invested would allow the obligations to be met as they became due.  This method is used by financial analysts every day to determine the present value of long term obligations.  The methodology also satisfies the Court's prior holding that '[f]ederal bankruptcy law requires the discount or interest rate assumptions used to determine the allowable amount of claims must be those realistically likely to result in the determination of the full economic value of the claim…" *Id.* at 175-176. (citing *In re Chateaugay Corp*., 115 B.R. 760, 769 (Bankr. S.D.N.Y. 1990)).

49.     The evidence will show that the Pipelines would not use any lump sum distributed to them in satisfaction of the Debtors' breach of the long-term contracts at issue for the building of any new natural gas pipelines, because it would be imprudent for the Pipelines to do so. Accordingly the FERC-mandated rates of return are inappropriate rates of return to use in arriving at a proper discount rate in this case.  Instead, the Court should apply the same analysis that it did in *In re Chateaugay* and apply a discount rate which is commensurate with the rate of return that the Pipelines could expect to achieve if they were to invest the funds in a reasonable, prudent investment which would allow the Pipelines to achieve the best long-term return on their investment consistent with preservation of capital and minimization of risk under their unique circumstances.   In this respect, the evidence will show that in carrying out their duty of prudence, the Pipelines would likely use the funds payable to them in this bankruptcy case to

either pay down their existing debt, or perhaps to invest in safe investments such as U.S. treasuries.

50.     GTN's average cost of its current debt is 5.28%.  PNGTS's average cost of its current debt is 5.9%.  Current Treasury Bill rates are in the range of 4.3% to 4.8% depending on duration.

51.     Debtors' argument that the Court should apply a risk-adjusted discount rate which is based on the creditworthiness of the Debtors at the time that they entered into the contracts at issue is contrary to fundamental principles of contract law, and is contrary to this Court's holding in *In re Chateaugay*.

## C.    Debtors Have Not Presented Any Evidence or Facts to Support Their Affirmative Defense of Mitigation, Nor are They Entitled to Mitigation.

52.     Debtors have attached no evidence to their Limited Objection in support of their mitigation objection to the Pipelines' claims, as is required to overcome the prima facie validity of a properly filed proof of claim.  *See* Fed. R. Bankr. P. 3001(f).

53.     Under California law, which governs the Debtors' contracts with GTN,[22] the burden of proof is on the breaching party to prove all matters related to mitigation, including the amount of mitigation.  *Steelduct Co. v. Henger-Seltzer Co*., 160 P.2d 804, 815 (Cal. 1945) ("The burden of proof is on the party whose breach caused damage, to establish matters relied on to mitigate damage."); *Vitagraph, Inc. v. Liberty Theatres Co. of California*, 242 P. 709, 712 (Cal. 1925) (the burden is on the defendant to prove mitigation); *Carnation Co. v. Olivet Egg Ranch*, 229 Cal. Rptr. 261, 265 (Cal. App. 1986) (same, and collecting cases).

---

[22] *See*  Keegan Declaration, Exhibits A-H, p. 4, ¶ 7.1.

54.    Maine law, which governs the Debtors' contract with PNGTS, is the same.[23]    *See Lee v. Scotia Prince Cruises Ltd.*, 2003 ME 78, ¶22, 828 A.2d 210 (Me. 2003) ("the burden is on the defendant to show that the plaintiff failed to take reasonable steps to mitigate damages"); *Tang of the Sea, Inc. v. Bayley's Quality Seafoods, Inc.*, 1998 ME 264, ¶12, 721 A.2d 648 (Me. 1998) ("Failure to mitigate damages is an affirmative defense, and therefore [defendant] has the burden of proving that [the plaintiff] failed to take reasonable steps to mitigate its damages.").

55.    The Pipelines are "lost volume sellers," which limits the amount of mitigation which applies, and market conditions on the GTN and PNGTS pipelines are highly unfavorable; therefore, Debtors' mitigation defense will not result in any significant reduction, if any, in the amount of the Pipelines' claims.[24]

56.    In the event that Debtors amend their Limited Objection to present facts or evidence in support their mitigation defense, the Pipelines reserve the right to supplement this response with additional argument and evidence relevant to the mitigation issue.

---

[23]  *See* Keegan Declaration, Exhibit I, p 9, ¶ 34.

[24]  *See*  RESTATEMENT (SECOND) OF CONTRACTS §350 cmt. d (noting that "[t]he mere fact that an injured party can make arrangements for the disposition of the goods or services that he was to supply under the contract does not necessarily mean that by doing so he would avoid loss   Under the "lost volume" rule, the doctrine of mitigation "may not be imposed to deprive [a claimant] of the benefit of subsequent contracts which would have been available to him irrespective of the original breach."  *See also Seaboard Music Co. v. Germano*, 101 Cal. Rptr. 255, 258, 24 Cal. App. 3d 618, 623 (Cal. App. 1972) (holding that the "trial court's ruling that plaintiff was not required to mitigate damages because it had the opportunity to release the repossessed equipment was correct"); RESTATEMENT (SECOND) OF CONTRACTS §347 cmt. f (noting that "[i]f the injured party could and would have entered into the subsequent contract, even if the contract had not been broken, and could have had the benefit of both, he can be said to have 'lost volume' and the subsequent transaction is not a substitute for the broken contract.").

    In the instant case, neither the GTN nor the PNGTS pipelines at issue are currently subscribed to capacity, nor are they operating at full capacity.  Current market forecasts indicate that the GTN and PNGTS pipelines are likely to operate at somewhat less than full capacity for the foreseeable future and probably through the terms of the transportation contracts at issue.

**RESERVATION OF RIGHT TO SUPPLEMENT INITIAL RESPONSE**

57.     This Initial Response is being filed at this time solely for the purpose of assisting the parties in mediating the issues related to the Pipelines' Proofs of Claim and Debtors' Limited Objection.  The Pipelines reserve the right to supplement this Initial Response at the appropriate time.

**REQUEST FOR EVIDENTIARY HEARING**

58.     The Pipelines request an evidentiary hearing of Debtors' Limited Objection.

**CONCLUSION**

59.     For the reasons set forth hereinabove, GTN and PNGTS respectfully request the Court to deny the relief sought in Debtors' Limited Objection, and grant the Pipelines all such other and further relief to which they are entitled.

Dated: November 8, 2007                          Respectfully submitted,


                                                 ___/s/  David W. Elrod_____
                                                 David W. Elrod (TX State Bar 06591900)
                                                 Craig Tadlock (TX State Bar 00791766)
                                                 ELROD, PLLC
                                                 500 N. Akard Street, Suite 3000
                                                 Dallas, Texas 75201
                                                 Telephone: (214) 855-5188
                                                 Facsimile: (214) 855-5183

                                                 **ATTORNEYS FOR GAS
                                                 TRANSMISSION NORTHWEST
                                                 CORPORATION AND PORTLAND
                                                 NATURAL GAS TRANSMISSION
                                                 SYSTEM**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 8, 2007, the above-referenced document was served upon parties in interest via the Court's ECF notification system and in accordance with the Debtor's September 21, 2007 Notice of Debtors' Limited Objection to Gas Transmission Northwest Corporation's Claim Nos. 4562, 5912, 5914, 5927, 5928 and 5929, and Portland Natural Gas Transmission System's Claim Nos. 4769 and 4773 via facsimile and e-mail to: **(a)** Kirkland & Ellis LLP, Citigroup Center, 153 East 53rd Street, New York, New York 10022, *Attn: Edward Sassower;* and Kirkland & Ellis LLP, 200 East Randolph Street, Chicago, Illinois 60601, *Attn.: David R. Seligman, James J. Mazza, Jr.,* and Kirkland & Ellis LLP, 555 California Street, San Francisco, California 94104, *Attn: Mark E. McKane* **(b)** the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, *Attn:  Paul Schwartzberg*; **(c)** counsel to the Unofficial Committee of First Lien Debtholders, Brown Rudnick Berlack Israels LLP, One Financial Center, Boston, Massachusetts 02111, *Attn.: Steven B. Levine*; **(d)** counsel to the Unofficial Committee of Second Lien Debtholders, Paul Weiss Rifkind Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064, *Attn.: Alan W. Kornberg, Andrew N. Rosenberg, Elizabeth R. McColm*; **(e)** counsel to the Official Committee of Unsecured Creditors, Akin Gump Strauss Hauer & Feld LLP, 590 Madison Avenue, New York, New York 10022-2524, *Attn: Michael S. Stamer, Philip C. Dublin, Alexis Freeman*; **(f)** counsel to Debtors' postpetition lenders, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York 10017, *Attn: David Mack and Peter Pantaleo*; **(g)** the Official Committee of Equity Security Holders, Fried Frank Harris Shriver & Jacobson LLP, One New York Plaza, New York, New York, 10004, *Attn: Gary Kaplan.*


_____/s/ Craig Tadlock_____
Craig Tadlock